IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MECHANICAL LICENSING COLLECTIVE,<br><br>                              Plaintiff,<br><br>v.<br><br>PANDORA MEDIA, LLC,<br><br>                              Defendant. | Civil Action No. _____<br><br><br>JURY DEMAND |

## COMPLAINT

For its Complaint against Pandora Media, LLC ("Pandora" or "Defendant"), Plaintiff Mechanical Licensing Collective ("The MLC") alleges as follows:

1. This action is brought by The MLC to recover royalties due from Pandora under the compulsory mechanical license that Pandora obtained pursuant to 17 U.S.C. § 115(d) to enable its consumer music streaming platform. The MLC brings this action in the discharge of its statutory function to "engage in legal and other efforts to enforce… obligations" under the compulsory license at issue. 17 U.S.C. § 115(d)(3)(C)(i)(VIII).

## INTRODUCTION

2. In 2018, the U.S. Copyright Act ("Act") was amended by the Music Modernization Act ("MMA"), which created a new compulsory blanket license ("Blanket License") for certain uses of musical compositions ("songs"). 17 U.S.C. § 115(d). The Blanket License became available on January 1, 2021. Digital music providers who obtain a Blanket License ("Blanket

Licensees") are permitted to reproduce and distribute copyrighted songs[1] in certain covered activity ("Covered Activity")[2] that includes digital streaming services that provide on-demand access to music.

3. The MMA directed the Register of Copyrights to appoint a single non-profit "mechanical licensing collective" to administer the Blanket License, collecting the royalties owed by Blanket Licensees and distributing those royalties to the songwriters, composers, lyricists, and music publishers to which the royalties are due. 17 U.S.C. § 115(d)(3).[3]

4. Plaintiff The MLC is the non-profit organization that was designated by the Register of Copyrights, pursuant to the MMA, to serve as the mechanical licensing collective under the MMA.[4]

5. Pandora is a Blanket Licensee. The MLC brings this action to recover unpaid royalties that Pandora owes for its Blanket License, as well as late fees on unpaid royalties and The MLC's costs and attorney's fees in bringing this action.

## PARTIES

6. Plaintiff The MLC is a non-profit corporation formed and existing under the laws of the State of Delaware with its headquarters at 333 11th Avenue South, Suite 200, Nashville,

---

[1] The rights to reproduce and distribute songs that are eligible for statutory licensing under 17 U.S.C. § 115 are also known, collectively, as the "mechanical" right.

[2] Covered Activity is defined in the MMA to mean "the activity of making a digital phonorecord delivery of a musical work, including in the form of a permanent download, limited download, or interactive stream, where such activity qualifies for a compulsory license under this section." 17 U.S.C. § 115(e)(7).

[3] The royalty rates and terms for the Blanket License are set by the Copyright Royalty Board in quinquennial administrative proceedings and codified in the Code of Federal Regulations. 17 U.S.C. Chapter 8; 37 C.F.R. Part 385.

[4] See 37 C.F.R. § 210.23(a); U.S. Copyright Office, Library of Congress, Designation of Music Licensing Collective and Digital Licensee Coordinator, 84 Fed. Reg. 32274 (July 8, 2019).

Tennessee 37203. The MLC is the sole entity authorized to offer and administer Blanket Licenses, and to collect the ensuing royalties due from Blanket Licensees. 37 C.F.R. § 210.23(a); 17 U.S.C. § 115(d)(3)(B)-(C). The MLC is explicitly authorized by statute to engage in legal action to enforce the royalty obligations of Blanket Licensees.[5]

7. Defendant Pandora is a limited liability company formed and existing under the laws of the State of Delaware with its headquarters at 2100 Franklin Street, Oakland, California 94612. Pandora is one of the largest music streaming services in the U.S. and undertakes substantial business activities throughout the country. Pandora obtained a Blanket License as of January 1, 2021 by operation of law because it was already operating under the previous statutory mechanical license, which was superseded by the Blanket License.[6] Pandora filed a Notice of License with The MLC confirming its operation under the Blanket License on or about January 30, 2021 (the "Notice of License"). Pandora engages in Covered Activity under the Blanket License through one ad-supported offering and multiple subscription offerings.

