**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| Mechanical Licensing Collective, <br><br> Plaintiff, <br><br> v. <br><br> Pandora Media, LLC, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Civil Case No: 3:24-cv-00168

District Judge Eli J. Richardson

Magistrate Judge Jeffrey S. Frensley

## PANDORA MEDIA, LLC'S ANSWER TO PLAINTIFF'S COMPLAINT

Defendant Pandora Media, LLC ("Pandora" or the "Company") respectfully answers the Complaint of Plaintiff Mechanical Licensing Collective (the "MLC") as follows:

## INTRODUCTORY RESPONSE

This action is a gross overreach by the MLC, the entity established by Congress under Section 115 of the U.S. Copyright Act for the limited purpose of administering the compulsory blanket license under which digital music providers ("DMPs") obtain the necessary "mechanical" rights to provide interactive music streaming services. The MLC is intended to be a neutral arbiter; it is funded solely and entirely by the DMPs to cover the "reasonable costs" associated with fulfilling the MLC's licensing and royalty distribution duties. The MLC is *not* authorized to opine on whether particular transmissions offered by Pandora or other DMPs are properly characterized as interactive or noninteractive as a legal matter, much less whether Pandora qualifies for statutory licensing under a *different* section of the Copyright Act (Section 114) that falls *outside* the MLC's purview. Nor is it authorized to insist, upon threat of default under its blanket license, that Pandora fundamentally change its approach to licensing an entire tier of its service solely because the MLC has taken upon itself to press a legally incoherent position at odds with the view of the rest of the music industry. Yet here we are.

For over six years Pandora has offered its users of free internet radio service the ability to access "Sponsored Premium Access" ("SPA") sessions, 30-minute trials of Pandora's full on-demand subscription service Pandora Premium. At no point during that time has anyone else in the music publishing or recorded music industry alleged that the limited availability of SPA sessions to Pandora's free-tier users turns the entirety of that tier into an interactive service like Spotify or Apple Music. Indeed, they have acted precisely to the contrary. The MLC's blatant mischaracterization of Pandora's offerings and misrepresentation of the law flouts this longstanding industry consensus and Pandora's unchallenged practice of operating as a noninteractive service under the two sections of the Copyright Act (Sections 114 and 115) implicated by this case.

## I. Pandora's Longstanding Operation Under the Statutory License for Noninteractive Internet Radio

Pandora launched its innovative internet radio service in 2005, with the goal of helping listeners discover music while giving artists the opportunity to have their music discovered by fans who might not otherwise have learned about it. For nearly twenty years, Pandora's free, ad-supported tier has offered noninteractive personalized radio stations that provide a "lean-back" or radio-style listening experience. This type of radio-style listening offers a very different user experience than that offered by on-demand services such as Spotify, Apple Music, and Amazon Unlimited. To start listening, a new user can either create a "seeded station" by typing the name of an artist, composer, or song title to serve as the starting point, or select one of Pandora's genre stations, such as "Today's Hits" or "Today's Country," *etc*. Once a user starts listening to a station, the user can then customize it by adding what Pandora calls "variety"—most commonly by "thumbing up" or "thumbing down" a song.

From its inception, Pandora has utilized the Section 114 statutory license to obtain rights to publicly perform sound recordings on its radio service. Pandora has carefully followed the detailed provisions of that statutory license, including by limiting the frequency with which a particular artist or album is played, forbidding pre-announcement of tracks, preventing user-side copying of tracks, and the like. Pandora has participated repeatedly in the Copyright Royalty Board ("CRB") proceedings that set the rates and terms for the Section 114 statutory license, starting with the *Web IV* proceeding in 2014–2015, which set the royalty rates applicable to the period January 1, 2016–December 31, 2020. *See* Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (*Web IV*), 81 Fed. Reg. 26,316, 26,409 (May 2, 2016). Even earlier than that, Pandora was an active participant in industry-wide settlement negotiations with SoundExchange (the entity responsible for collecting and distributing royalties under Section 114) and the major record companies under the Webcaster Settlement Act, which set the statutory license rates for various categories of noninteractive webcasters for 2006–2015. *See* Notification of Agreements Under the Webcaster Settlement Act of 2009, 74 Fed. Reg. 34796, 34799 (July 17, 2009) (describing the so-called "Pureplay" settlement negotiated in part by Pandora executives). Pandora took the lead role from the service side in negotiating the Pureplay settlement and litigating *Web IV*, and at no point during those proceedings did any record label or the CRB take the position that Pandora was not eligible for the Section 114 license, a conclusion which would have stripped Pandora of its ability to participate.

