**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| MECHANICAL LICENSING COLLECTIVE,<br><br>               Plaintiff,<br><br>v.<br><br>PANDORA MEDIA, LLC,<br><br>               Defendant. | Civil Action No. 3:24-cv-00168<br><br>District Judge Eli J. Richardson<br><br>Magistrate Judge Jeffrey S. Frensley<br><br>JURY DEMAND |

**MECHANICAL LICENSING COLLECTIVE'S MEMORANDUM OF LAW
<u>IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON LIABILITY</u>**

PRYOR CASHMAN LLP
Benjamin K. Semel (admitted pro hac vice)
M. Mona Simonian (admitted pro hac vice)
Joshua Weigensberg (N.Y. Bar No. 4894929)
Erik F. Bakke (admitted pro hac vice)
7 Times Square
New York, New York 10036
Phone: (212) 326-0181
Fax: (212) 798-6326
bsemel@pryorcashman.com
msimonian@pryorcashman.com
jweigensberg@pryorcashman.com
ebakke@pryorcashman.com


RILEY & JACOBSON PLC
Elizabeth O. Gonser (TN Bar No. 026329)
1906 West End Ave.
Nashville, TN 37203
P: (615) 320-3738
egonser@rjfirm.com

*Attorneys for Mechanical Licensing Collective*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

I.    STATEMENT OF FACTS ......................................................................................... 5

    A.    The MLC And The Blanket License.................................................................... 5

    B.    Pandora's Operation Under The Blanket License ............................................... 6

    C.    Pandora's Intentional Expansion Of Interactive Functionality........................... 9

    D.    Interactive Functionality On Pandora Free Under The Blanket License .......... 13

        1.    The Ability To Select And Play Music From Pandora's Catalog On Demand ............ 14

        2.    The Ability to Skip And Replay Music Within A Music Program.............................. 16

        3.    The Ability To Stream Music Programs Specially Created For The User ................... 17

    E.    Pandora Plus Features That Extend Beyond A "Limited Offering" ................... 19

II.   RELEVANT PROCEDURAL HISTORY ................................................................ 19

III.  ARGUMENT............................................................................................................ 20

    A.    Legal Standard For Summary Judgment........................................................... 20

    B.    Legal Standard For Blanket License Covered Activity ..................................... 21

        1.    Covered Activity Includes All Streams On An "Interactive Service" .......................... 21

        2.    What Constitutes An "Interactive Service" Under Section 114(j)(7).......................... 22

            (a)    The Definition Looks To The Most Interactive Features Available..................... 22

            (b)    The Three Features That Each Establish An Interactive Service ........................ 23

    C.    Application Of The Interactive Service Definition To Pandora Free ............................. 24

        1.    Pandora Cannot Wave Away Its "Most Interactive" Features In This Inquiry ............ 24

        2.    Unlimited Skip and Replay Functionality Is Universally Available And Independently  Sufficient ..................................................................................... 26

        3.    Pandora Far Exceeds The Threshold For Personalization To Make Its Music Programs Specially Created For Each User................................................................. 27

    D.    Pandora's Failure to Properly Report and Pay Royalties Violates The Law .................... 29

    E.    Pandora's Affirmative Defenses Should Be Dismissed.................................... 30

IV.   CONCLUSION....................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arista Records LLC v. Launch Media, Inc.*,
578 F.3d 151-152 (2d Cir. 2009) ................................................................... 20, 22, 27, 28-29

*Cruz-Cruz v. Conley-Morgan L. Grp., PLLC*,
No. 5:15-CV-157-REW, 2017 WL 2112637 (E.D. Ky. May 15, 2017) .................................30

*Johnson v. Copyright Royalty Board*,
969 F.3d 363 (D.C. Cir. 2020) .............................................................................................9

*Logan v. Cooper Tire & Rubber Co.*,
No. CIV.A. 10-03-KSF, 2011 WL 3267831 (E.D. Ky. July 29, 2011) ..................................30

*Poole v. Fed. Nat'l Mortg. Ass'n*,
768 F. App'x 332 (6th Cir. 2019) .......................................................................................20

*Resol. Tr. Corp. v. Metropole Bldg. Ltd.*,
110 F.3d 64 (6th Cir. 1997) ...............................................................................................30

*Roschival v. Hurley Med. Ctr.*,
695 F. App'x 923 (6th Cir. 2017) .......................................................................................20

**Statutes & Regulations**

17 U.S.C. § 102 ....................................................................................................................21

17 U.S.C. § 106 ....................................................................................................................21

17 U.S.C. § 114 ...............................................................................................2, 20, 21, 22, 23

17 U.S.C. § 115 .........................................................................................................5, 7, 21, 29

37 C.F.R. § 210 .......................................................................................................5, 7, 32, 33

37 C.F.R. Part 385 ..........................................................................................................9, 29, 30

88 Fed. Reg. 54,406 (Aug. 10, 2023) ......................................................................................9

**Legislative History Materials**

Conference Report on H.R. 2281,
144 Cong. Rec. H10048-01, 1998 WL 698645 (Oct. 8, 1998) .......................22, 23, 24, 26, 27

H.R. Rep. No. 104-274 (1995) .......................................................................................21, 22

Orrin G. Hatch-Bob Goodlatte Music Modernization Act, Pub. L. No. 115-264,
132 Stat. 3676 (2018)......................................................................................................5

S. Rep. No. 104-128, 1995 WL 472241 (Aug. 4, 1995) ...............................................23

**Additional Authorities**

Fed. R. Civ. P. 56....................................................................................................1, 20

Local Rule 56.01 .............................................................................................................1

U.S. Copyright Office, *Circular 56A: Musical Compositions and Sound
Recordings (Rev. July 2008)*........................................................................................21

Plaintiff Mechanical Licensing Collective ("The MLC") respectfully submits this memorandum of law in support of its motion for summary judgment on liability against Defendant Pandora Media, LLC ("Pandora"; together with The MLC, the "Parties"), and for dismissal of Pandora's affirmative defenses of equitable estoppel and waiver, pursuant to Fed. R. Civ. P. 56(a) and Local Rule 56.01.

## PRELIMINARY STATEMENT

The volume of evidence that the MLC submits in support of this motion is far more than necessary to demonstrate that summary judgment on liability is appropriate. Liability turns on a single straightforward statutory definition, and the evidence establishing Pandora's liability under that definition is inescapable. Moreover, the evidence comes straight from Pandora itself, including: the undisputed operation of its product; its legal admissions in discovery; its filings with The MLC pursuant to federal regulations; its SEC filings and investor materials; testimony of its 30(b)(6) witnesses; its own website; and a mountain of Pandora's own documentation obtained in discovery. Any one of these categories of evidence would be adequate to support summary judgment, and *every* category of evidence exists in this case. As the accompanying Statement of Undisputed Material Facts reflects, there are multiple independent grounds for liability, few facts are necessary to establish each ground, and none of the facts on any of the grounds are contested.

Yet Pandora has poured resources into litigating a refusal to accept the obvious, ignoring its many admissions and instead offering semantic defenses and red herrings to obscure the undisputed truths underlying its liability. The MLC is designated by law to administer and enforce Pandora's obligations under the statutory blanket license (the "Blanket License") to use songs in connection with interactive streaming services, and brings this motion to cut through the obfuscation and hold Pandora to the plain language of the statute and the simple reality of its own service.

The material facts are not in dispute. The parties agree that The MLC administers the Blanket License, and that Pandora is a Blanket Licensee. Blanket Licensees must, *inter alia*, report and pay royalties to The MLC for each "interactive service" that they operate. Royalties are

calculated using a percentage of each interactive service's revenues under a formula prescribed by law. Pandora has improperly excluded certain amounts from its calculations, resulting in unlawful reporting omissions and underpayments of royalties. Pandora refuses to report and pay properly because it denies that Pandora Free (or some part thereof) meets the definition of an "interactive service." The undisputed facts establish otherwise.

