# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

MECHANICAL LICENSING
COLLECTIVE,

                          Plaintiff,

v.

PANDORA MEDIA, LLC,

                          Defendant.

Civil Action No. 3:24-cv-00168

Judge Eli J. Richardson

# PANDORA MEDIA, LLC'S MEMORANDUM OF LAW IN SUPPORT OF
# ITS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

STATUTORY BACKGROUND ........................................................................................4

    A.    Sections 114 And 115 Of The Copyright Act .........................................4

    B.    The Creation Of A Private Mechanical Licensing Collective.................9

STATEMENT OF FACTS ................................................................................................10

    A.    Pandora's Service Tiers.........................................................................10

    B.    Pandora's Licensing Agreements And Participation In Section 114
             Proceedings Before The Copyright Royalty Board ...............................13

    C.    Usage Of The Disputed Features In This Case Is Minimal ..................15

ARGUMENT ....................................................................................................................16

I.      The MLC's Suit Violates The Separation Of Powers......................................17

II.     Pandora's Internet Radio Offering Satisfies All Section 114 Requirements For
        Statutory Licensing And Is Not An Interactive Service For Purposes Of Section
        115.....................................................................................................................21

    A.    Pandora's Internet Radio Offering Complies With All Of Section 114's
             Requirements For Statutory Licensing ................................................21

    B.    Pandora's Internet Radio Offering Is Noninteractive As Defined In Section
             114.......................................................................................................21

III.    Offering Free Pandora Users Limited Samples Of Pandora Premium Does Not
        Transform The Entire Free Tier Into An Interactive Service .............................23

    A.    The Undisputed Facts Establish That Premium Access Sessions Provide
             Frequency-Limited And Time-Limited Samples Of The Pandora Premium
             Experience............................................................................................24

    B.    Allowing Non-Subscribers To Access Limited Samples Of Pandora
             Premium Does Not Convert Pandora's Internet Radio Service Into An
             Interactive Service ...............................................................................27

IV.    None Of The Other Product Features Identified By The MLC Converts Pandora's
        Internet Radio Offering Into An Interactive Service ........................................30

i

  A.  Flex Skips.................................................................................30

  B.  Replays....................................................................................31

  C.  Modes Do Not Allow Free Pandora Users To Evade The SRPC..........................32

CONCLUSION.................................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                                **Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................16

*Arista Records, LLC v. Launch Media, Inc.*,
578 F.3d 148 (2d Cir. 2009) ............................................................................ *passim*

*Buckley v. Valeo*,
424 U.S. 1 (1976) ...................................................................................................18

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936) ............................................................................................3, 17

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...............................................................................................16

*DeVooght v. City of Warren, Mich.*,
157 F.4th 893 (6th Cir. 2025) ................................................................................16

*FCC v. Consumers' Research*,
606 U.S. 656 (2025) ...........................................................................................17, 18

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ...............................................................................................29

*Kennedy v. Braidwood Mgmt., Inc.*,
606 U.S. 748 (2025) ...............................................................................................19

*Lucia v. SEC*,
585 U.S. 237 (2018) ...............................................................................................20

*Oklahoma v. United States*,
163 F.4th 294 (6th Cir. 2025) ................................................................................19

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004) ...............................................................................................28

*Sunshine Anthracite Coal Co. v. Adkins*,
310 U.S. 381 (1940) ...............................................................................................17

*United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*,
41 F.3d 1032 (6th Cir. 1994) .................................................................................20

**Constitutional Provision**

U.S. Const. art. II, § 2, cl. 2 ......................................................................................19

iii

**Statutes**

17 U.S.C. § 106 ..............................................................................................................4

17 U.S.C. § 114(d)(2) .................................................................................................. *passim*

17 U.S.C. § 114(j)(7) ................................................................................................... *passim*

17 U.S.C. § 114(j)(13) ...................................................................................8, 32, 33, 34

17 U.S.C. § 115(d)(1) .....................................................................................................9

17 U.S.C. § 115(d)(3) ...........................................................................................9, 18, 20

17 U.S.C. § 115(d)(7) ...................................................................................................18

17 U.S.C. § 115(e)(10) ...................................................................................................6

17 U.S.C. § 115(e)(13) ...................................................................................................7

17 U.S.C. § 803 ............................................................................................................14

17 U.S.C. § 804 ............................................................................................................14

**Other Authorities**

Fed. R. Civ. P. 56 ........................................................................................................16

H.R. Rep. No. 104–274 (1995) .....................................................................................5

S. Rep. No. 104-128 (1995) ...........................................................................................7

H.R. Rep. No. 105–796 (1998) ..................................................................................7, 29

## INTRODUCTION

Pandora is, and for many years has been, the most popular provider of free internet radio in the United States.  For more than 20 years, it has offered its free internet radio service to consumers pursuant to a statutory license for copyrighted sound recordings under Section 114 of the Copyright Act for "noninteractive" webcasters.  It is widely accepted that noninteractive streaming does not implicate "mechanical" rights in the musical works underlying the sound recordings transmitted.  Pandora also provides subscription tiers of service that are considered "interactive" services under the Copyright Act, including an on-demand streaming service known as Pandora Premium, and it does secure mechanical rights to musical works in connection with those offerings.

The Mechanical Licensing Collective (the "MLC") is a private entity designated by Section 115 of the Copyright Act to administer and collect royalties for a different statutory license available under Section 115 for the mechanical rights to musical works that interactive music streaming services need in order to operate their services without infringing copyrights. The Copyright Act distinguishes between "interactive" streaming and "noninteractive" streaming for purposes of the licenses music services need from copyright holders and expressly recognizes that companies like Pandora, with diverse offerings that include both noninteractive and interactive components, only need mechanical rights for the interactive ones.  Pandora already pays significant royalties to the MLC for the mechanical rights it needs for its subscription services and for ad-supported samples of the Pandora Premium user experience known as "Sponsored Premium Access" or "Premium Access" sessions, which do implicate interactive streaming.  Pandora, along with the other digital music providers who pay mechanical royalties, also pays an annual administrative assessment that funds the MLC's operations.

This litigation, funded in part by Pandora's own assessments to the MLC, arises out of a gross overreach by the MLC to try to force Pandora to pay vast sums for additional mechanical rights it does not need to operate its longstanding noninteractive free radio service. Exploiting—indeed, abusing—its limited statutory role as an administrative middleman, the MLC seeks to use civil litigation to overturn two decades of industry practice and force upon Pandora a novel and incorrect interpretation of the Copyright Act that, as Pandora will show, even the MLC's own rights-owner constituents have never pressed: that the ability of Pandora users to sample Pandora Premium transforms the entirety of Pandora's ad-supported internet radio offering into an interactive service. But it is simply not the province of the MLC to opine on whether particular transmissions offered by Pandora or other digital music providers are properly characterized as interactive or noninteractive under the governing statutes, let alone to use civil litigation to try to force Pandora to change how and what it chooses to license through the MLC. While Section 115 of the Copyright Act does contain language granting the MLC certain rights of enforcement with respect to mechanical rights, the MLC does not and could not have the sweeping mandate it assumes here, including to determine what *sound recording* licenses Pandora can or cannot take under a completely different section of the Act.

The brazen nature of the MLC's efforts here cannot be overstated. Through this suit, the MLC seeks to use unchecked private litigation to force Pandora into compliance with its view of the Copyright Act—*i.e.*, to assume the role of regulatory enforcer of the Act. This claimed authority violates the Constitution's separation of powers twice over. To start, it is as clear a violation of the private nondelegation doctrine as one will find. Allowing a private, unaccountable, non-rightsholder entity like the MLC to serve as a roving enforcer of the Copyright Act, with no oversight or supervision from any entity of the federal government, is

"delegation in its most obnoxious form," and clearly unconstitutional. *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). It also violates the Constitution's Appointments Clause. Were the MLC's leadership truly vested with the authority to bring lawsuits like this for the public benefit, they would qualify as Officers of the United States exercising significant authority under the laws of the United States, and would need to be appointed consistent with the requirements of the Appointments Clause. Because they were not so appointed, they have no valid authority to maintain this lawsuit against Pandora. These clear constitutional defects in the MLC's lawsuit alone require this Court to grant summary judgment to Pandora.

