# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| MECHANICAL LICENSING COLLECTIVE,<br><br>    Plaintiff,<br><br>v.<br><br>PANDORA MEDIA, LLC,<br><br>    Defendant. | Civil Action No. 3:24-cv-00168<br><br>Judge Eli J. Richardson |

## PANDORA MEDIA, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO THE MECHANICAL LICENSING COLLECTIVE'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................3

I.    The MLC's Lawsuit Is Unconstitutional ................................................................4

II.   Premium Access Sessions Are Separate (And Separately Licensed) Components
      That Do Not Transform Pandora's Internet Radio Offering Into An Interactive
      Service.....................................................................................................................6

      A.    Premium Access Offers 30-Minute Sample Sessions Of Pandora Premium ...........6

      B.    The MLC's Interpretation Of The Copyright Act Is Wrong ...................................9

III.  Neither Extra Skips Nor Replays Convert Pandora's Internet Radio Offering Into
      An Interactive Service...........................................................................................14

IV.   Pandora's Internet Radio Stations Are Not "Specially Created" For Users Under
      Longstanding Precedent.........................................................................................17

      A.    The MLC's Personalization Argument Is Waived ................................................17

      B.    Pandora's Internet Radio Stations Are Not "Specially Created" For Users
            Within The Meaning Of The Statute.....................................................................19

            1.    The Second Circuit's Analysis Of LAUNCHcast Applies Equally
                  To Pandora Internet Radio Stations ..........................................................20

            2.    The Narrow Differences The MLC Identifies Between Pandora's
                  Internet Radio Stations And LAUNCHcast Do Not Make Pandora
                  Radio Stations Any More Controllable Or Predictable Than
                  LAUNCHcast...........................................................................................24

V.    The MLC's Motion Relies On Material That Is Irrelevant To This Court's
      Objective Statutory Analysis .................................................................................26

      A.    Statements By Pandora Executives And Employees In Other Contexts Are
            Irrelevant To The Court's Statutory Interpretation.................................................26

      B.    The MLC's Reliance On Pandora's Reporting Labels Also Fails...........................31

      C.    Even Were The Court To Consider Extrinsic Evidence, The MLC's Motion
            Would Still Fail ..................................................................................................32

i

VI.    The MLC's Arguments With Respect To Pandora Plus Are Waived And, In Any Event, Meritless ................................................................................................................33

CONCLUSION ..............................................................................................................................35

Case 3:24-cv-00168    Document 147    Filed 03/05/26    Page 3 of 42 PageID #: 8939

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. CareSource*,
  576 F.3d 551 (6th Cir. 2009) ...................................................................................29, 30

*Arista Records, LLC v. Launch Media, Inc.*,
  578 F.3d 148 (2d. Cir. 2009)............................................................................. *passim*

*Carter v. Carter Coal Co.*,
  298 U.S. 238 (1936)...........................................................................................................5

*Comm'r v. Duberstein*,
  363 U.S. 278 (1960).........................................................................................................28

*Commc'ns Unlimited Contracting Servs., Inc. v. Comdata, Inc.*,
  611 F. Supp. 3d 483 (M.D. Tenn. 2020) ...................................................................34

*Community for Creative Non-Violence v. Reid*,
  490 U.S. 730 (1989).........................................................................................................28

*Davis v. Echo Valley Condo. Ass'n*,
  945 F.3d 483 (6th Cir. 2019) ...............................................................................18, 33, 34

*Grand Traverse Band of Ottawa and Chippewa Indians v. Blue Cross Blue Shield of Michigan*,
  146 F.4th 496 (6th Cir. 2025) ...............................................................................17, 18

*Jones v. Bock*,
  549 U.S. 199 (2007).........................................................................................................19

*Kamen v. Kemper Fin. Servs., Inc.*,
  500 U.S. 90 (1991)...........................................................................................................27

*Kennedy v. Braidwood Mgmt., Inc.*,
  606 U.S. 748 (2025)...........................................................................................................5

*Knight v. Montgomery Cty.*,
  592 F. Supp. 3d 651 (M.D. Tenn. 2022)...............................................................9, 16

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024).........................................................................................................27

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)...........................................................................................................6

*Markman v. Westview Instruments, Inc.*,
　52 F.3d 967 (Fed. Cir. 1995)................................................................................27

*Oracle Int'l Corp. v. Rimini St., Inc.*,
　123 F.4th 986 (9th Cir. 2024) ...............................................................................28

*Pulsifer v. United States*,
　601 U.S. 124 (2024)...............................................................................................12

*Sosa v. Alvarez-Machain*,
　542 U.S. 692 (2004)...............................................................................................11

*Southwest Airlines Co. v. Saxon*,
　596 U.S. 450 (2022)...............................................................................................12

*TransUnion LLC v. Ramirez*,
　594 U.S. 413 (2021).................................................................................................6

*TRW Inc. v. Andrews*,
　534 U.S. 19 (2001).................................................................................................13

*UMG Recordings, Inc. v. Augusto*,
　628 F.3d. 1175 (9th Cir. 2011) .............................................................................28

*United Hous. Found., Inc. v. Forman*,
　421 U.S. 837 (1975)..........................................................................................27, 28

**Statutes**

17 U.S.C. § 114.................................................................................................... *passim*

17 U.S.C. § 115.......................................................................................................31

**Regulations**

37 C.F.R. § 385.2 ....................................................................................................34

## INTRODUCTION

The Mechanical Licensing Collective ("MLC") acknowledges that this case presents a clear question of law regarding the proper interpretation of the Copyright Act. But, among other deficiencies, each of the MLC's legal theories rests on an incorrect reading of the Copyright Act that cannot be squared with the express language of the relevant statutory provisions or the legislative history. The MLC's motion for summary judgment must be denied and, for the same reasons, Pandora's own motion for summary judgment should be granted.

As a threshold matter, the MLC's claimed authority to bring this lawsuit is unconstitutional. The MLC admits that it is not seeking to vindicate any private interest of its own. As explained in Pandora's own motion for summary judgment, the MLC's claim of authority to act as a public enforcer of copyright law violates both the private nondelegation doctrine and the Appointments Clause under governing Supreme Court precedent. The MLC's motion should be denied and its case dismissed for this reason alone.

Even if this lawsuit were constitutionally permissible—and it is not—the MLC's claims would still fail as a matter of law. The Copyright Act expressly provides that where an entity offers both interactive and noninteractive services "concurrently or at different times," the "noninteractive component shall not be treated as part of an interactive service." The MLC fails to grapple with this critical language (relegating it to a single footnote) and repeatedly tries to mislead the Court with incomplete recitations of the legislative history in ways that try to recast the key terms of the statutory definition of "interactive service" to mean the exact opposite of what Congress intended.

The MLC's misportrayal of the governing statute is matched by its misportrayal of how Pandora's internet radio offering functions. The MLC—as it has done since its Complaint—attempts to depict on-demand functionality as a fully integrated feature of Pandora's free internet

radio service that renders Pandora radio indistinguishable from premium on-demand services like Spotify or Apple Music. The MLC thus ignores that Pandora users wishing to listen to a song on demand can only do so by *leaving* the internet radio offering to enter into a Premium Access session, in which, after engaging with video advertising, the user can enjoy up to 30 minutes of Pandora Premium, a separately licensed, on-demand service, before *returning* to Pandora's free internet radio service at the conclusion of the session. Indeed, the MLC goes to near-comical lengths to avoid confronting this reality, refusing not only to grapple with how Premium Access sessions work, or should be treated under the governing law, but even to acknowledge their existence. Premium Access sessions are only briefly mentioned in the MLC's motion (and only in quotes from Pandora documents) and instead are awkwardly replaced with a new phrase of the MLC's own invention ("Premium Access Interactions") in the misguided belief that calling them by a new name will change their actual operation.

Unwilling to apply the full breadth of the relevant statutory provision to the actual operation of Pandora's internet radio offering, the MLC instead tries to take refuge in another argument altogether: that Pandora has already conceded the case. The MLC thus devotes the initial two-thirds of its brief to breathlessly recounting years-old statements from Pandora employees and marketers using the term "interactive" in ordinary English parlance as if those colloquial characterizations could replace the legal analysis required of this Court to determine how the highly specific statutory definition of an "interactive service" applies to the objective and undisputed material facts of how Pandora operates. They cannot. The case law is clear that such statements should be disregarded in lieu of the Court's own statutory analysis.

