**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

|  |  |
|---|---|
| MECHANICAL LICENSING COLLECTIVE, | Civil Action No. 3:24-cv-00168 |
| Plaintiff, | District Judge Eli J. Richardson |
| v. | Magistrate Judge Jeffrey S. Frensley |
| PANDORA MEDIA, LLC, | JURY DEMAND |
| Defendant. | |

**MECHANICAL LICENSING COLLECTIVE'S MEMORANDUM OF LAW IN
OPPOSITION TO PANDORA MEDIA LLC'S MOTION FOR SUMMARY JUDGMENT**

PRYOR CASHMAN LLP
Benjamin K. Semel (admitted *pro hac vice*)
M. Mona Simonian (admitted *pro hac vice*)
Joshua Weigensberg (N.Y. Bar No. 4894929)
Jason E. Sloan (*pro hac vice* application forthcoming)
Erik F. Bakke (admitted *pro hac vice*)
7 Times Square
New York, New York 10036
Phone: (212) 326-0181
Fax: (212) 798-6326
bsemel@pryorcashman.com
msimonian@pryorcashman.com
jweigensberg@pryorcashman.com
jsloan@pryorcashman.com
ebakke@pryorcashman.com

RILEY & JACOBSON PLC
Elizabeth O. Gonser (TN Bar No. 026329)
1906 West End Ave.
Nashville, TN 37203
P: (615) 320-3738
egonser@rjfirm.com

*Attorneys for Mechanical Licensing Collective*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

I.    STATEMENT OF FACTS ............................................................................ 4

   A.    The Blanket License That Pandora Elects To Use To Exploit Songs On Its Services....4

   B.    Pandora's Three Interactive Services ....................................................6

   C.    Pandora Has Not Reported Or Paid Royalties In Full Under The Blanket License........9

II.   PROCEDURAL HISTORY ......................................................................... 11

III.  ARGUMENT ...................................................................................... 12

   A.    Legal Standards ...............................................................................12

   B.    Pandora's Motion Admits That Pandora Free Is An Interactive Service .....................12

      1.    Pandora Admits That Pandora Free Provides Specially Created Programs ................ 13

      2.    Pandora Admits That Pandora Free Allows Users To Move Forward and Backward . 16

      3.    Pandora Admits that Pandora Free Users Can Select And Play Songs On Demand.... 17

   C.    Pandora's Claim That It Complies With the SRPC Is Wrong .....................................22

   D.    Pandora's Claims Concerning Activities Outside The Blanket License Confirm The Lack Of Merit In Its Arguments....................................................................24

   E.    Pandora's Motion Depends On Inadmissible Expert Testimony .................................25

   F.    Pandora's Perfunctory Constitutional Argument Fails in Every Respect ....................29

      1.    The MLC Is Authorized To Bring This Action ........................................... 30

      2.    The MLC's Authority Is Constitutional.................................................... 30

CONCLUSION........................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABKCO Music, Inc. v. Sagan*,
    50 F.4th 309 (2d Cir. 2022) ................................................19

*Arista Records LLC v. Launch Media, Inc.*,
    578 F.3d 148 (2d Cir. 2009)................................................ 12-15, 22

*Automated Mgmt. Sys., Inc. v. Rappaport Hertz Cherson Rosenthal, P.C.*,
    No. 16-CV-04762-LTS-JW, 2024 WL 4987018 (S.D.N.Y. Dec. 4, 2024) ...........................28

*Berlyn, Inc. v. The Gazette Newspapers, Inc*.,
    73 F. App'x 576 (4th Cir. 2003) ................................................28

*Bondi v. VanDerStok*,
    604 U.S. 458 (2025)................................................20

*Branche v. Zimmer, Inc*.,
    No. 3:06-CV-234, 2009 WL 8750012 (E.D. Tenn. Mar. 9, 2009) ........................28

*Cherokee Nation v. Georgia*,
    30 U.S. 1 (1831)................................................19

*Citcon USA, LLC v. RiverPay Inc.*,
    Case No. 18-cv-02585-NC, 2019 WL 2603219 (N.D. Cal. June 25, 2019) ...........................27

*City of Owensboro v. Kentucky Utilities Co*.,
    No. 4:04-CV-87-M, 2008 WL 4642262 (W.D. Ky. Oct. 14, 2008) ........................26

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*,
    447 U.S. 102 (1980)................................................21

*Coregis Ins. Co. v. Lewis, Johs, Avallone, Aviles & Kaufman, LLP*,
    No. 01 CV 3844 (SJ), 2006 WL 2135782 (E.D.N.Y. July 28, 2006) ....................28

*Eltra Corp. v. Ringer*,
    579 F.2d 294 (4th Cir. 1978) ................................................31

*First Years, Inc. v. Munchkin, Inc.*,
    575 F. Supp. 2d 1002 (W.D. Wis. 2008) ................................................29

*Frausto v. Cooper Tire & Rubber Co*.,
    No. 3:12-0761, 2014 WL 3496767 (M.D. Tenn. July 10, 2014)...........................26

ii

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995)............................................................................21

*Hermeling v. Montgomery Ward & Co.*,
    851 F. Supp. 1369 (D. Minn. 1994)..................................................27

*Hyundai Motor Co. v. Hyundai Tech. Grp., Inc.*,
    No. SA CV 23-01709-CBM, 2025 WL 1711440 (C.D. Cal. May 14, 2025) ..........................29

*Kennedy v. Braidwood Mgmt., Inc.*,
    606 U.S. 748 (2025)...................................................................31, 32

*Kewanee Oil & Gas Co. v. Mosshamer*,
    58 F.2d 711 (10th Cir. 1932) ...........................................................29

*Macurdy v. Sikov & Love, P.A.*,
    894 F.2d 818 (6th Cir. 1990) ...........................................................29

*Marmo v. Tyson Fresh Meats, Inc.*,
    457 F.3d 748 (8th Cir. 2006) ...........................................................28

*Med. Imaging & Tech. All. v. Libr. of Cong.*,
    103 F.4th 830 (D.C. Cir. 2024).........................................................31

*Mills v. Riggsbee*,
    No. CIV.A. 12-148-KKC, 2014 WL 1168726 (E.D. Ky. Mar. 21, 2014) ..............................26

*Nat'l Foods, Inc. v. Rubin*,
    936 F.2d 656 (2d Cir. 1991)............................................................19

*Nielsen v. Preap*,
    586 U.S. 392 (2019).....................................................................19

*Oklahoma v. United States*,
    163 F.4th 294 (6th Cir. 2025) .....................................................30, 34

*Reno v. Koray*,
    515 U.S. 50 (1995).......................................................................19

*Rothberg v. Cincinnati Ins. Co.*,
    No. 1:06-CV-111, 2008 WL 5545468 (E.D. Tenn. May 7, 2008) ....................27

*United States ex rel. Shepherd v. Fluor Corp., Inc.*,
    No. 13-CV-02428-JD, 2024 WL 6967290 (D.S.C. Sep. 13, 2024)................29

*SNMP Rsch., Inc. v. Extreme Networks, Inc.*,
    793 F. Supp. 3d 950 (E.D. Tenn. 2025)...........................................20

*Thomas v. Haslam*,
    303 F. Supp. 3d 585 (M.D. Tenn. 2018)................................................................12

*Tomazin v. Lincare, Inc.*,
    No. 3:13–cv–0875, 2015 WL 4545658 (M.D. Tenn. July 27, 2015)......................26

*United States v. Ganier*,
    468 F.3d 920 (6th Cir. 2006) ...................................................................................27

*United States v. Kouza*,
    No. 20-CR-20430, 2025 WL 1427040 (E.D. Mich. May 16, 2025)..................26, 27

*United States v. White*,
    492 F.3d 380 (6th Cir. 2007) ...................................................................................26

*United States v. Wilcox*,
    487 F.3d 1163 (8th Cir. 2007) .................................................................................19

*Vaughn v. City of Lebanon*,
    18 F. App'x 252 (6th Cir. 2001) ..............................................................................27

*West v. Heimermann*,
    Case No. 22-3532, 2023 WL 1822210 (6th Cir. Feb. 8, 2023) ................................27

*Yoe v. Crescent Sock Co.*,
    No. 1:15-CV-3-SKL, 2017 WL 11218929 (E.D. Tenn. Aug. 31, 2017) ............... 29f

**Statutes, Rules & Regulations**

Orrin G. Hatch-Bob Goodlatte Music Modernization Act,
    Pub. L. No. 115-264, 132 Stat. 3676 (2018)..............................................................4

17 U.S.C. § 114..............................................................................13, 19, 21, 22, 23

17 U.S.C. § 115....................................................................................4, 5, 30, 31, 32, 33

17 U.S.C. § 702..........................................................................................................32

17 U.S.C. § 803..........................................................................................................25

37 C.F.R. Part 210, Subpart B ..................................................................................33

37 C.F.R. § 210.23........................................................................................................5

37 C.F.R. § 210.27......................................................................................................33

37 C.F.R. § 210.33......................................................................................................33

Fed. R. Civ. P. 26...................................................................................................26, 28

iv

Fed. R. Civ. P. 56.................................................................................................12

Fed. R. Evid. 701 ...............................................................................................26

Music Modernization Act Transition Period Transfer and Reporting of Royalties
  to the Mechanical Licensing Collective, 86 Fed. Reg. 2176, 2021 WL 75953
  (Jan. 11, 2021)................................................................................................30

## Legislative History

H.R. CONF. REP. NO. 105-796, 1998 WL 703961 (Oct. 8, 1998) ...............................13, 15, 17, 20

H.R. REP. NO. 104-274, 1995 WL 606862 (Oct. 11, 1995)....................................20, 22

President Donald J. Trump, Statement on Signing the Orrin G. Hatch-Bob
  Goodlatte Music Modernization Act, 2018 WL 11390697 (Oct. 11, 2018)..........................31

Report and Section-by-Section Analysis of H.R. 1551 by the Chairmen and
  Ranking Members of Senate and House Judiciary Committees (2018) ...................................4

## Other Legislative and Agency Materials

Responses to Questions for the Record, by Shira Perlmutter, Register of
  Copyrights and Director, U.S. Copyright Office, S. Subcomm. on Intellectual
  Prop. (Sept. 7, 2022), ......................................................................................33

Testimony of Shira Perlmutter, Register of Copyrights and Director, U.S.
  Copyright Office, Oversight Hearing Before the S. Subcomm. on Intellectual
  Prop. (Nov. 13, 2024) .......................................................................................33, 34

U.S. COPYRIGHT OFFICE, ANNUAL REPORT FOR FISCAL 2018 (2019)...............................4

U.S. COPYRIGHT OFFICE, COPYRIGHT AND THE MUSIC MARKETPLACE (2015) ...........................4

U.S. Copyright Office, The Creation of the Music Modernization Act ..........................4

U.S. Copyright Office, Music Modernization Act (MMA) Rulemakings and Ex
  Parte Communications.......................................................................................33

U.S. Copyright Office, MLC and DLC Contact Information, Boards of Directors ....................32

U.S. COPYRIGHT OFFICE, UNCLAIMED ROYALTIES: BEST PRACTICE
  RECOMMENDATIONS FOR THE MECHANICAL LICENSING COLLECTIVE (2021)..........................33

## Other Authorities

Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF
  LEGAL TEXTS, 171 (2012)....................................................................................20

Digital Media Ass'n, *DiMA Urges Passage of Music Modernization Act* (Jan. 11, 2018) .................................................................................................................5

Digital Media Ass'n, *Streaming Forward: More Choices Better Value* (Jan. 11, 2018) .................................................................................................................5

Plaintiff Mechanical Licensing Collective ("The MLC") respectfully submits this memorandum of law in opposition to Defendant Pandora Media, LLC's ("Pandora") motion for summary judgment.