## JURISDICTION AND VENUE

8. This is a civil action arising under the Act, 17 U.S.C. § 101, *et seq*. and its associated regulations. This Court has original subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

---

[5] *See* 17 U.S.C. § 115(d)(3)(C)(i)(II), (VIII), (XIII) ("The mechanical licensing collective is authorized to perform the following functions… (II) Collect and distribute royalties from digital music providers for covered activities… (VIII) Engage in legal and other efforts to enforce rights and obligations under this subsection… (XIII) Engage in such other activities as may be necessary or appropriate to fulfill the responsibilities of the mechanical licensing collective under this subsection.").

[6] *See* 17 U.S.C. § 115(d)(9)(A) ("On the license availability date, a blanket license shall, without any interruption in license authority enjoyed by such digital music provider, be automatically substituted for and supersede any existing compulsory license previously obtained under this section by the digital music provider from a copyright owner to engage in 1 or more covered activities with respect to a musical work…").

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because a substantial part of the events giving rise to this action occurred in this District, and Pandora's contacts with Tennessee are sufficient to subject it to the jurisdiction of this Court. Pandora has purposely directed activities to Tennessee, including without limitation through the marketing and conduct of its Covered Activity in Tennessee. Pandora has consummated transactions with residents of Tennessee, including with consumers of its offerings under the Blanket License and with The MLC. Pandora filed its Notice of License that underlies its Blanket License activities with The MLC located in Nashville. Pandora's underpayment of royalties, which underlies the claims in this action, was accomplished by sending incorrect usage reporting and royalty payments to The MLC located in Nashville. Furthermore, these acts directed at Tennessee were done with the knowledge that the failure to pay royalties in full would cause direct and substantial harm to the many songwriters and music publishers in Tennessee to whom some of such royalties are due.

## FACTS

### A. Blanket License Availability and Scope

10. Section 106 of the Act grants the owner of a copyright in a song certain exclusive rights, including the exclusive rights to reproduce and distribute the song. 17 U.S.C. § 106(1) and (3).

11. Since 1909, the Act has also made these exclusive rights subject to compulsory licensing in certain situations, provided that there is compliance with applicable statutory and regulatory requirements. In particular, the Act provides that the exclusive rights to reproduce and

4

distribute songs are subject to compulsory licensing in situations involving audio-only sound recordings, or "phonorecords," of "nondramatic musical works." 17 U.S.C. § 115(a)(1).[7]

12. From 1909 until 2021, this compulsory mechanical license generally required that the licensee first send notice to the copyright owner of each song to be used under the compulsory license, and then account and pay monthly royalties directly to each copyright owner.

13. With the advent of digital music providers and their body of sound recordings embodying tens of millions of songs, many new problems developed around the system of individualized notice and payment. The MMA was designed to address these problems. Enacted into law in October 2018, the MMA created the Blanket License to go into effect just over two years later, on January 1, 2021.

14. Blanket Licenses are only available for certain digital music services offered to the public for private use, and they give the Blanket Licensee the right to reproduce and distribute *all* songs available for compulsory licensing in connection with Covered Activity that includes interactive streaming. 17 U.S.C. § 115(a)(1)(A), (d)(1)(A)-(B), (e)(7).

15. As a condition of the Blanket License, each Blanket Licensee must account and pay royalties to The MLC monthly for all Covered Activity, with the only exception being where

---

[7] "Phonorecords" are defined as "material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101. "A nondramatic musical work is an original work of authorship consisting of music — the succession of pitches and rhythm — and any accompanying lyrics not created for use in a motion picture or dramatic work." U.S. Copyright Office, Compulsory License for Making and Distributing Phonorecords, Circular 73 at p.1 (rev. 2021). Among the distinctions captured in these definitions is that the 17 U.S.C. § 115 compulsory license is not available for theatrical works or music embodied in audiovisual recordings.

activity is covered by a valid voluntary license from the copyright owner. 17 U.S.C. § 115(d)(1)-(2), (d)(4)(a)(ii).