In 2017, Pandora decided to launch Pandora Premium, a subscription on-demand service tier comparable to Spotify and Apple Music. Because the new on-demand functionality fell outside the Section 114 license, Pandora negotiated directly with record companies to obtain the necessary rights. As part of those direct negotiations, Pandora also licensed certain other features

for users of its two existing noninteractive service tiers from participating record companies. For both its free, ad-supported tier, and its ad-free subscription tier (then known as Pandora One, now Pandora Plus), Pandora negotiated to offer users the ability to access SPA sessions—primarily as an effort to introduce them to the features of Pandora's more lucrative Premium on-demand subscriptions.

As the name suggests, Sponsored Premium Access provides a user "access" to a short trial session of Pandora Premium functionality in exchange for first watching a video advertisement from a "sponsor." Among other features, after viewing the advertisement, the user is advised that their "complimentary Pandora Premium session starts now" and is also shown a link to subscribe to Pandora Premium for unlimited on-demand streaming. Access to such sessions was, and remains, carefully limited by Pandora's license agreements: in addition to a 30-minute time limit, the agreements also place strict caps on how much time a user can spend in SPA sessions on both a weekly and quarterly basis.[1] Less than one in twenty visits to Pandora's free tier involves a user availing themselves of the opportunity to sample Pandora Premium.

In 2019, after making these product changes, Pandora again led the charge for the statutory services in the *Web V* proceeding before the CRB, which set sound recording performance royalty rates for the period January 1, 2021–December 31, 2025. Pandora's testimony before the CRB described the then-recent changes to the company's service offerings, including the offer of SPA sessions. But never, through two years of hotly contested litigation and a multi-week trial featuring senior music licensing executives from each of the major record companies, did *any* of those

---

[1] With respect to its subscription radio tier, but not its ad-supported free tier, Pandora negotiated additional enhanced functionality with the labels that it could not get under the statutory license; chiefly, the ability for users to "cache" otherwise noninteractive stations on the user's device for offline listening and to skip songs an unlimited number of times. Since then, as a result of these features, Pandora has treated Pandora Plus as requiring Section 115 licensing.

witnesses (or the Copyright Royalty Judges themselves)—all fully aware of Pandora's service changes—make even the slightest suggestion that Pandora's free tier was no longer eligible for statutory licensing. If there was ever a setting to raise such arguments and remove Pandora from the proceeding for lack of standing—something the recorded music participants have not been shy to do with other would-be CRB participants—it would have been then and there.

Nor has anyone else questioned the practice in the five years since *Web V*. With the knowledge and consent of literally the entire recorded music industry, Pandora has continued to pay statutory royalties to SoundExchange for its free tier performances without incident or objection. And even where Pandora pays record companies directly for its free-tier plays under voluntary licenses, in almost all cases, Pandora still continues to pay the statutorily-prescribed artist share of those royalties (accounting for roughly 50%) to SoundExchange, reflecting the consensus understanding that Pandora's free tier is Section 114-compliant and not, as the MLC contends, interactive.