A service is an interactive service if it enables a user to (1) select and play music from its catalog on demand; (2) move forward and backward to select and play music within a music program, even if the program's contents were not selected by the user; or (3) stream music programming specially created for the user. 17 U.S.C. § 114(j)(7). The definition encompasses a service that enables *any one* of these functionalities, and the record is replete with admissions that Pandora Free enables *all three*. Indeed, the undisputed record reflects in detail how Pandora intentionally developed, marketed and provided each of these features to Pandora Free users, and then boasted of them to its investors.

Pandora's website openly describes its three streaming services, listing "**search and play what you want**" as a feature of each service, including Pandora Free. After logging into Pandora Free, users see a popup window pointing to a search box and telling the user to "**search and play your favorite songs on-demand for free**." And undisputed videos show that Pandora Free users can do exactly that: search for, select, and stream music of their choosing from Pandora's catalog. The evidence is hardly limited to product demonstration videos. Pandora has broadly advertised its on-demand functionality for Pandora Free users. Pandora executives have repeatedly touted the functionality as bolstering Pandora's competitive positioning and testified in agency proceedings concerning the functionality. Internal corporate documents show the planning, goals and success of providing on-demand functionality for Pandora Free users. Pandora's defense in this action thus asks the Court to ignore not just the reality of the product's operation, but also years of Pandora's own representations about its services, including in highly regulated corporate disclosures and under oath.

2

Pandora also does not dispute that Pandora Free users have access to unlimited skips and replays within Pandora's personalized music programs, and thus can move forward and backward to select and play specific songs within these programs. Nor does Pandora dispute that its programs are specially created for each Pandora Free user, something that is part of its core brand identity. As Pandora's CEO declared: "We're methodically and passionately developing the world's most personal music experience." Securities filings represent that Pandora offers "a personalized experience for each of our listeners wherever and whenever they want to listen to music." The mission statement of Pandora's algorithmic programming team is: ███████

███████████████████████████████████████████████████

███

There is no material dispute as to how Pandora Free works. Thus, as the one circuit court to consider the "interactive service" definition explained, because "[t]he parties do not materially disagree on how [the service] works," the question "clearly presents an issue of law" and is "strictly under the purview of the courts."

Pandora's unlawful underpayment of royalties also extends beyond Pandora Free to its Pandora Plus subscription service. The material facts as to this underpayment are similarly undisputed. While Pandora admits that Pandora Plus is an interactive service, it has improperly applied a royalty formula discount by incorrectly classifying Pandora Plus as a "Limited Offering" within the meaning of applicable regulations. The undisputed evidence establishes that Pandora Plus does not qualify as a Limited Offering, and Pandora was not entitled to unilaterally reduce its royalty payments through the discounted formula.

**Declarations Submitted In Support Of This Motion**

Four Declarations are submitted in support of this Motion, each one presenting evidence establishing liability:

**Declaration of Rick Marshall**: This Declaration by The MLC's General Counsel establishes Pandora's operation under the Blanket License, attaching a number of documents reflecting Pandora's admissions in its submissions to The MLC, including Pandora's refusal to

3

properly report and pay royalties under the Blanket License in connection with Pandora Free, and its reporting of Pandora Plus as a Limited Offering.

**Declaration of Benjamin Semel**: This Declaration of counsel attaches over 40 pieces of documentary evidence that originate from Pandora itself and reflect admissions establishing its liability. These materials include discovery responses, deposition transcripts, SEC filings and other investor materials, and documents produced by Pandora in discovery.

**Declaration of Juan Manuel Serruya**: This Declaration by a software design and engineering expert witness establishes both how Pandora's streaming services work and how Pandora intentionally designed Pandora Free to function as an interactive service. Mr. Serruya's report analyzes product design and engineering documents showing interactive feature deployment, explains the algorithmic programming process that delivers highly personalized music programs to each user, and explains product documentation, such as Pandora's data reporting processes that intentionally remove select streaming data from its Pandora Free records prior to delivering them to The MLC under the Blanket License.

**Declaration of Robin Flynn**: This Declaration by a media industry expert witness establishes Pandora's strategic planning and deliberate evolution of interactive features in Pandora Free, explaining the substantial investor materials and other corporate documentation recognizing the importance of interactive features for the Pandora Free business strategy. Ms. Flynn's analysis shows how Pandora's candid promotion of the interactive features of Pandora Free to investors and consumers sharply contrasts with the lawyered attempts in this proceeding to deny the undisputed interactive functionality on Pandora Free.

# I. STATEMENT OF FACTS[1]

## A. The MLC And The Blanket License[2]

In 2018, the Copyright Act (the "Act") was amended by the Orrin G. Hatch-Bob Goodlatte Music Modernization Act, Pub. L. No. 115-264, 132 Stat. 3676 (2018) (the "MMA") to create a new compulsory blanket license ("Blanket License") for the right to use musical compositions ("songs") in certain covered activity ("Covered Activity"), which includes streaming songs on "interactive services."[3] The MMA also established the role of a nonprofit collective to administer the Blanket License.[4] The MLC, incorporated in March 2019, was designated as the collective to serve under the statute.[5]

The MLC performs a number of statutory functions, including collecting royalties due from Blanket Licensees and distributing those royalties to the songwriters, composers, lyricists, and music publishers to whom they are due.[6] The MLC also "[e]ngage[s] in legal and other efforts to enforce rights and obligations under [the Blanket License]," efforts that include this action.[7] The MLC does not take commissions from the royalties that it collects and distributes to rightsholders, and has no pecuniary interest in the outcome of this lawsuit. (Marshall Decl. ¶ 11.)

The Blanket License is available to qualifying digital music providers (also known as digital service providers or "DSPs") engaged in Covered Activity, but use of the Blanket License by DSPs is optional. DSPs may instead negotiate voluntary licenses with copyright owners for all or some of their Covered Activity. DSPs that choose to become Blanket Licensees must engage

---

[1] The MLC respectfully refers the Court to its Statement of Undisputed Material Facts for terms not defined herein ("SUF").

[2] The accompanying Declaration of Rick Marshall, General Counsel of The MLC, explains The MLC's administration of the Blanket License and Pandora's operation under it. Select facts are reiterated here for convenience with citation to the Marshall Declaration, where related documentary evidence may also be found.

[3] 17 U.S.C. § 115(d), (e)(7); *see infra* at III.B.

[4] 17 U.S.C. § 115(d)(3).

[5] SUF no. 1; 37 C.F.R. § 210.23(a); Marshall Decl. ¶¶ 3-4.

[6] Marshall Decl. ¶¶ 5-7, 10, 12; 17 U.S.C. § 115(d)(3)(C)(i)(II)-(V), (G)(i).

[7] 17 U.S.C. §§ 115(d)(3)(C)(i)(VIII), (d)(3)(C)(i)(XIII).

5

with The MLC in many ways, including by filing a Notice of License, submitting monthly reporting, and paying monthly royalties.  (*Id.* ¶¶ 5, 7.)

**B.**    **Pandora's Operation Under The Blanket License**

Pandora has operated under the Blanket License since it became available on January 1, 2021.  (SUF no. 2; Marshall Decl.  ¶ 13.)  Its Notice of License submission to The MLC identified its three streaming services: Free Pandora, Pandora Plus and Pandora Premium.   (*Id.* ¶ 14.) Pandora stated that it was submitting "information for all three tiers of service," with a certification signed by Pandora's Senior Counsel. (*Id.* ¶¶ 14, 17-18.)

In its first monthly report of usage to The MLC,

(*Id.* ¶ 22-23.)

. (*Id.* ¶ 23.)  Pandora also submits responses to Records of Use requests from The MLC pursuant to federal regulations.  (*Id.* ¶ 25.)   In each quarterly submission that it has made since the first submission for Q1 2021,

. (*Id.* ¶¶ 26-29.)