Even if the MLC's unconstitutional lawsuit could proceed, its position is plainly and unmistakably wrong under the Copyright Act. The core of its claim is that because Pandora offers non-subscribers the ability to access a short and separately licensed sample session of the Pandora Premium experience after viewing video advertising, Pandora has transformed an indisputably noninteractive internet radio service that does not require mechanical rights into an interactive service that does. Resolving this claim involves a straightforward application of the Copyright Act to Pandora's ad-supported free service offering—most directly, the proper legal interpretation of the term "interactive service" under Section 114 of the Copyright Act, which in turn determines Pandora's treatment under Section 115 of the Act. That definition, as noted above, expressly permits entities like Pandora to offer interactive "components" alongside its noninteractive offering and to pay mechanical royalties only for the interactive components.

The material facts—which properly involve only the actual functionality of Pandora's ad-supported internet radio offering and how Premium Access sessions operate—are not genuinely in dispute. To the contrary, they indisputably demonstrate that Premium Access sessions are distinct, time- and frequency-limited sessions of Pandora Premium separable both factually and

legally from Pandora's free internet radio service. These sessions, which comprise a miniscule percentage of listening by free Pandora users, do not come close to transforming Pandora's internet radio service into the statutory equivalent of an on-demand streaming service like Spotify or Apple Music. The same is true of the handful of replays and additional song skips Pandora users can get after agreeing to watch a video ad, activities that, like Premium Access, comprise a negligible share of plays by non-subscribers.

Rather than grapple with the plain text of the Copyright Act, or the undisputed material facts as to how Pandora functions, the MLC will attempt to turn this case into a referendum on past statements Pandora executives have made about Pandora's service offerings. But the understanding of Pandora employees, Pandora's strategic intent, or its marketing messages to the public cannot substitute for the necessary statutory analysis required under the Copyright Act. That is for *this Court* to decide based on the undisputed material facts of how free Pandora operates today. An objective analysis of the undisputed facts makes plain that the MLC's claim fails, that Pandora has taken the licenses legally required for its offerings and paid the requisite royalties due to the MLC, and that this Court should grant summary judgment to Pandora.

## STATUTORY BACKGROUND

### A. Sections 114 And 115 Of The Copyright Act

The MLC's sole legal claim against Pandora turns on interlocking provisions of the Copyright Act that govern how different types of digital music services operate and obtain copyright licenses in the modern music industry. The Copyright Act provides certain exclusive rights to sound recording and musical composition owners, including the rights of reproduction, distribution, and public performance. *See* 17 U.S.C. § 106. Services must obtain licenses to cover rights implicated by their music uses. Some rights are subject to compulsory licenses under the Copyright Act, with fees determined and periodically adjusted by the Copyright

Royalty Board ("CRB"), while other rights are obtained directly between music users, on the one hand, and individual copyright holders (such as music publishers) or collective licensing organizations, on the other hand.

Based on the historical perception that on-demand music streaming would substitute for record sales, whereas radio-style streaming would be promotional for record sales,[1] Congress drew a line between "interactive" and "noninteractive" streaming when establishing and later amending the statutory licenses in Sections 114 and 115 of the Copyright Act (17 U.S.C. §§ 114; 115).[2]  For *non*interactive streaming services, Section 114 provides a statutory license for the public performance of sound recordings (as distinct from the underlying musical works).  *See* 17 U.S.C. § 114(d).  Under the Copyright Act and longstanding industry consensus, noninteractive webcasting does not involve the distribution of copies of tracks and therefore does not implicate distribution rights in sound recordings.  Interactive streaming services, by contrast, must obtain broader sound recording rights—reproduction and distribution as well as performance—and typically do so through direct licensing agreements with record companies.  With respect to musical works, the rights process is similarly split between noninteractive and interactive

---

[1]  *See* H.R. Rep. No. 104–274, at 14 (1995) (House Judiciary Committee Report) ("It is the intent of this legislation to provide copyright holders of sound recordings with the ability to control the distribution of their product by digital transmissions, without hampering the arrival of new technologies, and *without imposing new and unreasonable burdens on radio and television broadcasters, which often promote, and appear to pose no threat to, the distribution of sound recordings.*") (emphasis added).

[2]  *See Arista Records, LLC v. Launch Media, Inc.*, 578 F.3d 148, 161 & n.19 (2d Cir. 2009) (holding that Congress's intent in crafting the interactive service definition was to prevent a "diminution in record sales" that is created where "internet music listeners" are able to exercise "a degree of control . . . that dampens the music listeners' need to purchase music recordings" and observing that noninteractive webcasters "have been credited with becoming a massive driver in digital music sales by exposing users to new music") (internal quotations and brackets omitted).

webcasters. The former typically obtain public performance rights for musical works, not through a statutory license, but rather through direct license agreements with copyright holders or blanket licenses with performing rights organizations such as ASCAP and BMI. Interactive streaming services, which must obtain not only performance rights but also the rights of reproduction and distribution for musical works—so-called "mechanical" rights—can utilize the compulsory license available under Section 115 of the Copyright Act, which is administered by the MLC, or can enter into direct licenses with music publishers.[3]

Section 114 sets forth the specific criteria that services must satisfy to be eligible for the statutory sound recording performance license. 17 U.S.C. § 114(d)(2). The eligibility requirements for the Section 114 license specifically exclude an "interactive service," *id.* § 114(d)(2)(A)(i), which is defined as a service "that enables a member of the public to receive a transmission of a program specially created for the recipient, or on request, a transmission of a particular sound recording, whether or not as part of a program, which is selected by or on behalf of the recipient," *id.* § 114(j)(7). Importantly, the definition of "interactive service" also recognizes that a noninteractive streamer may also offer interactive streaming and makes plain that "[i]f an entity offers both interactive and noninteractive services (either concurrently or at different times), *the noninteractive component shall not be treated as part of an interactive service.*" *Id.* (emphasis added). This portion of the interactive service definition was added as part of the Digital Millennium Copyright Act of 1998. Pub. L. 105–304, 112 Stat. 2860 (1998),

---

[3] The legislation that created the MLC was careful to preserve, in Section 115, the distinction between interactive and noninteractive services found in Section 114, making clear that while interactive streaming was a form of digital phonorecord delivery implicating mechanical rights, "[a] digital phonorecord delivery does not result from a real-time, noninteractive subscription transmission of a sound recording . . . ." 17 U.S.C. § 115(e)(10).

codified at 17 U.S.C. § 114(j)(7).  The drafters of the DMCA expressly explained that this

portion of the interactive service definition:

> "make[s] clear that if a transmitting entity offers both interactive and noninteractive
> services then the noninteractive components are not to be treated as part of an
> interactive service, and thus are eligible for [Section 114] statutory licensing
> (assuming the other requirements of the statutory license are met). *For example, if
> a Web site offered certain programming that was transmitted to all listeners who
> chose to receive it at the same time and also offered certain sound recordings that
> were transmitted to particular listeners on request, the fact that the latter are
> interactive transmissions would not preclude statutory licensing of the former*."

H.R. Rep. No. 105–796, at 88 (1998 DMCA House Conference Report) (emphasis added).