The MLC's final gambit is nothing short of a "Hail Mary." In a new argument never mentioned in the Complaint and therefore waived, the MLC contends that Pandora internet radio

stations are too personalized—*i.e.*, they are too good at delivering desirable songs to users—to qualify as noninteractive under the governing statute.  This argument is squarely foreclosed by the landmark *Launch Media* case decided by the Second Circuit more than 15 years ago on which Pandora and many other services have long relied—and which the MLC otherwise embraces.  The MLC's attempts to parse that precedent in its favor fail.

Because the parties do not dispute the *material* facts about how Pandora's internet radio offering actually functions (versus the MLC's mischaracterization of that functionality) or how it relates to other components of Pandora's services, the Court's task is straightforward: apply Section 114(j)(7)'s interactive service definition to those undisputed facts.  The result is also straightforward: the MLC's claims fail and Pandora is entitled to summary judgment as a matter of law.

## ARGUMENT

The MLC puts forward three strained theories of liability, each of which fails to establish that the entirety of Pandora's free internet radio offering is engaged in interactive streaming under Section 115.  *First*, the MLC's argument that Premium Access sessions render the entire offering interactive fails because such sessions are limited samples of Pandora Premium that are clearly delineated from the free Pandora internet radio experience.  The Copyright Act expressly permits providers to offer interactive "components" without transforming a service offering into an interactive service.  *Second*, the MLC's argument that allowing users to replay tracks or to obtain additional skips beyond the typical hourly limit converts the radio offering into an interactive service fails because neither functionality is interactive under the statute and, even if they were, they constitute separate "components" that do not turn the noninteractive streams that overwhelmingly dominate activity on Pandora into interactive streams.  *Third*, the MLC's argument that Pandora's internet radio stations are so personalized as to be "specially created"

under the statute fails for two reasons: (i) it is waived, and (ii) Pandora's offering is clearly noninteractive under the standards articulated in the landmark *Launch Media* decision that the MLC otherwise embraces. The MLC's additional request for summary judgment on an unpleaded claim regarding a separate service offering, Pandora Plus, is also waived, and would fail on the merits even were it not, for the same reasons. Premium Access sessions provided to Pandora Plus users are likewise separate sample sessions of Pandora Premium.

The MLC's attempt to shore up its meritless legal theories with alleged concessions from Pandora employees and documents does not alter the conclusions above; as detailed in Section V below, no amount of employee statements or marketing copy can replace the objective statutory analysis required here or usurp the Court's role in determining Pandora's status under the Copyright Act.

## I. THE MLC'S LAWSUIT IS UNCONSTITUTIONAL

The MLC's motion should be denied from the outset for a very simple reason: its lawsuit is unconstitutional. As explained in Pandora's own motion, the MLC's claimed authority to sue Pandora here violates two aspects of the Constitution's separation of powers: the private nondelegation doctrine and the Appointments Clause. *See* Dkt. No. 127, Pandora's Mem. of Law in Support of Summary Judgment ("Pandora MSJ") at 17–20.

The MLC's moving brief only reinforces the strength and correctness of Pandora's constitutional arguments. The MLC repeatedly confirms, as Pandora explained in its own motion, that the MLC is *not* a private plaintiff seeking to vindicate its own interests but is instead trying to act as a statutory enforcer with the claimed authority to police the music industry's compliance with the Copyright Act. The MLC forthrightly acknowledges, for example, that it "does not take commissions from the royalties that it collects and distributes" and that it has "no pecuniary interest in the outcome of this lawsuit." Dkt. No. 110, MLC Mem. of Law in Support

of Summary Judgment ("MLC MSJ") at 5; *see also* Dkt. No. 113, Decl. of Rick Marshall ¶ 11 ("The MLC's operating costs are entirely paid from a statutory 'administrative assessment' paid by DSPs engaged in Covered Activity, at an amount fixed by the Copyright Royalty Board pursuant to the law."). Similarly, in the opening pages of its brief, the MLC tells the Court that it brings this motion "to cut through the obfuscation and hold Pandora to the plain language of the statute and the simple reality of its own service." MLC MSJ at 1. And the MLC closes its brief with a section contending (incorrectly) that Pandora's reporting "violates the law" and Pandora must be brought into compliance with Section 115. *Id.* at 29–30.

These statements openly concede—indeed hammer home—the obvious reality that the MLC is simply seeking to leverage federal litigation as an enforcement mechanism to compel Pandora, under threat of massive liability, to conform to the MLC's erroneous interpretation of the Copyright Act. In doing so, the MLC is seeking to act as a roving copyright police force, determining which offerings qualify as "interactive" and forcing Pandora to license its services based on the MLC's misinterpretation of the statute. As Pandora has explained (Pandora MSJ at 17–20), under the private nondelegation doctrine, that kind of sweeping power cannot be exercised by an unaccountable and unsupervised private entity such as the MLC, *see Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936), or without the MLC's officers having satisfied the requirements of the Appointments Clause, *see Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 760 (2025). Given the MLC's express disclaimer that it has no concrete, pecuniary interest in the outcome of this suit, it is unclear how it would even have Article III standing *without* relying on a theory of statutorily granted public enforcement authority. As the Supreme Court has explained, "under Article III, an injury in law is not an injury in fact," and "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private

defendant over that violation in federal court."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021).  Put simply, "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." *Id.* (citation and quotation omitted); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 574–77 (1992).

## II.  PREMIUM ACCESS SESSIONS ARE SEPARATE (AND SEPARATELY LICENSED) COMPONENTS THAT DO NOT TRANSFORM PANDORA'S INTERNET RADIO OFFERING INTO AN INTERACTIVE SERVICE

The MLC's primary argument that Premium Access sessions convert Pandora's entire internet radio offering into an interactive service fails for two key reasons: (i) the MLC completely ignores the undisputed evidence that Premium Access sessions are in fact separate sessions of Pandora Premium for which mechanical rights have already been separately licensed; and (ii) Section 114's interactive service definition makes clear that the noninteractive components of a service are not rendered interactive merely because the service also offers separate interactive components.  Applying the undisputed facts and proper interpretation of the interactive service definition to Premium Access sessions makes clear that they are separate "components" that do not convert Pandora's internet radio offering into an interactive service that requires a license from the MLC.

### A.  Premium Access Offers 30-Minute Sample Sessions Of Pandora Premium

The MLC's motion provides no evidence (much less *undisputed* evidence) that Premium Access sessions are not time-limited samples of Pandora Premium.  In its moving brief, the MLC repeatedly claims that Pandora's internet radio users have access to on-demand listening but ignores the material and undisputed facts highlighted in Pandora's motion that explain how and why Premium Access sessions are separate from Pandora's internet radio offering and may be licensed separately.

The MLC ignores those key facts because they indisputably show that Premium Access sessions are separate from Pandora's internet radio offering. When listening to a Pandora radio station, users of Pandora's internet radio offering cannot select tracks for listening on-demand because "the song selection for stations is always driven by Pandora's proprietary technology and playlist algorithms, which select which tracks are streamed for the user." Dkt. No. 132, Pandora's Rule 56 Statement of Undisputed Material Facts ("Pandora SUMF") ¶ 10. Thus, if a Pandora internet radio listener attempts to stream a particular song or album, they will not be able to do so within the internet radio offering, and are instead shown a "coachmark" with "options to (1) continue with their selection and commence a Premium Access session for a 'limited time' by watching an audiovisual ad, (2) opt-out, or (3) upgrade to a full Pandora Premium subscription." *Id.* ¶ 16.

If the user elects to begin a Premium Access session, the user must "watch[] an audiovisual ad" and "cannot leave the Pandora app . . . jump ahead, or do anything on the app or webpage other than watch the ad." *Id.* ¶¶ 16-17. Users are informed on their first use of a Premium Access session, and periodically thereafter, that they are entering Pandora Premium with a message stating "Your complimentary Pandora Premium session starts now." *Id.* ¶ 19. At that point, "the visual user interface changes to reflect that the user is accessing the Pandora Premium experience," *id.* ¶ 20, for example: "(1) there is more dynamic color, with the background changing to echo the colors in the album art displayed for the track that is playing; (2) the user's 'My Collection' page displays a broader range of content, including not only the user's Pandora stations and podcasts, but also content available solely in Pandora Premium . . . (3) the structure of the 'Now Playing' page changes—for example, on the web version, the full track list for the album of the currently playing song appears, and on the mobile app version,

users are presented with the option to add the current track to a playlist (something only available to Premium users); and (4) the download icon provided to Pandora Premium users appears, although grayed out, as limited downloads are not available in Premium Access." *Id.*

During a Premium Access session, the user "receive[s] all the functionality and experience available to Pandora Premium subscribers, with the exception of the ability to download tracks for later offline listening." *Id.* ¶ 14. Premium Access sessions "automatically end after 30 minutes," *id.* ¶ 22, and users will receive messages explaining that the Premium Access session has ended, including, "Your Pandora Premium session has ended. Want more?" and "Your Pandora Premium session has ended, but all your playlists, songs, and albums will be waiting for you when you return" depending on whether they are accessing the mobile or web version of Premium Access. *Id.* ¶ 23.