## PRELIMINARY STATEMENT

The two summary judgment motions before this Court are a study in contrast. The MLC's motion rests on the undisputed features available on Pandora Free[1] and on the reality that how Pandora Free works is consistent with how Pandora has described it to consumers, to investors, to regulators, and internally with its leadership and staff. The MLC's motion submits a vast amount of evidence that boils down to confirmation that Pandora Free is what it seems. Videos demonstrate how a user logs into Pandora Free, searches for a song, selects it and plays it. When Pandora's home page tells consumers that Pandora Free users can "search and play what you want," that is precisely what users can do. When Pandora's CEO explains to investors that Pandora Free users have access to "the most expansive ad-supported on-demand capability that exists in the marketplace," that too is true. When Pandora's internal analyses for leadership confirm that ███████████████████████████████████████████████████████████ ████████████████████████████████████ this confirmation is correct. When Pandora states that its algorithmic programming is designed to "████████████████████████ ████████████████████████████," this captures the specially created music programs that it delivers to Pandora Free users.

Pandora's motion asks the Court to conclude the opposite: that Pandora Free is not at all what it appears to be. Pandora asks the Court to conclude that Pandora's home page is misleading consumers, that the statements of Pandora's executives are misleading investors, that Pandora is producing inaccurate and misleading internal analyses for its leadership, and that when a user logs

---

[1] Since Pandora's motion does not address the underpayment of royalties in connection with Pandora Plus, this comparison and discussion will focus on the portion of The MLC's claims that relate to Pandora Free.

in to Pandora Free and plays music on demand, they are not actually playing music on demand on Pandora Free.

Perhaps the most remarkable aspect of Pandora's motion is that it admits the material facts and does not meaningfully contest the operative statutory test. Instead, Pandora effectively just *declares* that things are not what they seem and there must be a different result than the apparent one. This strategy requires Pandora to detour the Court away from the straightforward statutory test at every turn.

The statutory test is based on what the service *enables* users to do. In other words, it is about the features available on the service. If the service gives users *access* to *any* of three features described in the statute, the service is an interactive service. Pandora does not just give users access to all three features, Pandora *advertises* that it gives users access to all three features.

The first feature is personalized music programs that are "specially created for" the user. Pandora does not argue that it does not provide this feature to Pandora Free users. Pandora does not offer a single "undisputed material fact" that even implies that it does not provide this feature. On the contrary, providing the "most personalized" music programs is one of Pandora's brand messages. But instead of accepting the ramification of these facts, Pandora waves away the statutory language, arguing that a program is not specially created for a user unless the user can predict each next song—a self-serving, unreachable test that would effectively eliminate this prong of the definition and fly in the face of its legislative history.

The second feature that makes an interactive service is the ability to move forward and backward to select songs "as part of a program" that was not selected by the user. This is also known as the ability to skip and replay songs. Pandora admits these features exist on Pandora Free, and that there is no limit on the number of skips and replays a Pandora Free user can get. Pandora has also repeatedly admitted in investor materials and executive testimony that the skip/replay feature alone makes a service an interactive service under the statutory test at issue in this litigation. But again, instead of accepting the inescapable conclusion, Pandora seeks to eliminate the statutory test. Pandora offers the baffling argument that when a user goes through their listening history

2

and selects a song to play, it is actually Pandora that is selecting the song, in effect saying that replays cannot count. No precedent or logic is offered to square this counterintuitive argument with the fact that Congress amended the definition of "interactive service" to add this language to *explicitly* cover the skips and replays feature.

The third feature that makes an interactive service is the ability to select and play a song from across a catalog of music on the service. In other words, the ability to "search and play what you want." Which is, conveniently, the exact phrase that Pandora uses on its home page list of the features of Pandora Free. Pandora does not dispute that Pandora Free users have access to this feature. Pandora even has an internal name for it *that includes the word "access."* Pandora's internal name for this feature is Premium Access, which is what it sounds like. As Pandora describes the Premium Access feature in its SEC 10-K filings, it allows "listeners of the ad-supported service" to "access on-demand listening."

Pandora does not – and of course cannot – get away from these facts. It does not even attempt to confront the plain reality, captured repeatedly on video, of a user logging into Pandora Free and then selecting a song and playing it. Instead, Pandora incoherently argues that these activities are happening somewhere *else*, in some different "component" of Pandora, despite the fact that neither the law nor the facts provides such a loophole.

Without law or facts on its side, Pandora also pounds the proverbial table with spin and distraction. Pandora begins with a desperate and unfounded argument that this action violates the constitution, asking the Court to believe that it litigated this case for two years, through discovery on liability, while actually believing that the lawsuit could not be maintained. The argument itself rests on an extraordinary failure by Pandora to check basic facts about The MLC, and is as meritless as it is forfeited.

Beyond these arguments, Pandora offers a variety of irrelevant discussion about alleged activities outside of the Blanket License, such as private licensing and sound recording royalty payments. These have no legal bearing on the statutory test, and seem largely intended to substitute a self-proclaimed industry reputation for the law. Pandora's suggestion that Pandora Free has been

3

"viewed as the paradigmatic example of a noninteractive service" is an uncited and unserious assertion when there is a mountain of actual evidence about how Pandora Free meets the statutory test. Each of these distractions is addressed below, and none support the relief that Pandora seeks.

## I. STATEMENT OF FACTS

### A. The Blanket License That Pandora Elects To Use To Exploit Songs On Its Services

In 2018, the Copyright Act (the "Act") was amended by the Orrin G. Hatch-Bob Goodlatte Music Modernization Act, Pub. L. No. 115-264, 132 Stat. 3676 (2018) (the "MMA") to create a new compulsory blanket license ("Blanket License") for the right to use musical compositions ("songs") in certain covered activity ("Covered Activity"), which includes streaming songs on "interactive services."[2] Congress passed the MMA unanimously, and President Trump signed it into law.[3]

The MMA addressed problems that had arisen with the ascendance of large streaming services like Pandora (referred to as digital music providers, digital service providers, or "DSPs"). Before the MMA, DSPs wishing to obtain a compulsory license for interactive streaming had to do so on a song-by-song basis, by serving a notice on the copyright owner or filing the notice with the Copyright Office.[4] The rapid growth of DSPs in the 2010s strained this system. DSPs sought to add as much music as possible to their streaming catalogs[5] and filed thousands of notices for tens of millions of titles with the Office, while lawsuits were brought against them over noncompliance with the statutory license.[6]

---

[2] 17 U.S.C. § 115(d), (e)(7).
[3] U.S. Copyright Office, *The Creation of the Music Modernization Act*, https://www.copyright.gov/music-modernization/creation.html.
[4] *Id.* § 115(b)(1) (2017).
[5] *See Report and Section-by-Section Analysis of H.R. 1551 by the Chairmen and Ranking Members of Senate and House Judiciary Committees*, p. 3 (2018), https://www.copyright.gov/legislation/mma_conference_report.pdf ("CONF. REP."); U.S. COPYRIGHT OFFICE, COPYRIGHT AND THE MUSIC MARKETPLACE, at 107, 110 (2015), https://www.copyright.gov/policy/musiclicensingstudy/copyright-and-the-music-marketplace.pdf.
[6] *See, e.g.*, U.S. COPYRIGHT OFFICE, ANNUAL REPORT FOR FISCAL 2018, at 7 (2019) ("In fiscal 2018, the Office received 8,541 [notices], covering 42,443,863 titles."), https://copyright.gov/reports/annual/2018/ar2018.pdf.

4

The MMA addressed these issues by replacing the song-by-song licensing approach with a centralized and streamlined regime where DSPs can obtain a Blanket License for all eligible songs.[7] Instead of needing to serve notice on and report and pay royalties to many thousands of individual copyright owners, any one of whom could take issue with a DSP's compliance, the Blanket License allows DSPs to report and pay royalties to a single collective designated to administer the new system.[8] The MMA also offered DSPs a limitation on liability for misconduct prior to 2021 if they complied with certain requirements,[9] which was "a key component that was necessary to bring the various parties together" and put an end to "continual litigation."[10]

The MLC was designated pursuant to the MMA by the Register of Copyrights, with the approval of the Librarian of Congress, to be the collective that administers Blanket License.[11] The MLC performs a number of statutory functions, including collecting royalties due from Blanket Licensees and distributing those royalties to the songwriters, composers, lyricists, and music publishers to whom they are due.[12] The MLC also "[e]ngage[s] in legal and other efforts to enforce rights and obligations under [the Blanket License]," efforts that include this action.[13]

Pandora, through its trade group and along with other DSPs, negotiated the MMA with copyright owners and lobbied for its passage.[14] And Pandora has benefitted greatly from the MMA

---

[7] *See* 17 U.S.C. § 115(d)(1)-(3).

[8] *See id.* § 115(d)(3)-(4).

[9] *Id.* § 115(d)(10).

[10] CONF. REP. at 12.

[11] 37 C.F.R. § 210.23(a); Declaration of Rick Marshall in Support of Plaintiff's Motion for Summary Judgment on Liability ("Marshall Decl.") ¶¶ 3-4 (ECF No. 113).

[12] Marshall Decl. ¶¶ 5-7, 10, 12 (ECF No. 113); 17 U.S.C. § 115(d)(3)(C)(i)(II)-(V), (G)(i).

[13] 17 U.S.C. §§ 115(d)(3)(C)(i)(VIII), (d)(3)(C)(i)(XIII).

[14] *See, e.g.*, *Digital Media Ass'n*, *DiMA Urges Passage of Music Modernization Act* (Jan. 11, 2018), https://dima.org/wp-content/uploads/2018/07/01.11.18-MMA-Support-Letter-Release.pdf (quoting Pandora's general counsel as saying "Pandora commends DiMA, the National Music Publishers Association, and the songwriter community for coming together and proposing a workable solution to the music industry's licensing challenges. The Music Modernization Act is an important step towards improving the digital music services enjoyed by consumers and royalties received by songwriters."); *Digital Media Ass'n*, *Streaming Forward: More Choices Better Value*, p. 5 (Mar. 2018), https://dima.org/wp-content/uploads/2018/04/DiMA-Streaming-Forward-Report.pdf (discussing "negotiations with the National Music Publishers Association").

5

and the Blanket License.[15]  Pandora elected to use the Blanket License since it became available on January 1, 2021, and thus elected for its Covered Activities to be subject to the administration of the designated collective, The MLC.[16]  Pandora also took advantage of the MMA's limitation on liability for its streaming activities prior to 2021, again because it benefited Pandora to try to avoid litigation over any pre-MMA noncompliance.