**B.** **Definition of Interactive Streaming under the Blanket License**

16. The provision of interactive streams is a Covered Activity for which Blanket Licensees must pay royalties to The MLC absent voluntary licenses from copyright owners.

17. The Act defines an interactive stream as "a digital transmission of a sound recording of a musical work in the form of a stream, where the performance of the sound recording by means of such transmission is not exempt under section 114(d)(1) and does not in itself, or as a result of a program in which it is included, qualify for statutory licensing under section 114(d)(2). An interactive stream is a digital phonorecord delivery." 17 U.S.C. § 115(e)(13).

18. References to Section 114 of the Act in the Section 115 definition of "interactive stream" reflect the fact that the Act relies on the Section 114 definition of "interactive service" to help define "interactive stream" under Section 115.

19. Section 114 of the Act sets forth a different compulsory license scheme that pertains to the public performance of sound recordings on *non-interactive* streaming services. 17 U.S.C. § 114(d)(2). Sound recordings performed on an *interactive* service are *not* covered by the Section 114 compulsory license (*i.e.*, the sound recordings are not exempt under 17 U.S.C. § 114(d)(1) and do not qualify for statutory licensing under section 17 U.S.C. § 114(d)(2)).

20. Section 114 of the Act defines "interactive service" as a service that offers on-demand functionality, namely a service "that enables a member of the public to receive a transmission of a program specially created for the recipient, or on request, a transmission of a

particular sound recording… which is selected by or on behalf of the recipient." 17 U.S.C. §§ 114(d)(2)(A)(i), 114(j)(7).[8]

21. Thus, where a service has the on-demand functionality described in the definition of interactive service in 17 U.S.C. § 114(j)(7), music streaming activity on that service falls under the definition of interactive streams in 17 U.S.C. § 115(e)(13) and is Covered Activity.

22. Notably, an interactive service is *not* defined as a service in which every stream must be of a sound recording specifically chosen by the user. Virtually all interactive services offer "lean back" options where a user does not have to choose every song but can listen to pre-made playlists, customized webcasts, or other methods of music selection. Rather, interactive service is defined by the *ability* of the user to select a particular sound recording if the user so chooses. An interactive service is one that "enables" a user to request a particular sound recording.

---

[8] The full definition states: "An 'interactive service' is one that enables a member of the public to receive a transmission of a program specially created for the recipient, or on request, a transmission of a particular sound recording, whether or not as part of a program, which is selected by or on behalf of the recipient. The ability of individuals to request that particular sound recordings be performed for reception by the public at large, or in the case of a subscription service, by all subscribers of the service, does not make a service interactive, if the programming on each channel of the service does not substantially consist of sound recordings that are performed within 1 hour of the request or at a time designated by either the transmitting entity or the individual making such request. If an entity offers both interactive and noninteractive services (either concurrently or at different times), the noninteractive component shall not be treated as part of an interactive service." Section 114(j)(7).

Notably, the last sentence of this definition, concerning situations where an entity offers "both interactive and noninteractive services," addresses separate *services*, and does not allow a licensee to excise *streams* from an interactive service, as confirmed by the legislative history. H.R. Rep. 104-274 at 25-26 (1995) ("If an entity offering a nonsubscription service (*such as a radio or television station*) chooses to offer an interactive service *as a separate business, or only during certain hours of the day*, that decision does not affect the exempt status of any *component of the entity's business* that does not offer an interactive service. In other words, each transmission should be judged on its own merits with regard to whether it qualifies *as part of an 'interactive' service*. The third sentence of the definition of 'interactive service' is intended to make this clear.") (emphasis supplied).

7

*Id.* Covered Activity under 17 U.S.C. § 115 thus includes streaming activity on a service that enables users to select particular sound recordings on demand if the users so choose.