## II.     The MLC's Misguided Legal Theory

The MLC seems to think it knows something the entire music industry does not. In the MLC's view, Pandora's offer of SPA sessions disqualifies Pandora's *entire free tier* from statutory licensing under Section 114, merely because such opportunities to sample Pandora Premium can be launched from that tier. By the MLC's telling, Pandora's free tier is indistinguishable from Spotify or Apple (if not *more* interactive), with unfettered on-demand streaming freely intermixed with radio plays throughout the day and without limits. The MLC badly distorts reality.

One might ask why the MLC, which administers blanket licenses under Section 115, has taken upon itself to opine on Pandora's qualification for a statutory license under a different section of the Act (Section 114) addressing a different right (public performance) and a different category

of works (sound recordings).  The answer is that Section 115 defines interactive streams by reference to Section 114; *i.e.*, as streams that do not "qualify for statutory licensing under 114(d)(2)." 17 U.S.C. § 115(e)(13).  Rather than accepting the industry consensus that Pandora's free-tier streams outside of SPA sessions *do* qualify for statutory licensing under Section 114(d)(2), and the indisputable fact that they *are* licensed under that section (or a direct-license equivalent), the MLC instead insists that the entirety of the service tier is interactive, making it ineligible for the Section 114 license and, on the publishing side, requiring mechanical licensing and payment under Section 115.

This is a wild overreach.  The MLC, created as part of the 2018 Music Modernization Act ("MMA") and solely funded by DMPs (including Pandora), was intended to be a neutral intermediary charged with collecting and distributing royalties under the blanket license.  It is not authorized to play judge and jury over a streaming service's legal compliance, nor was it created to use DMP funds provided for legitimate operations under the MMA to pursue legal frolics and detours such as this one.  And while the MMA did grant the MLC some limited authority to engage in court actions (for example, to participate in bankruptcy proceedings involving failing streaming services, and to pursue "significant nonblanket licensees" who have not paid their administrative assessment), it never gave the MLC authority to weigh in on which performances offered by a DMP require Section 115 licensing or not—much less to insist that an *entire tier* of service that the music industry has accepted as statutorily compliant must nonetheless pay royalties required of interactive services.

The MLC's biased position might be explained by the fact that its counsel is the same as the National Music Publishers' Association, *i.e.*, the trade association for music publishers, except that its position is completely at odds with the marketplace behavior of those constituents as well.

When Pandora launched its Pandora Premium service, it entered into direct licenses not only with record companies (as discussed above), but with music publishers as well. While those publishers required Pandora to pay Section 115 royalties for Pandora Premium (the full on-demand service) and Pandora Plus (the mid-tier subscription service) under the CRB's "mechanicals" rate formula, those same direct licenses treat Pandora's free tier quite differently, calling instead for simple percentage-of-revenue royalties covering performance rights on the tier (generally identified in the agreements as Pandora's "non-interactive service"). And even when coverage for SPA sessions was added via amendment shortly thereafter, the publishers did *not* take the position that Pandora must start paying Section 115 mechanical royalties for the free tier. The royalty structure for the free tier remained exactly the same, with Pandora paying the same revenue-based royalty for SPA plays as all the other performances on the tier.

The MLC apparently thinks it knows better than the entire music publishing industry. Not only is the MLC operating far outside its administrative bounds, but it is also completely wrong on the law. Section 114 makes plain that a statutory licensee may offer both interactive and noninteractive transmissions, stating that "[i]f an entity offers both interactive and noninteractive services (either concurrently or at different times), the noninteractive component" (here, the free tier streams outside of SPA sessions) "shall not be treated as part of an interactive service." 17 U.S.C. § 114(j)(7). The legislative history behind that provision likewise instructs that "each transmission should be judged on its own merits with regard to whether it qualifies as part of an 'interactive' service." H.R. Rep. 104–274, 104th Cong., 1st Sess. at 26 (1995). Clearly, then, Pandora's offer of some interactive transmissions in discrete, separately licensed Premium Access sessions that offer the opportunity to sample its Pandora Premium service offering does not alter

the noninteractive status of the ad-supported transmissions that occur outside those Premium Access sessions.