The MLC immediately identified concerns with Pandora's royalty reporting and payment for Pandora Free.  (*Id.* ¶ 32.)  Pandora's reported service revenue (as discussed below, Blanket License royalty pool calculations involve a percentage of DSP "Service Provider Revenue") was extraordinarily low                                                                                        . (*Id.*)   After The MLC questioned this data, Pandora initially blamed the discrepancy on

. (*Id.* at ¶ 33.)  The MLC kept pressing for an explanation, and Pandora eventually stated that

(*Id.* ¶ 34.)

The MLC requested more explanation in its Records of Use request, and Pandora stated that

,

6

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████ (*Id*. ¶ 35.)

In November 2021, The MLC sent notice to Pandora that its usage reporting was not compliant and that it had underpaid the required royalties due for Pandora Free's engagement in Covered Activity. (*Id*. ¶ 37.) The letter explained that since "interactive streaming and the ability to select sound recordings on demand is a [Pandora Free] feature that is enabled at all times to users," Pandora Free constitutes an interactive service under the Copyright Act. (*Id*.) The letter explained that while Pandora's reporting of all plays for Pandora Free was appropriate, its exclusion of revenue, and resultant royalty underpayments, did not comply with the requirements of the Blanket License, specifically noting that:

> [Pandora Free] enables a user, at any time, to receive transmissions of particular sound recordings selected by the user. While we understand that Pandora refers to some of this on-demand streaming activity within the Free Offering by the term "Premium Access interactions," our review indicates that interactive streaming and the ability to select sound recordings on demand is a [Pandora Free] feature that is enabled at all times to users. [Pandora Free] is thus an interactive streaming offering, and the music streams provided to users of [Pandora Free] are Covered Activity subject to Pandora's Section 115 blanket license. …

> [O]ur review indicates that [Pandora Free] enables unlimited on-demand streaming on mobile devices and with background listening capacity, making it possibly the most full-featured free interactive streaming offering in the U.S. market. Thus, The MLC concludes that, while Pandora appears to have reported play information correctly, it has not correctly reported royalty payment and accounting information as required pursuant to 37 C.F.R. 210.27(d) or correctly paid royalties to The MLC in connection with [Pandora Free]. (*Id*.)

Pandora responded with a letter from outside counsel that "categorically reject[ed]" The MLC's letter and refused to correct previous usage reporting or make additional royalty payments. (*Id*. ¶ 38.) Pandora also offered a variety of admissions within its denials, including that "Pandora offers interactive streams to non-subscribers." (*Id*.) Pandora qualified that admission with the words "solely in Premium Access sessions," but the qualification does not change the admission that a feature of Pandora Free provides the ability to select and play music on demand. As

7

discussed below, this alone establishes that Pandora Free is an interactive service.[8] Pandora closed its letter from counsel by advising that it reserved the right "to submit usage reports for its free tier that include only the Premium Access plays," and shortly thereafter Pandora stopped reporting all plays on Pandora Free. (*Id.* ¶¶ 38, 40.)

In discovery in this action, Pandora has disclosed additional information about what it reports to The MLC, which stands in contrast to what it represented to The MLC. Whereas Pandora's counsel proclaimed that interactive functionality on Pandora Free was limited to "Premium Access interactions," Pandora now admits that ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████

Pandora admits that it ████████████████████████████████

██████████████████████████████████████████████

████████████"[9] The exclusion of ████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████, even though all three offer a similar mix of listening features.[10]

Pandora also excludes certain Pandora Free revenue. Pandora conceded in discovery that it only reports revenue that ██████████████████████████████████████████

---

[8] Furthermore, Pandora soon admitted to providing "on demand" functionality on Pandora Free even *outside* of its so-called "Premium Access interactions." ████████████████████

██████████████████████████████████████████████

██████████████████████████ (*Id.* ¶ 39.) Pandora confirmed in discovery that on-demand replays are available at all times for Pandora Free users even outside of "Premium Access interactions." SUF nos. 11-12.

[9] Amended RFAs Nos. 8-10 (Semel Exh. 32); Amended Response To Interrogatory No. 10 (Semel Exh. 7); MLC Usage Report (Semel Exh. 63 at PANDORA_000069271); Spin Type Descriptions (Semel Exh. 64 at PANDORA_000069274); Serruya Report ¶¶ 82-91.

[10] *Id.* ¶¶ 86-91.

████████████████████████████████████████████████

██████████████████████████████████████[11]

When The MLC first notified Pandora of its noncompliance, the industry was operating under interim royalty rates and terms due to the appeal and remand of a Copyright Royalty Board ("CRB") ratesetting proceeding, and the Blanket License royalty rates for 2021 and 2022 became final only in August 2023.[12] The deadline for Blanket Licensees to adjust their reporting and payments was six months later, on February 9, 2024. (Marshall Decl. ¶¶ 47-48.) Between the time of The MLC's initial notice of noncompliance and the February 2024 deadline, The MLC repeatedly communicated with Pandora concerning its obligation to correct its reporting and royalty underpayments. (*Id.*) Pandora declined to do so, and The MLC filed this action on February 12, 2024. (*Id.* ¶¶ 50-51.)

## C. Pandora's Intentional Expansion Of Interactive Functionality

Pandora launched in 2005.[13] Pandora was an early leader in personalized music programming, and it has only increased the sophistication of its personalized algorithmic programming over time.[14] For more than a decade, Pandora's interactivity revolved around this personalized music programming, with its ad-supported service growing to more than 81.5 million monthly users in 2014.[15]

---

[11] SUF no. 5. Pandora also does not fully report other royalty calculation metrics associated with Pandora Free, including a metric called "TCC," although details of these are most relevant for the damages phase of this action. *See* 37 C.F.R. § 385.2 (defining "TCC" as encompassing certain expensed costs for other licenses); Pandora Answer ¶ 45; Marshall Decl. ¶ 30, n. 27.

[12] Marshall Decl. ¶ 45; *Johnson v. Copyright Royalty Board*, 969 F.3d 363 (D.C. Cir. 2020); 88 Fed. Reg. 54,406 (Aug. 10, 2023). The CRB is an administrative tribunal tasked with setting or adjusting the rates and terms for the Copyright Act's statutory licenses, including the Blanket License. *See* 17 U.S.C. Ch. 8.

[13] Pandora 2017 10-K (Semel Exh. 14, p. 2); Flynn Report ¶ 12.

[14] Flynn Report ¶¶ 12-13, 70-78; Pandora 2014 10-K (Semel Exh. 12, p. 3). Pandora uses the term "station" for its personalized music programming. However, Pandora stations are not like radio stations broadcasted to the public; rather, Pandora "stations" are customized to each individual user. *See* SUF nos. 16-17.

[15] Flynn Report ¶¶ 12-13.

However, the growth of on-demand streaming, and in particular the U.S. launch of Spotify's free on-demand streaming service, put Pandora's market position under significant pressure, and Pandora eventually responded by expanding its interactive feature set until it offered full on-demand functionality across all of its services.[16] The Flynn Report explains in detail the market positioning that Pandora faced and the import of Pandora's frank discussions with investors about its intentional expansion of on-demand functionality to address competitive pressure.[17]

Pandora's expansion of on-demand functionality was accomplished in two primary steps. In the first step in late 2016, Pandora added unlimited skip and replay features to Pandora Free.[18] Pandora also launched its Pandora Plus subscription service with the same unlimited skip and replay ability but without advertisements. Importantly for this action, *Pandora openly acknowledged at the time that this expansion of functionality required mechanical licensing*.[19] Indeed, Pandora executives have admitted under oath in Copyright Royalty Board proceedings the precise mechanical licensing obligation that Pandora is now denying in this proceeding, including that "unlimited skips and replays" are "features that implicate mechanical licensing,"[20] and that

---

[16] Phillips Phonorecords III Testimony (Semel Exh. 30 ¶¶ 10-14); Flynn Report ¶¶ 15-18; 29-32; 47-49.