This interpretation fully aligns with the original purpose of the interactive service definition,

which was first enacted as part of the Digital Performance Right in Sound Recordings Act of

1995 ("DPRSRA") to protect traditional record sales from being replaced by on-demand digital

deliveries of songs—and thus exempted such plays from the statutory license.  As the drafters of

the DPRSRA made clear, the interactive service definition was meant to apply to "digital

transmission services, such as so-called 'celestial jukebox,' 'pay-per-listen' or 'audio-on-

demand' services" that "enable a member of the public to receive, on request, a digital

transmission of the particular recording that person wants to hear."  S. Rep. 104-128, at 12

(1995) (Senate Judiciary Committee Report).  Such interactive services were not entitled to the

statutory license and instead had to seek digital performance rights directly from the copyright

owners whose sales they threatened, while radio-like noninteractive services could enjoy the

statutory license at a regulated royalty rate.

Section 115, in turn, defines its coverage by an explicit statutory cross-reference to

Section 114: streams that do *not* qualify for the Section 114(d)(2) statutory license are deemed to

be "interactive streams" under Section 115 and require mechanical licensing.  *See* 17 U.S.C.

§§ 115(e)(13) (an interactive stream is a "digital transmission of a sound recording . . . [that]

does not in itself, or as a result of a program in which it is included, qualify for statutory licensing under section 114(d)(2)"); (e)(10) (a digital phonorecord delivery requiring mechanical licensing of the musical work includes an "interactive stream" but "does not result from a real-time, noninteractive subscription transmission of a sound recording").

In addition to being "noninteractive," in order to qualify for the Section 114 statutory license (and hence be excluded from the mechanical licensing requirement of Section 115) a digital music service provider must also satisfy other requirements. For example, Section 114 licensees must observe the "sound recording performance complement" ("SRPC"), which limits the transmission during any three-hour period on a particular channel to no more than three different sound recordings from a single album or four different sound recordings by the same recording artist.[4] 17 U.S.C. § 114(j)(13). And Section 114 services may not pre-announce upcoming track titles or allow users to save tracks for offline listening. *Id.* § 114(d)(2)(C).

Thus, while this litigation was brought under Section 115, the question of whether a service like Pandora engages in "interactive streaming" under Section 115 actually turns on the definitions contained in Section 114. Put simply, the Copyright Act sets up an either/or framework under Sections 114 and 115: streaming that complies with the requirements of Section 114(d)(2) and qualifies for statutory licensing of sound recordings is not interactive under Section 115 and therefore does not require a mechanical license for musical works. However, a service's transmissions that do not comply with Section 114 are interactive streams under Section 115 and require a mechanical license. As may be evident, Sections 114 and 115 thus use the term "interactive" in slightly different ways. A service not being an "interactive

---

[4] Providing transmissions in excess of these numerical limits does not preclude eligibility for the statutory license unless the programming of the excess transmissions was "willfully intended to avoid the numerical limitations." 17 U.S.C. § 114(j)(13).

service" under the Section 114(j)(7) definition is just one requirement of qualifying for a statutory license under Section 114; however, if a particular transmission fails to qualify for Section 114 licensing for another reason (*e.g.*, because the transmission causes the service to exceed the SRPC), that turns the particular transmission into an "interactive stream" under Section 115, even if the service as a whole is not interactive under Section 114's "interactive service" definition.

**B.    The Creation Of A Private Mechanical Licensing Collective**

In 2018, Congress passed the Music Modernization Act ("MMA"), which created a new compulsory blanket license for certain uses of musical compositions and authorized the Register of Copyrights to designate a private "mechanical licensing collective" to administer the license by collecting the royalties owed by licensees and distributing those royalties to the appropriate copyright holders.  17 U.S.C. §§ 115(d)(1); (d)(3)(B); *see also* Compl. ¶¶ 2-4.  The MMA requires that the collective be a "nonprofit entity, not owned by any other entity, that is created by copyright owners to carry out responsibilities" under Section 115.  17 U.S.C. § 115(d)(3)(A)(i).  The MMA further establishes the criteria for the composition of the collective's Board of Directors, which must have 14 voting members and 3 nonvoting members, and ten of the voting members must be "representatives of music publishers" and the remaining four must be "professional songwriters."  *Id.* § 115(d)(3)(D)(i).  The private collective is funded solely by administrative assessments from digital music services, including Pandora, and has no interest in the royalties it receives, all of which must be distributed to rightsholders.  *Id.* §§ 115(d)(7); (d)(3)(G).  The MMA authorizes this private collective to "[e]ngage in legal and other efforts to enforce rights and obligations under this subsection, including by filing bankruptcy proofs of claims for amounts owed under licenses."  *Id.* § 115(d)(3)(C)(i)(VIII). Neither the Register of Copyrights nor any other government official or agency has control over

the collective's activities—including its decisions to bring litigation and on what grounds. Under the MMA, the Register's role is limited to either re-designating the existing entity that is serving as the mechanical licensing collective for another five years or designating a new entity to serve as the collective for five years. *Id.* § 115(d)(3)(B)(ii). In 2019, the Register designated Plaintiff MLC as the first mechanical licensing collective under the MMA. Compl. ¶ 4 & n.4.

## STATEMENT OF FACTS

### A.    Pandora's Service Tiers

Pandora offers users three tiers of service. *See* Pandora's Rule 56.01 Statement of Undisputed Material Facts (hereinafter "SUMF") ¶ 7. Pandora's flagship service is a free, ad-supported, noninteractive, internet radio experience that appeals to the millions of music listeners who prefer "lean back" listening rather than on-demand services like Spotify or Apple Music, who do not want to (or cannot) pay for one of Pandora's subscription services, or who want to complement on-demand streaming services offered by other providers with lean-back radio listening. *Id.* ¶ 8.

After creating an account, a free Pandora listener need only "seed" a station by typing in the name of an artist or song title. *Id.* ¶ 9. Through its proprietary machine learning models and song-selection algorithms, Pandora then selects and plays tracks for the listener ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████. *Id.* Pandora users can also select genre-based stations, such as "Classic Country" or "Workout Hits," although unlike playlists on an interactive service like Spotify, Pandora's genre stations do not identify what specific tracks will play or when. *Id.* ¶ 9; *see also* Declaration of William Burrows ("W.B.") Peale ("Peale Decl.") ¶ 7. Pandora also offers "Modes," alternate

versions of a particular station for which Pandora's song selection algorithm leans more heavily in a particular stylistic direction, for example towards more popular music ("Crowd Faves") or newer releases ("Discovery")—although the song-selection process and track list on those Modes, which differ from the default station, remain invisible to the listener. SUMF ¶ 42.

Pandora listeners can offer feedback by "thumbing up" or "thumbing down" played songs. *Id.* ¶ 10. Pandora's ability to incorporate user feedback makes Pandora a powerful engine for music discovery by exposing listeners to music and artists that they may not know but will enjoy. Song selection for stations, however, is always driven by Pandora's proprietary song-selection algorithms, which are built from and rely on billions of data points Pandora has collected from its users over the years, eliminating the ability of any particular user to control or predict what song will play next. *Id.* ¶ 9. Pandora does not allow free Pandora users to replay a track from the station unless the user agrees to pause their session to watch a video advertisement, during which time the user cannot minimize or navigate away from the Pandora app or website. *Id.* ¶¶ 33-34. If a user attempts to replay more than three songs, the user must watch another video advertisement. *Id.* ¶ 35. Replays are used incredibly infrequently and account for approximately ▮▮▮ of total plays on free Pandora. *Id.* ¶ 37. Pandora also limits the number of times a free Pandora user can skip ahead to another song to six per hour, but users who hit the six-skip limit are offered the opportunity to watch a video advertisement to unlock a few additional skips. *Id.* ¶¶ 29-30. This feature, referred to as "Flex Skips," is also infrequently used and extra skips account for only ▮▮▮ of total plays on free Pandora. *Id.* ¶ 32.