Moreover, as a matter of technical operation, Pandora treats Premium Access users as engaging in a session of Pandora Premium. For instance, it is undisputed that Premium Access users are re-authenticated and logged in with a "PandoraPremium" configuration—the same as a Pandora Premium subscriber—and a duration of 1800 seconds (30 minutes) using the same API call that is used when a Pandora Premium subscriber logs in. *Id.* ¶ 21. It is also undisputed that Premium Access users see unique collections and "now playing" screens that are only made available to Pandora Premium subscribers, and are able to receive the Pandora Premium feature set more generally. *Id.* Additionally, the HTML code that a Premium Access user's browser receives from Pandora's servers changes from "Nav—Standard" to "Nav—Premium" when a Premium Access session is initiated. *Id.*

Given these undisputed material facts establishing that Premium Access sessions function separately and at different times from Pandora's core internet radio offering, the MLC's claim

that the internet radio offering contains an "on-demand" functionality is simply wrong. *See*

*Knight v. Montgomery Cty.*, 592 F. Supp. 3d 651, 657 (M.D. Tenn. 2022) ("The party bringing

the summary judgment motion has the initial burden of identifying portions of the record that

demonstrate the absence of a genuine dispute over material facts.").

### B. The MLC's Interpretation Of The Copyright Act Is Wrong

The MLC's failure to carry its burden to show, as a factual matter, that Pandora's internet

radio offering includes on-demand functionality is compounded by its misreading of the relevant

provisions of the Copyright Act. The interactive service definition makes clear that "[i]f an

entity offers both interactive and noninteractive services (either concurrently or at different

times), *the noninteractive component shall not be treated as part of an interactive service.*" 17

U.S.C. § 114(j)(7) (emphasis added). As a result, the interactive streams in the separately

licensed Premium Access sessions do not make the noninteractive radio streams occurring on

Pandora outside of those sessions interactive. The MLC addresses the interactive service

definition's critical "component" language in a single footnote and badly misinterprets its

meaning. The MLC claims that the "component" sentence "clarifies only that a noninteractive

service does not become an interactive service simply by virtue of being owned by an entity that

also owns an interactive service." MLC MSJ at 22 n.80. For support of this contortion, the

MLC relies entirely on a misleading and incomplete quotation from the 1995 House Judiciary

Committee Report: "[i]f an entity offering a nonsubscription service (such as a radio or television

station) chooses to offer an interactive service as a separate business . . . that decision does not

affect the exempt status of any component of the entity's business that does not offer an

interactive service." *Id.* (quoting H.R. Rep. No. 104-274, at 25–26 (1995)).

As an initial matter, and tellingly, the MLC elided the phrase "or only during certain

hours of the day" from the middle of its quote. The omitted language is fatal to the MLC's

9

misreading because it shows that operating a "separate business" was not the only example Congress considered. Congress also contemplated situations where interactive components of the *same* business were offered on a limited basis, such as during different times throughout the day—precisely the case for Premium Access sessions. *See* Pandora MSJ at 6–7. Making matters worse, the MLC also omits the very next sentence of the quote, which further destroys the MLC's entire theory of this case. That sentence states: "In other words*, each transmission should be judged on its own merits with regard to whether it qualifies as part of an 'interactive' service. The third sentence of the definition of 'interactive service' is intended to make this clear.*" H.R. Rep. No. 104-274, at 26 (emphasis added). Read in full, the legislative history that the MLC cites thus emphatically supports Pandora's reading of the statute as allowing service providers to offer interactive components without transforming a noninteractive service into an interactive service.

The MLC's reliance on a selective and misleading quotation from the 1995 report is further undermined because that report relates to an older version of the interactive services definition that was adopted as part of the Digital Performance Right in Sound Recordings Act of 1995 ("DPRSRA") but was subsequently amended. Additional legislative history from the operative 1998 version of the interactive services definition further confirms Pandora's interpretation of the provision and undermines the MLC's. The 1998 House Conference Report to the Digital Millennium Copyright Act of 1998 ("DMCA")—which enacted the operative language of the interactive services definition—explains that "if a Web site offered certain programming that was transmitted to all listeners who chose to receive it at the same time *and also offered certain sound recordings that were transmitted to particular listeners on request,* the fact that the latter are interactive transmissions would not preclude statutory licensing [as a

noninteractive service under Section 114] of the former."[1]  H.R. Rep. No. 105-796, at 88 (emphasis added).  This language does not come close to requiring separate "businesses" and instead clearly envisions a single service (a "Web site" in 1998 parlance) offering different kinds of transmissions to its users, including on-demand transmissions.  Viewed in its entirety, the legislative history confirms that the "component" language means what it says:  service providers may offer separate interactive transmissions without transforming their noninteractive components into interactive services.  That is precisely what Pandora does by separating Premium Access sessions from its internet radio offering and licensing them separately.

Stripped of its misleading quotation of the legislative history, the MLC has no affirmative argument on the "component" language.  Instead, the MLC's argument is entirely circular: "The MLC is not claiming that Pandora Free is an interactive service because Pandora owns other interactive services.  Pandora Free is an interactive service because it meets the definition of an interactive service."  MLC MSJ at 22 n.80.

Standard canons of statutory interpretation also require rejecting the MLC's tortured interpretation of the critical provision.  The MLC's misinterpretation of the word "component" to mean a "separate business" creates a clear conflict with the express terms of the statute.  Congress's deliberate choice to use two different words ("component" and "service") in the same sentence is a clear indication that the words have different meanings.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n. 9 (2004).  Indeed, under the meaningful-variation canon of statutory interpretation, courts presume that "[i]n a given statute  . . . different terms usually have different meanings."  *Pulsifer v. United States*, 601 U.S. 124, 149 (2024) (quotation omitted); *see*

---

[1] As explained in Pandora's motion for summary judgment, services eligible for the Section 114 statutory license for noninteractive webcasting do not require the mechanical license for interactive services available under Section 115.  *See* Pandora MSJ at 8.

*also Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022) (describing the applicability of the meaningful variation canon). The MLC puts forward no textual argument at all regarding the meaning of the "component" sentence—much less a cogent rationale for why this Court should set aside this well-settled presumption for statutory interpretation.

The MLC's tortured reading of the statute also renders critical words as mere surplusage, in violation of another canon of interpretation. The MLC's underlying theory for why Premium Access sessions convert Pandora's internet radio offering into an interactive service is based on the misguided premise that Premium Access sessions "enable" users of the radio offering to "request . . . a transmission of a particular sound recording," MLC MSJ at 22 (quoting 17 U.S.C. § 114(j)(7)), but that theory requires ignoring both the express language and clear legislative history of the critical "component" language. Pandora does not offer on-demand listening within its internet radio offering; Premium Access sessions only "enable" users of Pandora's internet radio offering to *exit the internet radio offering* and engage in a time-limited sample of the Pandora Premium service. This separation, as detailed in subsection A above, is underscored by the fact that Premium Access sessions are also available in the exact same manner to Pandora Plus users—making clear that Premium Access sessions are not an integrated part of Pandora's free internet radio offering—but are instead a transition to separate Pandora Premium sessions that are available equally to Pandora Plus users. *See* Pandora SUMF ¶ 13.