## B. Pandora's Three Interactive Services

Pandora has three services: its ad-supported service ("Pandora Free") and two subscription services ("Pandora Plus" and "Pandora Premium").[17]  As Pandora's Motion demonstrates, each of Pandora's services, including Pandora Free, has interactive features including the ability to receive specially created music programs and to search and play songs on demand.[18]  Pandora's Motion acknowledges that Pandora Free users are able to search and play specific sound recordings from Pandora's catalog.[19]  In product descriptions, including its website home page, Pandora calls this functionality simply "search and play what you want."[20]  In the context of this litigation, Pandora uses the term "Premium Access" for this functionality.  The MLC's motion for summary judgment, filed contemporaneously with Pandora's Motion, includes volumes of evidence demonstrating

---

[15] Marshall Decl. ¶ 13 (ECF No. 113); January 30, 2021 correspondence from The MLC to Alex Winck, Pandora Head of Royalties, *Notice of License* (Marshall Decl. Exhibit 1 at MLC00000341; ECF No. 113-1).

[16] *Id.*

[17] Pandora Media, LLC's Memorandum of Law in Support of its Motion for Summary Judgment ("Pandora Moving Br."), p. 10 (ECF No. 127) ("Pandora offers users three tiers of service" including Pandora Free); Pandora Statement of Undisputed Material Facts ("Pandora SUF") No. 7. *See also* Plaintiff's Statement of Undisputed Facts ("MLC SUF") No. 3 (ECF No. 111); Joe Dep. Tr. 43:8-18, 51:12-54:23 (Declaration of Benjamin K. Semel in Support of Plaintiff's Motion for Summary Judgment on Liability ("Semel Decl."), Exhibit ("Semel Exh.") 8; ECF No. 112-7) (testimony certifying the accuracy of Pandora 10-K listing three services).

[18] Pandora Moving Br., pp. 12-13 (ECF No. 127); Pandora SUF Nos. 13-14, 25 (ECF No. 132).

[19] Pandora Moving Br., pp. 12-13 (ECF No. 127); Pandora SUF Nos. 13-14, 25 (ECF No. 132).

[20] Pandora homepage, https://www.pandora.com (Semel Exh. 77); Pandora Plans web page, https://www.pandora.com/plans (Semel Exh. 71).

6

Pandora Free users' ability to search and play songs on-demand, including, *inter alia*: video evidence demonstrating this feature, SEC filings confirming Pandora Free users can "access on-demand listening," and admissions by Pandora's CEO that the on-demand listening option provides Pandora with "more compelling and complete functionality in [its] mobile ad-supported service than any other competitor."[21]

Pandora's Motion also acknowledges that Pandora Free users, in addition to being able to search and play songs on-demand, can move forward (*i.e.*, skip the currently playing song to receive new songs) and backwards (*i.e.*, replay songs from their listening histories) within personalized music programs that Pandora provides for each user.[22] This ability to skip and replay songs an unlimited number of times, internally called "Flex" by Pandora, is a feature that is available at all times to all Pandora Free users, and is an additional feature separate from the so-called "Premium Access" feature.[23] Pandora discloses to investors in SEC filings that replays are an "interactive feature" that "implicate[s]" the "mechanical rights" covered by the Blanket License.[24]

---

[21] Pandora Free: Product Feature Demonstration Videos (Expert Report of Juan Serruya ("Serruya Report"), Exhibits ("Serruya Exhs.") 1(a), 1(b), 1(e)); Pandora Q4'17 Earnings Call (Semel Exh. 75, p. 4; ECF No. 106-31).

[22] Pandora SUF Nos. 28-37 (ECF No. 132); Pandora Moving Br., pp. 30-32 (ECF No. 127). The MLC's summary judgment motion addresses Pandora Free's skip and replay functionality in detail. *See* MLC SUF Nos. 10-14 (ECF No. 111); Mechanical Licensing Collective's Memorandum of Law in Support of Motion for Summary Judgment on Liability ("MLC Moving Br."), pp. 16-17, 26 (ECF No. 110). The MLC incorporates into this opposition the materials submitted in connection with its own Motion for Summary Judgment on Liability ("MLC Motion"; ECF Nos. 103-108, 110-114, 116-118.)

[23] Pandora SUF Nos. 28-37 (ECF No. 132); Pandora Moving Br., pp. 30-32 (ECF No. 127). The MLC Motion also addresses Pandora Free's backward-and-forward skip-and-replay functionality at length. *See* MLC SUF Nos. 10-14 (ECF No. 111); MLC Moving Br., pp. 16-17, 26 (ECF No. 110).

[24] Pandora 2016 10-K (Semel Exh. 13, pp. 13-14; ECF No. 106-3); *see also* SiriusXM 2021 10-K (Semel Exh. 18, p. 25; ECF No. 106-8) (describing the need, on the sound recording side, to enter into "agreements grant[ing] us the right to... add interactive features, such as replays, additional

7

Pandora's Motion also admits that Pandora delivers to all users, including Pandora Free users, individually personalized music programs (which Pandora calls "stations"). While Pandora avoids discussing the full extent of personalization,[25] even its reticent admissions confirm that these music programs are specially created for each user. Pandora admits in its motion that Pandora Free users can search for and select particular songs or artists to "seed" the station,[26] that users can shape their personalized stations with direct feedback, and that songs are selected using a song-scoring algorithm driven by user data points.[27] These admissions represent merely the tip of the iceberg of sophisticated personalization algorithms that Pandora does not dispute it utilizes to create personalized music programs for each user (even if it may seek to avoid discussing them in this litigation).[28] Indeed, this reality cannot be escaped when the goal of Pandora's science and engineering teams is to ██████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████"[29]

---

skips and offline play, to Pandora's ad-supported service and to Pandora Plus"); Pandora 2017 10-K (Semel Exh. 14, p. 16; ECF No. 106-4) (describing dependence on agreements allowing Pandora to offer "interactive features in our ad-supported service").

[25] For example, Pandora submits a summary declaration with technical opinion testimony from its head of Algorithmic Programming, but it does not cite to any supporting evidence and glaringly omits a detailed and extensive technical report from the same witness which reveals the depth of personalization at work. *Compare* Declaration of William Barrows Peale ("Peale Declaration") (ECF No. 131) *with* Pandora, Algorithmic Programming Overview, July 2023 (Semel Exh. 67; ECF No. 112-41). As discussed below, the Peale Declaration should be excluded as it does not come close to complying with the Rule 26(a)(2) requirements for expert testimony. The attempt to submit this improper testimony while omitting Pandora's own documentation on how the algorithm actually works is part of a broader effort in Pandora's papers to avoid inconvenient facts that are material to the case – and that are overwhelmingly established by Pandora's own prior admissions.

[26] Pandora Moving Br., p. 10 (ECF No. 127); Pandora SUF No. 9 (ECF No. 132).

[27] Pandora Moving Br., p. 11 (ECF No. 127); Pandora SUF No. 10 (ECF No. 132).

[28] MLC SUF Nos. 15-25 (ECF No. 111); MLC Moving Br., pp. 17-19, 27-29 (ECF No. 110).

[29] Pandora, Algorithmic Programming Overview, July 2023 (Semel Exh. 67 at PANDORA_000061917; ECF No. 112-41).

8

**C.**  **Pandora Has Not Reported Or Paid Royalties In Full Under The Blanket License**

Pandora's Motion requests summary judgment "[b]ecause Pandora has fully paid all royalties due to the MLC."[30]  Pandora provides no explanation for this conclusory statement, and no facts to support its veracity in any way.  These failures are particularly notable where, as The MLC's motion for summary judgment indicates, Pandora admits that (i) it has not reported all revenues or plays in connection with Pandora Free, and (ii) it has utilized a "Limited Offering" royalty category for Pandora Plus despite its full catalog on-demand functionality.[31]

The only "fact" that Pandora offers about the core issue of its royalty payments to The MLC does not support its claim.  In Pandora SUF No. 27, Pandora claims that "Pandora provides a specific accounting of all Premium Access activity to the MLC and pays the royalty rates established under Section 115 to the MLC for Premium Access activity (as well as Pandora Plus and Premium)."

Instead of establishing compliance with its royalty obligations, this fact establishes Pandora's noncompliance.  It is undisputed that Pandora has three streaming services, one of which is ad-supported: Pandora Free.[32]  "Premium Access activity" is not one of Pandora's three services, but represents simply a subset of activity by users of Pandora Free.[33]  Remarkably, the deposition testimony that Pandora cites for this alleged fact reveals that Pandora's own internal guidelines contradict its position.  Pandora cites to the deposition testimony of Kimberly Joe, its 30(b)(6) designee on its reporting to The MLC.  The passage that Pandora cites is part of Ms. Joe's examination on Pandora's royalty reporting processes and controls.  In the passage that Pandora cites, Pandora's witness is asked about Pandora's internal guideline that: "██████████████

---

[30] Pandora's Motion for Summary Judgment, p. 1 (ECF No. 115).

[31] MLC SUF Nos. 4-6, 26-28 (ECF No. 111).

[32] Pandora SUF No. 7 ("Pandora offers three distinct tiers of service."), No. 8 (Pandora's "most popular service" is ad-supported and referred to, *inter alia*, as "free") (ECF No. 132).  *See also* MLC SUF No. 3 (ECF No. 111).

[33] 2024 SiriusXM 10-K (Semel Exh. 21, pp. 8, 13-14; ECF No. 106-11) (identifying three available Pandora streaming services: one ad-supported service and two subscription services, and Premium Access is a feature available to listeners of the ad-supported service and the Plus subscription service).



[34] Ms. Joe confirms that ███████████████████

███████████████████████████████████.[35]

Pandora omitted from its summary judgment papers the transcript page where the witness discusses this earlier list, which states: "███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████[36]

Pandora's own internal controls thus *admit* that mechanical royalties are due for *all* songs played on services where a listener has "the ability to" replay a song or select a specific track to play. The only thing surprising about this admission is that Pandora apparently inadvertently included it as a citation for an alleged fact that claims precisely the opposite. But this admission is fully consistent with that statutory text, as discussed below. It is also consistent with Pandora's repeated admissions outside of its dealings with The MLC and this proceeding. Multiple Pandora executives have admitted under oath in multiple legal proceedings that the replay feature alone triggers the need to obtain mechanical licensing *for all of the activity on that service*.[37] Pandora's certified SEC filings also repeatedly disclosed that mechanical rights are implicated by "interactive features" including replays.[38] All of these admissions are consistent with the statutory text and Pandora's internal controls.

---

[34] Joe Dep. Tr. 81:10-19 (emphasis added) (Declaration of Benjamin K. Semel in Opposition to Pandora Media, LLC's Motion for Summary Judgment ("Semel Opp.") Exh. 1).
[35] *Id.* at 81:10-24.
[36] *Id.* at 79:18-80:9 (emphasis added).
[37] Herring CRB Testimony (Semel Exh. 31 at PANDORA_000070553; ECF No. 112-15) (in open-session, when discussing Pandora's determination that it needed to pay mechanical royalties for Pandora Plus, Pandora's CFO was asked, "[y]ou described Plus as basically a non-interactive radio. Is it because of the replays [and] other features[?]" The CFO testified in response: "Replays, off-line listening, et cetera, yes."); White CRB Testimony (Semel Exh. 22, ¶ 15; ECF No. 112-11) (noting that Pandora offerings involve "features that implicate mechanical licensing, including unlimited replays [and] unlimited skips").
[38] See MLC SUF No. 14 (ECF No. 111).