23. All of Pandora's streaming offerings fit this definition of Covered Activity, and Pandora must report and pay monthly royalties to The MLC under the Blanket License for *all* of its offerings.

24. Pandora has to date failed and refused to report and pay monthly royalties in full to The MLC for at least one of these offerings, namely the ad-supported offering that it calls Pandora Free (or Free Pandora).

**C.     Royalty Obligations Under The Blanket License**

25. The royalty rates and terms for the Blanket License are set by the Copyright Royalty Board ("CRB"). 17 U.S.C. § 115(c)(1)(F); 37 C.F.R. Part 385 (for the period 2023 through 2027); 37 C.F.R. Part 385, Appendix A (for the period 2018 through 2022).

26. These rates and terms set forth a detailed formula for calculating royalties due for Covered Activity in ad-supported streaming offerings like Pandora Free. The formula is as follows:

> **Step 1: Calculate the all-in royalty for the Offering.[9]**
>
> In this step, the "all-in royalty" is calculated as the greater of (i) the applicable percentage of "Service Provider Revenue" and (ii) the applicable percentage of "TCC" in connection with the offering. Each of these terms is defined in detail in the regulations.[10] The applicable percentages vary by calendar year as follows:

---

[9] 37 C.F.R. § 385.21(b)(1); 37 C.F.R. Part 385, Appendix A at 385.21(b)(1).

[10] 37 C.F.R. § 385.2; 37 C.F.R. Part 385, Appendix A at 385.2. For convenience, TCC is essentially the amount paid by the Blanket Licensee to record labels for the rights to stream the sound recordings in which the songs are embodied.

| Calendar Year of Usage | Percentage of Service Provider Revenue | Percentage of TCC |
|---|---|---|
| 2021 | 14.2 | 22 |
| 2022 | 15.1 | 22 |
| 2023 | 15.1 | 26.2 |
| 2024 | 15.2 | 26.2 |

**Step 2: Subtract applicable Performance Royalties.**[11]

In this step, from the all-in royalty is subtracted the total "Performance Royalties" paid in connection with the offering, as defined in the regulations.[12]

27.     The amount that remains is the "payable royalty pool," namely the royalty payable by the Blanket Licensee for all Covered Activity in connection with the offering for the respective monthly period.  If the Blanket Licensee has entered into voluntary licenses with copyright owners that cover some of this Covered Activity, then the prorated portion of the payable royalty pool related to these voluntary-licensed uses is not payable to The MLC under the Blanket License.  17 U.S.C. § 115(d)(1)(C).[13]  With the exception of any amounts deducted in connection with voluntary licenses, the full payable royalty pool must be paid to The MLC by each Blanket Licensee for each of its offerings.

28.     Under the Act and regulations, all amounts due in monthly reporting under the Blanket License that are not paid to The MLC within 45 days after the end of the respective month also incur late fees at a rate of 1.5% per month, or the highest lawful rate, whichever is lower.[14]

---

[11] 37 C.F.R. § 385.21(b)(2); 37 C.F.R. Part 385, Appendix A at 385.21(b)(2).

[12] 37 C.F.R. § 385.2; 37 C.F.R. Part 385, Appendix A at 385.2.

[13] The proration is calculated as the portion of total reported streams (defined as "Plays" in the regulations) that are determined to be streams of songs (or shares of songs) covered by voluntary licenses with copyright owners.  *Id*.; 17 U.S.C. § 115(d)(3)(G)(i)(I)(bb).

[14] 17 U.S.C. § 115(d)(8)(B); 37 C.F.R. § 385.3; 37 C.F.R. Part 385, Appendix A at § 385.3; *Fees for Late Royalty Payments Under the Music Modernization Act*, 88 Fed. Reg. 60587 (September 5, 2023) ("the plain and natural meaning of the statute is that 'all royalties' for a given monthly reporting period are 'due' no later than 45 days after the end of the monthly reporting period.  Thus,

D. **The Pandora Free Offering**

29. As required by the Act, Pandora submits monthly reporting to The MLC on its Covered Activities under the Blanket License.