The MLC distorts the Pandora experience and neglects crucial differences between Pandora's statutory offering and other services to reach this conclusion. The MLC's complaint conflates the fact that a free-tier user can choose when he or she wishes to launch an SPA session with the very different sort of on-demand listening one finds on other services (Spotify, Amazon Unlimited, *etc.*) that are accepted by the industry to be interactive: unlimited on-demand music intermingled indiscriminately and round the clock with lean-back plays selected by the service or other users. As noted above, however, SPA sessions are discrete, time-limited, and occur separately from (*i.e.*, at "different times" than) the noninteractive components, as evidenced by the fact that they are also available to Pandora Plus users in the same form.

More fundamentally, the MLC's theory violates the letter and spirit of the governing statute, which clearly attempts to ward off precisely the argument MLC is making now, *i.e.*, that a noninteractive service would lose access to the statutory license merely by offering some small amount of interactive programming at certain times. Under any reasonable interpretation of the statute, the fact that a free-tier user may launch an SPA session from the free tier and then listen to on-demand streaming during a 30-minute trial of Pandora Premium does not transform the entirety of Pandora Free from a noninterative service into an interactive one.

## RESERVATION OF RIGHTS AND GENERAL DENIAL

In answering, Pandora denies all allegations contained in the Complaint except as otherwise expressly admitted herein. Pandora specifically denies any liability to Plaintiff for any relief including, but not limited to, the relief sought in the section titled "Prayer for Relief."

8

Pandora reserves any applicable rights, defenses, or objections, including the right to seek to amend or supplement its Answer as may be necessary.

## RESPONSES TO SPECIFIC ALLEGATIONS:

## COMPLAINT[2]

1.      Paragraph 1 contains legal argument and conclusions to which no response is necessary.  To the extent the allegations in Paragraph 1 are deemed factual, Pandora denies them.

## INTRODUCTION

2.      Paragraph 2 contains legal argument and conclusions to which no response is necessary.

3.      Paragraph 3 contains legal argument and conclusions to which no response is necessary.

4.      Pandora lacks knowledge or information sufficient to respond to the statement that the MLC is a non-profit organization.  Pandora admits that the MLC was designated by the Register of Copyrights, pursuant to the MMA, to serve as the mechanical licensing collective.

5.      Pandora admits that it is a Blanket Licensee.  Pandora denies the remaining allegations in Paragraph 5.

## PARTIES

6.      Pandora lacks knowledge or information sufficient to respond to the allegations in the first sentence of Paragraph 6.  Pandora admits the MLC is the sole entity presently authorized to offer and administer Blanket Licenses and to collect royalties under those licenses from

---

[2] The section headings hereafter are included only for purposes of clarity and organization, and Pandora does not admit, but rather hereby specifically denies, any factual or legal allegations in the headings and subheadings used in the Complaint.

licensees.  The remainder of the allegations in Paragraph 6 contain legal argument and conclusions to which no response is necessary.

7.      Pandora admits the allegations in Paragraph 7 concerning its business organization but denies that it is headquartered at 2100 Franklin Street, Oakland, California 94612.  Pandora also admits that it is one of the largest music streaming services in the United States, that it offers its service to users throughout the country, that it obtained a Blanket License, and that it "filed a Notice of License with the MLC confirming its operation under the Blanket License on or about January 30, 2021."  Pandora also admits that it "engages in Covered Activity under the Blanket License" in connection with Pandora Premium, Pandora Plus, and Sponsored Premium Access, but otherwise denies the allegations in Paragraph 7.

## JURISDICTION AND VENUE

8.      Paragraph 8 contains legal argument and conclusions to which no response is necessary.

9.      Pandora admits that it offers its service to users in Tennessee and that MLC receives royalty payments from Pandora in Tennessee, but otherwise denies the allegations in Paragraph 9, including (but not limited to) the allegation that venue is proper in this district.