[17] Flynn Report ¶¶ 12-51.

[18] Phillips Phonorecords III Testimony ¶¶ 10-15, ¶ 17.

[19] *See* SUF nos. 13-14; Semel Decl. ¶ 14; Pandora 2016 10-K, p. 14 (stating that "so-called 'reproduction rights' or 'mechanical rights'" are "implicated in the interactive features that we introduced on September 15, 2016 to our current ad-supported and subscription radio services"). *See also* SiriusXM 2021 10-K, p. 25 (describing the need, on the sound recording side, to enter into "agreements grant[ing] us the right to... add interactive features, such as replays, additional skips and offline play, to Pandora's ad-supported service and to Pandora Plus"); Pandora 2017 10-K, p. 16 (describing dependence on agreements allowing Pandora to offer "interactive features in our ad-supported service."); Phillips Phonorecords III Testimony ¶ 15 (describing Pandora's recognition that it "could not rely solely on its noninteractive, statutorily compliant service, but rather would need to develop some of the features that were causing listeners to spend time on other services."); Flynn Report ¶¶ 22-24.

[20] White CRB Testimony ¶ 15 (noting that Pandora offerings involve "features that implicate mechanical licensing, including unlimited replays [and] unlimited skips").

10

offering users the *ability* to obtain additional replays and skips by watching a video ad requires Pandora to obtain a mechanical license for *all* activity on the service.[21]

A few months later, Pandora launched its subscription service Pandora Premium, which offered even more full-featured on-demand functionality. Within months, Pandora's leadership decided to add on-demand functionality to Pandora Free to remain competitive.[22] Its then-President and CEO Roger Lynch told investors:

> The industry has seen a big shift in listening towards ad-supported or free on-demand… When you look at the top reasons why listeners leave the Pandora experience, it's because they cannot hear the song they want on-demand, and this is particularly important to younger listeners.[23]

In December 2017, Pandora launched functionality within Pandora Free that enables users to search and play songs on-demand after watching an advertisement.[24] CEO Lynch told investors that Pandora had addressed its "ad-supported listeners' top request," namely, "the ability to directly play the specific songs, albums, or playlists they want," and that Pandora "now [had] more compelling and complete functionality in [its] mobile ad-supported service than any other competitor."[25] Pandora's Chief Product Officer echoed these statements, saying Pandora gave free

---

[21] Herring CRB Testimony (during open session available at https://app.crb.gov/document/download/13877) at PANDORA_000070553) (the judge asked Pandora's CFO whether "the playing [of] songs on Pandora Plus will trigger payments [under] the mechanical license[,] or only Pandora Premium?" Pandora's CFO testified, "[n]o, both Plus and Premium." The judge then replied, "[y]ou described Plus as basically a non-interactive radio. Is it because of the replays [and] other features[?]" Pandora's witness testified in response: "Replays, off-line listening, et cetera, yes."); *id.* (Flynn Report Exh. 7 at PANDORA_000070668-69) █████████

[22] Semel Decl. ¶ 24; Board Update, June 20, 2017 (Semel Exh. 23 at PANDORA_000029465-66); Pandora Nov. 7, 2017 Company Conference Presentation (Semel Exh. 41, p. 7) (stating that bringing on-demand functionality "into our ad-supported product" was a key priority that "plugs the biggest leak we have in terms of losing listeners"); Flynn Report ¶¶ 26-27, 35.

[23] Pandora Q3'17 Earnings Call Tr. (Semel Exh. 36, p. 4); Semel Decl. ¶ 37.

[24] SUF no. 7; Flynn Report ¶ 29; Semel Decl. ¶ 15; Pandora 2017 10-K, p. 2.

[25] Pandora, *Pandora Unlocks On-Demand Listening With Video Ads* [press release] (Dec. 14, 2017) (Flynn Exh. 15); Pandora Q4'17 Financial Results Conference Call (Semel Exh. 75, p. 4).

11

users "the ability … to search and play songs" so they could get what they wanted "when they want it."[26]

Pandora's CEO told investors that the goal of "bring[ing] more interactivity into our ad-supported tier" had been "accomplished." [27] Pandora's CFO similarly told investors that Pandora had brought "more interactivity into our ad-supported service so that it can be a full alternative to things like YouTube or Spotify's free services."[28] CEO Lynch explained that Pandora had added:

> …**a feature that allows you to listen on demand within our ad-supported product**, which Pandora didn't have before. It was a sore point with listeners. It was one of the most requested features. And the ability to listen to a song, a playlist and album without having to pay for a subscription.[29]

At an investor presentation, CEO Lynch praised the "unprecedented functionality" of Pandora's "ad-supported tier," including the "new feature" he called "Premium Access."[30] Lynch praised the feature as "the most expansive ad-supported on-demand capability that exists in the marketplace."[31]

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████ [32]

---

[26] Stutz, Colin, Pandora Extends On-Demand Listening to 'Freemium' Listeners With Video Ads, Billboard (Dec. 14, 2017) (Serruya Exh. 9, p. 4).

[27] Pandora Sept. 12, 2018 Company Conference Presentation (Flynn Exh. 20, p. 6).

[28] Pandora Sept. 7, 2018 Company Conference Presentation (Semel Exh. 43, p. 5).

[29] Pandora Sept. 12, 2018 Company Conference Presentation (Flynn Exh. 20, p. 6) (emphasis added).

[30] Pandora Q1'18 Earnings Call Tr. (available at https://app.crb.gov/document/download/21136); Semel Exh. 35 at PANDORA_000029417; Semel Decl. ¶ 36.

[31] *Id.* at -29418.

[32] Pandora, *Mobile Ad Supported Competitive Feature Summary*, (Semel Exh. 54 at PANDORA_000069580); Serruya Report ¶¶ 18-22.

12



This chart, which was produced in discovery and was part of an exchange between two Pandora executives, is particularly notable because of how clearly it reflects Pandora's own assessment that ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████.[33] Pandora has never contested that the features available on Pandora Plus and Premium make them interactive services under the Blanket License, and by Pandora's own assessment, Pandora Free has *the same features*.[34]

**D.      Interactive Functionality On Pandora Free Under The Blanket License**

As discussed above, throughout its operation under the Blanket License, Pandora has offered three streaming services: (1) Pandora Free, its non-subscription, ad-supported service; (2)

---

[33] Serruya Report ¶ 20.

[34] ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████

Pandora Plus, a subscription service with limited advertising; and (3) Pandora Premium, a subscription service with no advertising.[35]

Throughout this time, Pandora Free has included multiple features that classify Pandora Free as an "interactive service" under the law.  These include giving users the ability to: (1) select and play particular music from Pandora's catalog on demand; (2) move forward (skip) and backward (replay) in order to select and play particular music from within a music program that was not selected by the user; and (3) stream music programming specially created for the user.

       1.       The Ability To Select And Play Music From Pandora's Catalog On Demand

Pandora Free offers the ability to search and play songs from Pandora's catalog on demand.[36]  Pandora promotes this functionality heavily, including on its website, which identifies the ability to "Search and play what you want" as a top Pandora Free feature:[37]



Pandora's advertising campaigns likewise highlight that Pandora Free enables "FREE access to on-demand" so that users can "search & play all you want for free":[38]

---

[35] SUF nos. 2-3.

[36] SUF no. 7.

[37] Pandora homepage, https://www.pandora.com/ (Semel Exh. 77); Pandora "Plans" web page, https://www.pandora.com/plans (same) (Semel Exh. 71).

[38] Love Adele Radio? [Advertisement] (Semel Exh. 24). *See also* Semel Decl. ¶¶ 25-30 and corresponding exhibits.