Pandora Plus is the ad-free, subscription version of free Pandora and remains a fundamentally "lean-back" listening experience like the free service. *Id.* ¶ 11. Users cannot, for example, play songs on demand or listen to entire albums. *Id.* But unlike free Pandora, Pandora

Plus offers certain additional features in addition to ad-free listening, including limited caching of stations on user devices for offline listening (*e.g.*, when on a plane) and unlimited skips and replays without any ad-viewing requirement. *Id.* Pandora Premium is the company's premium subscription service—an interactive, on-demand subscription offering that, like Spotify and Apple Music, allows subscribers to play songs and albums on-demand, in whatever order they want to hear them and as many times as they want; to create and listen to playlists; and to download and save songs to the user's device. *Id.* ¶ 12. Pandora pays the MLC royalties under Section 115 for all streams that occur on the Pandora Plus and Pandora Premium service offerings. *See* Answer, ECF No. 28, at 7.

In order to expose free Pandora users and Pandora Plus subscribers to the benefits of a subscription to Pandora Premium, Pandora offers Premium Access sessions, which lie at the heart of this dispute. In exchange for engaging with a video advertisement, and subject to usage caps, free Pandora and Pandora Plus users who do not yet subscribe to Pandora Premium can access a 30-minute session of Pandora Premium. *Id.* ¶ 13. As discussed in detail below, after watching a video advertisement to start a Premium Access session for the first time, users are informed that they are entering Pandora Premium with a message stating "Your complimentary Pandora Premium session starts now." *Id.* ¶ 19. The user's virtual interface changes in multiple ways to reflect that the user is accessing the Pandora Premium service, rather than remaining on the radio tier or on Pandora Plus. *Id.* ¶ 20. And Pandora treats the user in the Premium Access session, as a technical matter, as a Pandora Premium subscriber and provides them the identical functionality to a Pandora Premium subscriber, with the sole exception that a Premium Access user cannot download songs for offline listening. *Id.* ¶ 21. Premium Access sessions automatically end after 30 minutes. *Id.* ¶ 22. On the mobile version of Pandora, the user is then

automatically returned to the user's most listened to Pandora radio station and shown a banner stating "Your Pandora Premium session has ended. Want more?" together with an option to start a longer free trial of Pandora Premium. *Id.* ¶ 23. On the web version, the user will hear an audio message stating "Your Pandora Premium session has ended, but all your playlists, songs, and albums will be waiting for you when you return." *Id.* Because they are sessions of Pandora Premium, Pandora pays the MLC royalties under Section 115 for all streams that occur during Premium Access sessions. *Id.* ¶ 27.

**B.** **Pandora's Licensing Agreements And Participation In Section 114 Proceedings Before The Copyright Royalty Board**

Pandora relies on a combination of private license agreements with individual record companies and music publishers, blanket licenses with collective licensing organizations such as ASCAP or BMI that license music collections on behalf of many rightsholders, and statutory licenses available under the Copyright Act. Declaration of Craig McFadden ("McFadden Decl.") ¶ 2. Prior to 2016, with very limited exceptions, Pandora relied solely on the Section 114 statutory license to cover its public performances of sound recordings, and on licenses from performing rights organizations to cover its public performances of musical works. *Id.* ¶ 3. With the introduction of Pandora Premium, Pandora needed additional reproduction and distribution rights from both record companies and music publishers and negotiated new private licenses covering ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ █ ████████████

---

[5] The MLC is not challenging the validity of those direct licenses nor claiming that Pandora owes fees to the MLC in connection with any directly licensed transmissions.

With respect to sound recordings, Pandora's private license agreements cover many of the recordings performed across all of its various offerings. *Id.* ¶ 4. For those sound recordings not covered by Pandora's direct licenses, however, Pandora continues to utilize the Section 114 statutory license and pays royalties for statutorily-licensed plays through SoundExchange, which administers the Section 114 statutory license on behalf of record companies and recording artists. *Id.* In connection with Pandora's longstanding use of the Section 114 statutory license, Pandora participated in each of the *Web IV, Web V,* and *Web VI* rate setting proceedings before the Copyright Royalty Board, which established the governing royalty rates for noninteractive streaming. *Id.*

In order to participate in such proceedings, a digital music service must be one that utilizes, or can utilize, the Section 114 statutory license. *See* 17 U.S.C. §§ 803(b)(2); 804(b)(3). And if they are not, the counterparties on the other side of such proceedings—typically SoundExchange and the major record companies—can and frequently do move to exclude them. But neither SoundExchange nor any other rightsowner-side participant has *ever*—even in the face of testimony from Pandora witnesses about Pandora's introduction of Premium Access sessions to free Pandora users[6]—moved to exclude Pandora on the ground that free Pandora is an interactive service and thus ineligible for the Section 114 statutory license. That includes both the *Web V* and *Web VI* proceedings, the latter of which occurred entirely after the commencement of this lawsuit and went to trial in May 2025.[7]

---

[6] *See* Sirius XM Radio LLC and Pandora Media, LLC's Second Corrected Proposed Findings of Fact and Conclusions of Law, *Web VI*, Docket No. 23-CRB-0012-WR, Unique Document No. 58670, at 11–12 (explaining that Pandora offers "Sponsored Premium Access sessions to Pandora users who do not yet subscribe to Pandora Premium").

[7] *See* 89 Fed. Reg. 812 (Jan. 5, 2024) (announcing the commencement of the *Web VI* proceeding).

Pandora's private license agreements with music publishers, including licenses with each of the major U.S. music publishing companies (UMPG, Warner-Chappell, and Sony Music Publishing) and numerous smaller publishing companies, reveal ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

## C.     Usage Of The Disputed Features In This Case Is Minimal

It is undisputed that the features the MLC claims turn the entirety of free Pandora into an interactive service comprise only a tiny sliver of usage by free Pandora users.  Between January 2021 and August 2025, plays during Premium Access sessions (whether on-demand or radio) accounted for, on average, only ████ of monthly plays by free Pandora users, and, on-demand plays and replays specifically comprised only ████ of total plays by free Pandora listeners.  *Id.* ¶ 26.  In other words, nearly ████ of total track plays on free Pandora occur outside of Premium Access sessions, and ████ of plays are *not* on-demand plays or replays.  The same is true of the other disputed features.  Transmissions resulting from Flex Skips account for ████

██████ of total plays on free Pandora, and ████████████ of free Pandora users do not use the Flex Skips feature at all in a given month. *Id.* ¶ 32. Replays alone are used even less, accounting for an ██████████████ of total plays on free Pandora—and ████ of free Pandora users do not engage with replays *at all* during a given month. *Id.* ¶ 37. With respect to Modes, ██████ ████ of free Pandora users do not use a single Mode in a given month, and ████████████ of free Pandora users use two or more Modes on the same day during an average month. *Id.* ¶ 50.

## ARGUMENT

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The mere existence of *some* alleged factual dispute between the parties isn't enough." *DeVooght v. City of Warren, Mich.*, 157 F.4th 893, 899 (6th Cir. 2025) (internal quotations and citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

As a threshold matter, this lawsuit cannot proceed because it violates two aspects of the Constitution's separation of powers. And even if this suit could proceed, the MLC's legal claim is meritless. Pandora's accompanying Rule 56.01 Statement makes plain that all of the material facts that are relevant to the legal issue in this litigation—facts concerning how Pandora operates its free internet radio offering and how users interact with Pandora Premium via Premium Access sessions—are not genuinely in dispute and entitle Pandora to summary judgment.

Free Pandora is a noninteractive service that qualifies for statutory licensing under Section 114. Premium Access sessions, as their name suggests, are merely limited windows of access to Pandora Premium, and it is only within those sessions, for which Pandora already pays the MLC royalties under Section 115, that non-subscribers are able to experience on-demand

listening.  The Copyright Act expressly allows music service providers to offer interactive

"components" like Premium Access sessions along with noninteractive streaming without

converting the noninteractive components into an interactive service.  The same is true of various

other features accessible to free Pandora users such as Flex Skips and Replays, which constitute

a vanishingly small share of plays on Pandora.  The law as applied to the undisputed facts make

clear that none of these ancillary features are interactive on their own, and that even if they were,

they constitute separable interactive "components" under Section 114 and do not convert the

entire free tier of Pandora into an interactive service.  Accordingly, Pandora is not required to

obtain mechanical licenses for free Pandora or make any additional royalty payments to the MLC

under such licenses, and Pandora is entitled to summary judgment.