The MLC's suggestion that any point of access to a separate interactive component (no matter how indirect) is sufficient to "enable" on-demand listening proves too much. As an initial matter, the Copyright Act does not require service providers to develop separate applications, separate logins, or separate terms and conditions before a functionality may become a separate "component." Congress provided a straightforward test: where "an entity offers both interactive

and noninteractive services (either concurrently or at different times), the noninteractive component shall not be treated as part of an interactive service." 17 U.S.C. § 114(j)(7). The use of the words "component" and "at different times" makes clear that the relevant question is whether there is functional separability between the interactive component and the broader noninteractive service. And the relevant legislative history confirms this understanding, making clear that the availability of interactive transmissions does "not preclude statutory licensing" of a provider's noninteractive service. *See* H.R. Rep. No. 105-796, at 88.

Under the MLC's contrary reading, the existence of *any* interactive component—no matter how time-limited, separately licensed, or clearly demarcated—would convert every other transmission on the service into an interactive one. The MLC essentially asks this Court to adopt an interpretation that would make nearly any modern digital audio product "interactive" so long as it includes any pathway, link, prompt, or upsell to a separate on-demand functionality. But courts do not construe statutes to nullify their text. The MLC's reading should be rejected because it would improperly drain the "component" sentence of any meaning and turn the phrase "at different times" into pure surplusage. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (courts are "reluctant to treat statutory terms as surplusage in any setting").[2]

---

[2] Moreover, the MLC's repeated argument that the interactivity of a service must be judged by its "most interactive features" (*see* MLC MSJ at 24–25) badly misreads the *Launch Media* decision and seeks to turn a narrow evidentiary assumption in that case into a broad and general interpretive principle. There, where LAUNCHcast allowed users to specify a range of rated tracks in a playlist, the court used the high end of that allowable range to determine whether the playlists were "specially created" for users. *See infra* Section IV. But that assumption does not compel the conclusion that the mere availability of on-demand transmissions requires, as a legal matter, treating the separate noninteractive transmissions on the service as if they were on-demand as well, or the entire service as interactive. Such an approach would be irreconcilable with the entire thrust of the last sentence of the definition, which plainly envisions that the "most interactive features" on a service will *not* make the separate noninteractive components interactive.

In sum, applying all of the traditional tools of statutory construction to the interactive service definition, including the definition's plain text, its context, interpretive canons, and the relevant legislative history, makes clear that the definition authorizes music providers to offer separate interactive components without "enabling" interactive transmissions. This correct interpretation of the interactive services definition is fatal to the MLC's legal theories in this litigation. With respect to Premium Access sessions, it removes any liability for Pandora because Pandora already treats Premium Access transmissions as interactive and pays the MLC Section 115 royalties for such transmissions. Pandora SUMF ¶ 27.

## III. NEITHER EXTRA SKIPS NOR REPLAYS CONVERT PANDORA'S INTERNET RADIO OFFERING INTO AN INTERACTIVE SERVICE

The MLC next argues that the availability of allegedly "unlimited" skips and replays to Pandora's internet radio users is itself sufficient to convert the entire offering into an interactive service. *See* MLC MSJ at 26. The MLC's argument draws not on the plain text of the interactive service definition, which states that an interactive service is one that enables, on-request, "a transmission of a particular sound recording, whether or not as part of a program, which is selected by or on behalf of the recipient." 17 U.S.C. § 114(j)(7). The MLC instead suggests, based again on a highly misleading and incomplete quotation of the legislative history, that the phrase "whether or not as part of a program" in the interactive service definition means that a service can be interactive even where a user does *not* select the actual songs that comprise the program, but (per the legislative history) "has the ability to move forward and backward between songs" in a program. *See* MLC MSJ at 26.

The definition on its face says no such thing. By referencing a "program," it simply captures a situation where a particular recording chosen by a user is included in a program rather than streamed individually. And the full context of the statement the MLC relies on from the

legislative history is not so permissive either; it states instead that a service may be interactive in the "program" situation if users can move back and forth between "particular sound recordings *in a prerecorded or predetermined* program." *See* 144 Cong. Rec. H10048, H10071–72, 1998 WL 698645 (emphasis added). In other words, a service would be interactive if it allowed users to move back and forth between songs the user knows in advance and can thus select because they are part of a prerecorded or predetermined program that the service makes available to users— *i.e.*, what are now known as "playlists," where users can see and select songs within the song list because the playlist has been programmed from beginning to end. This concept does not apply to Pandora, whose internet radio offering does not play songs as part of "prerecorded" or "predetermined" programs at all, much less ones that the user knows in advance. For Pandora internet radio, song selection instead occurs one-by-one, in real time, and is driven by Pandora's proprietary song-selection algorithms, which are built from and rely on billions of data points Pandora has collected from its users over the years, eliminating the ability of any particular user to control or predict what song will play next. Pandora SUMF ¶¶ 9-10.

A skip on Pandora thus merely results in the end of a transmission of a particular song chosen by Pandora and the start of a different song that is also chosen by Pandora—something very different than being able to jump ahead to a song that is known because the order of the program has been predetermined. *See id.* ¶ 28. And as the Second Circuit observed in *Arista Records, LLC v. Launch Media, Inc.*, "the ability not to listen to a particular song is certainly not a violation of a copyright holder's right to be compensated when the sound recording is played." 578 F.3d 148, 164 (2d Cir. 2009). Nor does a replay allow a Pandora internet radio user to "request" a sound recording of their choosing. Replays only allow a user to replay a song that

was pre-selected and recently played by Pandora on the current station, not chosen by the user. Pandora SUMF ¶ 33.

The MLC, in its rush to characterize the skip and replay functionality as "unlimited," also leaves out important information as to how extra skips and replays actually work. The undisputed material facts confirm that both functionalities are special cases offered only with material limits and significant user friction. *See* Dkt. No. 128, Rebuttal Expert Report of Christopher Rucinski ("Rucinski Rept.") at 30–35. For instance, it is undisputed that Pandora does not afford access to any replays at all and limits skips to six per hour unless the user follows a series of time-consuming steps and agrees to watch video advertisements in order to unlock either a limited number of replays or some additional skips beyond the typical limit. *Id.* at 31–32, 34–35. The MLC's bald assertion that Pandora's internet radio users can move backward and forward through a boundless list of songs without limitation, *see* MLC MSJ at 26, is just wrong. *See Knight v. Montgomery Cty.*, 592 F. Supp. 3d at 657.

Even if replays or skips were interactive—and they are not—they are clearly separable components from Pandora's internet radio offering more generally under the final clause of the interactive service definition, for the same reasons discussed above with respect to Premium Access sessions. *See supra* pp. 9–14. As detailed in Pandora's motion and supporting declarations, users must watch a video ad in order to unlock access, that access is limited, and the user must watch additional ads to reenter the "reward" state and get access to further skips and replays. Rucinski Rept. at 31–32, 34–36. In addition, the usage of these features is trivially small, confirming that they have, at best, an attenuated connection to Pandora's core internet

radio offering.[3]  The MLC fails to establish why the mere availability of an ancillary feature that occurs in limited, specialized, and segregable circumstances and results in a trivial number of performances would transform Pandora's entire internet radio offering—including the more than ███ of plays that are *not* extra skips or replays—into an interactive service.  Pandora SUMF ¶¶ 32, 37.  It should not: just like the website described in the legislative history—which remained noninteractive despite providing "certain sound recordings that were transmitted to particular listeners on request"—Pandora's exceedingly limited provision of bonus skips and replays, even if they were deemed interactive, are transmissions that should "be judged on their own merits" and do not convert the entirety of Pandora's noninteractive service into an interactive service.  *Supra* pp. 9–14; *see also* H.R. Rep. No. 105-796, at 88.

## IV.   PANDORA'S INTERNET RADIO STATIONS ARE NOT "SPECIALLY CREATED" FOR USERS UNDER LONGSTANDING PRECEDENT

Beyond the incorrect claim that Pandora's internet radio offering contains "on-demand functionality" that is the focus of the Complaint, the MLC now tries to argue that Pandora radio stations exceed the "threshold" of personalization, making the stations "specially created" for users under the interactive service definition.  MLC MSJ at 27–29.

### A.   The MLC's Personalization Argument Is Waived

The Court need not address the MLC's argument on this point at all because it is waived.  Under the notice pleading standard, a complaint must provide "fair notice of the nature and basis or grounds for a claim." *Grand Traverse Band of Ottawa and Chippewa Indians v. Blue Cross Blue Shield of Michigan*, 146 F.4th 496, 512 (6th Cir. 2025) (citation omitted).  Accordingly,

---

[3] The usage statistics for skips and replays underscore the fact that they are minimally used components.  Only ███ of total plays on Pandora's internet radio offering involve the use of bonus skips and only ███ of total plays involve the use of replays.  Pandora SUMF ¶¶ 32, 37.