10

What is inconsistent with all of the law and record evidence is Pandora's contrary position in this litigation that Pandora Free can offer users "the ability to" engage in unlimited skips and replays and to "search and play what [they] want" across Pandora's catalog, while reporting only the small subset of "Premium Access activity," depriving songwriters of the bulk of the royalties they are owed from the use of their songs on an undeniably interactive service.

## II.      **PROCEDURAL HISTORY**

The MLC filed this action on February 12, 2024.[39]  Pandora did not move to dismiss the complaint, did not assert any affirmative defenses related to separation of powers, and, through two years of litigation and the entirety of discovery as to liability, did not assert a separation of powers defense.[40]  On March 3, 2025, the Court granted a joint motion to bifurcate this action between a liability phase and a damages phase. (*See* ECF No. 50.) The parties are in the liability phase.

The deadline for disclosure of affirmative experts as to liability was October 24, 2025. (ECF No. 75.)  On that date, The MLC served the reports of its two experts, Juan Serruya and Robin Flynn; Pandora did not serve any affirmative reports.  The rebuttal report of Christopher Rucinski, which Pandora submits in support of its Motion, was served in purported rebuttal of Mr. Serruya's affirmative report.  (ECF No. 120.) Pandora did not disclose William Barrows Peale or Nick Marcantonio as experts at any point.[41]

On February 5, 2026, the parties filed their respective summary judgment motions.  (ECF Nos. 103, 115.)  The MLC's motion seeks judgment as to Pandora's liability, with damages to be addressed in the second phase of this bifurcated proceeding.

---

[39] Semel Decl. ¶ 81 (ECF No. 112); The MLC's Complaint (Semel Exh. 80; ECF No. 106-36).
[40] Semel Decl. ¶ 82 (ECF No. 112); Pandora Answer, p. 17 (Semel Exh. 1; ECF No. 106-1).
[41] Semel Opp. Decl. ¶ 6.

### III.    ARGUMENT

### A.    Legal Standards

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible.  *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018).

### B.    Pandora's Motion Admits That Pandora Free Is An Interactive Service

The MLC and Pandora agree that there are no genuine disputes of material fact to be tried in this case with respect to how Pandora Free operates.  Because "[t]he parties do not materially disagree on how [Pandora's service] works," the question of whether Pandora Free is an "interactive service" under Section 114(j)(7) of the Copyright Act is "clearly an issue of law and therefore strictly under the purview of the courts."  *Arista Records LLC v. Launch Media, Inc.* ("*LAUNCHcast*"), 578 F.3d 148, 151-152 (2d Cir. 2009).  For the reasons stated in The MLC's Motion, these undisputed features and functionalities render Pandora Free an interactive service as a matter of law, and summary judgment should be granted in The MLC's favor.[42]  The MLC here responds to the assertions made in Pandora's Motion, which provide further support for The MLC's Motion.

As discussed in The MLC's Motion,[43] a service is an "interactive service" if it "enables" *any* of the following three features for its users: (1) stream music programs specially created for

---

[42] The MLC respectfully refers the Court to the MLC Motion for a full explication of the grounds for granting summary judgment in The MLC's favor, including with respect to Pandora's liability for underpayment of royalties for the Pandora Plus service due to the use of the improper Limited Offering category, which Pandora does not address in its Motion.

[43] MLC Moving Br., pp. 23-24 (ECF No. 110).

12

the user;[44] (2) move forward (skip) and backward (replay) in order to select and play particular music from within a program that is comprised of music that was *not* chosen by the user;[45] or (3) select and play music from a catalog on demand.[46] While enabling even just one of these features is enough for a service to be deemed an "interactive service," The MLC demonstrates in its Motion that Pandora Free enables all three.[47] Pandora moves for summary judgment arguing to the contrary, but as discussed below, its positions are meritless.

### 1. Pandora Admits That Pandora Free Provides Specially Created Programs

Pandora concedes that Pandora Free is a "personalized streaming service[]."[48] As The MLC's Motion discusses in detail, the facts on this point are overwhelming.[49] Pandora's stated mission is to ███████████████████████████████████████████ ███████████████████████████[50] That alone is enough to render Pandora Free an "interactive service."[51] Congress literally used the exact same word, "personalized," explaining that "personalized transmissions—those that are specially created for a particular individual—are to be considered interactive." H.R. CONF. REP. NO. 105-796, 1998 WL 703961, at 87 (Oct. 8, 1998).

Pandora does not argue that it is not an interactive service under the plain language of the "specially created" prong of 17 U.S.C. § 114(j)(7). Rather, Pandora argues that the plain language of the statute should be disregarded, and that instead of adhering to the statute this court should craft a test based on select language from the *LAUNCHcast* opinion. As discussed in detail in The MLC's Motion, the *LAUNCHcast* court's factual conclusions concerning an early, turn-of-the-century streaming technology cannot be simply transferred to Pandora Free's current sophisticated

---

[44] 17 U.S.C. § 114(j)(7) ("An 'interactive service' is one that enables a member of the public to receive a transmission of a program specially created for the recipient.").

[45] *Id.* ("An 'interactive service' is one that enables a member of the public to receive… on request… a particular sound recording,… as part of a program,… selected by… the recipient.").

[46] *Id.* ("An 'interactive service' is one that enables a member of the public to receive… on request… a particular sound recording… selected by… the recipient.").

[47] MLC Moving Br., pp. 24-29 (ECF No. 110).

[48] Pandora Moving Br., p. 22 (ECF No. 127); Pandora SUF Nos. 9-10 (ECF No. 132).

[49] MLC Moving Br., pp. 17-19, 27-29 (ECF No. 110); MLC SUF Nos. 15-25 (ECF No. 111).

[50] Peale Dep. Tr. 64:14-66:25, 67:18-68:11 (Semel Exh. 11; ECF No. 112-10).

[51] MLC Moving Br., p. 27 (ECF No. 110).

algorithms.[52]   Moreover, Pandora Free does not come close to implementing the extreme limitations on music programs cited by *LAUNCHcast* in finding that the LAUNCHcast service was not an interactive service.[53]

However, while a factual comparison of LAUNCHcast and Pandora confirms that Pandora's extreme personalization exceeds the court's relevant limits (and what was even algorithmically conceivable in the era LAUNCHcast operated), the plain language of the statute must remain the touchstone for the analysis. No particular gloss by the Second Circuit can supplant the statutory language. While the Second Circuit found the "degree of predictability" relevant to its application of the statute in that case, that does not convert the statutory test from "specially created" to "predictable" as Pandora appears to suggest. If Congress had wanted the test to be "predictable," it would have used that term – and nowhere in the statute or legislative history is there any discussion of predictability as the test. Such a radical reinterpretation of a statute cannot be founded on a single, brief discussion by a court that did not itself criticize or purport to override the actual statutory test.

Further, Pandora's narrow spin on *LAUNCHcast* ignores that the Second Circuit's actual factual analysis looked at factors that more closely matched the statutory "specially created" test than a "predictable" test. *LAUNCHcast*, 578 F.3d at 162-64. The court specifically validated the statutory test with its holding that, "the word 'specially' implies that the program was made by taking some of the user's preferences into consideration. We cannot conclude that a specially created program could include a playlist of completely random songs selected without regard for the user's preferences. First, such a result would make no sense because a unique playlist of random songs would be little different from a radio station streamed over the internet." *Id.* at 162 n.22. Following this holding, the court highlighted that 60% of a playlist pool on

---

[52] *Id.* pp. 27-29. The *LAUNCHcast* case did not involve allegations concerning the other prongs of the interactive service definition, so Pandora's arguments on this point are limited to just one of the three independently sufficient reasons that Pandora Free is an interactive service.
[53] *Id.* (discussing examples).

14

LAUNCHcast were selected without any consideration for the user's song, artist, or album preferences.

Notably, while a lack of predictability may *follow* from this finding, the finding was directly about capturing the extent to which the playlist was "specially created" in terms of being *influenced* by information about the specific user. This finding also highlights how far Pandora Free is from the LAUNCHcast service on the facts. On Pandora Free, *every* song selection is influenced by user preference, every selection specially chosen for that user based on data about that user – and not just a small amount of personalization. Pandora's algorithm aims for maximum user influence and "█████████████████████████." That is nothing like the LAUNCHcast service, which employed comparatively drastic limits on the amount of influence that data about the user could have on the music programs, which could underlie a finding that it delivered unique programs but not "specially created" programs. *Id*. at 163-164.

The fact that the Second Circuit thus explicitly applied the actual statutory test, regardless of its additional explanation examining predictability, reinforces that there is no grounds for disregarding the statutory language in this analysis in favor of an undefined "predictability" test. Congress also provided specific guidance on what counts as an interactive service that speaks to influence over predictability. Congress explained that "[t]he recipient of the transmission need not select the particular recordings in the program for it to be considered personalized, for example, the recipient might identify certain artists that become the basis of the personal program." H.R. Conf. Rep. No. 105-796, 1998 WL 703961, at 87. A music program based on certain artists does not offer predictability at the level of any specific recording, but it does offer influence, and Congress intended it to constitute an interactive service. This example again confirms that Pandora Free – which offers users the ability to select and stream Artist-Only music programs that play the music of only the selected artist(s)– is an interactive service.[54]

---

[54] MLC SUF No. 25 (ECF No. 111); Pandora SUF No. 9 (ECF No. 132).

15

The MLC's Motion cites substantial record evidence on these issues, evidence that establishes the extreme degrees of user influence and personalization in Pandora's algorithmic programming.[55] This is highly technical material that is analyzed and explained by The MLC's expert witness in product design and engineering, along with full expert disclosures.[56] Pandora chose to not designate an expert witness on this topic, and further chose to not submit any rebuttal expert analysis from its Algorithmic Programming team on the points raised by The MLC's expert witness.[57] Submitting such expert testimony would have required Pandora to provide access to the materials underlying such analysis, and subjected the witness to cross-examination on such materials. Pandora made the conscious decision to avoid having to provide such disclosures by forgoing such expert testimony. As discussed below Pandora cannot now through the improper Peale Declaration submit expert testimony in the guise of lay testimony.

    2.    <u>Pandora Admits That Pandora Free Allows Users To Move Forward and Backward</u>

Pandora concedes that Pandora Free users can "skip ahead to another song" and "replay… tracks… previously played."[58] This undisputed skip and replay functionality independently makes Pandora Free an "interactive service" under the law.[59]

---

[55] Pandora was apparently unable to identify a single undisputed material fact that supports their analysis on this statutory test, offering only a vague allegation that "Pandora's… algorithms… select which tracks are streamed for the user." Pandora SUF No. 10 (ECF No. 132).

[56] Serruya Report ¶¶ 97-122 (ECF No. 116).