30. Beginning with its first reporting in 2021, monthly reporting by Pandora has reflected that it operates a single ad-supported offering, reported under the name Pandora Free.

31. Users of the Pandora Free offering can search for and play music on demand. This on-demand feature is a key part of Pandora's marketing of its Pandora Free offering, and "Search and play what you want"[15] is publicized as a primary functionality of Pandora Free on the Pandora.com home page:



*Source: Pandora.com home page, available as of February 12, 2024.*

---

any royalties received by the MLC for such reporting period after this 'due date for payment' are late. They are 'past due royalty payments' that are subject to such 'late fees' as the CRJs may adopt.").

[15] An asterisk to the Pandora Free on-demand functionality leads to a footnote that says simply "Unlock by viewing an ad." Despite the selective asterisk placement, Pandora Free is an ad-supported offering, and thus all functionality is conditioned on the user receiving ads.

32. Pandora's promotion of the on-demand functionality of Pandora Free continues at each critical user interface. Dominating the start of the signup and login pages, Pandora publicizes the on-demand functionality of Pandora Free as "ad-free search and play":



*Source: https://www.pandora.com/account/register, available as of February 12, 2024; See also https://www.pandora.com/account/sign-in, available as of February 12, 2024.*

33. Pandora explicitly promotes Pandora Free's "on-demand for free" functionality through automatic pop-up boxes pointing to the on-demand search bar upon certain logins to Pandora Free:



*Source: Pandora.com Pandora Free user landing page, available as of February 12, 2024.*

34. Upon information and belief, users of Pandora Free can select and receive streams of particular sound recordings on demand at any time. Even if a Pandora Free user decides to listen to music in a "lean back" mode such as a playlist or custom-made webcast, they remain *able* to listen to particular sound recordings on demand whenever they choose.[16]

---

[16] Pandora Free is an ad-supported service, and users may be required to receive advertisements before or after some, but not all, streams that are selected by users. Advertisements are also delivered before or after some streams that are not directly selected by users, such as when users listen in a "lean back" mode.

35. Further, upon information and belief, the on-demand functionality of Pandora Free was intentionally designed to emulate and compete with other ad-supported interactive services that operate under the Blanket License.

36. In written testimony before the Copyright Royalty Board in connection with administrative proceedings to set royalty rates and terms, Pandora's Chief Product Officer admitted that Pandora added on-demand functionality to Pandora Free to reduce the number of users who were "leav[ing] our service temporarily for another streaming service or some other form of entertainment. Now, a user who wants to hear one particular song again can stay in the Pandora app and watch a video advertisement to earn more replays . . . instead of jumping to YouTube, Spotify's ad-supported tier, or one of the other services they utilize."[17]

37. The competitive offerings that Pandora mentions by name in this testimony, YouTube and Spotify's ad-supported tier, are *interactive* services precisely because of the on-demand functionality that Pandora adopted for Pandora Free to make it more competitive with these services.

38. In fact, upon information and belief, Pandora provides even *greater* interactive access and functionality than these other ad-supported interactive streaming services, because Pandora provides full interactive streaming functionality to Pandora Free users even on mobile devices and even when the Pandora app is in the background or the mobile device is locked.

39. The ad-supported offerings by YouTube and Spotify, which are appropriately reported to The MLC under the Blanket License because they are interactive services, do not even offer this level of interactive functionality.

---

[17] *In the Matter of Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate Performances (Web V)*, Written Direct Testimony of Christopher Phillips, ¶ 26, available at https://app.crb.gov/document/download/19227.

40. Pandora has explicitly acknowledged that *all* of its offerings are interactive. In its website Help section on licensing, Pandora explains that "we need specific rights granted to us for the *interactive* features available on *each* tier of Pandora (*radio*, Pandora Plus and Pandora Premium)" (emphasis supplied).[18]

41. As this statement confirms, each of the three offerings ("radio" is another term used for Pandora Free) that Pandora markets is interactive.