## JURISDICTION AND VENUE

A.      **Blanket License Availability and Scope**

10.     Paragraph 10 contains legal argument and conclusions to which no response is necessary.

11.     Paragraph 11 contains legal argument and conclusions to which no response is necessary.

10

12.     Paragraph 12 contains legal argument and conclusions to which no response is necessary.

13.     Paragraph 13 contains legal argument and conclusions to which no response is necessary.

14.     Paragraph 14 contains legal argument and conclusions to which no response is necessary.

15.     Paragraph 15 contains legal argument and conclusions to which no response is necessary.

16.     Paragraph 16 contains legal argument and conclusions to which no response is necessary.

**B.     Definition of Interactive Streaming under the Blanket License**

17.     Pandora admits that Paragraph 17 accurately quotes language from the cited statute.

18.     Paragraph 18 contains legal argument and conclusions to which no response is necessary.

19.     Paragraph 19 contains legal argument and conclusions to which no response is necessary.

20.     Pandora admits that Paragraph 20 and footnote 8 included therein accurately quote language from the cited statute.  The remaining allegations in footnote 8 contain legal argument and conclusions to which no response is necessary.  To the extent the allegations in footnote 8 are deemed factual, Pandora denies them.

21.     Paragraph 21 contains legal argument and conclusions to which no response is necessary.  To the extent a response is deemed necessary, Pandora denies the allegations in Paragraph 21.

22.     Pandora lacks knowledge or information sufficient to admit or deny whether "[v]irtually all interactive services offer 'lean back' options." Paragraph 22 otherwise contains legal argument and conclusions to which no response is necessary.

23.     Pandora denies the allegations in Paragraph 23.

24.     Pandora denies the allegations in Paragraph 24.

**C.     Royalty Obligations Under the Blanket License**

25.     Paragraph 25 contains legal argument and conclusions to which no response is necessary.

26.     Paragraph 26 contains legal argument and conclusions to which no response is necessary. To the extent a response is deemed necessary, Pandora denies that "Pandora Free" engages in Covered Activity under governing law.

27.     Paragraph 27 contains legal argument and conclusions to which no response is necessary. To the extent a response is deemed necessary, Pandora admits that amounts payable under voluntary licenses are excludable from the Blanket License's "payable royalty pool."

28.     Paragraph 28 contains legal argument and conclusions to which no response is necessary.

**D.     The Pandora Free Offering**

29.     Pandora admits the allegations contained in Paragraph 29.

30.     Pandora denies the allegations contained in Paragraph 30.

31.     Pandora admits that qualifying users of the Pandora Free offering are presented with opportunities to gain access to Sponsored Premium Access sessions wherein they can participate in a short, time-limited trial of Pandora Premium. Pandora otherwise denies the allegations in Paragraph 31.

32.     Pandora denies the allegations in Paragraph 32.

33.     Pandora admits that, "upon certain logins," some qualifying users of "Pandora Free" may be offered a Sponsored Premium Access session though references to "on-demand for free" that appear in "pop-up boxes pointing to the on-demand search bar."  Pandora otherwise denies the allegations in Paragraph 33.

34.     Pandora denies that users of "Pandora Free" can select and receive streams of particular sound recordings on demand at any time.  Pandora admits that qualifying users of Pandora Free can, on occasion, within Sponsored Premium Access sessions, make song selections during a time-trial period of thirty minutes, and that such qualifying users must view a video advertisement at the start of such sessions.  Pandora also admits that advertisements are delivered "before or after some streams that are not directly selected by [Pandora Free] users, such as when users listen in a 'lean back' mode."  Finally, Pandora admits that Pandora Free "is an ad-supported service," as set forth in footnote 16.  Pandora otherwise denies the allegations in Paragraph 34 and footnote 16, including that "users of Pandora Free can select and receive streams of particular sound records on demand at any time" and that Pandora Free users "remain able to listen to particular sound records on demand whenever they choose."