Pandora Free users can search and browse Pandora's complete catalog.[39] Pandora also employs in-app design to highlight and promote this on-demand feature, such as regularly pushing to Pandora Free users on the web app a pop-up window pointing to the search box (which is always available), and stating "**New!** Search and play your favorite songs on-demand for free":[40]



At all times, the search feature delivers the same complete results to Pandora Free users as it does to Pandora Premium users.[41] The user can then select a song from the results and have it play.[42] On Pandora Free, when the user selects a particular song to play for the first time, Pandora displays a video advertisement before the selected song plays.[43] After watching the ad, the user

---

[39] RFAs No. 75 ███████████████████, No. 103; Marcantonio Dep. Tr. 166:12-167:7.

[40] Serruya Report ¶¶ 28-29. The bolded "**New!**" language continues to be used to promote user attention despite the fact that search-and-play functionality has been available on Pandora Free since 2017. (*supra* at I.C.)

[41] *See supra* n. 39.

[42] Serruya Report ¶¶ 27, 31-32, Exhibits 1(a), 1(b), 1(d). Pandora Free users can also browse Pandora's catalog and select particular music to play. *Id.* ¶¶ 27-32.

[43] RFAs Nos. 28-30.

15

can continue playing music on demand with no ad interruptions for approximately 30 minutes.[44] The user can continue playing songs on-demand, receiving one additional advertisement approximately every 30 minutes.[45]  When selecting and playing music on demand, a Pandora Free user does not open a separate application, log out of their account, create a new account, enroll in another service, accept any other terms of service, enter a credit card or accept any subscription or renewal obligations.[46]

The evidence shows that Pandora's product design and deployment of on-demand functionality within Pandora Free has been an intentional and central part of Pandora's product development.[47]  In sum, it is not disputed that Pandora Free enables users to stream music from its catalog on demand.[48]

2. The Ability to Skip And Replay Music Within A Music Program

The ability to skip and replay could be viewed as a subset of the general ability to select and play music on demand.  Nonetheless, as discussed below, it is addressed distinctly in the statute, and thus facts establishing this functionality are presented separately here.

There are multiple ways to skip the rest of the song currently playing on a Pandora Free "station" and start a new song: (1) a forward arrow icon to the right of the play/pause icon that the user can click/tap; (2) a "thumbs down" icon to the left of the play/pause icon; and (3) using one of several "modes" buttons in a sidebar (web app) or dropdown (mobile) to switch modes.[49]  There is no limit on the user's ability to skip more songs.[50]  The first two skip methods lead to the user

---

[44] Pandora Answer ¶ 34; Marcantonio Dep. Tr. 344:4-6.
[45] RFAs No. 66; Serruya Report ¶ 46; Marcantonio Dep. Tr. 170:9-18 (same).  Pandora has stated in discovery that eventual caps exist on repeated use of what they call "Premium Access interactions," but Pandora does not state publicly or communicate to users information on any such caps.  Response To Interrogatory No. 16 (Semel Exh. 6); Serruya Report ¶ 47.
[46] RFAs Nos. 25-26, 69, 73-74, 88-89, 93-94; Serruya Report ¶¶ 65, 70.
[47] Serruya Report ¶¶ 10-91, Exhibits 1(a), 1(b) and 1(d).
[48] SUF no. 7-9.
[49] Serruya Report ¶¶ 50, 52, 55-57, Exhibit 1(d).
[50] SUF nos. 10, 12.

16

receiving additional advertisements periodically, while the third method of switching modes does not prompt additional advertisements.[51]

Pandora Free users can also replay songs previously played on the "station."[52] To replay a song, the user selects a replay icon (a curling arrow pointing counter-clockwise). The replay functionality is not limited to restarting a currently playing or just-finished song. Users are also able to replay songs by swiping through their listening history and selecting the replay icon over a chosen song in their history.[53] There is no limit to the number of times a Pandora Free user can replay songs.[54] Pandora Free users are presented with additional advertisements periodically as they replay songs.[55] Skip and replay functionality is universally available on Pandora Free.

3.     The Ability To Stream Music Programs Specially Created For The User

Personalized music programming is a core part of the Pandora Free product identity.[56] The team that runs Pandora's algorithmic programming has the stated mission to: ████████████

████████████████████████████████████████ [57]

Pandora's securities filings represent that it offers "a personalized experience for each of our listeners wherever and whenever they want to listen to music."[58]

The remarkable level of personalization that Pandora has engineered with its algorithmic programming is presented in detail in the record, including such concepts as ████████████

---

[51] Serruya Report ¶¶ 59-60; RFAs No. 48; Peale Dep. Tr. 251:16-252:3.
[52] SUF no. 11-12.
[53] *Id.*
[54] *Id.*
[55] Serruya Report ¶¶ 70-71.
[56] Flynn Report ¶¶ 70-78.
[57] Peale Dep. Tr. 64:14-66:25, 67:18-68:11. Pandora summarized this goal in 2023 as the challenge to ████████████████████████████████████████ ████████████████████████████████████ Pandora, *Algorithmic Programming Overview* (Semel Exh. 67 at PANDORA_000061905, -917).
[58] Pandora 2017 10-K, p. 2. *See also* SiriusXM 2023 10-K, p. 5 (substantially similar statement); SiriusXM 2022 10-K, p.5 (same); SiriusXM 2021 10-K, p. 4 (same); SiriusXM 2020 10-K, p. 4 (same); Sirius XM Holdings Inc. Sept. 7, 2022 Company Conference Presentation (Flynn Exh. 54, p. 14) (CEO Witz noting Pandora had made "better investments in algorithm programming to provide more personalized experiences within the Pandora experience").

17

[BLACK REDACTION BAR]

and more.[59] The undisputed evidence reflects the intentionality and depth of customization provided by Pandora to tailor programs to each individual user, evidence that far exceeds the threshold to demonstrate that Pandora Free users can receive music programs specially created for them.[60] The highly personalized programming that Pandora promotes as its business model independently establishes its classification as an interactive service under the law.

Pandora Free users can create personalized stations beginning with what Pandora calls a "seed," such as an artist or song.[61] Each user's station is uniquely tailored to them - where two users create stations using the same seed, Pandora creates two different stations.[62] Pandora's algorithm leverages user-specific data to determine every song to play on a personalized station.[63]

[BLACK REDACTION BAR].[66]

Pandora Free's algorithmic programming is so sophisticated in its personalization that its song selection process utilizes [BLACK REDACTION BAR]

[BLACK REDACTION BAR]

---

[59] Serruya Report ¶¶ 92-122.
[60] *Id.*
[61] SUF no. 16.
[62] SUF no. 16-17.
[63] SUF no. 15-22.
[64] SUF no. 18-22.
[65] SUF no. 21-22.
[66] SUF no. 18.
[67] SUF no. 22.

████████████████████████████████████████████████████████████

████████.[68]

Pandora Free users can even further exercise direct control over their music programs by using the "modes" feature, which allows users to "fine-tune" stations by applying preferences such as "newly released" songs, "deep cuts," and "crowd faves."[69] Users can also choose an "artist only" mode that plays only music by the seed artist(s) that the user chose to create the station.[70]

### E. Pandora Plus Features That Extend Beyond A "Limited Offering"

Pandora has not disputed that Pandora Plus is an interactive service. However, it reports Pandora Plus as eligible for a discounted royalty formula for interactive services that are "Limited Offerings" under applicable regulations.[71] As discussed below, this discount is only available for services that either do not enable on-demand streaming or provide access to only a limited catalog. Pandora Plus does enable users to select and play specific songs on demand in the same way as Pandora Free users (and similarly delivers advertisements to the user in connection with the use of these features).[72] Pandora Plus users also have access to the same full catalog of songs as Pandora Premium users.[73]

## II.     RELEVANT PROCEDURAL HISTORY

The MLC filed this action on February 12, 2024.[74] Pandora's Answer asserted affirmative defenses of equitable estoppel, waiver, and failure to state a claim, but Pandora did not move to dismiss the Complaint.[75] On March 3, 2025, the Court granted a joint motion to bifurcate this action between a liability phase and a damages phase. (*See* ECF No. 50.) The parties are in the liability phase.