## I.     THE MLC'S SUIT VIOLATES THE SEPARATION OF POWERS

At the outset, this Court must grant summary judgment to Pandora because the MLC

cannot constitutionally bring this type of lawsuit.  The MLC is not itself a rightsholder, and it

does not sue to recover royalties for itself.  Instead, it purports to act as a public regulator,

claiming unsupervised litigation authority to force Pandora into compliance with federal law for

the benefit of third parties.  But that is the classic role of the federal Government, not of a private

party.  The MLC's attempt to exercise the role of copyright law enforcer runs headlong into

bedrock constitutional doctrines that ensure that such executive power may only be exercised by

the Executive Branch.

As the Supreme Court has explained for decades, delegation by Congress of enforcement

authority to a private actor is "delegation in its most obnoxious form" because "it is not even

delegation to an official or an official body, presumptively disinterested, but to private persons

whose interests may be and often are adverse to the interests of others." *Carter Coal*, 298 U.S.

210–11.  Accordingly, a statute "violates the private nondelegation doctrine when it allows non-

governmental entities to govern." *FCC v. Consumers' Research*, 606 U.S. 656, 697 (2025). By contrast, where a private entity "function[s] subordinately to" a governmental agency and is subject to its "authority and surveillance," there is no impermissible delegation. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940). What is relevant is whether the "agency . . . retains decision-making power," and merely "enlist[s] private parties to give it recommendations." *Consumers' Research*, 606 U.S. at 692.

Here, the MLC purports to bring a damages action against Pandora not to recover its *own* damages, but instead to sanction Pandora for what the MLC views (incorrectly) as non-compliance with the Copyright Act. Indeed, the MLC has *no* interest in this litigation. Because the MLC is funded by administrative assessments from statutory licensees including Pandora itself, not by royalties, it won't keep a penny if it prevails in this litigation. *See* 17 U.S.C. § 115(d)(7). Yet the MLC assumes in this litigation the unfettered authority to bring suit to vindicate the interests of third parties in Pandora's licensing arrangements under various provisions of the Copyright Act—including, remarkably, Pandora's eligibility for the Section 114 statutory license that is administered by an entirely separate collective. To repeat, the MLC's claimed authority here is essentially unlimited: no government body constrains the MLC's decision as to whether to sue, whom to sue, and on what grounds. Thus, no federal agency exercises even a modicum of "authority and surveillance" over the MLC's litigation decisions, nor does any agency "retain[] decision-making power" to constrain the MLC's ability to bring suit. *Consumers' Research*, 606 U.S. at 692. And there is no statutory standard that limits the MLC's discretion in pursuing litigation to enforce its preferred, though misguided, view of the relevant provisions of the Copyright Act. *See* 17 U.S.C. § 115(d)(3)(C)(i)(VIII).

A mandate as broad as the one the MLC claims to possess here is unconstitutional. As the Supreme Court has long recognized, "conducting civil litigation in the courts of the United States for vindicating public rights" is a paradigmatically executive function that cannot be delegated to private parties. *Buckley v. Valeo*, 424 U.S. 1, 140 (1976). Such a lawsuit "is the ultimate remedy for a breach of the law, and it is to the President that the Constitution entrusts [this] responsibility." *Id.* at 138. Unsurprisingly, then, the Sixth Circuit has held that it would violate the private nondelegation doctrine if private actors could bring civil suits on behalf of the public, as the MLC does here with respect to third-party copyright rights. As the court explained in a recent decision affirming the constitutionality of the Horseracing Authority (a private corporation charged with enforcing the Horseracing Integrity and Safety Act), such actions are permissible *only* if "the private entity remains subject to the [government] agency's pervasive surveillance and authority" when bringing suit. *Oklahoma v. United States*, 163 F.4th 294, 314 (6th Cir. 2025) (internal quotations and citation omitted). The court declined to invalidate the Horseracing Authority because the Authority had "*never* filed a civil enforcement action," and thus any challenge to its litigation authority was likely unripe. *Id.* This case is as ripe as can be: the MLC is currently suing Pandora to enforce its aggressive and unsupported view of the statute for the sole benefit of third parties, without any accountability or oversight by any portion of the federal Government. That cannot be squared with the Constitution.

The MLC's assertion of litigation authority also fails under a second, independent constitutional doctrine. The MLC's suit cannot proceed because its leadership was not appointed consistent with the Appointments Clause of the Constitution, which requires that all "Officers of the United States" be appointed either by the President, by the Courts of Law, or by the Heads of Departments. U.S. Const. art. II, § 2, cl. 2. This is "among the significant structural safeguards

of the constitutional scheme," because it "ensures that the President or his subordinate Heads of Departments play a central role in selecting the officers within the Executive Branch who will assist in exercising the 'executive Power.'" *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 760 (2025) (citations omitted).

The MLC is not led by individuals who have been appointed by the President, by Courts of Law, or by the Head of any Department, nor is its leadership subject to removal by the President or by any subordinate Executive official. Instead, it is a private entity, accountable to no individuals elected by the American public. It can appoint whomever it likes to be a voting member of its board, as long as they are representatives of music publishers or songwriters. 17 U.S.C. § 115(d)(3)(D)(i). As the MLC sees it, its leadership has free reign to decide whether and when to bring civil actions to enforce § 115 for the public benefit. If so, then these individuals are Officers of the United States because they occupy "a 'continuing' position established by law" and exercise "significant authority pursuant to the laws of the United States." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (citation omitted).

Again, precedent from the Sixth Circuit confirms the problem and mandates the solution. In the context of *qui tam* actions brought by relators under the False Claims Act—individuals who bring suit to obtain damages awards from those who defraud the federal Government—the Sixth Circuit has held that relators are not officers because the federal Government controls the course of litigation. As the court has explained, relators are "not vested with governmental power" because "the government may take complete control of the case if it wishes." *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994). The government, of course, has no authority to take over this case or otherwise supervise actions brought by the MLC. As a result, the MLC's lawsuit may proceed no further.

## II. PANDORA'S INTERNET RADIO OFFERING SATISFIES ALL SECTION 114 REQUIREMENTS FOR STATUTORY LICENSING AND IS NOT AN INTERACTIVE SERVICE FOR PURPOSES OF SECTION 115

### A. Pandora's Internet Radio Offering Complies With All Of Section 114's Requirements For Statutory Licensing

Since its inception, Pandora has fully complied with all of the Section 114(d)(2) requirements for statutory licensing for its internet radio offering. *See* 17 U.S.C. §§ 114(d)(2)(C)(i)–(ix). To start, it is undisputed that Pandora radio stations contain a variety of specific programming rules to ensure that stations do not exceed the SRPC: Pandora stations are programmed to follow certain technical rules that ensure users are not able to hear more than three different songs from the same record or four different songs from the same recording artist. SUMF ¶ 38; *see* 17 U.S.C. §§ 114(d)(2)(C)(i); (j)(13).[8] And as discussed further below, the MLC has not adduced any evidence of a single Pandora transmission that exceeded the SRPC in a way that would take it outside the coverage of the statutory license. *See* 17 U.S.C. § 114(d)(2)(C)(i) (applying the SRPC at the level of a particular transmission). Nor has the MLC argued or offered any evidence that Pandora failed to satisfy any of the other conditions in Section 114(d)(2)(C) (*e.g.*, the prohibitions on pre-announcing upcoming track titles or allowing users to save copies of tracks for offline listening).