"[a] party may not pivot to a new factual basis for liability after the close of discovery." *Id.*

While parties may adjust their arguments as discovery provides new information, they are not

allowed to entirely transform the case at summary judgment by expanding their claims to new

theories of liability.

The MLC's new theory was not pleaded in the Complaint, which repeatedly alleged that

Pandora's internet radio offering is interactive, not because it offers personalized stations, but

rather because it provides access to "on-demand functionality." Compl. ¶¶ 32, 35, 36, 37, 58.

*Nowhere* does the Complaint contain any hint that the MLC was independently challenging

Pandora's radio stations separate and apart from the other functionalities addressed above.

The MLC's failure to include allegations regarding the personalization of Pandora's

internet radio stations is all the more egregious and inexcusable because Pandora has been

publicly offering—and celebrated for—its customized radio stations since 2005. Indeed, the

MLC's motion is focused on aspects of Pandora radio stations that have been part of the service

and well-known since its founding, for instance the fact that Pandora's internet radio stations are

"artist-seeded." MLC MSJ at 27. If the MLC is of the view that such aspects make the service

interactive, it could and should have included those allegations in its Complaint, rather than

ambush Pandora with this new argument now. Because the MLC failed to do so, the Court

should decline to entertain it. *See Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 496 (6th

Cir. 2019) (rejecting plaintiffs' effort to frame claims "at a high level of generality" to avoid

waiver).[4]

---

[4] Because Pandora's waiver defense is premised on shortcomings in the MLC's Complaint, the
MLC's request that the Court deny Pandora's affirmative waiver defense (MLC MSJ at 30)
should be denied. That defense can be established through the MLC's own pleadings and does
not require any additional facts obtained through formal discovery as the MLC wrongly claims.
Moreover, Pandora cannot possibly have been required to produce discovery relating to the

18

## B. Pandora's Internet Radio Stations Are Not "Specially Created" For Users Within The Meaning Of The Statute

In the Second Circuit's landmark *Launch Media* decision, the court held that a program is "specially created" (and thus interactive) only where "the user has sufficient control over the interactive service such that she can predict the songs she will hear, much as she would if she owned the music herself and could play each song at will." 578 F.3d at 161. The court rooted this conclusion in the directive that to properly interpret the phrase "specially created for the user," one must first understand and appreciate the context in which Congress adopted it and its reasons for doing so. The decision thus traced in detail the history of the limited U.S. sound recording performance right (from its initial adoption in 1995 to its revision in the 1998 DMCA), concluding that Congress's key reason for excluding interactive services from statutory licensing was that such services might "adversely affect sales of sound recordings." *Id.* at 154. Congress's particular "concern" about programs "specially created" for the user, the court explained, was that such programs "provide[] a degree of predictability—based on choices made by the user—that approximates the predictability the music listener seeks when purchasing music." *Id.* at 161.[5] *Launch Media* thus rejected the notion that "any service that reflects user input is specially created for and by the user." *Id.* at 152.

The MLC does not reject *Launch Media*, suggest it should be overturned, or argue that this Court should ignore it. To the contrary, the MLC embraces the *Launch Media* decision, and

---

MLC's waiver of new claims and theories of liability when the MLC failed to include those theories in its Complaint. *Cf. Jones v. Bock*, 549 U.S. 199, 215–16 (2007).

[5] The *Launch Media* opinion also favorably notes the Copyright Office's view that "Congress sought to identify a service as interactive according to the amount of influence a member of the public would have on the selection and performance of a *particular sound recording*" and that "consumers can have some influence on the offerings made by a service without making the service interactive." 578 F.3d at 156 (emphasis added).

19

instead attempts to distinguish Pandora internet radio stations from LAUNCHcast stations, highlighting a handful of narrow, trivial, and legally irrelevant differences between the services' song-selection algorithms that fail to meaningfully distinguish Pandora from LAUNCHcast with respect to the operative legal test. In all the ways that matter legally, Pandora easily satisfies the fundamental legal test identified by the Second Circuit: that stations are specially created for the user (and the service thus interactive) only if "the user has sufficient control over the interactive service such that she can predict the songs she will hear." *Id.* at 161.

### 1. The Second Circuit's Analysis Of LAUNCHcast Applies Equally To Pandora Internet Radio Stations

The *Launch Media* court's analysis of LAUNCHcast under its "predictability" test applies on all fours to Pandora. To start, the court made clear—from the first sentence of the opinion—that LAUNCHcast, just like Pandora now, provided users with "individualized internet radio stations—the content of which can be affected by users' ratings of songs, artists, and albums." *Id.* at 149. And the record was clear that each LAUNCHcast playlist was "unique to that user at that particular time." *Id.* at 162. But neither fact made LAUNCHcast interactive. The decision extensively analyzed the detailed workings of LAUNCHcast's song-selection process to gauge the degree of control and predictability that service afforded to users. And the court's conclusion that LAUNCHcast was noninteractive applies equally to the undisputed material facts about the operation of Pandora's internet radio stations at every step of the way.

***Seed Selection***: The creation of a LAUNCHcast station started with the user selecting artists and genres that would form the basis of a station. *Id.* at 157. The same is true of Pandora, where users can select an artist or genre "seed" to start their stations—although Pandora users have the added limitation that they cannot provide specific numerical ratings for artists or songs as LAUNCHcast users could. *See* Dkt. No. 131, Decl. of William Burrows Peale ¶ 7.

***Song Candidate Pool Creation***: LAUNCHcast would assemble a pool of roughly 10,000 candidate songs (called a "hashtable") from which the user's 50-song playlist would ultimately be drawn. *Launch Media*, 578 F.3d at 159. LAUNCHcast assembled the hashtable by focusing on user-specific inputs (*e.g.*, songs recently played for the user, songs the user explicitly rated, "implicitly" rated songs appearing on the same albums as songs the user rated, etc.) supplemented with the most popular songs among LAUNCHcast users and other songs drawn from the particular genres selected by the user. *Id.* at 159–60. Pandora, for its part, ██████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████ Peale Decl. ¶¶ 8-12; *see also* Dkt. No. 116, Expert Report of Juan Serruya ¶ 100.

***Filters***: LAUNCHcast would exclude songs from further consideration based on various filters (*e.g.*, songs rated zero, songs played within the last three hours). *Launch Media*, 578 F.3d at 158. Pandora likewise implements filters to cull songs from the candidate pool, including songs the user thumbed down, songs that would violate the sound recording performance complement, ████████████████████████████. Peale Decl. ¶ 13.

***Playlist Creation***: LAUNCHcast, just like Pandora today, created user-specific playlists from the larger candidate pool ████████████████████████████████████ ████████████████████████████. *Launch Media*, 578 F.3d at 158–60. In LAUNCHcast's case, it first sorted the candidate pool into rated and unrated categories, then chose songs from those categories based on the user's self-specified quota for rated vs. unrated

songs—with up to 80% of the selected songs having been rated.[6]  The decision highlights expert testimony that the LAUNCHcast algorithm, when selecting songs for the playlist, was "biased towards" more highly rated songs at "the top of the list," leading to a "high probability" of a selected song coming from the "higher scored songs."  *Id.* at 160.  Pandora similarly utilizes █

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████.[7]  Peale Decl. ¶¶ 13-21.

Pandora users, like LAUNCHcast users, ***cannot predict what songs will play***.  The record is devoid of any evidence to the contrary.  Nearly every statement by the Second Circuit explaining why LAUNCHcast did not provide the requisite predictability in song selection (and was therefore not interactive) applies equally to Pandora.

As to the creation of the song pool, for example, the Second Circuit explained that "the user has almost no ability to choose, let alone predict, which specific songs will be pooled in anticipation for selection to the playlist."  *Launch Media*, 578 F.3d at 162.  The same is true of

---

[6] The only exception to this approach was if fewer than 100 songs had been explicitly rated by the user.  *Launch Media*, 578 F.3d at 159.