[57] The Rucinski Rebuttal Report includes a few pages on algorithmic programming, but it does not rebut any of the key findings in the Serruya Report. Rather, consistent with the conclusion discussed below that the Rucinski Rebuttal Report was simply an affirmative expert report that was not timely submitted and was disguised as a rebuttal report to deprive The MLC of a rebuttal opportunity, the brief Rucinski discussion focuses on Pandora's attempt to modify the statutory test to be about predictability and in particular, an irrelevantly narrow inquiry into whether "a user is able to control or predict the next song that Pandora plays during Lean-Back Listening." Rucinski Rebuttal Report ¶ 79 (ECF No. 128).

[58] Pandora Moving Br., pp. 30-32 (ECF No. 127); Pandora SUF Nos. 28, 33 (ECF No. 132); *see also* MLC Moving Br., pp. 16-17 (ECF No. 110).

[59] MLC Moving Br., p. 26 (ECF No. 110). Pandora further concedes that this unlimited "Flex" skip/replay feature is always available and separate from the Premium Access feature on Pandora Free. (Pandora SUF Nos. 28-31, 33-36 (ECF No. 132); *see also* MLC Moving Br., pp. 16-17, 26 (ECF No. 110).).

16

As Congress explained, the phrase "whether or not as part of a program" from the statutory definition was added to the statute *expressly to expand its scope and capture precisely this functionality*: where the user did not "select the actual songs that comprise the program," but "has the ability to move forward and backward between songs in [the] program." H.R. CONF. REP. NO. 105-796, 1998 WL 703961, at 88.

Pandora is fully aware of this prong of the definition, and its denial of liability on this prong stands in stark conflict with the repeated admissions, including by its leadership in certified SEC filings and in other proceedings, that this skip/replay functionality creates an interactive service under the law that requires mechanical licensing.[60] With nowhere to go, Pandora resorts to the baffling argument that when a Pandora Free user selects and plays particular songs from their listening history, the songs should be deemed selected instead by Pandora because the songs originally appeared in a music program that the user did not assemble.[61] This interpretation is untenable for many reasons, not the least being that it is *precisely the opposite* of the statutory language and the expressed Congressional intent. Pandora is arguing that it is not legally possible for Pandora Free users to select and play sound recordings from music programs. But the "whether or not as part of a program" phrase was explicitly added to address *exactly* that situation: where the user does *not* "select the actual songs that comprise the program," yet can still select from within that program by "mov[ing] forward and backward." Pandora's attempt to effectively write this phrase out of the statute must fail.

3.    Pandora Admits that Pandora Free Users Can Select And Play Songs On Demand

Pandora does not dispute that (1) Pandora Free users are able to search and play music on demand, and (2) the ability to search and play music on demand suffices to make a service an "interactive service" under the law.[62] Factually and legally, this should be the end of the inquiry, the third independent test that confirms that Pandora Free is an interactive service that must be

---

[60] MLC Moving Br., pp.10-11, n. 19, 20, 21 (ECF No. 110).
[61] Pandora Moving Br., pp. 31-32 (ECF No. 127).
[62] Pandora SUF Nos. 14-15 (ECF No. 132); MLC SUF No. 7 (ECF No. 111).

reported and paid for under the Blanket License.

This conclusion is apparent to the naked eye, and it holds Pandora to the same Blanket License standards observed by its self-described competitors. Pandora explicitly designed the functionality of Pandora Free to compete with other ad-supported interactive services, most notably Spotify and YouTube.[63] As The MLC's Moving Brief reflected, Pandora memorialized this competitive landscape ██████████████████████████████████████ ██████████████████████████████████████████.[64] Spotify and YouTube report and pay royalties under the Blanket License for their ad-supported offerings.[65] Yet Pandora operates under the Blanket License while clinging to the untenable refusal to pay royalties for the majority of the activity on its ad-supported streaming service, a service that openly and obviously allows users to stream music on demand.

However, Pandora refuses to accept the plain reading of Sections 114 and 115. After rotating through several arguments over the course of this action, Pandora's Moving Brief seems to have settled on arguing that the word "component" in the last sentence of Section 114(j)(7) is the proverbial elephant hidden in a mousehole. Pandora incorrectly suggests that this word allows it to ignore what Pandora Free enables users to do and fabricate a completely inconsistent and unprecedented definition of "interactive service" that is not about the service at all, but is based on the live, moment-to-moment activities of each Pandora Free user.

Pandora's contrived argument fails at every level, and indeed fails before one even reaches the word "component" in the last sentence of Section 114(j)(7):

> An "interactive service" is one that enables a member of the public to receive a transmission of a program specially created for the recipient, or on request, a transmission of a particular sound recording, whether or not as part of a program, which is selected by or on behalf of the recipient… If an entity offers both interactive and noninteractive services (either concurrently or at different times), the noninteractive component shall not be treated as part of an interactive service.

---

[63] Phillips CRB Testimony ¶¶ 10-14 (Semel Exh. 30; ECF No. 112-14).
[64] MLC Moving Br., p. 13 (ECF No. 110) (citing Pandora, *Mobile Ad Supported Competitive Feature Summary* (Semel Exh. 54 at PANDORA_000069580)).
[65] Marshall Decl ¶ 9 & n. 8, 9 (ECF No. 113).

17 U.S.C. § 114(j)(7). This last sentence begins with the conditional phrase: "If an entity offers both interactive and noninteractive services…." The rest of the sentence is thus only relevant where an entity has *both* types of services. Pandora does not have a noninteractive service, since all of Pandora's services enable the activities referenced in the first sentence of the definition. And while, as discussed below, "noninteractive component" in context can only mean "noninteractive service," it would not make a difference either way. Without a noninteractive service, Pandora does not even reach the phrase discussing noninteractive components in this last sentence. Put another way, Pandora cannot get the loophole it seeks: it cannot start with its interactive service and end with a noninteractive service.

More granular analysis of the statutory text only hammers home this result. Pandora's suggestion would contravene the fundamental rule that "the meaning of a word cannot be determined in isolation." *Reno v. Koray*, 515 U.S. 50, 56 (1995). Like any statutory term, the meaning of "component" as it is used in Section 114(j)(7) is controlled by its semantic and syntactic context. *Cherokee Nation v. Georgia*, 30 U.S. 1, 19 (1831). Read in that light, "component"—which forms part of the noun phrase "*the* noninteractive component"—plainly refers to the "noninteractive services" offered by "an entity" discussed in the immediately preceding clause. The definite article "the" is "a function word . . . indicating that a following noun . . . has been previously specified by context." *Nielsen v. Preap*, 586 U.S. 392, 408 (2019) (quoting Merriam-Webster's Collegiate Dictionary 1294 (11th ed. 2005)).[66] To paraphrase the Supreme Court, "[f]or ['noninteractive component'] to have been previously specified, its scope must have been settled by the time ['the noninteractive component'] appears at the end of [Section 114(j)(7)]." *Preap*, 586 U.S. at 393.[67] Looking at Section 114(j)(7), there is only one

_____

[66] *See also ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 317 (2d Cir. 2022) (interpreting statutory definition in the Copyright Act and finding "the use of the definite article 'the' to reference the concepts [A and B] . . . can only be read to refer to these terms as *previously* defined in the first sentence") (emphasis in original).
[67] *See also United States v. Wilcox*, 487 F.3d 1163, 1176 (8th Cir. 2007) ) (holding "[t]he use of the definite article indicates that '*the* victim' . . . is the victim described at the beginning of the subsection") (emphasis in original); *Nat'l Foods, Inc. v. Rubin*, 936 F.2d 656, 660 (2d Cir.

19

natural referent: "noninteractive services." Syntax confirms this reading as well. Sentences following an *if/then* construction (*i.e.,* conditional sentences) presuppose a logical connection between their constituent parts. Indeed, if "noninteractive component" does *not* refer back to "noninteractive services," the internal syntax of the sentence falls apart.[68]

Pandora's invocation of the canon of meaningful variation does not save its argument. As Justice Scalia and linguist Bryan Garner have explained, "[b]ecause it is so often disregarded, [it] is particularly defeasible by context." Reading Law: The Interpretation of Legal Texts, 171 (2012). "[O]ften (out of misplaced pursuit of stylistic elegance), [Congress] use[s] different words to denote the same concept." *Id.* at 170. Here, obvious contextual clues compel the conclusion that the variation between "noninteractive component" and its functional antecedent "noninteractive service" cannot be meaningful. *See, e.g.*, *Bondi v. VanDerStok*, 604 U.S. 458, 482-83 (2025).

This analysis is a more meticulous way of explaining what Congress said succinctly in the legislative history discussing this provision:

> If an entity offering a nonsubscription service (such as a radio or television station) chooses to offer an interactive service *as a separate business*, or only during certain hours of the day, that decision does not affect the exempt status of any component *of the entity's business* that does not offer an interactive service. In other words, each transmission should be judged on its own merits with regard to whether it qualifies as *part of an "interactive" service*. The third sentence of the definition of "interactive service" is intended to make this clear.

H.R. Rep. No. 104-274, 1995 WL 606862, at 25-26 (Oct. 11, 1995) (emphasis added).[69]

---

1991) (construing statute's second use of the term 'the court' as referencing "the same [court] referred to the first time"); *SNMP Rsch., Inc. v. Extreme Networks, Inc.*, 793 F. Supp. 3d 950, 979 (E.D. Tenn. 2025) (finding "[g]rammatically, 'the inaccurate information' in [the Copyright Act] . . . refer[s] to the preceding phrase 'any inaccurate information'").

[68] Pandora's interpretation proves this point. Pandora does not propose an alternative antecedent for "noninteractive component," opting to ignore the definite article that precedes it altogether.

[69] Pandora's reliance on a separate "example" offered by a later Congress is misplaced. *See* Pandora Moving Br., p. 7 (ECF No. 127) (quoting H.R. Conf. Rep. No. 105-796, 1998 WL 703961, at 88) ("For example, if a Web site offered certain programming that was transmitted to all listeners who chose to receive it at the same time and also offered certain sound recordings that were transmitted to particular listeners on request, the fact that the latter are interactive transmissions would not preclude statutory licensing of the former."). Besides the fact that Pandora inaccurately

As this history explains, the last sentence simply clarifies that owning an interactive service does not mean that all of an entity's other business lines become interactive services simply by virtue of shared ownership.[70]

This interpretation is also the only one that fits with the first sentence of the "interactive service" definition, which makes clear that a service is "interactive" or it is not. If it "enables [its users] to receive . . . on request, a transmission of a particular sound recording . . . which is selected by . . . the recipient," then the service is an "interactive service." 17 U.S.C. § 114(j)(7).[71] Pandora concedes that this functionality exists with Pandora Free, where "users of the Pandora Free offering are presented with opportunities" to "make song selections" through the Premium Access feature.[72] "[T]o provide with the means or opportunity" is the very definition of "enable." Enable, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/enable.