42. Pandora Free is an interactive service under the Act, and royalties paid to The MLC under the Blanket License must reflect all Pandora Free activity.

E.  **Pandora's Failure to Report In Full For Pandora Free**

43. Despite the interactive functionality of Pandora Free, Pandora has failed to report in full Pandora Free usage to The MLC, including through failure to account for all of the Service Provider Revenue and TCC in connection with Pandora Free.

44. The MLC first identified concerns with Pandora's reporting for Pandora Free when comparing the high number of streams reported by Pandora with the low amount of revenue reported.

45. In its initial monthly usage reporting to The MLC beginning in 2021, Pandora reported all Pandora Free streams to The MLC. The reporting of all streams was consistent with Pandora Free being an interactive service. However, Pandora did not report all of the Service Provider Revenue or TCC associated with all of the streams that it had reported. As a result, the ratio of royalties to streams (also known as the "per-play rate") was unusually low.

---

[18] See *Partnering with Pandora*, available at https://help.pandora.com/s/article/Partnering-with-Pandora-1519949304420, *available as of February 12, 2024*.

46. The MLC inquired further with Pandora to better understand the reason for the unusually low royalties per stream. The MLC learned that Pandora was not reporting Service Provider Revenue or TCC in connection with many of the streams through Pandora Free.

47. On November 4, 2021, a letter from the Chief Legal Officer of The MLC was delivered to Pandora identifying Pandora's failure to report correctly to The MLC, including the following statements:

> Our review indicates that [Pandora Free] enables a user, at any time, to receive transmissions of particular sound recordings selected by the user. While we understand that Pandora refers to some of this on-demand streaming activity within [Pandora Free] by the term "Premium Access interactions," our review indicates that interactive streaming and the ability to select sound recordings on demand is a [Pandora Free] feature that is enabled at all times to users. [Pandora Free] is thus an interactive streaming offering, and the music streams provided to users of [Pandora Free] are Covered Activity subject to Pandora's Section 115 blanket license.

> Pandora has confirmed to The MLC that its reporting for [Pandora Free] includes "all plays by all users accessing the free tier." This is appropriate reporting of plays for [Pandora Free] under our review. Pandora has indicated, however, that it is *not* reporting all revenue received in connection with [Pandora Free]. Instead, Pandora has stated that it is only reporting a *subset* of revenue received from [Pandora Free], which Pandora describes as revenue "associated with 'Premium Access' interactions." We have concluded that this exclusion of revenue is inappropriate and does not comply with the requirements of Section 115.

> Pandora has indicated that it has excluded "revenue derived from non-interactive services on the Free Pandora configuration" because "they are beyond the scope of 17 U.S.C. 115." This is an incorrect statement of the law. As noted above, our review indicates that [Pandora Free] enables all users, at all times, to receive transmissions of particular sound recordings selected by the user. The fact that users of [Pandora Free] may choose to listen to playlists consisting of sound recordings they have not selected does not change the fact that these users have at all times the ability to listen, on-demand, to sound recordings that they select. Moreover, these streams of sound recordings on playlists do not qualify as [Pandora Free] streams for licensing under Section 114 and the revenue generated by these streams is not exempt from reporting under Section 115. Instead, our review indicates that [Pandora Free] enables unlimited on-demand streaming on mobile devices and with background listening capacity, making it possibly the most full-featured free interactive streaming offering in the U.S. market. Thus, The MLC concludes that, while Pandora appears to have reported

play information correctly, it has not correctly reported royalty payment and accounting information as required pursuant to 37 C.F.R. 210.27(d) or correctly paid royalties to The MLC in connection with [Pandora Free].

Accordingly, we request that Pandora: (i) provide corrected monthly usage reports for all prior usage reporting periods dating back to January 2021 that includes all Service Revenue received, as well as the associated TCC and Performance Royalties payments made, for [Pandora Free] no later than November 15, 2021, (ii) provide all additional royalties due for [Pandora Free] under the corrected reporting as soon as possible, plus all late fees accruing from the dates these additional royalties were initially due pursuant to Section 115(d)(4) and (8)(B) and 37 C.F.R. 210.27(k)(4). … Going forward, Pandora should report its royalty payment and accounting information for [Pandora Free] as discussed herein.