35.     Pandora denies the allegations in Paragraph 35.

36.     Pandora admits that the quoted language appears in written testimony provided by its former Chief Product Officer before the CRB, but otherwise denies the allegations in Paragraph 36.

37.     Pandora denies the allegations in Paragraph 37.

38.     Pandora denies the allegations in Paragraph 38.

39.     Pandora lacks knowledge or information sufficient to respond to the allegations in Paragraph 39.  To the extent a response is deemed necessary, Pandora denies the allegations in Paragraph 39.

40.     Pandora admits that the quoted language in Paragraph 40 appears in the Help section of Pandora's website, but otherwise denies the allegations in Paragraph 40.

41.     Pandora denies the allegations in Paragraph 41.

42.     Pandora denies the allegations in Paragraph 42.

**E.     Pandora's Failure to Report in Full for Pandora Free**

43.     Pandora denies the allegations in Paragraph 43.

44.     Pandora denies that the MLC has any basis for "concerns" with Pandora's reporting, and lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 44.

45.     Pandora admits that it inadvertently reported all Pandora Free streams to the MLC in its initial monthly usage reporting and properly reported Service Provider Revenue or TCC only for Sponsored Premium Access sessions accessed by Pandora Free users, and it otherwise denies the allegations in Paragraph 45.

46.     Pandora admits that on November 4, 2021, the MLC sent Pandora a letter regarding royalties in connection with Pandora Free.  Pandora otherwise denies the allegations in Paragraph 46.

47.     Pandora admits that it received a letter from the MLC's Chief Legal Officer dated November 4, 2021 and that the language block quoted in Paragraph 47 appears in that letter. Pandora otherwise denies the allegations in Paragraph 47, including as stated in the quoted letter, that it "fail[ed] to report [royalties] correctly to [t]he MLC."

14

48.     Pandora admits that counsel to Pandora sent a reply letter to the MLC on November 15, 2021, which contained the language quoted in Paragraph 48.

49.     Paragraph 49 contains legal argument and conclusions to which no response is necessary.  To the extent a response is deemed necessary, Pandora denies the allegations in Paragraph 49.

**F.     Pandora's Failure to Cure Its improper Reporting**

50.     Paragraph 50 contains legal argument and conclusions to which no response is necessary.  To the extent a response is deemed necessary, Pandora admits that the royalty rates and terms for the first two years of the Blanket License was not final until 2023.

51.     Paragraph 51 contains legal argument and conclusions to which no response is necessary.  To the extent a response is deemed necessary, Pandora admits that the Copyright Royalty Board issued a final determination on Blanket License royalty rates on August 10, 2023.

52.     Paragraph 52 contains legal argument and conclusions to which no response is necessary.  To the extent a response is deemed necessary, Pandora admits that deadline for adjusted reporting at the final rates and terms was February 9, 2024.

53.     Paragraph 53 contains legal argument and conclusions to which no response is necessary.  To the extent a response is deemed necessary, Pandora admits that Blanket Licensees are required to deliver an annual report to the MLC.

54.     Pandora denies the allegations in Paragraph 54.

55.     Pandora admits that the MLC sent Pandora a letter on December 20, 2023, and that it contained the language quoted in Paragraph 55.  Pandora otherwise denies the allegations in Paragraph 55.

56.     Pandora admits that it did not report retroactive adjustments to its Blanket License royalty payments for 2021 and 2022 by February 9, 2024.  Pandora otherwise denies the allegations and characterizations in Paragraph 56, including that Pandora has "fail[ed] to report and pay royalties for all Pandora Free usage," such that a curative adjustment is was warranted.