---

[68] *Id.*
[69] SUF no. 24.
[70] SUF no. 25.
[71] SUF no. 26.
[72] SUF no. 27.
[73] SUF no. 28.
[74] Semel Decl. ¶ 81; The MLC's Complaint, Doc. No. 1 (Feb. 12, 2024) (Semel Exh. 80).
[75] Semel Decl. ¶ 82; Pandora Answer, p. 17.

19

On June 4, 2025, in response to The MLC's interrogatories, Pandora admitted that "Pandora has not identified any facts in discovery to date that support" its equitable estoppel and waiver defenses.[76] Pandora has not amended these responses or withdrawn the defenses, despite a request from The MLC to do so.[77]

### III.  ARGUMENT

### A.  Legal Standard For Summary Judgment

Most relevant for this motion, the question of whether a streaming service is an "interactive service" under Section 114(j)(7) is "clearly an issue of law and therefore strictly under the purview of the courts" where "[t]he parties do not materially disagree on how [the service] works." *Arista Records LLC v. Launch Media, Inc.* ("LAUNCHcast"), 578 F.3d 151-152 (2d Cir. 2009).  There is no genuine dispute on the facts of how Pandora Free or Pandora Plus work.

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A "genuine" factual dispute exists "when a "reasonable jury could return a verdict for the nonmoving party," and a "material" fact is one that affects the outcome of the case.  *Roschival v. Hurley Med. Ctr.*, 695 F. App'x 923, 927 (6th Cir. 2017) (citations and quotation marks omitted).  Here, there is no genuine factual dispute.

The party moving for summary judgment must identify specific portions of the record, such as from depositions, documents, affidavits or declarations, showing the absence of a genuine dispute over material facts.  Fed. R. Civ. P. 56(c)(1)(A); *Poole v. Fed. Nat'l Mortg. Ass'n*, 768 F. App'x 332, 337 (6th Cir. 2019).  As reflected in the accompanying Statement Of Undisputed Material Facts, Plaintiff has carried that burden on this Motion.

---

[76] Semel Decl. ¶ 84; Supplemental Response To Interrogatory Nos. 6-7 (Semel Exh. 4).
[77] Semel Decl. ¶ 84.

## B.   Legal Standard For Blanket License Covered Activity

### 1.   Covered Activity Includes All Streams On An "Interactive Service"

The Copyright Act ("Act") grants copyright owners the exclusive right to reproduce and distribute their works.  17 U.S.C. §§ 102(a), 106.  However, certain reproductions of musical works (termed "mechanical" rights because they reproduced the sounds of the song mechanically, as opposed to sheet music) are subject statutory licensing, meaning the copyright owner does not have right to refuse the license, so long as the licensee complies with the statutory terms and pays the statutory royalty.  *See* 17 U.S.C. § 115.

The scope of the Blanket License is defined through a series of interconnected definitions. The relevant conclusion from these definitions is that *all streams of music on an "interactive service" are Covered Activity for which a Blanket Licensee must report and pay statutory royalties to The MLC*.

The Blanket License is a license to engage in Covered Activity, which is defined in Section 115(e)(7) to include the activity of making an "interactive stream," which is in turn defined in Section 115(e)(13) to include a stream "where the performance of the sound recording… is not exempt under section 114(d)(1) and does not… qualify for statutory licensing under section 114(d)(2)."  Critically for this action, streams made as "part of an interactive service" are neither exempt nor subject to statutory licensing.  17 U.S.C. § 114(d)(1), (d)(2)(A)(i).[78]  Thus, every stream on an interactive service is an "interactive stream,"[79] and all streaming activity on an interactive service is Covered Activity.

---

[78] The Blanket License concerns songs, but there is a separate statutory license in Section 114 that relates to sound recordings.  (Songs are distinct copyrightable works from sound recordings that embody songs.  U.S. Copyright Office, *Circular 56A: Musical Compositions and Sound Recordings (Rev. July 2008)*.)  Section 114 was enacted in the 1990s to cover certain *non-interactive* services, and uses a definition of "interactive service" to define its scope.  Although Sections 114 and 115 address different works and different rights, they share a definitional "border": the "interactive service" definition *excludes* services from the Section 114 license and *includes* them in the Blanket License scope.

[79] The legislative history of Section 114 confirms that "[a] statutory license is not available for transmissions *by an interactive service*."  H.R. REP. NO. 104-274, at 21 (1995).

21

2. <u>What Constitutes An "Interactive Service" Under Section 114(j)(7)</u>

(a) <u>The Definition Looks To The Most Interactive Features Available</u>

As the facts laid out above establish, Pandora Free is unquestionably an "interactive service" within the meaning of the Copyright Act. The term is defined in Section 114(j)(7), in relevant part, as follows (emphasis added):

> An "interactive service" is one that **enables** a member of the public to receive a transmission of a program specially created for the recipient, or on request, a transmission of a particular sound recording, whether or not as part of a program, which is selected by or on behalf of the recipient.[80]

As the definition makes clear, it is an inquiry into a service's functionality and features: what the service "enables" users to do. The legislative history confirms this understanding, emphasizing what users are "allowed" or have "the ability" to do. Conference Report on H.R. 2281, 144 Cong. Rec. H10048-01, 1998 WL 698645, at H10072 (Oct. 8, 1998). Factual inquiries into whether and how users use the features made available on a service cannot preclude summary judgment, once the features are established. As the Second Circuit emphasized in *LAUNCHcast*, as long as is it clear "how [the service] works" then application of the definition is "clearly an issue of law." *See LAUNCHcast*, 578 F.3d at 151-152.

The Second Circuit explained further that the court must judge the service by its *most* interactive functionality. In that case, the court found irrelevant a factual dispute over what the default setting was for a feature that offered a range of user influence. The court held that it must assume the setting that offered the *most* user influence, explaining that, "**in determining whether**

---

[80] In its Answer (p. 7), Pandora cited to the last sentence of Section 114(j)(7): "If an entity offers both interactive and noninteractive services (either concurrently or at different times), the noninteractive component shall not be treated as part of an interactive service." This sentence is not relevant, as it clarifies only that a noninteractive service does not become an interactive service simply by virtue of being owned by an entity that also owns an interactive service. *See e.g.*, H.R. REP. NO. 104-274, at 25–26 ("If an entity offering a nonsubscription service (such as a radio or television station) chooses to offer an interactive service as a separate business… that decision does not affect the exempt status of any component of the entity's business that does not offer an interactive service."). The MLC is not claiming that Pandora Free is an interactive service because Pandora owns other interactive services. Pandora Free is an interactive service because it meets the definition of an interactive service.

22

**[the service] is an interactive service we consider the particular aspect of [the service] that is the most interactive, or in other words, the aspect that provides the user with the greatest possible amount of influence** on the [music being streamed]." *Id*. at 159 n.14 (emphasis added).

        (b)      The Three Features That Each Establish An Interactive Service

A service is an "interactive service" if it enables *any* of following three features for its users:

- **Select and play music from a catalog on demand** ("receive… on request… a particular sound recording…selected by… the recipient") (Section 114(j)(7))

- **Move forward (skip) and backward (replay) in order to select and play particular music from within a program that is comprised of music that was *not* chosen by the user** ("receive… on request… a particular sound recording,… as part of a program,… selected by… the recipient) (*Id.*)

- **Stream music programs specially created for the user** ("receive a transmission of a program specially created for the recipient") (*Id.*)

The first two features are captured in the second prong of Section 114(j)(7). The first feature reflects the scope when Section 114 was enacted in 1995 and focused on on-demand functionality. *See* S. Rep. No. 104-128, 1995 WL 472241, at *24 (Aug. 4, 1995) ("Interactive services … allow listeners to receive sound recordings 'on-demand[.]'"). In 1998, Congress expanded the original definition. One expansion was to encompass the second feature by adding the clause "whether or not as part of a program," thus including the ability to select and play music within a music program by "mov[ing] forward and backward between songs" – in other words, to be able to skip and replay songs:

> This language clarifies that if a transmission recipient is permitted to select particular sound recordings in a prerecorded or predetermined program, the transmission is considered interactive. For example, **if a transmission recipient has the ability to move forward and backward between songs in a program, the transmission is interactive**. **It is not necessary that the transmission recipient be able to select the actual songs that comprise the program**.