### B. Pandora's Internet Radio Offering Is Noninteractive As Defined In Section 114

The undisputed material facts also establish that Pandora is not, as the MLC contends, an "interactive service" as that term is defined under Section 114. Outside of Premium Access

---

[8] The MLC's sole argument with respect to Pandora's compliance with any of these Section 114 requirements involves a narrow use case of the Modes feature (rather than free Pandora stations themselves). Pandora addresses the MLC's Modes argument in detail below. *See infra* Section IV.C.

sessions, for which Pandora already pays royalties to the MLC under Section 115, it is undisputed that free Pandora users do not have the ability to select a particular sound recording of their choosing. The MLC's argument is instead that the availability of on-demand listening *within* Premium Access sessions infects the remainder of free Pandora listening occurring *outside* those sessions. Pandora addresses the many flaws of that argument in Section III below.

Nor are Pandora stations "specially created" for users as that phrase has been interpreted by squarely applicable and long-accepted precedent addressing personalized streaming services like Pandora. In the Second Circuit's landmark decision in *Arista Records, LLC v. Launch Media, Inc.*, the court issued a definitive ruling on the meaning and application of the Section 114 "interactive service" definition. 578 F.3d 148 (2d Cir. 2009). In that case, a group of sound recording copyright owners sued Yahoo! over its webcasting service LAUNCHcast, which enabled users "to create stations that play[ed] songs . . . similar to a particular artist or song the user selects" and reflecting individual feedback from the users. *Id.* at 150, 157–58 (internal quotations omitted). The copyright owners alleged that LAUNCHcast's personalized stations were transmissions of programs "specially created" for the recipient and thus part of an "interactive service" under Section 114, but the district court disagreed. *Id.* at 151.

On appeal, the Second Circuit examined the context and legislative history of the interactive service definition. *Id.* at 152–56. The court carefully traced the history of the definition from its inclusion in the DPRSRA to its amendment in the DMCA, where it was expanded to include the "specially created" prong. *Id.* at 154–55. The inclusion of that provision, the *Launch Media* court explained, revealed Congress's intent to define interactive services as those that, because they gave users the opportunity to select songs of their choosing (or control what specific songs would play with a very high level of predictability), would

*substitute* for other forms of music purchases (at the time, CD sales). *Id.* at 161. The court thus determined that the "specially created" prong of the "interactive service" definition was best interpreted to apply to a service not merely that provides personalized transmissions, but only those services that allow the user to have "a degree of predictability—based on choices made by the user—that approximates the predictability the music listener seeks when purchasing music." *Id.* As applied to LAUNCHcast, the court determined that the service did "not provide sufficient control to users such that playlists are so predictable that users will choose to listen to the webcast in lieu of purchasing music, thereby—in the aggregate—diminishing record sales." *Id.* at 162. As a result, even though stations were "uniquely created for each user," LAUNCHcast did "not provide a service so specially created for the user that the user cease[d] to purchase music." *Id.* at 164.

Since *Launch Media*, Pandora's internet radio offering has been viewed as the paradigmatic example of a noninteractive service—as witnessed by Pandora's regular and unchallenged participation in Section 114 CRB proceedings. As with LAUNCHcast, the rules and algorithms that undergird free Pandora ensure that even though free Pandora provides users with music reflecting their general music tastes and preferences (as informed by their prior listening activity), Pandora users have no ability to predict, let alone control, which song from among millions of possibilities will play next. *See id.* at 162–63. Under *Launch Media* and longstanding industry practice, free Pandora is a noninteractive service under Section 114.

## III. OFFERING FREE PANDORA USERS LIMITED SAMPLES OF PANDORA PREMIUM DOES NOT TRANSFORM THE ENTIRE FREE TIER INTO AN INTERACTIVE SERVICE

Given that the functionality of Pandora's internet radio offering does not enable users to choose songs on request, the MLC alleges that the availability of Premium Access sessions is sufficient to convert the entirety of free Pandora into an interactive service because users can

select songs on-demand during those sessions. *See* Compl. ¶¶ 31, 32, 33. That argument fails for multiple reasons. The undisputed facts establish that Premium Access sessions provide both free Pandora and Pandora Plus users with limited periods of access to Pandora Premium and are not an integrated part of Pandora's internet radio offering. And even assuming Premium Access sessions were viewed as somehow part of the free Pandora service (notwithstanding their identical availability to Pandora Plus users), they are nonetheless an interactive *component* that can be separated from the broader free tier under the plain language of the Copyright Act. The MLC's contrary arguments regarding Premium Access sessions are in direct conflict with the plain text, context, and legislative history surrounding the Copyright Act and should be rejected by this Court.

> **A.** **The Undisputed Facts Establish That Premium Access Sessions Provide Frequency-Limited And Time-Limited Samples Of The Pandora Premium Experience**

Pandora users have the ability to unlock frequency-limited and time-limited access to Pandora Premium through Premium Access sessions. Premium Access sessions allow free Pandora users or Pandora Plus subscribers to sample Pandora Premium for 30 minutes after first agreeing to watch a video advertisement. Since the launch of Premium Access sessions, Pandora has secured the necessary mechanical rights for interactive streaming within those sessions and paid the required royalties to publishers and the MLC.[9] The MLC's central allegation that Premium Access sessions do not involve the user accessing a limited session of Pandora Premium, but rather are an inseparable feature of free Pandora itself, *see* Compl. ¶¶ 31, 34,

---

[9] As part of its reporting to the MLC, Pandora provides a specific accounting of all Premium Access activity to the MLC and pays the royalty rates established under Section 115 for Premium Access activity. SUMF ¶ 27.

cannot be squared with the undisputed material facts about how Premium Access sessions function:

- Users of free Pandora, when listening to a Pandora radio station (the lone form of music listening offered to free-tier users), cannot select tracks for listening on-demand; Pandora's radio algorithms select which tracks are streamed for the user. SUMF ¶ 10.

- If free Pandora listeners attempt to stream a particular song or album, they cannot do so within the free radio service; they are instead offered the opportunity to watch a 15-second video advertisement in order to access 30 minutes of Pandora Premium through what is unmistakably identified as a Premium Access session. *Id.* ¶¶ 15-16.

- Before accessing a Premium Access session, a pop-up or "coachmark" will appear providing the user with the following options: (1) commence a Premium Access session for a "limited time" by watching an ad, (2) opt out, or (3) upgrade to a Pandora Premium subscription. *Id.* ¶ 16.

- After watching a video advertisement to start a Premium Access session (during which users cannot leave the app, jump ahead, or do anything other than watch the ad), users are informed on their first use of the Premium Access, and periodically thereafter, that they are entering Pandora Premium with a message stating "Your complimentary Pandora Premium session starts now." *Id.* ¶ 19.

- At that point, the user's virtual interface changes to reflect that the user is accessing the Pandora Premium service. *Id.* ¶ 20. The background changes dynamically to display the colors of the album art for the current track that is playing. *Id.* The user's "My Collection" page will display a broader range of content than when the user is in free Pandora, including

the user's playlists, albums, and tracks listened to in prior Premium Access sessions, and the structure of the "now playing" page changes as well.  *Id.*

- A user in a Premium Access session has the identical functionality to a Pandora Premium subscriber, with the sole exception that a Premium Access user cannot download songs for later offline listening, which would be inconsistent with the time-limited nature of the Premium session.  *Id.* ¶ 14.

- Premium Access sessions automatically end after 30 minutes.  On the mobile app version, the same audio chime plays, and the user is automatically returned to the user's most listened to Pandora radio station, with the now-playing page displaying a visual banner stating "Your Pandora Premium session has ended. Want more?" together with an option to start a longer free trial of Pandora Premium.  On the web version of Pandora, the user hears an audio message stating "Your Pandora Premium session has ended, but all your playlists, songs, and albums will be waiting for you when you return."[10]  The web user is similarly returned to the free internet radio service and the user's most listened-to station will begin to play.  *Id.* ¶ 23.