[7] While these are the most fundamental similarities, other aspects of LAUNCHcast identified by the Second Circuit apply just as well to Pandora.  The court noted, for example, that "LAUNCHcast also does not enable the user to view the unplayed songs in the playlist," *Launch Media*, 578 F.3d at 164, such that the user "does not know what songs might be played," *id.* at 158.  The same is true of Pandora.  The court also noted that "LAUNCHcast randomly orders the playlist," with further restrictions on "the consecutive play of artists or albums."  *Id.* at 164. Again, the same is true of Pandora, ████████████████████████████████████████ ███████████████████        *see* Peale Decl. ¶¶ 16, 19, █████████████████ ████████████████████████████████████, *id.* ¶¶ 13, 17.

Pandora. As Mr. Peale (the Pandora witness on whose documents and testimony the MLC hinges its entire argument) explains, "[t]he candidate generation process . . . ████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████" Peale Decl. ¶ 12. And as to playlist generation, the Second Circuit rested its decision on the conclusion that "to the degree the LAUNCHcast's playlists are uniquely created for each user, that feature does not ensure predictability" or "provide sufficient control to users such that playlists are so predictable that users will choose to listen to the webcast in lieu of purchasing music." *Launch Media*, 578 F.3d at 162, 164. Again, the same is true of Pandora. Mr. Peale, relying on documentation the MLC itself cites and relies on, explained that Pandora's algorithmic approach "ensures that a listener can neither use their feedback to cause any particular song to play nor predict what songs will play next on a station, even if it is true that the user's station will be 'personalized' to some degree compared to what other users may hear when they create a station based on the same seed."[8] Peale Decl. ¶ 5.

In the end, what the Second Circuit concluded was true of LAUNCHcast more than 15 years ago is equally true of Pandora today: "It appears the only thing a user can predict with certainty—the only thing a user can control—is that by rating a song zero"—thumbing down in the case of Pandora—"the user will not hear that song on that station again." *Launch Media*, 578 F.3d at 164. And as the Second Circuit explained, "the ability not to listen to a particular song is certainly not a violation" of the terms of the statutory license. *Id.*

---

[8] Mr. Peale further notes that ████████████████████████████████████ ███████████████████████ makes it impossible for the user to thumb or skip in a way that would allow him or her to steer the algorithm to play any particular song, let alone at any particular time, and also prevents the user from being able to predict which song will play and when." Peale Decl. ¶ 16.

> ## 2. The Narrow Differences The MLC Identifies Between Pandora's Internet Radio Stations And LAUNCHcast Do Not Make Pandora Radio Stations Any More Controllable Or Predictable Than LAUNCHcast

The MLC attempts to overcome the dispositive similarities between the two services by alleging certain trivial distinctions between them to imply that Pandora stations are more personalized than were LAUNCHcast's. That effort fails completely.

The MLC starts with a blatant misrepresentation of the *Launch Media* decision: that 60% of the songs on a user's LAUNCHcast playlist were selected without consideration of their particular preferences. MLC MSJ at 28. What the decision actually explains is that 60% of the *hashtable* (the initial pool of candidate songs) was drawn from songs that were popular service-wide or from genres selected by the user. *Launch Media*, 578 F.3d at 162. That 60% ratio did *not* apply to the eventual user *playlist*, which the decision makes clear could include up to 80% of tracks explicitly or implicitly rated by the user.[9] *Id.* at 159–63.

The MLC next claims that no more than 20% of the total songs the user rated could be included in the list of potential songs for a LAUNCHcast playlist. MLC MSJ at 28. Again, one needs to parse this representation carefully. This simply means that if the LAUNCHcast user had rated (for example) 200 songs, no more than 40 of those could end up in the playlist. It does *not* mean that only 20% of the eventual 50-song *playlist* (*i.e.*, only 10 songs) could be those the user explicitly rated: again, as noted above, the user could explicitly request that up to 80% of his playlist be rated tracks.[10] Moreover, the MLC's implication that Pandora is "not constraining its

---

[9] The MLC also ignores that 5,000 out of the 6,000 supplemental tracks in the LAUNCHcast hashtable could in fact be drawn from genres specifically identified by the user. *Launch Media*, 578 F.3d at 162–63.

[10] While rated tracks could include "implicitly" rated tracks along with explicitly rated tracks, those implicit ratings were based directly on the rating the user gave to another song by the same artist or another song on the same album.

model" with respect to user influence over song choice is also highly misleading.  MLC MSJ at 28.  All Mr. Peale said in the (selectively) quoted testimony is merely that Pandora does not constrain how its machine-learning model *learns* what user signals best predict increased listening.  He in no way suggested that users are unconstrained in their ability to use feedback (*e.g.*, thumbs up) to influence what song plays next, and his deposition testimony in fact identified a wide range of constraints on a user's ability to do so.  *See* Dkt. No. 112-10, Decl. of Benjamin K. Semel Ex. 11 (Excerpts of the Transcript of the Deposition of William Burrows Peale, dated July 25, 2025) at 105:5-19, 106:8-107:3, 182:14-18, 182:21-23.

The MLC next points out that LAUNCHcast penalized users who attempted to game the system.  MLC MSJ at 28.  That is true insofar as LAUNCHcast narrowly sought to prevent users from intentionally rating only a few songs highly so all of them would end up on the playlist.  *Launch Media*, 578 F.3d at 163.  But the record here makes clear that there is no ability for Pandora users to game their listening in the first place.  As Mr. Peale explained in the language referenced above, a thumbs-up does not guarantee a song will play (much less when)— ███████

██████████████████████████████.  The same logic is true of the "quarry songs" cited by MLC—████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████.

The MLC's final two points of alleged distinction can be dispatched quickly.  The MLC notes that *Launch Media* said users might have songs played that they do not like.  MLC MSJ at 28.  But the same is of course true of Pandora, where users routinely thumb songs down notwithstanding Pandora's efforts to play them only songs they want to hear.  Finally, the MLC

also suggests that LAUNCHcast was different from Pandora because the songs in the LAUNCHcast hashtable were picked randomly and because playlists were "ordered" randomly. *Id.* at 28–29.  This misleading recitation of the facts obscures that the first 4,000 songs in the LAUNCHcast hashtable were tied specifically to the user's input, and even the allegedly "random" songs added to the hashtable were drawn from the 1,000 most popular songs on LAUNCHcast or genres explicitly selected by the user.  *Launch Media*, 578 F.3d at 158–59.  Nor were the actual playlists on LAUNCHcast actually randomly selected—the court made clear that the LAUNCHcast algorithm was in fact "biased towards" more highly rated songs at "the top of the list," that were played in random order once selected.  *Id.* at 160.  Pandora is thus even less dependent on user input than LAUNCHcast in these respects.  ███████████████████ ████████████████████████████████  And Pandora implements even greater randomization with respect to song order by selecting songs one at a time and █████████ ████████████████████████████[11]

## V. THE MLC'S MOTION RELIES ON MATERIAL THAT IS IRRELEVANT TO THIS COURT'S OBJECTIVE STATUTORY ANALYSIS

### A. Statements By Pandora Executives And Employees In Other Contexts Are Irrelevant To The Court's Statutory Interpretation

The MLC acknowledges that this case "clearly presents an issue of law," and that it is "strictly under the purview of the court[]" to resolve that question.  MLC MSJ at 3 (quoting

---

[11] More generally, the MLC tries to suggest that Pandora cannot be compared to LAUNCHcast because the latter was created in 2001.  *See* MLC MSJ at 27.  But even if Pandora has continued to refine its algorithms, there is no dispute that it has been offering the same basic internet radio offering since its launch in 2005, and no evidence that it does so in materially different ways, only that it takes into account a wide swath of signals and uses more advanced techniques to find something the user will like.  That may make it better at picking songs the user likes, but if anything, these technological advances give the user even *less* control over the song-selection process, not more.

*Launch Media*, 578 F.3d at 152).  Yet the MLC devotes vast swaths of its motion to quoting statements made by Pandora employees or characterizations in Pandora's usage reporting that it claims do the Court's job for it by purportedly admitting (and thus establishing on their own) that Pandora is, legally, an interactive service.  Those statements should be disregarded as legally irrelevant.

Supreme Court precedent makes clear that statutory interpretation does not turn on how a party characterizes the meaning of a statute.  *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court . . . [the court] retains the independent power to identify and apply the proper construction of governing law."); *see also Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 987 (Fed. Cir. 1995) ("Statutory interpretation is a matter of law strictly for the court.").  The Supreme Court emphatically underscored this principle recently, holding that "[w]hen the meaning of a statute [i]s at issue, the judicial role [i]s to interpret the act of Congress, in order to ascertain the rights of the parties."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (citation omitted).