---

states that this portion of the "interactive service" definition was adopted in 1998, rather than in 1995, this example supports The MLC's position. In the example, an entity has a noninteractive service akin to a traditional radio station simulcast ("programming…transmitted to all listeners who chose to receive it at the same time") and also an interactive service where users select and play sound recordings on demand (sound recordings "transmitted to particular listeners on request"). Regardless, this after-the-fact example should not be preferred, as it is from the 1998 Congress, which neither enacted nor amended the language at issue, unlike the 1995 Congress whose contemporaneous, on-point example Pandora avoids. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 580 (1995) (explaining that "[i]f legislative history is to be considered, it is preferable to consult the documents prepared by Congress when deliberating"); *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117-18 (1980) (explaining that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one").

[70] The MLC is not claiming that Pandora Free is an interactive service because Pandora owns other interactive services. Pandora Free is an interactive service because it meets the definition of an interactive service.

[71] Thus, the only relevance to Pandora's assertion that "usage of the disputed features in this case is minimal" is that it is a further conclusive admission that Pandora Free users are indeed enabled to engage in these interactive activities. Moreover, Pandora's statistics are deeply misleading as to Pandora's estimation of the importance of interactive features on Pandora Free. What the record actually shows is that these features are very significant to Pandora. *See, e.g.*, Flynn Report ¶¶ 41, 47, 52, 65 (ECF No. 114) ("Pandora gave Pandora Free users the ability to stream music on demand in order to respond to competitive pressure and increase advertising revenues."); August 17, 2023 internal e-mail among Pandora executives (Semel Exh. 44 at PANDORA_000056581; ECF No. 112-19) (███████████████████████████████████████████████)

[72] Pandora Answer ¶¶ 31, 34 (Semel Exh. 1; ECF No. 106-1); *see also* MLC SUF Nos. 7-9 (ECF No. 111).

The plain language of the categorical definition of interactive service is reinforced again by Section 114's explicit provision stating that no "*transmission*" that is "*part of* an interactive service" is eligible for a noninteractive statutory license. *See* 17 U.S.C. § 114(d)(2)(A)(i) (emphasis added); *see also* H.R. REP. NO. 104-274, 1995 WL 606862, at 21 ("A statutory license is not available for transmissions by an interactive service."). That is why the statute looks to "the particular aspect of [the service] that is the most interactive" to determine its status and why that status applies to the service as a whole. *LaunchCAST*, 578 F.3d at 159 n.14.[73] Any other reading would collapse the distinction between "services" and "transmissions" made throughout Section 114. *See generally* 17 U.S.C. § 114 (using and defining terms like "eligible nonsubscription transmission" and "new subscription service"); *id.* § 114(j)(6) (defining an "eligible nonsubscription transmission" as a particular type of "transmission . . . that is made as part of a [particular type of] service").

The limited scope of Pandora's inadequate "component" argument also bears emphasis. Pandora does not even attempt to argue that it can excuse Pandora Free's provision of specially created music programs, which independently render it an "interactive service." (*See supra* Sec. III.B.1.) And while Pandora offers a passing reference alleging another "component" defense with respect to unlimited skip/repaly functionality on Pandora Free, it offers no attempt to conceptually square that contrived argument with its different contrived argument concerning the Premium Access feature, serving to show the unprincipled nature of the "component" argument.[74]

## C.  Pandora's Claim That It Complies With the SRPC Is Wrong

Pandora's argument that it supposedly complies with statutory limits known as the "sound recording performance complement" ("SRPC") on "modes" is irrelevant.[75] Pandora appears to have included it in anticipation of The MLC moving for summary judgment on the grounds of

---

[73] Pandora understands this when it comes to its Premium service. Like Pandora Free, Pandora Premium allows users to listen to stations or listen to music on demand. Yet Pandora has never argued that Premium is anything less than an "interactive service."

[74] *See* Pandora Moving Br., pp. 28, 32 (ECF No. 127).

[75] Pandora Moving Br., pp. 21, 32-35 (ECF No. 127).

Case 3:24-cv-00168    Document 153    Filed 03/05/26    Page 29 of 43 PageID #: 9155

Pandora's *non*compliance with the SRPC limits. It is true that Pandora's noncompliance with these limits is a fourth independent reason why Pandora Free falls under the Blanket License, but The MLC focused its motion on the even more fundamental fact that Pandora Free is an interactive service.

Compliance or non-compliance with the SRPC has no bearing whatsoever on whether a service is an "interactive service" under Section 114(j)(7). *See* 17 U.S.C. § 114(d)(2)(A)(i). Pandora acknowledges this.[76] The SRPC is a separate limitation under the Section 114 license on how frequently sound recordings by the same recording artist or from the same album can be played on a channel. 17 U.S.C. § 114(j)(13). Transmissions that do not comply with the SRPC are not eligible for the Section 114 statutory license. 17 U.S.C. § 114(d)(2)(C)(i).

Pandora's argument regarding the SRPC rests on a contrived interpretation of what constitutes a "channel" under Section 114. The natural reading of "channel" is that the individual user accounts, the singular transmission feeds between the service and each listener, are channels. Pandora instead argues that each user's account can be subdivided into an endless number of "channels."[77] This reading would lead to the absurd proposition that an unlimited number of songs by the same artist can be played in succession through a single user's transmission feed while Pandora simultaneously claims that it is not playing more than four songs by a single artist in any three-hour period for that user. Pandora even admits that Pandora Free users can stream Artist-Only music programs that explicitly consist entirely of songs by a single artist,[78] while inexplicably submitting a proposed undisputed fact asserting that it "is not aware of any instances" where it has exceeded the limit of four songs by an artist in three hours on a channel. Pandora's claim that it does not violate the SRPC is simply not credible. Regardless, as noted above, whether and how

---

[76] *See* Pandora Moving Br., pp. 8-9 (ECF No. 127) (discussing the independent requirements that a service not be interactive and that the SRPC be observed).
[77] Pandora Moving Br., p. 33 (ECF No. 127).
[78] MLC SUF No. 25 (ECF No. 111).

23

Pandora violates the SRPC is irrelevant to the larger issue that Pandora Free is an "interactive service."

**D.**    **Pandora's Claims Concerning Activities Outside The Blanket License Confirm The Lack Of Merit In Its Arguments**

Pandora's brief includes a variety of irrelevant claims about its activities outside of the Blanket License, including its historical private licensing for the right to use songs, its payments of sound recording royalties to another entity (SoundExchange), and its participation in proceedings before the Copyright Royalty Board.[79] These assertions generally have no bearing on this action under the Blanket License. However, Pandora's discussion of its private licensing reinforces an important fact: Pandora is not and has never been required to utilize the Blanket License to operate its business.[80] Pandora can – and has – licensed its use of songs through private agreements. And indeed, if the "market" rates were lower than the Blanket License rates established by the Copyright Royalty Board, it can be assumed that Pandora would operate under private agreements with those rates. All of Pandora's irrelevant, self-serving, and unsubstantiated claims about what the "market" thinks about its royalty obligations must be viewed through the reality that nothing has ever stopped Pandora from operating under private licenses instead of the Blanket License.[81]

Pandora's history of making sound recording royalty payments to SoundExchange is also legally irrelevant, and factually serves only to show the lack of merit in Pandora's arguments. SoundExchange is a collective that processes royalties under the Section 114 license as well as under private agreements. Pandora seeks to use the fact that Pandora sends royalties to SoundExchange for processing as evidence that Pandora Free is eligible under Section 114. But

---

[79] Pandora Moving Br., pp. 13-15, 23 (ECF No. 127).

[80] Marshall Decl. ¶ 8 (ECF No. 113) (explaining how "[t]he use of the Blanket License is optional for DSPs, and a DSP may instead negotiate voluntary licenses for Covered Activity directly from copyright owners," and in such cases "The MLC will carve out" the associated royalties from the Blanket License).

[81] Notably, Pandora did not submit a single one of its alleged licenses with music publishers as evidence in support of its motion.

24

Pandora admitted in discovery that SoundExchange ████████████████████████████
████████████████████████.[82]  Moreover, the sound recording royalties that Pandora pays
to SoundExchange for ████████████████████████████████████████████████
████████████████████████████.[83]

Similarly, Pandora's history of participating in Copyright Royalty Board proceedings to
set Section 114 rates, which are open to the public, is also legally irrelevant.  Nor is its participation
even persuasive as to eligibility under Section 114, as participants need only have "a significant
interest in the proceeding," not necessarily be eligible for or actually utilize the statutory license.
17 U.S.C. § 803(b)(2)(C).  Indeed, Pandora's petitions to participate in proceedings concerning
Section 114 do not even confirm that Pandora operates under the Section 114 license, but offer
that Pandora may instead "incorporate" some of the terms of that license into its private deals.[84]

## E.    Pandora's Motion Depends On Inadmissible Expert Testimony

In the absence of admissible evidence to support its positions, Pandora tries to build a case
on unsubstantiated and often cryptic opinion testimony on highly technical topics offered by
witnesses whom Pandora never properly disclosed as experts.  None of this opinion testimony is
relevant, let alone persuasive in the face of the clear statutory test and overwhelming evidence of

---

[82] Joe Dep. Tr. 145:19-24, 149:18-150:11 (Semel Opp. Exh. 1).

[83] Joe Dep. Tr. 59:25-60:17 (Semel Opp. Exh. 1) ████████████████████████████████
███████████████████████████████████████████████████████████████████████████
*id.* 110:12-16 ████████████████████████████████████████████████████████████
████████████████

[84] *See* Pandora Media, LLC's Petition to Participate, *In the Matter of Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate Performances (Web V)*, Dkt. No. 19-CRB-0005-WR (2021-2025) (Copyright Royalty Bd. Feb. 1, 2019), https://app.crb.gov/document/download/3629; Sirius XM Radio Inc./Pandora Media, LLC Petition to Participate, *In the Matter of Determination of Royalty Rates and Terms for Ephemeral Recording and Digital Performance of Sound Recordings (Web VI)*, Dkt. No. 23-CRB-0012-WR (2026-2030) (Copyright Royalty Bd. Jan. 26, 2024), https://app.crb.gov/petitionToParticipate/view/58770.

Pandora's liability. However, Pandora is attempting to confuse and distract from its liability with such testimony, and thus The MLC addresses here its impropriety and inadmissibility.

<u>The Peale and Marcantonio Declarations Contain Expert Testimony</u>

It is settled law that a lay witness may not offer an opinion "based on scientific, technical, or other specialized knowledge." F.R.E. Rule 701. Lay testimony is limited to that which "results from a process of reasoning familiar in everyday life." *United States v. White*, 492 F.3d 380, 401, 403 (6th Cir. 2007). Indeed, Congress amended Fed. R. Evid. 701 specifically to "preclude[] a party from surreptitiously circumventing the reliability requirements set forth in Rule 702…through the simple expedient of proffering an expert in lay witness clothing." *White*, 492 F.3d at 400-01 (internal quotation omitted).