48. On November 15, 2021, Pandora responded with a letter from its outside counsel stating, *inter alia*: "To cut to the chase, Pandora categorically rejects your contentions, which are outside the purview of the MLC and both factually and legally unfounded. It is not the role of the MLC to offer 'statements of the law' on whether particular transmissions offered by Pandora are properly characterized as interactive or non-interactive, whether they qualify for statutory licensing under 17 U.S.C. § 114, or whether Pandora's approach to calculating service revenue under 17 U.S.C. § 115 is therefore legally compliant with the governing definition set by the Copyright Royalty Board."

49. The above statements in Pandora's November 15, 2021 letter to The MLC do not reflect the law, as the Act explicitly authorizes The MLC to perform the function of enforcing the royalty obligations of Blanket Licensees, including the obligation of Blanket Licensees to correctly report all Covered Activity and fully pay associated royalties to The MLC under the rates and terms established by the Copyright Royalty Board pursuant to 17 U.S.C. § 115.

15

Case 3:24-cv-00168 Document 1 Filed 02/12/24 Page 15 of 20 PageID #: 15

F.   **<u>Pandora's Failure to Cure Its Improper Reporting</u>**

50.   As a result of an appellate remand[19] of the Copyright Royalty Board royalty rate determination for the years 2018-2022, the royalty rates and terms for the first two years of the Blanket License (namely, 2021 and 2022) were not final until 2023.

51.   During 2021 and 2022, The MLC operated using interim rates that were subject to retroactive adjustment upon a final determination by the Copyright Royalty Board. That final determination was issued on August 10, 2023.[20]

52.   The regulations provided a six-month grace period before Blanket Licensees were required to report retroactively-adjusted usage reporting to The MLC for 2021 and 2022. The deadline for adjusted reporting at the final rates and terms was February 9, 2024.

53.   The regulations also provide for each Blanket Licensee to deliver an annual report to The MLC in the sixth month after the end of each fiscal year, in which the Blanket Licensee is to further certify reporting and make appropriate adjustments for the prior fiscal year.

54.   Pandora has failed to cure its improper reporting either in its regular monthly payments at interim rates, in its annual reports, or in retroactively-adjusted reporting at the final rates for 2021 and 2022.

55.   The MLC has repeatedly reminded Pandora about the need to cure its improper reporting over this time, including in December 20, 2023 correspondence "memorializing that, as has been discussed multiple times, The MLC's position has not changed that Pandora's usage reporting for [Pandora Free] has been materially deficient due to Pandora's failure to report all usage under the blanket license (including all Plays, Service Provider Revenue, and TCC)… The

---

[19] *Johnson v. Copyright Royalty Board*, 969 F.3d 363 (D.C. Cir. 2020).
[20] 88 Fed. Reg. 54,406 (Aug. 10, 2023).

MLC expects Pandora to promptly report all revenues, TCC, and plays for Pandora Free to The MLC for all rate periods going forward, and to make required adjustments to past periods."

56. By the February 9, 2024 deadline, Pandora did not report retroactive adjustments to its Blanket License royalty payments for 2021 and 2022, using the final rates and terms for these periods, that cured the failures to report and pay royalties for all Pandora Free usage in the prior monthly and annual reports.

## CAUSES OF ACTION

## COUNT I

**Recovery of Unpaid Statutory License Royalties and Late Fees**

**(Violations of 17 U.S.C. 115 (including §§ 115(c)(2)(I), (d)(4)(A) and (d)(8)(B));
37 C.F.R. Part 385 (including §§ 385.21(a), (d), Appendix A); 37 C.F.R. § 210.27)**

57. Plaintiff repeats and re-alleges paragraphs 1-56, as though fully set forth herein.

58. 17 U.S.C. § 115(d) establishes the Blanket License for the use of musical compositions in, *inter alia*, streaming services with on-demand functionality.