## CAUSES OF ACTION

## COUNT I

**Recovery of Unpaid Statutory License Royalties and Late Fees**
**(Violations of 17 U.S.C. 115 (including §§ 115(c)(2)(I), (d)(4)(A) and (d)(8)(B));**
**37 C.F.R. Part 385 (including §§ 385.21(a), (d), Appendix A); 37 C.F.R. § 210.27)**

57.     Pandora repeats and incorporates by reference each response set forth above.

58.     Paragraph 58 contains legal argument and conclusions to which no response is necessary.

59.     Paragraph 59 contains legal argument and conclusions to which no response is necessary.

60.     Pandora admits that "[s]ince the Blanket License became available on January 1, 2021, [it] has been a Blanket Licensee and has engaged in Covered Activity through multiple streaming offerings," including Sponsored Premium Access sessions.   Pandora denies that it otherwise engages in Covered Activity through "its Pandora Free ad-supported offering."

61.     Paragraph 61 contains characterizations, legal argument, and conclusions to which no response is necessary.

62.     Pandora denies the allegations in Paragraph 62.

63.     Pandora denies the allegations in Paragraph 63.

64.     Pandora denies the allegations in Paragraph 64.

65.     Pandora denies the allegations in Paragraph 65.

66.     Pandora denies the allegations in Paragraph 66.

16

## PRAYER FOR RELIEF

Pandora denies the allegations contained in the "Prayer for Relief" of the Complaint, including subparagraphs "A" through "E," and denies that the MLC is entitled to any relief whatsoever.

## AFFIRMATIVE AND OTHER DEFENSES

Without assuming any burden of proof they would not otherwise bear, Pandora asserts the following affirmative and other defenses. Pandora reserves the right to assert further defenses as the case proceeds.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

The MLC's claims are barred, in whole or in part, by the doctrine of equitable estoppel.

## THIRD AFFIRMATIVE DEFENSE

The MLC's claims are barred, in whole or in part, by waiver.

## PRAYER FOR RELIEF

WHEREFORE, Pandora respectfully requests that this Court:

A.      Deny any and all relief requested by the MLC;

B.      Dismiss the Complaint with prejudice and enter judgment in favor of Pandora;

C.      Award Pandora its costs and attorneys' fees and expenses in defending against the Complaint; and

D.      Award such other and further relief as the Court deems just and proper.

17

Dated: April 16, 2024

Respectfully submitted,

s/ *Michael G. Abelow*

Michael G. Abelow (No. 026710)
Micah N. Bradley (No. 38402)
SHERRARD ROE VOIGT & HARBISON
150 3rd Avenue S. #1100
Nashville, TN 37201
Phone:  (615) 742-4532
Fax:  (615) 742-4539
mabelow@srvhlaw.com

Benjamin E. Marks (*pro hac vice*)
Todd Larson (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue, 32nd Fl.
New York, NY 10153
Phone:  (212) 310-8238
Todd.Larson@weil.com
Benjamin.Marks@weil.com

Crystal L. Weeks (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, D.C.  20036
Phone:  (202) 682-7516
Fax: (202) 857-0940
Crystal.Weeks@weil.com

*Attorneys for Defendant Pandora Media, LLC*

## CERTIFICATE OF SERVICE

       I hereby certify that on April 16, 2024, I filed the foregoing Answer with the clerk of the court by using the CM/ECF system and sent via electronic transmission to the following counsel of record:

Benjamin K. Semel
M. Mona Simonian
Susannah G. Price
PRYOR CASHMAN LLP
7 Times Square
New York, N.Y. 10036
Phone: (212) 326-0181
Fax: (212) 798-6326
bsemel@pryorcashman.com
msimonian@pryorcashman.com
sprice@pryorcashman.com

Jacob T. Clabo
Lauren E. Kilgore
SHACKELFORD BOWEN MCKINLEY
NORTON, LLP
1 Music Circle South Suite 300
Nashville, TN 37203
Phone: (615) 329-4440
Fax: (615) 329-4485
jclabo@shackelford.law
lkilgore@shackelford.law

*Counsel for Plaintiff,*
*Mechanical Licensing Collective*

s/ *Michael G. Abelow*