Conference Report on H.R. 2281, 144 Cong. Rec. at H10071-72 (emphasis added).

The definition was also expanded to cover the third feature above. Congress explained the intention that this expansion was intended to cover custom-created programming personalized for individual users" - even where the user does not select the music comprising the program:

> The definition of "interactive service" is amended in several respects. First, **personalized transmissions--those that are specially created for a particular individual--are to be considered interactive**. The **recipient**… **need not select the particular recordings in the program for it to be considered personalized**, for example, the recipient might identify certain artists that become the basis of the personal program… For example, a service would be interactive if it allowed a small number of individuals to request that sound recordings be performed in a program specially created for that group and not available to any individuals outside of that group.

*Id.* at H10071 (emphasis added).

## C.     <u>Application Of The Interactive Service Definition To Pandora Free</u>

As the preceding section makes clear, Pandora Free is an "interactive service" if it enables just one of the three interactive features outlined in the statute. Further, in evaluating whether Pandora Free is an "interactive service," the Court should "consider the particular aspect of [Pandora Free] that is the most interactive." The evidence discussed above concerning the interactive functionality on Pandora Free (*supra*, I.D), as well as the record evidence cited in the accompanying Statement of Undisputed Material Facts, leaves no doubt that definition applies to Pandora Free. It bears emphasis that, even as Pandora disputes that the words of the statute mean what they say, Pandora's own statements and positions admit the material facts that establish its liability.

### 1.     <u>Pandora Cannot Wave Away Its "Most Interactive" Features In This Inquiry</u>

The record is saturated with evidence that Pandora Free users are able to search for, request and play songs of their choice from Pandora's catalog.[81] Indeed, Pandora submits monthly Blanket License reporting that it claims includes on-demand access "interactions" on a service that it reports alternately as "Pandora Free" (in Records of Use filings) and "Free Pandora" (in monthly

---

[81] SUF no. 7.

usage reports).[82]  Pandora cannot dispute that for years its parent corporation (SiriusXM) has represented in SEC filings that "[l]isteners of the ad-supported service are provided with the option to temporarily access on-demand listening."[83]  Pandora's attempt to minimize or downplay this on-demand access fails from every angle.  The law is clear that the issue turns on the simple existence of the feature – what users have the *ability* to do.  This was hammered home by the Second Circuit's reminder that the Court should look to the "particular aspect of [the service] that is the most interactive," or in other words, what provides the user the greatest "possible amount of influence" over music selection.  There is no greater ability than for the user to be able to "search and play what they want," as Pandora's home page advertises for Pandora Free.  Pandora's attempt to separate and wave away its "most interactive" feature from this inquiry is precisely the opposite of what the law instructs.

Any attempt by Pandora to downplay on-demand access on Pandora Free also runs squarely into its many admissions that this on-demand access is in fact of great importance to Pandora, evidence that is enlightening even though it is not necessary to establish Pandora's liability.  Quite the opposite of downplaying these features to its investors, Pandora has consistently communicated how on-demand access on Pandora Free substantially enhances Pandora's business prospects and is a key driver of user engagement and ad revenue across *all* of Pandora Free.[84]

When Pandora implemented these features, its executives boasted to investors that it had added "a feature that allows you to listen on demand within our ad-supported product,"  that this feature was added to address its "ad-supported listeners' top request," namely, "the ability to directly play the specific songs, albums, or playlists they want," that Pandora "[had] more compelling and complete functionality in [its] mobile ad-supported service than any other competitor," and that Pandora had "[brought more interactivity into [its] ad-supported service so

---

[82] SUF no. 3, 5.  Amended RFAs Nos. 8-10; Joe Dep. Tr. 161:10-162:7; Amended Response To Interrogatory No. 10 (Semel Exh. 7); Marshall Decl. ¶¶ 22-29, 34-35, with referenced exhibits.
[83] RFAs No. 58; *see also* Semel Decl. ¶ 18; SiriusXM 2020 10-K, p. 8; SiriusXM 2021 10-K, p. 8; SiriusXM 2022 10-K, p. 9; SiriusXM 2023 10-K, p. 10; SiriusXM 2024 10-K, p. 13.
[84] Flynn Report ¶¶ 52-69.

25

that it can be a full alternative to things like YouTube or Spotify's free services." (*Supra* at I.D.1.) Under the law and the undisputed facts, there can be no dispute that Pandora is an "interactive service" in the meaning of the Copyright Act.

### 2. Unlimited Skip and Replay Functionality Is Universally Available And Independently Sufficient

Even if one contradicted the statute and ignored Pandora's "most interactive" on-demand features in this inquiry, there is still no dispute that Pandora Free is an "interactive service." The unlimited skip and replay features that are always available on Pandora Free (*supra* at I.D.2) independently render Pandora Free an "interactive service."[85] Pandora Free users can skip and replay tracks without limitation, including by swiping backward and forward within their listening histories and selecting particular tracks to replay.

As the legislative history explains, the phrase "whether or not as part of the program" from the statutory definition of "interactive service" was expressly intended to capture precisely this functionality: where the user did not "select the actual songs that comprise the program," but "has the ability to move forward and backward between songs" in the program. Conference Report on H.R. 2281, 144 Cong. Rec. at H10071-72.

It is also worth emphasis that the record also demonstrates that Pandora is fully aware that skip and replay functionality renders Pandora Free an "interactive service." Its executives have admitted under oath that such features trigger the need to secure mechanical licenses, and that the expansion of these features made Pandora Plus – which has materially *the same features* as Pandora Free – an "interactive service."[86] There is thus no ambiguity in the law or facts establishing that this functionality separately renders Pandora Free an "interactive service."

---

[85] SUF nos. 10-14.

[86] *See supra* at I.C.

### 3. Pandora Far Exceeds The Threshold For Personalization To Make Its Music Programs Specially Created For Each User

Pandora Free is independently an interactive service as a result of the "program[s] specially created for the recipient" it makes available to users. As Congress made clear, transmissions that are "personalized transmissions… [are] specially created for a particular user… [and] are to be considered interactive." Conference Report on H.R. 2281, 144 Cong. Rec. at H10071-72. Pandora Free easily meets this test.

Pandora's algorithmic programming team's mission to ███████████████████████ ████████████████████████████████████████████ permeates every part of its song selection system. Pandora's algorithm ██████████████████████ ████████████████████████████████████████████████ ████████████ (*Supra* at I.D.3.) Pandora Free also enables direct user control over station programming by, for example, enabling users to add songs or artists as "seeds" or by using "modes" to "fine tune" their preferences, even to the point of limiting the station to recordings by a single artist (*See id.;* SUF no. 16-17, 24-25.) Personalized, artist-seeded music programs are a precise example that the legislative history identifies as implicating this prong of the definition of an "interactive service" 1998 WL 698645, at H10071-72 ("identify[ing] certain artists that become the basis of the personal program.")

The *LAUNCHcast* court examined this first prong of the definition of an "interactive service."[87] The *LAUNCHcast* case was filed in 2001, and concerned a service from the early days of music streaming with dramatically more primitive technology than exists today. As a result, the circuit court's analysis concerning the particular technology at issue cannot map onto the sophisticated algorithmic tools that Pandora uses today. Nonetheless, the court's analysis is instructive in distinguishing the implementation of guardrails on the service to limit the influence of individual user influence on music programming. As discussed above, Pandora eschews

---

[87] To be clear, the second prong of the definition of "interactive service" was not at issue in *LAUNCHcast*, as there was no allegation that users were able to request and hear particular songs on demand. 578 F.3d at 161. *LAUNCHcast* dealt strictly with the first prong of the definition.