In addition to a user's experience during a Premium Access session, the technical operation of the Pandora system likewise treats Premium Access users as engaging in a session of Pandora Premium:

- The user entering Premium Access is re-authenticated and logged in with a "PandoraPremium" configuration—the same as a Pandora Premium subscriber—and a duration of 1800 seconds (30 minutes) using the same API call that is used when a Pandora Premium subscriber logs in.  *Id.* ¶ 21.

---

[10]  The referenced audio message plays at the end of a user's first Premium Access session and periodically thereafter, although the visual message indicating the user's Pandora Premium Access Session has ended is displayed each time.

- This Premium subscription state, in turn, causes the user to see the unique collections and now playing screens made available to Pandora Premium subscribers and to receive the Pandora Premium feature set more generally. *Id.*

- The HTML code the user's browser receives from Pandora's servers (which in turn impacts the user's visual interface) reflects the change in state, being flipped from "Nav—Standard" to "Nav—Premium," and the value of the "is_on_demand_listener" field is likewise changed from false to true—again, comparable to what a Premium Subscriber receives. *Id.*

- This is all buttressed by the Product Requirements Document for Premium Access (a document the MLC's own expert relies on), which explains that the Premium Access user encounters a "state change from T1/T2 to T3," "enters" Pandora Premium during Premium Access sessions, receives a reward session that is "identical to the standard Pandora Premium experience" (with the lone exception of limited downloads), and then "returns to" and "re-enters" the free tier after the session. *Id.* ¶ 20.

   **B.     Allowing Non-Subscribers To Access Limited Samples Of Pandora Premium Does Not Convert Pandora's Internet Radio Service Into An Interactive Service**

Given these undisputed material facts, the MLC's claim that the entirety of free Pandora becomes interactive because Pandora offers limited windows of access to Pandora Premium fails as a matter of law. Section 114's plain text squarely addresses this scenario: where an entity

offers both interactive and noninteractive services—"either concurrently or at different times"—"the noninteractive component shall not be treated as part of an interactive service." 17 U.S.C. § 114(j)(7). That is the beginning and the end of the inquiry.

Premium Access sessions are precisely the kind of separable interactive "component" Congress contemplated. They occur only during defined, 30-minute windows triggered by a user's decision to watch an ad, and users receive clear notices when the Premium Access session begins and ends. SUMF ¶¶ 14, 19-20, 23. During that window, Pandora's systems treat the user as if they have left the free tier and are now a Pandora Premium subscriber. *Id.* ¶ 21. And consistent with that separability, it is undisputed that Pandora has paid the MLC mechanical royalties for Premium Access sessions as a separate interactive offering—confirming that these sessions are distinct from Pandora's noninteractive radio service.

The MLC may respond that Section 114(j)(7)'s "component" sentence applies only where interactive and noninteractive offerings are separate business lines (*e.g.*, where a corporation operates a noninteractive broadcast radio station and also operates a separate interactive online streaming platform). But the last line of the statute says that a noninteractive "component" is separable, not just a "service," and courts must presume that when a statute uses two different terms, Congress must have intended the words to have two different meanings. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n. 9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.") (citation omitted). Reading "component" to mean only a wholly separate "service" would rewrite the text and drain the word "component" of independent effect.

This understanding is further confirmed by the legislative history. As discussed above, when discussing the import of the "component" sentence in the interactive service definition, the

drafters expressly stated that "if a Web site offered certain programming that was transmitted to all listeners who chose to receive it at the same time *and also offered certain sound recordings that were transmitted to particular listeners on request,* the fact that the latter are interactive transmissions would not preclude statutory licensing of the former." H.R. Rep. No. 105–796, at 88 (1998 DMCA House Conference Report) (emphasis added); *see also supra* pp. 6–8 . This makes clear that the mere fact that free Pandora (the "Web site" in this example) offers free Pandora listeners the opportunity to access a separate service "on request" (via Premium Access sessions) does not "preclude" statutory licensing of its other, *non*interactive components (the free Pandora radio service) under Section 114 nor, therefore, transform the entire free tier into an interactive service for purposes of Section 115.

Nor does the mere availability of Premium Access sessions mean free Pandora "enables" users to "request . . . a transmission of a particular sound recording." 17 U.S.C. § 114(j)(7). Any on-demand requesting occurs within Pandora Premium during the Premium Access session. In other words, it is Pandora Premium that "enables" listening on request, not the internet radio offering. This point is underscored by the fact that Premium Access sessions are available the same way to Pandora Plus users, showing that a Premium Access session is not an integrated feature of free Pandora, but a temporary transition into Pandora Premium equally available free Pandora and Pandora Plus users. SUMF ¶¶ 13-14.

More broadly, the MLC's sweeping interpretation of the term "enable" in the interactive service definition would convert any noninteractive service into an interactive one so long as it provided an option for a user to sample or subscribe to a separate interactive service. This would include even a simple link to that separate service. The MLC's reading would effectively erase Section 114(j)(7)'s express instruction that a provider may offer interactive and noninteractive

components without converting the noninteractive component into an interactive service. Courts do not construe statutes to create that kind of internal conflict or to render language superfluous. They should instead interpret statutes into "a symmetrical and coherent regulatory scheme," by fitting "all parts into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotations and citation omitted). Accordingly, this Court should apply Section 114(j)(7) as written and reject the MLC's effort to treat Pandora's noninteractive radio service as interactive based solely on separate, time-limited Premium Access sessions.

## IV. NONE OF THE OTHER PRODUCT FEATURES IDENTIFIED BY THE MLC CONVERTS PANDORA'S INTERNET RADIO OFFERING INTO AN INTERACTIVE SERVICE

The MLC also suggests that certain other ancillary features of free Pandora render the entire free Pandora service "interactive."[11] Those arguments fail as a matter of law.

### A. Flex Skips

Pandora limits the number of times a free Pandora user can skip ahead to another song to six per hour. SUMF ¶ 29. If a user reaches that limit, Pandora may offer the user an option to watch a video advertisement to unlock three additional Flex Skips. *Id.* ¶ 30. Flex Skips do not make free Pandora an "interactive service," and the MLC has no credible explanation for why they would.[12] Section 114's definition of interactive service turns on whether the service enables a user to request particular sound recordings; it does not mention skips or impose any numerical

---

[11] The MLC's Complaint does not allege that these features are the reason why free Pandora is an interactive service under Section 114. However, the MLC's experts have relied on these features as a reason why free Pandora is an interactive service. For the sake of completeness, Pandora explains why these arguments are meritless.

[12] At most, one of the MLC's experts has claimed that users may be able to use skips to control playback, or interact with, the free Pandora service. But of course this claim falls well short of establishing that skips enable free Pandora users to request or receive particular sound recordings of their own choosing.

limits on them. *See* 17 U.S.C. § 114(j)(7). A skip does not allow the user to select the next track. It merely ends the transmission of a particular song, with the selection of the next track determined by Pandora's algorithms, not the user. SUMF ¶ 28. Consistent with that understanding, *Launch Media* held that "the ability *not* to listen to a particular song is certainly not a violation of a copyright holder's right to be compensated when the sound recording is played." 578 F.3d at 164 (emphasis added). Because Flex Skips merely allow a listener to end a song sooner—without enabling song-by-song selection—they cannot convert Pandora's noninteractive radio service into an interactive one.

### B. Replays

Pandora allows free Pandora users to watch a video advertisement to unlock the ability to restart the track currently playing or to replay one of the tracks Pandora previously played on that station ("Replays"). SUMF ¶ 33. The MLC alleges that this constitutes "on-demand functionality" that renders free Pandora an interactive service under Section 114. *See* Compl. ¶ 36. That is incorrect. A replay does not allow a user to "request" a particular sound recording "selected by" *the recipient*, § 114(j)(7), it allows only the repetition of a track selected by *Pandora* and transmitted to the user. Free-tier users cannot search for, choose, or predict what songs will play next on a station—Pandora's programming rules and algorithms control song selection. SUMF ¶¶ 10, 36; *see supra* pp. 11. Replaying a recently transmitted track—one Pandora "selected" for the user—does not allow the user to "request" a particular sound recording within the meaning of Section 114.