The principle that party characterizations of a product or transaction do not control its statutory classification is well-established across diverse statutory contexts.  Two Supreme Court decisions are illustrative.  First, in *United Hous. Found., Inc. v. Forman*, 421 U.S. 837 (1975), the Supreme Court declined to treat the parties' label for a financial instrument (as a "stock") as determinative of whether the instrument at issue was a "security" under the relevant statute because the inquiry turned on economic realities, "not on the name appended thereto."  *Id.* at 848–49.  The Court "reject[ed] at the outset any suggestion that the present transaction, evidenced by the sale of shares called 'stock,' must be considered a security transaction simply because the statutory definition of a security includes the words 'any . . . stock.'"  *Id.* at 848.

Rather, the Court adhered to "the basic principle that . . . form should be disregarded for substance and the emphasis should be on economic reality." *Id.* (citation omitted). Similarly, in *Comm'r v. Duberstein*, 363 U.S. 278, 286 (1960), the Court held that a party's characterization of a transaction as a "gift" under the tax code is not determinative of whether the transaction is, as a matter of statutory construction, actually a gift, emphasizing that "*the donor's characterization of his action is not determinative*—there must be an objective inquiry as to whether what is called a gift amounts to it in reality." *Id.* at 285–86 (emphasis added).

The same principle holds true in the copyright context. For example, in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), the Supreme Court confronted the question of whether an artist's work qualified as a statutory "work made for hire" under the Copyright Act. The Court held that the relevant term "employee" should be understood in light of the general common law of agency and the real factual circumstances of control and supervision, *id.* at 740–41, not the parties' statements as to the artist's employment status, *id.* at 751–53. Similarly, the Ninth Circuit's decision in *UMG Recordings, Inc. v. Augusto* rejected a record label's argument that CDs were "licensed" rather than sold based on statements added to the CDs that they were "licensed to the intended recipient for personal use only." 628 F.3d 1175, 1177–78 (9th Cir. 2011). The Ninth Circuit rejected the notion that it was bound by the parties' characterizations of the transaction and independently examined whether the actual transfer and sale of the product constituted a sale. *Id.* at 1180–81; *see also id.* at 1178 n.2 ("Insofar as the parties' agreement purports to establish that the two statements have the same legal consequences, it does not bind us."); *Oracle Int'l Corp. v. Rimini St., Inc.*, 123 F.4th 986, 997–98 (9th Cir. 2024) (vacating district court opinion for relying only on parties' labeling of agreements as a "license," rather than independently analyzing the transactions).

As the authorities above make clear, Pandora employees' colloquial use of the word "interactive" should not influence, let alone replace, this Court's independent judgment in determining what constitutes an "interactive service" under the Copyright Act. Statutory terms like the "interactive service" definition at issue in this case must be interpreted based on the statute's own criteria applied to the facts at hand (how Pandora's internet radio offering operates), not on how Pandora's executives, marketing materials, or public filings used the word "interactive" in ordinary English parlance (or a layperson's reading of the Copyright Act) to describe aspects of Pandora's internet radio offering. Indeed, the *Launch Media* case, which the MLC otherwise embraces (*see* MLC MSJ at 27–29), reached exactly this conclusion: "In its brief, BMG offers evidence of Launch describing LAUNCHcast as 'interactive' in its marketing literature. But our task is to determine whether LAUNCHcast was an interactive service as that term is defined in the statute and not how it was marketed to the public." *Launch Media*, 578 F.3d at 162 n.21. This Court should take the same approach.

To be clear, Pandora does not contend that this Court must ignore *all* party statements or documents wholesale. Statements and documents can be properly considered for what they are competent to prove—namely, objective *facts* about how the product functions (*e.g.*, what a user must do to trigger a feature, what a user hears or sees on the interface, what happens when a session begins and ends, etc.). *See Alexander v. CareSource*, 576 F.3d 551, 562 (6th Cir. 2009) (at summary judgment, materials should be considered "for the factual material [they] contain[]" to assess whether a genuine question of fact exists). But subjective and colloquial characterizations by Pandora employees of whether a given feature is "interactive," for example, or whether it requires "mechanical licensing" stray far beyond statements of fact and directly invade the independent duty of this Court to determine whether, given the undisputed material

facts, Pandora's free internet radio offering is or is not "interactive" and does or does not require mechanical licensing. *See id.* at 560 ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment.").

For example, the MLC reports that "Pandora's CEO told investors that the goal of 'bring[ing] more interactivity into our ad-supported tier' had been 'accomplished,'" MLC MSJ at 12, and "praised the 'unprecedented functionality' of Pandora's 'ad-supported tier,' including the 'new feature' he called 'Premium Access,'" *id.* But whether Pandora's features make it "interactive," thus requiring mechanical licensing under the Copyright Act, is precisely the statutory question before the Court.[12] And even statements that may at first blush appear factual in nature—for example, statements that Premium Access is a "feature" of the "ad-supported tier" or that users can "search and play what you want"[13]— beg the core *legal* question that this Court must independently decide: whether that functionality as made accessible to Pandora's free internet radio users is an integrated feature of the service or a separable "component" that may be

---

[12] Along similar lines, the MLC cites CRB testimony from a Pandora employee, George White, that purportedly "not[es] that *Pandora offerings* involve 'features that implicate mechanical licensing, including unlimited replays and unlimited skips.'" MLC MSJ at 10 n.20 (emphasis added). As an initial matter, the MLC's parenthetical is misleading—the full quote makes clear that Mr. White was exclusively referring to *Pandora Plus*, which Pandora acknowledges requires mechanical licensing, and which allows replays and skips without the limits applied on Pandora's free internet radio offering. *See infra* Section VI; Dkt. No. 112-22, Semel Decl. Ex. 22 at ¶ 15 (George White CRB Testimony) ("*Pandora Plus* offers several features that implicate mechanical licensing including unlimited replays, unlimited skips, and the ability temporarily to cache a limited number of stations . . .") (emphasis added); *see also* Rucinski Rept. at 31–32, 34–36. Setting aside the MLC's misleading quotation, the issue of whether Pandora's free internet radio offering requires mechanical licensing under the Copyright Act is for this Court to independently determine, not Mr. White.

[13] The MLC's reliance on the "search and play what you want" puffery is misplaced. That statement contains an asterisk informing users that they must "unlock by watching an ad" which further informs users that they are beginning a Premium Access session. MLC MSJ at 14; *see also* Pandora SUMF ¶¶ 15-17.

licensed separately and does not transform an otherwise noninteractive service into an interactive one. *Accord* MLC MSJ at 20 ("The question of whether a streaming service is an 'interactive service' under Section 114(j)(7) is clearly an issue of law and therefore *strictly under the purview of the courts*") (emphasis added) (internal quotations omitted).

## B. The MLC's Reliance On Pandora's Reporting Labels Also Fails

The MLC's reliance on the fact that Pandora paid royalties for Premium Access transmissions under the "Free Pandora" label, *see* MLC MSJ at 6–9, 24–25, fails for numerous reasons. First and foremost, as with the statements of Pandora employees, the shorthand labels used in Pandora's royalty reports cannot override the objective statutory definition of an "interactive service." How the statute applies to Pandora's various offerings is the operative legal issue presented by the MLC's Complaint and a question for the Court to answer through independent analysis.

Moreover, as the MLC's motion and its Complaint acknowledge, Pandora made its position clear from the beginning that, notwithstanding whatever labels its operations personnel may have used on reports sent to the MLC at the outset of a new reporting process, Pandora was *not* taking the blanket license or paying Section 115 royalties for its internet radio offering, only for Premium Access sessions. *See, e.g.*, MLC MSJ at 7–8 (admitting that Pandora stated that "[r]evenue derived from non-interactive services on the Free Pandora configuration have been excluded on the basis that they are beyond the scope of 17 U.S.C. 115"); *see also* Compl. ¶¶ 46-48. In short, Pandora made clear from the start that its use of the "Free Pandora" label in its royalty reporting referred exclusively to ad-supported Premium Access transmissions.