The fact that a party uses employees to testify on matters involving specialized knowledge does not change the application of the disclosure rules for offering expert opinions. *See Frausto v. Cooper Tire & Rubber Co*., No. 3:12-0761, 2014 WL 3496767, at *3 (M.D. Tenn. July 10, 2014) (testimony was not lay opinion even though specialized knowledge was gained through employee's own work experience). *See also, e.g.*, *United States v. Kouza*, No. 20-CR-20430, 2025 WL 1427040, at *10 (E.D. Mich. May 16, 2025); *City of Owensboro v. Kentucky Utilities Co*., No. 4:04-CV-87-M, 2008 WL 4642262, at *2 (W.D. Ky. Oct. 14, 2008); *Mills v. Riggsbee*, No. CIV.A. 12-148-KKC, 2014 WL 1168726, at *6 (E.D. Ky. Mar. 21, 2014). Such a party using its employee as an expert must still: (A) disclose to the other side that the party will be giving evidence as an expert, Fed. R. Civ. P. 26(a)(2)(A); (B) serve an expert report satisfying Fed. R. Civ. P. 26(a)(2)(B) where the employee will offer an opinion "formed in anticipation of litigation" rather than "in the course" of his work and within "his personal knowledge," *Tomazin v. Lincare, Inc.*, No. 3:13–cv–0875, 2015 WL 4545658, *10 (M.D. Tenn. July 27, 2015); and (C) even where Fed. R. Civ. P. 26(a)(2)(B) expert report is not required, serve a statement of "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify" at the time disclosures are due, Fed. R. Civ. P. 26(a)(2)(C). *See also*

*West v. Heimermann*, Case No. 22-3532, 2023 WL 1822210, *3 (6th Cir. Feb. 8, 2023).  Pandora did not comply with *any* of these requirements for Mr. Peale or Mr. Marcantonio.

Pandora cannot credibly deny that Mr. Peale and Mr. Marcantonio offer testimony involving specialized knowledge "beyond that of the average lay person."  *White*, 492 F.3d at 403. Mr. Peale offers quintessential opinion testimony on the operation of highly technical computer algorithms.  In his own words, he "describe[s] Pandora's algorithmic song-selection process and the role that explicit input from the particular listener plays at various stages of the process, if any." (Peale Decl. at ¶ 5 (ECF No. 131).)  Likewise, the Marcantonio Declaration includes testimony about, in Mr. Marcantonio's own words, "the technical operation of the Pandora system." (Declaration of Nick Marcantonio ("Marcantonio Decl.") ¶¶ 11-12 & n.1 (ECF No. 129).)  *White*, 492 F.3d at 403; *see also, e.g.*, *United States v. Ganier*, 468 F.3d 920, 926 (6th Cir. 2006) (testimony applying "knowledge and familiarity with computers and the particular forensic software well beyond that of the average layperson" deemed to constitute "'scientific, technical, or other specialized knowledge' within the scope of Rule 702"); *Kouza*, 2025 WL 1427040, at *10 (lay testimony crossed the line into expert testimony by requiring "technical knowledge of how the software operates"); *Citcon USA, LLC v. RiverPay Inc.*, Case No. 18-cv-02585-NC, 2019 WL 2603219, at *2-3 (N.D. Cal. June 25, 2019) (disregarding testimony analyzing computer code as inadmissible expert testimony).

"Federal Rule of Civil Procedure 37(c)(1) requires absolute compliance with Rule 26(a) [and] mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified."  *Vaughn v. City of Lebanon*, 18 F. App'x 252, 263 (6th Cir. 2001); *see also Rothberg v. Cincinnati Ins. Co.*, No. 1:06-CV-111, 2008 WL 5545468, at *3 (E.D. Tenn. May 7, 2008).  Pandora has not acknowledged and cannot justify its Rule 26 violation, and its nondisclosure was not harmless.  It deprived The MLC of a meaningful opportunity to evaluate the expert opinions Mr. Peale and Mr. Marcantonio would be offering, obtain further discovery, prepare a rebuttal, and examine them in the roles of would-be expert witnesses.  *Hermeling v. Montgomery Ward & Co.*, 851 F. Supp. 1369, 1376 (D. Minn.

27

1994) ("[plaintiff's] untimely disclosure has unfairly prejudiced [defendant] in its preparation for this motion [for summary judgment] by effectively precluding any type of formal rebuttal"). *See also Automated Mgmt. Sys., Inc. v. Rappaport Hertz Cherson Rosenthal, P.C.*, No. 16-CV-04762-LTS-JW, 2024 WL 4987018, at *4 (S.D.N.Y. Dec. 4, 2024); *Coregis Ins. Co. v. Lewis, Johs, Avallone, Aviles & Kaufman, LLP*, No. 01 CV 3844 (SJ), 2006 WL 2135782, at *9 (E.D.N.Y. July 28, 2006). Pandora is not allowed to use the Peale Declaration or Mr. Marcantonio's technical discussion (¶¶ 11-12 & n.1) in support of its motion (or otherwise). Fed. R. Civ. P. 37(c)(1).[85]

<u>The Rucinski Rebuttal Report Is Neither Rebuttal Nor Submitted As Rebuttal</u>

Pandora's reliance on the report of its "rebuttal" expert, Mr. Rucinski, in support of its affirmative motion for summary judgment is improper. Expert rebuttal testimony exists to respond to the other side's expert—not to build a party's case-in-chief. Fed. R. Civ. P. 26 (rebuttal testimony must be "intended solely to contradict or rebut evidence on the same subject matter identified by" the other party in its expert disclosures); *see also Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006) (upholding district court's confinement of rebuttal expert's testimony to rebuttal and disallowing his testimony in case-in-chief); *Berlyn, Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576, 580-81 (4th Cir. 2003) (upholding district court's refusal to consider rebuttal evidence as part of case-in-chief at summary judgment); *Branche v. Zimmer, Inc.*,

---

[85] The problems with these witnesses' testimony go beyond just a failure to meet the deadline to disclose. The Peale Declaration is barren of any citation to evidence underlying his opinions. It is a profoundly inscrutable document that wheels off a litany of extremely technical and self-serving opinions without showing how he reached his opinions were reached or indicating the whereabouts of evidence supporting the opinions. Mr. Marcantonio's improper testimony is similarly devoid of citation to evidence. The indecipherable nature of his opinions is crystallized in the cryptic paragraph 11 purportedly concerning "technical operation" in which jargon like ███████ ████████████████████████████████ all without any definitions or explanations or reference to any source materials, let alone materials produced in discovery. There is no discussion as to how Mr. Marcantonio is even qualified to discuss this technical matter, let alone what opinions he is offering in this case.

28

No. 3:06-CV-234, 2009 WL 8750012, at *8 (E.D. Tenn. Mar. 9, 2009) (contents of rebuttal report inadmissible in party's case-in-chief).

Pandora's improper reliance on Mr. Rucinski's rebuttal report to try to establish its *prima facie* case exposes the Rucinski Report for what it always has been: affirmative expert opinion dressed up as "rebuttal testimony" to deprive MLC of the opportunity of the full rebuttal procedure on Rucinski's tenuous positions. Pandora's decision to not even submit with its Motion the expert report that Mr. Rucinski was supposedly rebutting underscores the gamesmanship. *See Yoe v. Crescent Sock Co.*, No. 1:15-CV-3-SKL, 2017 WL 11218929, at *10 (E.D. Tenn. Aug. 31, 2017) ("[I]f a party's supplemental or rebuttal disclosure is, in truth, neither supplemental nor rebuttal . . . substance triumphs over form") (quoting *Bentley v. Highlands Hosp. Corp.,* No. CV 15-97-ART-EBA, 2016 WL 5867496, at *5 (E.D. Ky. Oct. 6, 2016)). Accordingly, the Rucinski Report should not be considered either. *See, e.g., First Years, Inc. v. Munchkin, Inc.*, 575 F. Supp. 2d 1002, 1008 (W.D. Wis. 2008); *Hyundai Motor Co. v. Hyundai Tech. Grp., Inc*., No. SA CV 23-01709-CBM (DFMx), 2025 WL 1711440 (C.D. Cal. May 14, 2025).

## F. <u>Pandora's Perfunctory Constitutional Argument Fails in Every Respect</u>

Pandora's cavalier claim that The MLC "cannot constitutionally bring this type of lawsuit" is meant to distract from the weakness of Pandora's arguments on the merits. Indeed, the notion that Pandora litigated this case for two years, through all discovery on liability, while holding a bona fide belief that the lawsuit could not be maintained defies credulity.

Pandora's argument fails completely on the merits, as discussed below, although this Court need not even address the merits of the constitutional arguments. Pandora's failure to plead them as an affirmative defense and prejudicial delay in raising them renders such defense forfeited.[86]

---

[86] "Typically, a party's constitutional challenge to a statute giving rise to a cause of action pressed against that party is treated as an affirmative defense." *United States ex rel. Shepherd v. Fluor Corp., Inc.*, No. 13-CV-02428-JD, 2024 WL 6967290, at *2 (D.S.C. Sep. 13, 2024) (collecting cases); *see also Kewanee Oil & Gas Co. v. Mosshamer*, 58 F.2d 711, 712 (10th Cir. 1932) (contention that statute is unconstitutional is an affirmative defense and "must be so pleaded in the answer"). Failing to plead an affirmative defense results in the waiver of that defense where it would "unfairly prejudice the plaintiff." *Macurdy v. Sikov & Love, P.A.*, 894 F.2d 818, 824 (6th

29

1.     The MLC Is Authorized To Bring This Action

Pandora concedes that The MLC has statutory authority to bring this action, complaining that the statute does not "limit[] the MLC's discretion in pursuing litigation."[87]  Lest there be any doubt, the MMA explicitly authorizes The MLC to "[e]ngage in legal and other efforts to enforce rights and obligations under [the Blanket License]."  17 U.S.C. § 115(d)(3)(C)(i)(VIII).  The MMA even has a specific provision describing how The MLC is to distribute "[a]ny royalties recovered by the mechanical licensing collective as a result of efforts to enforce rights or obligations under a blanket license, including through a bankruptcy proceeding or other legal action."  *Id.* § 115(d)(3)(G)(ii).  Thus, The MLC's enforcement authority plainly extends to bringing a "legal action," like this one, through which "royalties [may be] recovered by [The MLC]."[88]  Such enforcement authority has been recognized by the courts and the Copyright Office.  *See* U.S. Copyright Office, Library of Congress, Music Modernization Act Transition Period Transfer and Reporting of Royalties to the Mechanical Licensing Collective, 86 Fed. Reg. 2176, 2021 WL 75953, at 2180 (Jan. 11, 2021) ("The statute provides the MLC with the authority to enforce rights and obligations, including regulatory obligations, through the courts.").

2.     The MLC's Authority Is Constitutional

Contrary to Pandora's specious assertions, the authority granted by Congress to The MLC is constitutional.  It does not violate the Appointments Clause or private nondelegation doctrine.[89]

---

Cir. 1990) (finding newly raised defense waived where defendants waited nineteen months before first asserting it on summary judgment).  Pandora's decision not to raise these arguments for two years in the face of forfeiture speaks volumes to its knowledge of the lack of merit discussed herein.

[87] Pandora Moving Br., p. 18 (ECF No. 127) (citing 17 U.S.C. § 115(d)(3)(C)(i)(VIII)).

[88] In addition to this specific authority, Congress gave The MLC authority to "[e]ngage in such other activities as may be necessary or appropriate to fulfill the responsibilities of the mechanical licensing collective under [the Blanket License]."  17 U.S.C. § 115(d)(3)(C)(i)(XIII).