59. The MLC is designated pursuant to the Act to administer the Blanket License and collect royalties owed by Blanket Licensees, including by engaging in "legal and other efforts to enforce… obligations" under the Blanket License. 17 U.S.C. § 115(d)(3)(C)(i)(VIII).

60. Since the Blanket License became available on January 1, 2021, Pandora has been a Blanket Licensee and has engaged in Covered Activity through multiple streaming offerings, including its Pandora Free ad-supported offering as well as multiple subscription offerings.

61. As a Blanket Licensee, Pandora is required to report and pay royalties for Covered Activities in accordance with the rates and terms set forth in the Act and the regulations promulgated in connection therewith. 17 U.S.C. § 115(c)(2)(I), (d)(4)(A); 37 C.F.R. Part 385; 37 C.F.R. § 210.27.

62. Pandora has systematically and repeatedly omitted required data and information from its usage reporting under the Blanket License, including by excluding substantial Service Provider Revenue and TCC for Pandora Free, in contravention of the Act and regulations governing the Blanket License.

63. Pandora's failure to properly report information related to its Covered Activity has led to repeated and significant underpayments of the royalties due under the Blanket License.

64. As a result of Pandora's improper actions, The MLC (and consequently, its member copyright owners) have been deprived of substantial royalties due under the Blanket License, to which The MLC is entitled by statute, in order to distribute to the proper rightsholders.

65. Pandora has not paid late fees in connection with its failure to timely pay all royalties due under the Blanket License and owes late fees for each monthly reporting period that involved an underpayment of royalties, at the regulatory rate and accruing from the statutory due date. 17 U.S.C. § 115(d)(8)(B); 37 C.F.R. § 385.3; 37 C.F.R. Part 385, Appendix A at § 385.3.

66. Further, because Pandora has failed to satisfy its obligations under the Blanket License under Title 17 of the Copyright Act, The MLC is also entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

## PRAYER FOR RELIEF

WHEREFORE, The MLC prays for judgment against Pandora and for the following relief:

A. For compensatory damages, in such amounts to be determined at trial, arising from Pandora's underpayment of royalties, plus late fees, as required by statute and regulation; and

B. For The MLC's costs and attorneys' fees pursuant to 17 U.S.C. § 505; and

C. For pre-judgment and post-judgment interest according to law, as applicable; and

D. For an order declaring Pandora's current and historical practices regarding its reporting, recognition, and attribution of revenues for Pandora Free to be unlawful and in violation of the Blanket License and related statutory provisions and regulations; and

E. For preliminary and permanent injunctive relief prohibiting Pandora from continuing its unlawful practice of reporting usage improperly and requiring that Pandora report, recognize and attribute all of its usage and related royalty calculation data for Pandora Free for the purposes of calculating and paying royalties under the Blanket License; and

F. For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to the Federal Rules of Civil Procedure Rule 38(b), and otherwise, The MLC respectfully demands a trial by jury.

Dated: February 12, 2024

    Respectfully Submitted,

    **SHACKELFORD, BOWEN, MCKINLEY & NORTON, LLP**

    */s/ Lauren Kilgore*
    Lauren Kilgore (TN Bar No. 30219)
    Jacob T. Clabo (TN Bar No. 36760)
    1 Music Circle South, Suite 300
    Nashville, TN 37203
    P: (615) 329-4440
    F: (615) 329-4485
    lkilgore@shackelford.law
    jclabo@shackelford.law


    **PRYOR CASHMAN LLP**

    Benjamin K. Semel (*pro hac vice* application forthcoming)
    M. Mona Simonian (*pro hac vice* application forthcoming)
    7 Times Square
    New York, New York 10036
    Phone: (212) 326-0181
    Fax: (212) 798-6326
    bsemel@pryorcashman.com
    msimonian@pryorcashman.com

    *Attorneys For Plaintiff Mechanical Licensing Collective*