27

limitations on user influence, and seeks to enhance such influence to deliver "perfect personalization."

A review of the *LAUNCHcast* analysis underscores the contrast between protections that the court observed in finding that the service at issue in that case was *not* an "interactive service" and the algorithmic process that Pandora employs in connection with its personalized stations:

- *LAUNCHcast* highlighted that 60% of a playlist's songs on the service were "selected without any consideration for the user's song, artist, or album preferences." 578 F.3d at 162. For Pandora Free, every song selection is influenced by user preference. (SUF nos. 15, 20-23.)

- *LAUNCHcast* observed that "no more than 20% of the songs the user rates" could be included in the list of potential songs for a playlist on the service. *Id.* at 163. ████ ████████████████████████████████████████████ ██████ . (SUF no. 23.)

- *LAUNCHcast* observed that if a user attempted to game the algorithm to hear a particular song, the service would penalize the user, filling 90% of the playlist with songs "for which the user has never expressed a preference," 578 F.3d at 163. Pandora uses sophisticated algorithmic analysis ███████████████████████████████ ████████████████████████████████████████████[88]

- *LAUNCHcast* observed that the algorithm's song promotion model "subject[ed] the user to many songs the user may have never heard or does not even like," 578 F.3d at 163. Pandora's algorithm seeks ███████████████████████████ ██████████████████████████████████ (SUF no. 15, 22.)

- *LAUNCHcast* found that the algorithm often picked thousands of candidate songs "randomly" and ordered songs randomly in a playlist, 578 F.3d at 158-60, 164. For Pandora's algorithmic programming, ████████████████████████████

---

[88] Serruya Report ¶ 114.

████████████████████████████████████████████████████

(SUF no. 18.)

These holdings distinguish Pandora Free from the service in *LAUNCHcast*. However, the plain language of the statute remains the touchstone for the analysis on this motion, and there can be no question that under the statutory language and the undisputed facts concerning how Pandora's personalized algorithmic programming works, Pandora Free is independently rendered an "interactive service" under this prong as well.

**D.** **Pandora's Failure to Properly Report and Pay Royalties Violates The Law**

As a Blanket Licensee, Pandora is required to submit monthly reports of usage to The MLC for all Covered Activity in which it engages, accompanied by the required royalty payments. These obligations are set forth in the Act and applicable regulations.[89] Regulations of the CRB in 37 C.F.R. Part 385 establish the "rates and terms of royalty payments" for the Blanket License.[90]

Under these regulations, the formula for calculating royalties due includes, *inter alia*, a percentage of Service Provider Revenue for each interactive service.[91] By its admitted refusal to report all Service Provider Revenue and other royalty calculation data in connection with Pandora Free, Pandora has thus underreported and underpaid the royalties due each month under the Blanket License.[92] Similarly, Pandora's refusal to report Pandora Plus using the proper rate category has directly resulted in its underpayment of the royalties due each month under the

---

[89] 17 U.S.C. § 115(c)(2)(I) ("royalty payments shall be made on or before the twentieth day of each month"), (d)(4)(A)(i) (Blanket Licensees "shall report and pay royalties to [The MLC] under the [B]lanket [L]icense on a monthly basis in accordance with clause (ii) and subsection (c)(2)(I)"); (d)(4)(ii) (reporting shall include usage data for all Covered Activity, including all digital phonorecord deliveries; 37 C.F.R. § 210.27 (A [B]lanket [L]icensee shall report and pay royalties to [The MLC] on a monthly basis in accordance with 17 U.S.C. 115(c)(2)(I), 17 U.S.C. 115(d)(4)(A), and this section.").

[90] 17 U.S.C. § 115(c)(1)(E)–(F).

[91] 37 CFR § 385.2 (definition of Service Provider Revenue), 385.21 (royalty calculation formulas).

[92] SUF nos. 4-6; Answer ¶ 45; Marshall Decl. ¶¶ 31, 34, 30 n. 27; Complaint ¶¶ 25-28; Pandora's Answer explicitly expresses its rejection of The MLC's claim that "an *entire tier* of service… must… pay royalties required of interactive services." Answer at p. 6.

Blanket License.[93]  Late fees are also statutorily prescribed where Blanket License royalties are not paid by the due date in the Act.[94]  Pandora's noncompliance under the Blanket License is a violation of the Act and applicable regulations.  *See* 17 U.S.C. 115 (including §§ 115(c)(2)(I), (d)(4)(A) and (d)(8)(B)); 37 C.F.R. Part 385 (including §§ 385.21(a), (d), Appendix A); 37 C.F.R. § 210.27).

This action is subject to a bifurcation order separating the liability phase from the damages phase, and this motion seeks summary judgment as to liability only.  Determination of the precise amount of damages owed for the underpayment of royalties (as well as late fees and other relief) that arises from Pandora's noncompliance with its reporting and payment obligations under the Blanket License is thus properly the subject of the damages phase of this action.

### E.    Pandora's Affirmative Defenses Should Be Dismissed

Pandora has admitted that it did not "identif[y] any facts in discovery to date that support" its affirmative defenses of equitable estoppel and waiver.  Accordingly, these affirmative defenses should be dismissed.  *See Resol. Tr. Corp. v. Metropole Bldg. Ltd.*, 110 F.3d 64, at *1-2 (6th Cir. 1997) (affirming summary judgment dismissing affirmative defenses where defendants "did not present a single piece of evidence" supporting their affirmative defenses); *Cruz-Cruz v. Conley-Morgan L. Grp., PLLC*, No. 5:15-CV-157-REW, 2017 WL 2112637, at *3 (E.D. Ky. May 15, 2017) (granting summary judgment dismissing affirmative defenses that defendant "conceded" were no longer applicable in light of discovery); *Logan v. Cooper Tire & Rubber Co.*, No. CIV.A. 10-03-KSF, 2011 WL 3267831, at *5 (E.D. Ky. July 29, 2011) (same).

### IV.    CONCLUSION

For the foregoing reasons, The MLC respectfully requests that the Court grant its Motion for Summary Judgment against Pandora on liability, dismiss Pandora's affirmative defenses of equitable estoppel and waiver, and grant all other relief as the Court deems just and proper.

---

[93] Marshall Decl. ¶¶ 41-44.
[94] 17 U.S.C. § 115(d)(8)(B); 37 C.F.R. § 385.3.

Dated: New York, New York
February 5, 2026

**PRYOR CASHMAN LLP**

 */s/ Benjamin K. Semel*  w/permission
Benjamin K. Semel (admitted *pro hac vice*)
M. Mona Simonian (admitted *pro hac vice*)
Joshua Weigensberg (N.Y. Bar No. 4894929)
Erik F. Bakke (admitted *pro hac vice*)
7 Times Square
New York, New York 10036
Phone: (212) 326-0181
Fax: (212) 798-6326
bsemel@pryorcashman.com
msimonian@pryorcashman.com
jweigensberg@pryorcashman.com
ebakke@pryorcashman.com


*/s/ Elizabeth O. Gonser*
Elizabeth O. Gonser (TN Bar No. 026329)
**RILEY & JACOBSON PLC**
1906 West End Ave.
Nashville, TN 37203
P: (615) 320-3738
egonser@rjfirm.com

*Attorneys For Plaintiff*
*Mechanical Licensing Collective*

31

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and exact copy of the foregoing document has been filed with the Clerk of Court using the CM/ECF system, which sent notice of such filing to the parties' counsel of record.

This 5th day of February, 2026.


_/s/ Elizabeth O. Gonser_

Elizabeth O. Gonser