As discussed above, the legislative history of Section 114 and the interactive service definition in particular confirm that personalized song choice is what the interactive service definition was intended to forbid. As noted, the drafters of the definition were keenly focused on the "celestial jukebox" that might replace CD sales if users could request any song of their

choosing. *See supra* pp. 6–8. Pandora's replay feature is no "celestial jukebox"; it merely allows the user to listen again to a song recently selected for the user by Pandora according to Pandora's noninteractive algorithms. The trivial usage of replays drives home this reality: replays constitute an inconsequential ▮▮▮▮ of plays by free Pandora users, making it abundantly clear that no one is using the feature as any kind of jukebox to select songs (or indeed really using it all), *see* SUMF ¶ 37, yet the MLC contends that this minimally used feature is sufficient to convert the entire free tier into an interactive service.

Just as important, and as highlighted by the usage statistics, even if replays on their own were considered interactive plays, they too (like Premium Access sessions) are plainly a separate interactive "component" of Pandora's free offering that would need to be treated separately from Pandora's noninteractive radio streaming service available to free tier users. *See supra* pp. 15–16. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As a result, only the exceedingly small number of transmissions that involve the use of a replay, not the entire free tier, would plausibly be considered an "interactive" component subject to a mechanical license payment to the MLC.

### C. Modes Do Not Allow Free Pandora Users To Evade The SRPC

Finally, Modes is a feature on free Pandora that presents users with alternative versions of an artist-seeded station. SUMF ¶ 42. For example, a user can listen to her "default" Sabrina Carpenter station or can choose from among various alternative Sabrina Carpenter stations marketed by Pandora as "Modes" and offering a different stylistic slant from the default station: for example, "Crowd Faves," "Discovery," and "Deep Cuts." Peale Decl. ¶ 23. The MLC does not appear to be challenging Modes as a feature that makes free Pandora an "interactive service" under Section 114, but instead has suggested that if a user moves *between* Modes, the user could

theoretically hear an artist in excess of the SRPC, thus taking the combined transmissions outside of the Section 114 statutory license. *See* 17 U.S.C. §§ 114(d)(2)(C)(i); (j)(13). This suggestion—which relies on the assumption that all Modes for a given seed should be considered a single "channel" rather than separate channels under the SRPC—fails for several reasons.

*First*, the undisputed facts make clear that Modes, even if tied to the same artist, are each programmed as separate stations according to Pandora's default algorithmic station-creation protocols. ████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████. Taken together, these undisputed facts establish that Modes do not operate as subsets of a single artist station as the MLC contends, but rather as separate channels.

*Second*, under Section 114, establishing a violation of the SRPC requires the MLC to make an additional showing of willfulness. The SRPC specifically provides that "the transmission of selections in excess of the numerical limits . . . shall nonetheless qualify as a sound recording performance complement if the programming of the multiple phonorecords *was not willfully intended to avoid the numerical limitations prescribed in such clauses*." 17 U.S.C. § 114(j)(13) (emphasis added). Even if separate Modes were artificially added together into a single channel despite the undisputed evidence that they are separate channels for purposes of

Section 114, and even if some user figured out that she could potentially evade the SRPC by jumping back and forth between Modes, the MLC's argument would still fail because there is no evidence whatsoever that Pandora is providing Modes transmissions in a willful attempt to avoid the numerical limitations of the SRPC. As discussed above, the undisputed facts establish that Pandora has programmed into its stations specific rules to ensure that free Pandora users cannot evade the SRPC's limits on that station—and there is not even a whisper of evidence that Pandora programmed a workaround with the intent of allowing users to evade those limits.

*Third*, there is not a scintilla of evidence that Pandora has provided any transmissions that actually violate the SRPC. By statute, the SRPC is analyzed on a *transmission-specific* basis: Section 114(d)(2) specifically provides for the "statutory licensing of *certain transmissions*" and provides that "[t]he *performance* of a sound recording . . . shall be subject to statutory licensing" if, among other criteria, it "does not exceed the sound recording performance complement." *Id.* (emphasis added). And the SRPC, in turn, is defined as "*the transmission* during any 3-hour period, on a particular channel used by a transmitting entity, of no more than" the specified limits on tracks from the same artist or album. *Id.* § 114(j)(13) (emphasis added). The upshot is that a *transmission* that fails to follow the SRPC is not eligible for statutory licensing. But that does not mean that other transmissions on the same service (or the service at large) are ineligible for statutory licensing merely because some transmissions are not. The statute is simply not phrased in such an all-or-nothing, service-wide manner. Thus, even if the MLC could somehow make the showings above (*i.e.*, that all Modes constitute a single station, and that Pandora was willfully seeking to violate the SRPC across by providing Modes), it would still only be the *particular transmissions* that exceed the SRPC's limits that would run afoul of Section 114, not

the whole free Pandora service.  There is no evidence of such transmissions other than as staged by the MLC's expert.

With respect to actual Pandora users, the MLC's contention is undermined by the usage statistics regarding Modes.  As discussed above, nearly ██ of free Pandora users do not even use a single Mode during a given month, and fewer than ██ of free Pandora users use two or more Modes on the same day within an average month.  SUMF ¶ 50.  As a result, there is simply no evidence in the record of anyone other than the MLC's counsel and expert witness receiving transmissions that exceed the SRPC through the use of Modes.[13]  Thus, the MLC's contention that free Pandora users are using the Modes feature to avoid the limits of the SRPC (and that Pandora somehow willfully intended this result) not only fails as a matter of law, but is also plainly contradicted by the record evidence.

## CONCLUSION

For the foregoing reasons, Pandora respectfully requests that this Court enter judgment in favor of Pandora on the MLC's sole claim of underpaid royalties under the Copyright Act.

Dated:  February 5, 2026

Respectfully Submitted,

*Benjamin E. Marks*

**WEIL, GOTSHAL & MANGES LLP**

Benjamin E. Marks (admitted *pro hac vice*)
Todd Larson (admitted *pro hac vice*)
767 Fifth Avenue, 32nd Fl.
New York, NY 10153

---

[13]  To be clear, even those users who did use a Mode or two did not necessarily receive a transmission in excess of the SRPC (which, under the MLC's theory, involves jumping back-and-forth between Modes).  Nor is there any reason to believe that a user would undertake the many convoluted steps required to evade the SRPC in this fashion when ad-supported on-demand listening is readily available from a variety of other services in the marketplace.

Tel: (212) 310-8000
Benjamin.Marks@weil.com
Todd.Larson@weil.com

Crystal L. Weeks (admitted *pro hac vice*)
Sebastian Laguna (*pro hac vice* pending)
2001 M Street, NW, Suite 600
Washington, DC 20036
Phone: (202) 682-7516
Fax: (202) 857-0940
Crystal.Weeks@weil.com
Sebastian.Laguna@weil.com

**SHERRARD ROE VOIGT &
HARBISON, PLC**

Michael G. Abelow (No. 26710)
Micah N. Bradley (No. 38402)
1600 West End Ave., Suite 1750
Nashville, TN 372013
Tel: (615) 742-4532
Fax: (615) 742-4539
mabelow@srvhlaw.com
mbradley@srvhlaw.com

*Counsel for Defendant Pandora Media, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 5, 2026, the foregoing **Memorandum of Law** was filed

with the Court's electronic filing system, which will serve a copy on all counsel of record.


Dated:  February 5, 2026

/s/ *Benjamin E. Marks*

Benjamin E. Marks