The MLC's motion also seizes on the initial months of Pandora's reporting where Pandora's usage reports mistakenly included information for all spins on Pandora's internet radio offering. *See* MLC MSJ at 6; *see also* Marshall Decl. ¶¶ 32-38. The MLC states that it

"immediately identified concerns with Pandora's royalty reporting and payment for Pandora Free," and then attempts to conjure a "variety of admissions" stemming from Pandora's response to the MLC—for instance, Pandora correctly noting that "Pandora offers interactive streams to non-subscribers *solely in Premium Access sessions*."  MLC MSJ at 7.  But this statement merely reiterates Pandora's consistent position that Premium Access sessions are separate and distinct from its internet radio offering.[14]

### C.    Even Were The Court To Consider Extrinsic Evidence, The MLC's Motion Would Still Fail

Even were the Court to consider extrinsic evidence, the far more probative evidence—as set forth in Pandora's own motion—demonstrates the music industry's widespread understanding that Pandora's free internet radio offering is *not* an interactive service. ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████ *See* Dkt. No. 130, Decl. of Craig McFadden ¶¶ 7-9; *see also* Pandora MSJ at 14 (describing Pandora's repeated participation, without challenge, in Section 114 CRB proceedings).  Although none of this evidence should influence the Court's objective application of the Copyright Act to how Pandora's internet radio offering operates, it provides the Court with a more accurate picture of how Pandora should be characterized than cherry-picked statements from Pandora employees.[15]

---

[14] To the extent this case surfaces unintended discrepancies with the labels Pandora uses for its royalty reporting, or for example, plays within Premium Access sessions that should be included, the proper course is for Pandora simply to correct the reports.  But the labeling or reporting itself, if incorrect, cannot independently transform the legal status of Pandora's internet radio offering from a noninteractive service to an interactive service.

[15] Additionally, if the Court were to wade into this battle of extrinsic evidence, it would necessarily preclude the Court from granting the MLC's motion because a clear and material dispute would exist regarding the weight and inferences to be drawn from various types of extrinsic evidence.

## VI. THE MLC'S ARGUMENTS WITH RESPECT TO PANDORA PLUS ARE WAIVED AND, IN ANY EVENT, MERITLESS

Finally, the MLC's motion puts forward a half-hearted attempt to attack an entirely separate service, Pandora Plus, as having been improperly categorized in Pandora's reporting and payment statements as a "Standalone Limited Offering" rather than a "Standalone Portable Subscription Offering." *See* MLC MSJ at 19, 29. Because the MLC's Complaint contains no reference to this theory, this argument is waived. Moreover, the MLC's argument fails on the merits because Pandora Plus satisfies the regulatory requirements to be categorized as a Limited Offering.

The Sixth Circuit has made clear that parties may not introduce new claims or materially new theories into the case at the summary judgment stage. "Parties who seek to raise new claims at the summary-judgment stage must first move to amend their pleadings . . . before asserting the claims in summary-judgment briefing." *Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 496 (6th Cir. 2019). Where a plaintiff "raises the new claims for the first time in the summary-judgment briefing, it generally 'subjects a defendant to unfair surprise,' because the defendant has no opportunity to investigate the claim during discovery." *Id.* (quotation omitted).

The MLC's Complaint contains one ancillary reference to Pandora Plus, *see* Compl. ¶ 40, but nowhere even hints that the MLC was alleging any underpayment of royalties for Pandora Plus—much less claim that Pandora Plus is not a Standalone Limited Offering under the relevant regulations. Indeed, in describing its sole cause of action, the MLC made it clear that it was only challenging the reporting of Pandora's free internet radio offering. Compl. ¶ 62 ("Pandora has systematically and repeatedly omitted required data and information from its usage reporting . . . *for Pandora Free* . . . .") (emphasis added). Nor can the MLC avoid waiver by characterizing Pandora Plus as another "example" of its general grievance about Pandora's royalty payments.

The Sixth Circuit rejects precisely that type of abstract labeling, *see Davis*, 945 F.3d at 496, and the MLC's Pandora Plus argument turns on distinct factual predicates (it being a separate tier with different features and user entitlements) and a distinct legal question (its eligibility for the Standalone Limited Offering category) that are not remotely fairly encompassed by the Complaint. *See, e.g.*, *Commc'ns Unlimited Contracting Servs., Inc. v. Comdata, Inc.*, 611 F. Supp. 3d 483, 497 (M.D. Tenn. 2020) (Richardson, J.) (declining to consider "new claims [made] in summary-judgment briefing").

Even if the MLC's Pandora Plus argument were not waived, it would fail on the merits. Pandora already pays the MLC royalties for the entirety of Pandora Plus under Section 115 because it enables users to save (or "cache") local copies of stations on their devices—a functionality that takes it outside the Section 114 statutory license. But because Pandora Plus does *not* provide for on-demand track listening, it is appropriately reported as a "Standalone Limited Offering," which is defined under the relevant regulation as a subscription offering for which:

> (1) An End User cannot choose to listen to a particular sound recording (*i.e.*, the Service Provider does not provide Eligible Interactive Streams of individual recordings that are on-demand, and Eligible Limited Downloads are rendered only as part of programs rather than as individual recordings that are on-demand); or
>
> (2) The particular sound recordings available to the End User over a period of time are substantially limited relative to Service Providers in the marketplace providing access to a comprehensive catalog of recordings (*e.g.*, a product limited to a particular genre or permitting Eligible Interactive Streams only from a monthly playlist consisting of a limited set of recordings)." 37 C.F.R. § 385.2.

The MLC's argument that Pandora Plus should be categorized as a "Standalone Portable Subscription Offering" (no differently than Pandora Premium or other on-demand, premium subscription services) is devoid of any analysis and simply pays lip service to Pandora Plus's alleged violation of each prong. *See* MLC MSJ at 19, 29. That analysis-free conclusion—which

appears to be premised on the availability of Premium Access sessions to Pandora Plus users—falls well short of satisfying the MLC's burden at summary judgment.

To the contrary, the undisputed material facts establish that Pandora Plus satisfies both prongs. For all of the reasons explained above, Premium Access sessions are limited samples of Pandora Premium—and thus do not render Pandora Plus an on-demand service (under the first prong) any more than they do for Pandora's free internet radio offering.[16] With respect to the second prong, Pandora Plus is not remotely comparable to other subscription services like Spotify and Apple Music. While those services offer users on-demand listening to a comprehensive catalog of hundreds of millions of recordings, Pandora Plus makes *no* songs available to users on-demand outside of Premium Access sessions, only the much smaller subset of tracks that Pandora, through its algorithms, streams non-interactively on its stations. Tellingly, the MLC offers no facts (much less undisputed material facts) about this prong at all.

## CONCLUSION

For the foregoing reasons, Pandora respectfully requests that this Court deny the MLC's motion for summary judgment and enter judgment in favor of Pandora.

Dated: March 5, 2026

Respectfully Submitted,

*/s/ Benjamin E. Marks*

**WEIL, GOTSHAL & MANGES LLP**

Benjamin E. Marks (admitted *pro hac vice*)

---

[16] To be clear, the analysis of Pandora Plus does not implicate the other features disputed with respect to Pandora's free internet radio offering (*e.g.*, replays) because Pandora already categorizes the Plus service as interactive under Section 115 because of station caching. The sole issue is whether the alleged availability of on-demand listening through Premium Access sessions tips the entire Plus tier into a different *category* of interactive streaming (a Standalone Portable Subscription Offering rather than a Standalone Limited Offering).

Todd Larson (admitted *pro hac vice*)
767 Fifth Avenue, 32nd Fl.
New York, NY 10153
Tel: (212) 310-8000
Benjamin.Marks@weil.com
Todd.Larson@weil.com

Crystal L. Weeks (admitted *pro hac vice*)
Sebastian Laguna (admitted *pro hac vice*)
2001 M Street, NW, Suite 600
Washington, DC 20036
Phone: (202) 682-7516
Fax: (202) 857-0940
Crystal.Weeks@weil.com
Sebastian.Laguna@weil.com

**SHERRARD ROE VOIGT &
HARBISON, PLC**

Michael G. Abelow (No. 26710)
Micah N. Bradley (No. 38402)
1600 West End Ave., Suite 1750
Nashville, TN 372013
Tel: (615) 742-4532
Fax: (615) 742-4539
mabelow@srvhlaw.com
mbradley@srvhlaw.com

*Counsel for Defendant Pandora Media, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 5, 2026, **Pandora's Opposition Brief to the MLC's Motion for Summary Judgment** was filed with the Court's electronic filing system, which will serve a copy on all counsel of record.

Dated: March 5, 2026

/s/ *Benjamin E. Marks*

Benjamin E. Marks