[89] Statutes "'should be read, if possible, to comport with the Constitution, not to contradict it'"; courts "should harmonize statutes with the Constitution, not create chasms between them."  *Oklahoma v. United States*, 163 F.4th 294, 313 (6th Cir. 2025) (quoting *FCC v. Consumers' Research*, 606 U.S. 656, 691 (2025)).

30

(a)     Appointments Clause

Pandora's one-page Appointments Clause argument is premised on the incorrect assertion that "The MLC is not led by individuals who have been appointed by the President, by Courts of Law, or by the Head of any Department."[90]  If Pandora had consulted the statute, the MMA's presidential signing statement, the Copyright Office's website, or The MLC's bylaws, it would have known that The MLC and the individual voting members of its board of directors are indeed appointed by a department head.  Moreover, The MLC's "work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate."  *See Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 761 (2025).  Thus, to the extent the Appointments Clause applies to The MLC, it is plainly satisfied.

In the MMA, Congress provided that the entity to serve as the mechanical licensing collective shall be "designated by the Register of Copyrights, with the approval of the Librarian of Congress."[91]  17 U.S.C. § 115(d)(3)(A)(iv).  The Librarian of Congress is unquestionably a department head.  *See, e.g.*, *Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 833 (D.C. Cir. 2024) ("As we have recognized, the Librarian is a 'Head of Department' within the Executive Branch.") (citing *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1341-42 (D.C. Cir. 2012)); *Eltra Corp. v. Ringer*, 579 F.2d 294, 300-01 (4th Cir. 1978).

The MMA's presidential signing statement expresses the President's "expect[ation] that the Register of Copyrights will work with the collective, once it has been designated, to ensure that the Librarian retains the ultimate authority, as required by the Constitution, to appoint and remove all directors."  President Donald J. Trump, Statement on Signing the Orrin G. Hatch-Bob Goodlatte Music Modernization Act, 2018 WL 11390697 (Oct. 11, 2018).  The Copyright Office's website explains that a "candidate [for The MLC's board of directors] only becomes a member of the board if, and after, the Librarian of Congress, upon the recommendation of and in consultation

---

[90] Pandora Moving Br., p. 20 (ECF No. 127).

[91] The Supreme Court has found that "'the department head's approval' of an inferior officer's appointment of another inferior officer 'satisfies the Appointments Clause.'"  *Kennedy*, 606 U.S. at 785 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 512 n.13 (2010)).

31

with the Register, appoints them to the board."[92]  Finally, The MLC's bylaws expressly provide that all board members must be appointed by the Librarian of Congress: "Any recommendation for appointments shall be sent to the Register of Copyrights for approval and appointment.  If the Register of Copyrights approves and the Librarian of Congress appoints the Class B Members' recommendation, the recommended individual will become a Board member."[93]

Pandora also incorrectly states that The MLC's "leadership [is not] subject to removal by the President or by any subordinate Executive official."[94]  Again, with a simple review of The MLC Bylaws, Pandora would have seen that the Librarian of Congress "may remove any Director occupying any seat from office at any time, with or without cause."[95]  As the Supreme Court has explained, "[a]n officer . . . who is removable at will by a principal officer . . . typically qualifies as an inferior officer."  *Kennedy*, 606 U.S. at 762.

Additionally, the Register and the Librarian have the authority to direct and supervise The MLC and its board in significant ways beyond the threat of removal.  As the Supreme Court has concluded, "to supervise and direct for purposes of the Appointments Clause, the [principal officer] need not review every decision," but "[r]ather, what matters is that the [principal officer] have the *discretion* to review decisions rendered by the [inferior officer]."  *Kennedy*, 606 U.S. at 767-68 (internal citations and quotation marks omitted).  Such discretion is embodied in the Register's authority to "conduct such proceedings and adopt such regulations as may be necessary or appropriate to effectuate the provisions of [section 115 governing the Blanket License]."[96]  17 U.S.C. § 115(d)(12)(A).  It is also found in The MLC's bylaws, which state that "[t]he Board of

---

[92] U.S. Copyright Office, MLC and DLC Contact Information, Boards of Directors, and Committees, https://copyright.gov/music-modernization/mlc-dlc-info/ (Semel Opp. Exh. 4).

[93] Bylaws of the Mechanical Licensing Collective, § 4.2(b)(2)(ii) (Semel Opp. Exh. 3), § 4.2(b)(2)(i) (similar provision for Class C Board members); § 4.2(b)(1)( (similar provision for Class A Board members), § 4.2(d) ("Notwithstanding anything in these bylaws to the contrary, any individual may be appointed as a Voting Director by the Librarian of Congress upon the recommendation of and in consultation with the Register of Copyrights.").

[94] Pandora Moving Br., p. 20 (ECF No. 127).

[95] Bylaws of the Mechanical Licensing Collective, § 4.7 (Semel Opp. Exh. 3).

[96] Such regulations "are subject to the approval of the Librarian of Congress."  17 U.S.C. § 702.

32

Directors . . . shall manage the business and affairs of the Collective subject to the oversight of the Register of Copyrights under the general supervision of the Librarian of Congress."[97]   The Supreme Court recently found very similar "general supervisory" provisions to be sufficient.  *See Kennedy*, 606 U.S. at 766-68.

While potential oversight is enough, there is also substantial actual oversight by the Register and the Librarian.  For example, the Register must review The MLC's designation every five years.  17 U.S.C. § 115(d)(3)(B)(ii).  The MLC must submit annual reports to the Register containing detailed information about its activities.  *Id.* § 115(d)(3)(D)(vii); 37 C.F.R. § 210.33. And the MLC is subject to periodic audits, the reports from which must be submitted to the Register.  17 U.S.C. § 115(d)(3)(D)(ix)(II).  More broadly, The MLC's functions and authorities are limited by the MMA and are subject to extensive regulations promulgated by the Register with the Librarian's approval.  *See generally id.* § 115(d); 37 C.F.R. Part 210, Subpart B.  For example, such regulations set forth records of use that The MLC can request to evaluate a DSP's compliance with the Blanket License.  37 C.F.R. § 210.27(m).[98]

The MLC also regularly meets with the Copyright Office to discuss its operations.[99]   And the Register has asserted that the Office has "broad" authority to direct The MLC's specific actions if it deems it necessary.[100]   Notably, the Register testified to Congress well after this action was

---

[97] Bylaws of the Mechanical Licensing Collective, § 4.1 (Semel Opp. Exh. 3).

[98] To date, the Office's comprehensive oversight of The MLC has included issuing over 350 pages of notices and rules in the Federal Register totaling nearly 450,000 words, and publishing a 117-page report.  *See* U.S. Copyright Office, *Music Modernization Act (MMA) Rulemakings and Ex Parte Communications*, https://copyright.gov/music-modernization/related-rulemakings.html (collecting proceedings); U.S. COPYRIGHT OFFICE, UNCLAIMED ROYALTIES: BEST PRACTICE RECOMMENDATIONS FOR THE MECHANICAL LICENSING COLLECTIVE (2021), https://www.copyright.gov/policy/unclaimed-royalties/unclaimed-royalties-final-report.pdf.

[99] *See, e.g.*, Testimony of Shira Perlmutter, Register of Copyrights and Director, U.S. Copyright Office, at 3, Oversight Hearing Before the S. Subcomm. on Intellectual Prop. (Nov. 13, 2024), available at https://www.copyright.gov/laws/hearings/Testimony-Register-Shira-Perlmutter-Nov-13-Hearing-Senate-IP-Subcommittee-of-US-Copyright-Office.pdf.

[100] *See, e.g.*, Responses to Questions for the Record by Shira Perlmutter, Register of Copyrights and Director, U.S. Copyright Office, at 5, Oversight Hearing Before the S. Subcomm. on Intellectual Prop. (Sept. 7, 2022), available at https://www.judiciary.senate.gov/imo/media/doc/QFR%20Responses%20-%20Perlmutter%20-%202022-09-071.pdf.

33

initiated that "the MLC is administering the statutory blanket license in line with the statute and [the Office's] regulations." Testimony of Shira Perlmutter, Register of Copyrights and Director, U.S. Copyright Office, at 3, Oversight Hearing Before the S. Subcomm. on Intellectual Prop. (Nov. 13, 2024).

        (b)      <u>Private Nondelegation Doctrine</u>

Pandora's private nondelegation doctrine arguments fail for essentially the same reasons as its Appointments Clause claims. In the very case Pandora primarily relies on, even though the Sixth Circuit found it "premature and inappropriate to finally resolve" the issue, the court explained that, in evaluating the delegation of civil enforcement authority, "[t]he test is whether the private entity remains 'subject to [the agency's] pervasive surveillance and authority' when it matters"—*i.e.*, "whether the private entity is subject to the agency's supervision." *Oklahoma v. United States*, 163 F.4th 294, 314 (6th Cir. 2025) (alterations in original) (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940)). The Sixth Circuit elaborated that the evaluation "does not depend on how the [agency] employs its power—by action or inaction." *Oklahoma*, 163 F.4th at 312-13 (explaining that "the [agency] could require the [entity] to seek its permission before pursuing *any* enforcement action" or it "could decide to take a more hands-off approach," but "[n]o matter which way it goes, the [agency's] *capacity* to control the [entity's] enforcement activities ensures that the [agency], not the [entity], is the agency of ultimate resort that decides how the federal government enforces the Act") (second emphasis added).

As detailed above, The MLC is subject to pervasive potential and actual oversight by the Register and the Librarian that is more than sufficient to ensure that it functions subordinately to the Copyright Office and the Library of Congress and is subject to their direction, supervision, authority, and surveillance in all areas. Pandora puts forth no evidence suggesting (let alone proving) otherwise, including with respect to this specific lawsuit. Thus, to the extent the private nondelegation doctrine applies to The MLC, there is no violation.

## CONCLUSION

For the foregoing reasons, The MLC respectfully requests that the Court deny Pandora's

Motion for Summary Judgment, and grant all other relief as the Court deems just and proper.

Dated: New York, New York
        March 5, 2026

PRYOR CASHMAN LLP


 */s/ Benjamin K. Semel*
Benjamin K. Semel (admitted *pro hac vice*)
M. Mona Simonian (admitted *pro hac vice*)
Joshua Weigensberg (N.Y. Bar No. 4894929)
Jason E. Sloan (*pro hac vice* application forthcoming)
Erik F. Bakke (admitted *pro hac vice*)
7 Times Square
New York, New York 10036
Phone: (212) 326-0181
Fax: (212) 798-6326
bsemel@pryorcashman.com
msimonian@pryorcashman.com
jweigensberg@pryorcashman.com
jsloan@pryorcashman.com
ebakke@pryorcashman.com


*/s/ Elizabeth O. Gonser*
Elizabeth O. Gonser (TN Bar No. 026329)
**RILEY & JACOBSON PLC**
1906 West End Ave.
Nashville, TN 37203
P: (615) 320-3738
egonser@rjfirm.com

*Attorneys For Plaintiff Mechanical Licensing Collective*

35

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and exact copy of the foregoing document has been filed with the Clerk of Court using the CM/ECF system, which sent notice of such filing to the parties' counsel of record.

This 5th day of March, 2026.

_/s/ Elizabeth O. Gonser_
Elizabeth O. Gonser