# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |
|---|---|
| MECHANICAL LICENSING COLLECTIVE,<br><br>              Plaintiff,<br><br>v.<br><br>PANDORA MEDIA, LLC,<br><br>              Defendant. | Civil Action No. 3:24-cv-00168<br><br>Judge Eli J. Richardson |

## PANDORA MEDIA, LLC'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| INTRODUCTION | | 1 |
| ARGUMENT | | 2 |
| I. | This Court Should Recognize The Constitutional Defect At The Heart Of The MLC's Suit | 2 |
| II. | Pandora Radio Stations Are Not Interactive On Account Of Their Personalization | 5 |
| III. | Limited Samples of Pandora Premium Do Not Make Pandora's Free Internet Radio Offering Interactive | 8 |
| IV. | Offering The Ability To Unlock Additional Skips And Replays Does Not Make Pandora's Free Radio Offering Interactive | 13 |
| V. | The Peale And Marcantonio Declarations Do Not Provide Expert Testimony | 16 |
| VI. | The Rucinski Report Is Appropriate Rebuttal | 19 |
| CONCLUSION | | 20 |

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arista Records, LLC v. Launch Media, Inc.*,
   578 F.3d 148 (2d Cir. 2009)..................................................................................5, 6, 7, 8

*Branche v. Zimmer, Inc.*,
   2009 WL 8750012 (E.D. Tenn. 2009) .................................................................................20

*Davis v. Echo Valley Condo. Ass'n*,
   945 F.3d 483 (6th Cir. 2019) .................................................................................................6

*First Years, Inc. v. Munchkin, Inc.*,
   575 F. Supp. 2d 1002 (W.D. Wis. 2008) .............................................................................20

*Henson v. Santander Consumer USA Inc.*,
   582 U.S. 79 (2017)................................................................................................................11

*Hyundai Motor Co. v. Hyundai Tech. Grp., Inc.*,
   2025 WL 1711440 (C.D. Cal. 2025)....................................................................................20

*Kennedy v. Braidwood Mgmt., Inc.*,
   606 U.S. 748 (2025)............................................................................................................4, 5

*Mills v. Riggsbee*,
   2014 WL 1168726 (E.D. Ky. Mar. 21, 2014)......................................................................18

*Moore, Owen, Thomas & Co. v. Coffey*,
   992 F.2d 1439 (6th Cir. 1993), *as amended on denial of reh'g* (Aug. 31, 1993) .....................3

*Oklahoma v. United States*,
   163 F.4th 294 (6th Cir. 2025) ............................................................................................3, 4

*Perez v. Volvo Car Corp.*,
   247 F.3d 303 (1st Cir. 2001)................................................................................................19

*Pulsifer v. United States*,
   601 U.S. 124 (2024)..............................................................................................................11

*Rogers v. IRS*,
   822 F.3d 854 (6th Cir. 2016) .................................................................................................3

*S. Track & Pump, Inc. v. Terex Corp.*,
   2013 WL 5461615 (D. Del. Sep. 30, 2013), *rev'd & remanded on other
   grounds*, 618 F. App'x 99 (3d Cir. 2015) ..............................................................................2

ii

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004) ..........................................................................................................11

*United States v. Ganier*,
  468 F.3d 920 (6th Cir. 2006) ............................................................................................18

*United States v. Kerley*,
  784 F.3d 327 (6th Cir. 2015) ......................................................................................17, 18

*United States v. Kouza*,
  2025 WL 1427040 (E.D. Mich. May 16, 2025)................................................................18

**Consitutional Provisions**

U.S. Const. art. II, § 2 ................................................................................................................4

**Statutes**

17 U.S.C. § 114(j)(7) ........................................................................................................1, 8, 11

**Other Authorities**

Fed. R. Civ. P. 8 ..........................................................................................................................2

Fed. R. Civ. P. 26 ......................................................................................................................19

Fed. R. Evid. 602 ................................................................................................................17, 19

Fed. R. Evid. 702 ......................................................................................................................19

Case 3:24-cv-00168    Document 167    Filed 03/31/26    Page 4 of 26 PageID #: 9441

# INTRODUCTION

The MLC's opposition to Pandora's summary judgment motion confirms the constitutional defect at the heart of this lawsuit. The MLC does not deny that it is using this action as a public enforcement tool to seek to extract hundreds of millions of dollars from Pandora under an extreme view of the law. Nor does the MLC identify any legal constraint on its authority to direct whether this suit may be brought, on what theory, or to what end. The MLC's abstract references to *potential* supervision are not enough. Nor can the MLC cure the Appointments Clause problem by relying on its own bylaws.

On the merits, the MLC's legal theories rest on an incorrect reading of the Copyright Act that cannot be squared with the express language of the relevant statutory provisions or the legislative history. The MLC's theory treats discrete, ad-gated trial sessions of Pandora Premium functionality and other scarcely-used ancillary functionalities as if they were indistinguishable from Pandora's free internet radio offering and convert the entirety of that prototypical noninteractive service into a fully on-demand service. Section 114(j)(7) and Congressional intent foreclose that all-or-nothing reading. That provision does not merely define an "interactive service;" it expressly instructs courts how to treat statutory licensees that offer both interactive and noninteractive components: "[i]f an entity offers both interactive and noninteractive services (either concurrently or at different times), the noninteractive component shall not be treated as part of an interactive service." 17 U.S.C. § 114(j)(7). The MLC repeatedly tries to make that last sentence disappear, arguing that "component" only means a separate business line, and that any noninteractive service becomes interactive in its entirety if it offers users even the slightest opportunity to sample a different, interactive functionality. But the MLC's reading incorrectly collapses the term "component" into "service," reads the final sentence of the definition out of the statute, and would transform virtually any modern

noninteractive streaming platform into an interactive service.  The statutory text does not permit that result, and neither do interpretive canons or the legislative history.  For these reasons and those described below, Pandora's motion for summary judgment should be granted and the MLC's motion for summary judgment denied.

ARGUMENT

## I.     THIS COURT SHOULD RECOGNIZE THE CONSTITUTIONAL DEFECT AT THE HEART OF THE MLC'S SUIT

As explained in Pandora's summary judgment motion, this suit cannot be squared with the Constitution because the MLC is a private entity that acknowledges it is exercising governmental powers.  *See* Pandora's Mot. for Summ. J., Dkt. 127 ("Pandora MSJ"), at 17–20.  The MLC's opposition all but admits the key points: that bringing this action was an exercise of public enforcement authority; that no statute or regulation constrains its discretion to sue; and that if its leadership has that authority, those decisionmakers are Officers of the United States subject to the Appointments Clause.  Instead, the MLC asks the Court to avoid the issue, points to hypothetical future regulation, and argues that the MLC's *own bylaws* can substitute for the appointment mechanism that Article II requires.  None of that works.

The MLC first says the Court should disregard the significant separation-of-powers questions implicated by this lawsuit because Pandora did not expressly plead them in its Answer.  *See* MLC Opp. to Pandora's Mot. for Summ. J. ("MLC Opp."), at 29 & n.86.  That is wrong.  A constitutional challenge to the legal authority underlying a cause of action is not one of Rule 8(c)(1)'s enumerated affirmative defenses, and courts have repeatedly rejected "the proposition that a constitutional challenge to a statute is waived under Rule 8(c) if not pled as an affirmative defense in the answer."  *S. Track & Pump, Inc. v. Terex Corp.*, 2013 WL 5461615, at *2 (D. Del. Sep. 30, 2013), *rev'd & remanded on other grounds*, 618 F. App'x 99 (3d Cir. 2015).  Even if

this argument *were* treated as an affirmative defense, Sixth Circuit precedent is clear that failure to plead it results in waiver only if the opposing party suffers prejudice.  *See Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993), *as amended on denial of reh'g* (Aug. 31, 1993).  But the MLC identifies no prejudice from allowing Pandora to assert its constitutional argument now, and there clearly is none.  The issue is a purely legal one on which there are no disputed facts, and which the MLC has had a full opportunity to brief.  In the absence of prejudice, a party may "raise an affirmative defense for the first time in a motion for summary judgment."  *Rogers v. IRS*, 822 F.3d 854, 856 (6th Cir. 2016) (citation omitted).

On the core private nondelegation argument, the MLC says little.  *See* MLC Opp. at 34. The MLC does not dispute that it exercises governmental authority when it brings suit or identify *any* source of authority, whether in law or in regulation, that limits its discretion to do so.  The sources of authority it cites—such as regulations that allow the Register of Copyrights to review the MLC's designation every five years—have nothing to do with the MLC's ability to litigate, much less regulate it in real time.  *See id.* at 33.  There is thus no dispute that the MLC exercises executive power without relevant supervision from an Executive Branch entity.

The MLC suggests that "potential oversight is enough" because the Register could, in theory, adopt regulations that would limit the MLC's ability to bring suit.  *Id.* at 32–33.  This suggestion is contradicted by the Sixth Circuit's decision just a few months ago in *Oklahoma v. United States*, 163 F.4th 294 (6th Cir. 2025).  There, too, the FTC had general rulemaking authority by which it *could* constrain the Horseracing Authority, the private entity in question. The court held that this rulemaking authority was a relevant constraint on the Authority's *internal* enforcement actions, but only when combined with the FTC's ability to directly review such actions and to stay any sanctions issued by the Authority, *id.* at 311–12, but neither the

Register nor the Librarian of Congress exercises this authority with respect to the MLC's decisions to bring suit.  And the Sixth Circuit notably did not extend this argument to the "Horseracing Authority's power to bring civil enforcement actions on its own initiative in federal court."  *Id.* at 314.  The court declined to address that "difficult and fundamental" question because Oklahoma brought a facial challenge, because the Authority had "*never* filed a civil enforcement action," and because the Authority had proposed rulemaking that might "moot this very concern" by requiring the FTC's sign-off on such actions.  *Id.* at 314–15.  Here, Pandora's defense arises in a classic as-applied posture, the MLC has filed suit, and neither the MLC nor the Register has taken any steps to constrain the MLC's litigation authority.

The Appointments Clause problem is equally straightforward.  The MLC does not dispute that its decisionmakers are Officers of the United States or contend that they were nominated by the President with the advice and consent of the Senate; nor does the MLC identify any statutory authority by which Congress has vested their appointment in the Head of a Department.[1]  Art. II, § 2, cl. 2.  This is a plain violation of the Appointments Clause.  The MLC's answer is that *its own bylaws* supply the necessary appointment authority.[2]  They do not.  The Appointments Clause itself provides that "*the Congress* may *by Law* vest the Appointment of such inferior Officers, *as they think proper* … in the Heads of Departments."  *Id.* (emphasis

---

[1] The MLC suggests in passing that the Appointments Clause problem might be cured by the fact that the Librarian of Congress approves the relevant *entity* that serves as the mechanical licensing collective.  *See* MLC Opp. at 31.  But the Appointments Clause is concerned with the process for selecting the *individuals* who exercise executive power, not the broader entity.

[2] The MLC also appears to suggest that general oversight by the Register of Copyrights cures any Appointments Clause defect.  *See* MLC Opp. at 32–33.  But the cited discussion in *Braidwood* addresses a different question:  whether an already appointed officer is principal or inferior in light of a superior officer's power to review the officer's decisions.  *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 767 (2025).  Here, Pandora's argument is antecedent to that issue: the MLC's decisionmakers were not appointed pursuant to any law enacted by Congress.

added).  If Congress does not do that, the default rule is presidential nomination and Senate confirmation.  The Supreme Court recently reaffirmed that officers must be "appointed . . . pursuant to a law enacted by Congress."  *Kennedy v. Braidwood Management, Inc.*, 606 U.S. 748, 780 (2025).  Here, even under the MLC's own account, its leadership was selected pursuant only to private bylaws that can be amended without any involvement by the Executive Branch.[3] That is not an Article II appointment, and it independently bars the MLC from exercising the authority it claims here.  This case should be dismissed.

## II. PANDORA RADIO STATIONS ARE NOT INTERACTIVE ON ACCOUNT OF THEIR PERSONALIZATION

On the merits, the MLC begins its opposition by arguing that Pandora radio stations are personalized and therefore "specially created" for users as that phrase is used in the interactive service definition.  MLC Opp. at 13–16.  For the reasons spelled out in Pandora's opposition to the MLC's summary judgment motion ("Pandora Opp."), *see* Dkt. 151, at 17–18, the MLC's personalization argument is waived:  the MLC's Complaint challenged Pandora's free internet radio offering because it allegedly offered "on-demand" functionality, not the more sweeping claim that Pandora's radio stations, standing alone, were interactive on account of personalization.  The personalized nature of Pandora's radio stations has been a matter of public record for twenty years, yet the MLC waited until summary judgment to pivot to this new theory and to delve into how Pandora's stations do or do not compare to those addressed in the *Launch Media* case.  That is precisely the sort of late-stage shift that impermissibly and unfairly expands

---

[3] *See* Bylaws of the Mechanical Licensing Collective, art. X (Dkt. 115-1, Semel Ex. 3) (providing that the Bylaws may be amended by the Board or by the Members, and giving the Librarian a role only in the amendment of bylaw provisions relating to the "succession or removal of Directors," not in their appointment).

the case after discovery has closed, and which courts routinely dismiss.[4] *See Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 496 (6th Cir. 2019) (rejecting plaintiff's effort to frame claim "at a high level of generality" to avoid waiver).

Even if the MLC's personalization argument were not waived, it fails on the merits. To start, the parties agree that the operative legal test for interpreting whether a service is "specially created" for users is guided by the *Launch Media* decision. *See* Pandora MSJ at 22; MLC Mot. for Summ. J., Dkt. 117 ("MLC MSJ"), at 27–29. *Launch Media* expressly holds that whether a service is interactive under the "specially created" prong turns on whether "the user has sufficient control . . . such that she can predict the songs she will hear, much as she would if she owned the music herself and could play each song at will." 578 F.3d 148, 161 (2d Cir. 2009). As Pandora explained in detail in its opposition to the MLC's summary judgment motion, Pandora easily satisfies this test, relying on (among other safeguards) a ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Dkt. 131, Peale Decl. ¶¶ 13-21; *see also* Pandora Opp. at 21–22 (detailing lack of predictability and crowd-sourced nature of Pandora song-selection algorithms). As Pandora also explained in its prior filings, the MLC badly misstated the *Launch Media* court's analysis of the relevant facts in its effort to distinguish Pandora from LAUNCHcast, *id.* at 26–30, and it does so again here. For instance, the MLC claims that the *Launch Media* court "highlighted that 60% of a playlist pool on LAUNCHcast were selected without any consideration for the user's song, artist, or album preferences." MLC MSJ at 28. But as Pandora explained, that statement is very misleading: the 60% figure did *not* apply to a user's *playlist*, which could in fact include up to 80% of tracks that

---

[4] Pandora's constitutional arguments, by contrast, involve pure questions of law, *supra* pp. 2–5.

were rated by the user. 578 F.3d at 159–63. And the court observed that the LAUNCHcast algorithm was actually "biased towards" placing a user's highly rated songs at "the top of the list," leading to a "high probability" of a selected song coming from the "higher scored songs." *Id.* at 160.

The MLC's response and opposition brief do not disturb these conclusions. The MLC does not dispute, for example, that Pandora's proprietary song-selection algorithms "rely[] on hundreds of different song-selection strategies, song-scoring features, song weightings, and filters, which in turn rely on hundreds of billions of data points collected from tens of millions of Pandora users over decades." Dkt. 158, MLC Response to Pandora's SUMF ("MLC Resp.") ¶ 9. Indeed, the MLC acknowledges that there are "no genuine disputes of material fact to be tried in this case with respect to how Pandora Free operates." MLC Opp. at 12. The dispute is therefore purely a matter of applying the legal standard to the undisputed facts: whether Pandora's stations cross the *Launch Media* predictability threshold and are thus "specially created" for users under the Copyright Act. To the extent the MLC's opposition addresses that question, it is largely just to double down on its incorrect claims about *Launch Media* that Pandora has already dispatched in its prior submissions. *See* MLC Opp. at 12–16; Pandora Opp. at 19–26. The MLC also places great significance on a high-level Pandora mission statement. MLC Opp. at 13 & n.50.[5] But that statement does not bear the weight the MLC ascribes to it. First, to the extent the MLC is implying that the goal of "perfection" in the statement means that users can predict or pick the songs they want (the actual legal test), the facts as to the operation of Pandora's song-

---

[5] The MLC cites five pages of deposition testimony from Pandora's Principal Product Manager of Algorithmic Programming, W.B. Peale, as the source for this purported company "mission" statement, but that quotation was not testimony by Mr. Peale; it was read into the record by the *MLC's counsel* from a separate document the MLC does not cite in its opposition brief. *See* Dkt. 112-10, Deposition Transcript of W.B. Peale, 68:3-11.

selection algorithms do not remotely support that contention.  And the MLC is simply wrong to contend that the statement "alone is enough to render Pandora Free an 'interactive service.'"  *Id.* An aspirational statement, even if aimed at what the MLC implies, obviously contains no objective facts about the operation of Pandora's radio stations.  As such, like many of the public statements of Pandora personnel on which the MLC relies, it is irrelevant to the legal application of the Copyright Act to the actual operation of Pandora's stations and whether users can control or predict the songs that play.  *See* Pandora Opp. at 26–31.

In a last-ditch effort to avoid the inevitable conclusion that follows from a forthright application of *Launch Media*, the MLC backtracks, claiming that the court's analysis in that case was "brief" and would amount to a "radical reinterpretation of [the] statute."  *Compare* MLC MSJ at 27, *with* MLC Opp. at 14.  The MLC even implausibly argues that *Launch Media* did not articulate a "predictable test" at all.  MLC Opp. at 14.  But the holding of *Launch Media*—a case the MLC until now embraced—could not be clearer:  "LAUNCHcast does not provide a specially created program within the meaning of § 114(j)(7) *because the webcasting service does not provide sufficient control to users such that playlists are so predictable* that users will choose to listen to the webcast in lieu of purchasing music."  578 F.3d at 162 (emphasis added).  That is a predictability test in sum and substance, and Pandora passes that test with flying colors.

## III.    LIMITED SAMPLES OF PANDORA PREMIUM DO NOT MAKE PANDORA'S FREE INTERNET RADIO OFFERING INTERACTIVE

In its summary judgment motion, Pandora identified the material facts establishing that Premium Access sessions are separate, time-limited samples of Pandora Premium.  *See* Pandora MSJ at 24–27.  While the MLC quibbles with some of the particulars, its opposition does not dispute the core aspects of Premium Access sessions that make them separate and distinct from the free offering:

- Pandora presents a pop-up message for users who attempt to "play music on demand" informing them that they may do so by commencing a session of Pandora Premium for "a limited time" by watching an audiovisual ad.  MLC Resp. ¶ 16.

- Users must complete the video ad to initiate the session and cannot minimize the browser or navigate away from the app during that ad period.[6]  MLC Resp. ¶ 17.

- Users are shown this message when first engaging with the feature: "Your complimentary Pandora Premium session starts now. Search and play what you want."  MLC Resp. ¶ 19.

- "[O]nce the user enters the Premium Access session, the visual user interface changes to reflect that the user is now in the Pandora Premium experience" in four distinct aspects including "more dynamic color," and "a broader range of content."  *See* MLC Resp. ¶ 20.

- Users receive periodic messages that they are accessing Pandora Premium.  MLC Resp. ¶ 23.

- Pandora caps Premium Access sessions over seven-day and 90-day periods. MLC Resp. ¶ 24.

Given the MLC's agreement on these key points, there remains no genuine dispute over the material facts establishing that Premium Access sessions are separate sessions of Pandora Premium where the user leaves Pandora's free internet radio offering and is temporarily treated as a Premium subscriber.  And as Pandora's prior briefing makes clear, that is enough to decide this case as a matter of law: Pandora's free radio offering is not, under the interactive service definition, "enabling" on-demand plays; a temporary session of Pandora Premium is.  Pandora MSJ at 29–30.  And even if one wrongly construes the definitional phrase "enable" so broadly as

---

[6] The MLC's own expert acknowledges that this step imposes substantial friction for users.  *See* Laguna Decl. Ex. A, Serruya Dep. Tr. at 122-123 (confirming that among the subset of users who attempt to play a song on-demand, ▒▒▒ choose not to click the prompt to watch the advertisement at all, ▒▒▒ who do click fail to watch the entire ad, and that overall ▒▒▒ of those who get the Premium Access prompt "stop the process before they actually get to the listening experience").

to capture a mere pathway to a separate on-demand offering, Premium Access sessions still do not make the entire Pandora free tier interactive: rather, by merely providing access to a separate service (Pandora Premium), they are easily separable under the final sentence of the definition. *Id.* The MLC's opposition nonetheless continues to insist that every play on free Pandora itself is interactive because it allegedly "enables" on-demand listening through Premium Access sessions, without any consideration of the final sentence of the interactive service definition whatsoever. MLC Opp. at 18. Alternatively, the MLC argues that even if one were to consider the last sentence, it applies solely to the exceedingly narrow circumstance of an entity offering a completely separate interactive streaming business. *Id.* at 20. Neither of these arguments has merit.

The MLC's first argument suffers from two flaws. As a matter of statutory construction, it turns the last sentence of the definition into surplusage: in the MLC's view, any service allegedly "enabling" on-demand plays, however attenuated the path, is completely interactive, end of story. But even if the MLC were correct that the sole factor is whether a service "enables" on-demand plays in some fashion, Pandora's free radio offering is *not* interactive under that test: as the undisputed facts show, Premium Access sessions involve temporary access to a *different* service: Pandora Premium. It is thus *Pandora Premium* that enables on-demand plays, not free Pandora.[7]

The MLC's interpretation of the final sentence of the interactive service definition is also fatally flawed. As noted, the MLC contends it solely addresses a situation where an entity operates completely independent interactive and noninteractive businesses—and that because

---

[7] Pandora emphatically does not concede that on-demand plays occur *within* Pandora's free internet radio offering, as the MLC erroneously contends. *See* MLC Opp. at 21.

10

Pandora's free radio offering itself is interactive (on account of allegedly enabling on-demand plays), the last sentence is not triggered. But that is entirely circular: rather than determining whether Pandora's free internet radio offering remains noninteractive under the final sentence *despite* providing access to interactive Premium Access sessions, the MLC simply presupposes that the service is interactive *because* of Premium Access sessions. *See* MLC Opp. at 18–19 (Pandora "cannot start with its interactive service and end with a noninteractive service"). This reading collapses into the MLC's first argument and invalidates the import of the last sentence of the definition even as it purports to be interpreting it.

The MLC also fails to explain why Congress used the narrower phrase "component" in the final sentence of the definition, falling back on the completely unsupported suggestion that it merely represented an attempt at "stylistic elegance" and that "component" must mean the same thing as "service." *Id.* at 20. But courts presume the opposite. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004); *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017) (when "interpreting statutes we presume differences in language . . . convey differences in meaning"); Pandora Opp. at 11–12 (citing additional examples under the meaningful variation canon). That presumption is especially applicable in situations like this one where the disputed terms ("service" and "component") have particular "heft and distinctiveness." *See Pulsifer v. United States*, 601 U.S. 124, 149 (2024).

Moreover, interpreting the final sentence as the MLC suggests to cover only a totally separate business line, MLC Opp. at 21, would effectively render it a nullity. As the MLC insists, the first part of the definition makes clear that a "service" is interactive only where it is "enabling" on-demand plays in the first place—with the question then turning to whether, under the final sentence of the definition, those interactive plays can be separated from the

noninteractive component of the service.  But if on-demand plays are only available through a totally separate service offering, such as Pandora Premium, then the noninteractive service is not even plausibly interactive to start because it would have no connection to any interactive plays whatsoever.  In such a scenario, there would be no need to turn to or rely on the final sentence of the definition to carve out an interactive component that is already a separate service offering.

The MLC does eventually step back and consider what Congress was actually intending in the interactive service definition, but it misconstrues the legislative history it quotes.  The snippet of legislative history quoted by the MLC on page 20 of its opposition was written as part of a statute (the 1995 DPRA) where nonsubscription transmissions were still exempt from the newly created performance right; the legislative history was therefore addressing a different situation: the impact of offering an interactive service on the (then) exempt status of the entity's nonsubscription transmissions.  Moreover, as Pandora has explained, the snippet explicitly considers the provision of interactive streaming not only through a separate business, but by the *same* service during discrete periods of time (precisely the case with Premium Access sessions). Pandora Opp. at 9–10.  Indeed, it goes even further, specifying that "each *transmission*" (not just each service or business line) "should be judged on its own merits with regard to whether it qualifies as part of an 'interactive' service," a statement that clearly envisions the possibility of a single service offering hybrid functionality.  *Id.* at 10.

To that end, when Congress expanded Section 114 to cover nonsubscription streaming services like Pandora's free internet radio offering, it provided a hybrid example when explaining how to interpret the third sentence of the interactive service definition: a "Web site [that] offered certain *programming* that was transmitted to all listeners who chose to receive it at the same time and also offered certain *sound recordings* that were transmitted to particular

listeners on request." H.R. Rep. No. 105–796, at 88 (1998 DMCA House Conference Report) (emphasis added).  In that situation, Congress explained, "the fact that the latter are interactive transmissions would not preclude statutory licensing of the former." *Id.*  Congress went even further by making clear that where a service like Pandora licenses certain non-statutory functionality from record labels for its users—precisely as Pandora does with Premium Access sessions—that does *not* disqualify the service from statutory licensing for its other transmissions:

> The conferees note that if a sound recording copyright owner authorizes a transmitting entity to take an action with respect to that copyright owner's sound recordings that is inconsistent with the requirements set forth in section 114(d)(2), the conferees do not intend that the transmitting entity be disqualified from obtaining a statutory license by virtue of such authorized actions.

*Id.* at 80.  These Congressional statements address the precise situation here and are directly at odds with the MLC's arguments that Premium Access sessions (or other directly licensed features addressed below) invalidate Pandora's statutory license for its free radio service.

## IV. OFFERING THE ABILITY TO UNLOCK ADDITIONAL SKIPS AND REPLAYS DOES NOT MAKE PANDORA'S FREE RADIO OFFERING INTERACTIVE

Next, the MLC reiterates the argument from its motion that the ability "to move forward or backwards" (*i.e.*, to skip or replay tracks) renders Pandora interactive, an argument that hinges on a lone statement from the legislative history.  MLC Opp. at 17.  As Pandora explained in its own opposition, however, that snippet of legislative history actually addressed a particular, narrow situation (where users can choose tracks in *prerecorded or predetermined* programs) that Pandora does not even offer.  Pandora Opp. at 14–15.  And the fact that the statute envisions that an on-demand play can be made from such a "program," or that the user need not have created the playlist herself, does not mean that any ability to skip or replay more generally renders a service wholly interactive.  *See id.* (distinguishing the limits of Pandora's replay and skip functionality from on-demand track selection).  But the MLC's flawed argument regarding the

alleged interactivity of such plays (as with its position on Premium Access sessions) carries an even more extreme implication: that if a user of Pandora's free internet radio offering is able to engage in even one replay, then *every* transmission offered by Pandora on that tier is an interactive stream. *See* MLC Opp. at 10, 17. No matter how separate or little used the feature (indeed, even if not used at all), the Court, under the MLC's interpretation, cannot conclude that such a feature is a component that can be treated separately from the remainder of the free service under the last sentence of the interactive service definition.

To appreciate the staggering implications of that contention (including financially), it is useful to step back and place the MLC's arguments in their proper factual context, which makes abundantly clear the degree to which these so-called "Flex" features are—from the user experience, to licensing structure, to usage—separate and incredibly ancillary aspects of free Pandora. The MLC does not dispute that a user seeking to replay a song or obtain extra skips must pause their listening and affirmatively agree to watch a 15-second video ad before getting to the replay or skip—during which the user must watch and cannot leave or minimize the Pandora app. *See* MLC Resp. ¶¶ 33-34. And the choices for what can be replayed are limited to songs played recently on the particular station, as selected previously by Pandora, not any song of the user's choosing, and not even songs from the user's other Pandora stations—a far cry from the imagined "celestial jukebox" that inspired Congress to exclude interactive services from the statutory license.[8] *See* Pandora MSJ at 31–32. If that's not enough, the user needs to repeat that ad-break process every third replay to access additional replays. MLC Resp. ¶ 35. No small wonder, then, that these features are scarcely used: replays constitute only ▮▮▮ of plays and

---

[8] With a Pandora skip, the user has no idea what song is coming next (unlike being able to skip ahead to a selected track in a predetermined program), and the MLC does not dispute that the next transmission remains chosen by Pandora's algorithms, not by the user. *See* MLC Resp. ¶ 28.

additional skips ▮▮—an infinitesimal fraction of activity on free Pandora—and more than ▮▮

of users never engage in even one replay in a given month.  Pandora MSJ at 11.

Consistent with the user experience, Pandora's licenses with record companies ▮▮



*See* Declaration of Sebastian Laguna ¶ 4–5.  Pandora's publishing licenses likewise ▮▮

▮▮.  *See* Dkt. 130, McFadden

Decl. ¶ 9.  The MLC itself acknowledges that Pandora ▮▮

▮▮.  *Cf.* Dkt. 152, Pandora's Response to

MLC SUMF ¶ 5.

Against this practical backdrop, the only reasonable and equitable result is to give full

force to the final sentence of the interactive service definition and to recognize the trivial number

of replays and Flex skips as the separate and ancillary "components" they are.  *See* Pandora Opp.

at 14–17.  Yet the MLC insists on pressing an extreme position, hinged on technicalities, that is

at odds with the statute, the legislative history, and its own publisher constituents, arguing that

Pandora engages in interactive streaming under Section 115 across the board, even for the ▮▮

of plays that do not involve replays and the ▮▮ of plays that do not involve additional skips—

and worse, that Pandora should pay royalties and late fees on *all of it*, to the tune of literally

hundreds of millions of dollars in additional payments.[9]  And it contends that the Court has

---

[9] Under the approach proposed by Pandora (and supported by the statute), even if replays and/or additional skips were themselves viewed as interactive streams (which Pandora does not concede), only those particular transmissions would be the ones subject to mechanical royalties, not the entire tier.  Such an approach would not only avoid the inequitable result discussed above, but it would also square precisely with the way Pandora already offers and monetizes

essentially no choice but to reach this conclusion because the statute demands this all-or-nothing approach.  *See* MLC Opp. at 20–21.

But the interactive service definition is not the judicial straightjacket that the MLC posits. For all of the reasons discussed in the prior section, the statutory text and the legislative history confirm that, such features are separable "components" that do not (and should not) turn an overwhelmingly noninteractive service into an interactive service.  *See supra* pp. 10–12.  When a service like Pandora licenses certain non-statutory functionality from rightsowners—precisely as Pandora does with Flex skips and replays—Congress made clear its intention that such a practice should *not* disqualify the service from statutory licensing.  *See supra* pp. 12–13.

## V. THE PEALE AND MARCANTONIO DECLARATIONS DO NOT PROVIDE EXPERT TESTIMONY

Confronted with factual testimony from Mr. Peale and Mr. Marcantonio that undercuts its case, the MLC seeks to block its consideration on the basis that the Peale and Marcantonio declarations contain improper expert testimony.  MLC Opp. at 26–27.  Mr. Peale is a Pandora employee who oversees Pandora's algorithmic programming and described in his declaration the testimony he is prepared to offer on how Pandora's algorithmic song-selection functions, as informed by his daily work.  Dkt. 131 at 1.  Mr. Marcantonio is a Pandora employee who oversees Pandora's product management and likewise described his personal knowledge of Pandora's products.  Dkt. 129 at 1.  The MLC deposed both witnesses extensively on these subjects during discovery.  The MLC's own summary judgment motion also relies heavily on deposition testimony from both witnesses regarding those same aspects of Pandora's services—

---

these features:  through "flex" ads that users watch specifically to get access, thus creating an easily identifiable pool of revenue for the mechanical royalty calculation that Pandora already includes in its MLC reporting. *See* Dkt. 152, Pandora's Response to MLC SUMF ¶ 5.

yet the MLC now seeks effectively to bar Mr. Peale and Mr. Marcantonio from responding to the MLC's characterization and use of their own testimony. MLC MSJ at 16 nn.44 & 45 (citing Mr. Marcantonio regarding the operation of Premium Access sessions); *id.* at 17 n.51 (citing Mr. Peale regarding the operation of the Modes functionality). The MLC cannot recast Mr. Peale or Mr. Marcantonio as "undisclosed experts" after relying on them as Pandora's fact witnesses throughout discovery. Nor can the MLC claim any prejudice given the MLC's repeated citation of each witness's testimony in its summary judgment motion and its expert's significant reliance on Mr. Peale's testimony (along with a document of Mr. Peale's creation) as the exclusive factual basis for his testimony about personalization in Pandora's song-selection.[10] Indeed, the prejudice runs the other direction: the MLC's position would give it the exclusive ability to rely on Mr. Peale and Mr. Marcantonio's testimony and deprive Pandora of the ability to respond.

As a legal matter, both individuals are percipient fact witnesses who provided testimony regarding facts within their personal knowledge as senior employees at Pandora, and their declarations identify the factual testimony they are prepared to give at trial. This is squarely within the bounds of FRE 602. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if . . . the witness has personal knowledge of the matter."); *United States v. Kerley*, 784 F.3d 327, 340 (6th Cir. 2015) (where a witness's "testimony [i]s limited to information within his personal

---

[10] The MLC's summary judgment motion attaches more than 200 pages of Mr. Peale's deposition transcript. *See* Dkt. 112-11. The MLC's expert, Juan Serruya, also relies extensively on Mr. Peale's deposition testimony, attaching nearly 200 pages of the transcript as an exhibit to his report. *See* Dkt. 116-13. Moreover, the report contains substantial analysis based on Mr. Peale's discussion of how Pandora's free internet radio algorithm functions. *See* Dkt. 116-1 at 34–44. For instance, the report relies on a slide deck compiled by Mr. Peale, *see id.* at 40–43, and consistently relies on his testimony for facts regarding Pandora's algorithm, *see id.* at 38. During his deposition, Mr. Serruya confirmed that his opinions on Pandora's personalization were based on facts provided solely by Mr. Peale and the document Mr. Peale prepared. Laguna Decl. Ex. A, Serruya Dep. Tr. 270:16–271:7; 272:14-273:14.

knowledge . . . [the] testimony [i]s strictly that of a fact witness."). The declarations offer fact testimony within their personal knowledge, not expert opinion. *See Kerley*, 784 F.3d at 340.

The cases the MLC relies upon to argue that Mr. Peale and Mr. Marcantonio provided expert testimony are easily distinguishable because they involved opinion testimony by an employee applying specialized knowledge to new facts that were unrelated to information acquired through the witness's role in the business. *See, e.g.*, *United States v. Kouza*, 2025 WL 1427040, at *10 (E.D. Mich. May 16, 2025) (proposed witness was called on to critique a third-party audit and explain how specialized pharmacy-software tools and terms worked); *Mills v. Riggsbee*, 2014 WL 1168726, at *6 (E.D. Ky. Mar. 21, 2014) (proposed witness asked to testify about causation). The MLC also cites a Sixth Circuit case, *United States v. Ganier*, 468 F.3d 920 (6th Cir. 2006), for the proposition that "knowledge and familiarity with computers and [] particular forensic software well beyond that of the average layperson" constitutes "'scientific, technical, or other specialized knowledge' within the scope of Rule 702." *See* MLC Opp. at 27. But *Ganier* is entirely inapposite. That case involved testimony from the government's forensic computer specialist who ran various technical searches of the defendant's computers after they had been seized. 468 F.3d at 923–24. The Sixth Circuit explained that "witnesses who perform[] after-the-fact investigations [a]re generally not allowed to apply specialized knowledge in giving lay testimony" and held that the testimony needed to comply with the requirements of Rule 702. *Id.* at 927. But the court did not issue a general holding that any testimony related to technical information, including fact testimony, is subject to Rule 702.

The MLC does not (and could not) argue that Mr. Peale or Mr. Marcantonio are not percipient fact witnesses testifying about matters within their personal knowledge as Pandora employees. The MLC's misguided argument instead hinges entirely on the fact that both

employees work on technical matters that involve topics purportedly "beyond that of the average lay person." MLC Opp. at 26. But that is not the test for distinguishing fact from expert testimony; the proper test is whether the witness has personal knowledge of the matter they are testifying about or is instead offering specialized knowledge to assist the trier of fact. *See* Fed. R. Evid. 602; 702.[11] Here, it is clear that both declarations provide information that was personally acquired through each witness's role at Pandora. Moreover, the MLC's argument that it is prejudiced by the declarations is deeply undercut given that the MLC treated both individuals as fact witnesses throughout discovery and cites their testimony as the factual basis for its arguments notwithstanding its technical nature, including topics such as the operation of Premium Access sessions and Modes. MLC MSJ at 16 n.44–45; *id.* at 17 n.51.

## VI.      THE RUCINSKI REPORT IS APPROPRIATE REBUTTAL

The MLC also wrongly takes issue with the fact that Mr. Rucinski's report was submitted as a rebuttal report, rather than an affirmative report. MLC Opp. at 28–29. This argument fails. As an initial matter, the Rucinski report directly responds to the claims of the MLC's expert, Juan Serruya, about how Pandora's free radio offering functions. *See* Dkt. 120-1. That is classic rebuttal testimony. *See* Fed. R. Civ. P. 26(a)(2)(D)(ii) (defining a rebuttal report as one "intended solely to contradict or rebut evidence on the same subject matter identified by another party"). Nor was the MLC prejudiced by the Rucinski report—the MLC took Mr. Rucinski's deposition and had every opportunity to ask him about the report's content and methodology. The MLC primarily takes issue with the fact that Pandora attached the Rucinski report to its

---

[11] Even if any isolated comment was too technical, or impermissibly crossed the line into expert testimony, the appropriate remedy would be to strike that particular statement—not to exclude the declarations in their entirety. *See, e.g.*, *Perez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001) (excluding supporting evidence under Rule 56 "requires a scalpel, not a butcher knife").

summary judgment motion rather than its opposition brief to the MLC's motion.  *See* MLC Opp. at 29.  But the MLC cites no bar foreclosing Pandora from referring to a rebuttal expert report in its moving brief in anticipation of the MLC's arguments in response.  There is none.

Instead, the MLC cites cases in which parties tried to include new opinions through rebuttal reports that did not respond to the opposing expert or in which parties deliberately delayed the service of the report to cause prejudice.  *See, e.g.*, *First Years, Inc. v. Munchkin, Inc.*, 575 F. Supp. 2d 1002, 1009 (W.D. Wis. 2008) (striking portion of rebuttal report that addressed an argument that was not raised in the affirmative report); *Hyundai Motor Co. v. Hyundai Tech. Grp., Inc.*, 2025 WL 1711440, at *3 (C.D. Cal. 2025) (striking portion of rebuttal report that "offer[ed] new opinions"); *Branche v. Zimmer, Inc.*, 2009 WL 8750012, at *8 (E.D. Tenn. 2009) (limiting a report disclosed after the disclosure deadline "solely to rebuttal").  Here, Pandora did not raise any new arguments through the Rucinski Report—indeed, the MLC does not identify any argument that does not rebut the Serruya Report.  Nor did Pandora's service of the Rucinski Report prejudice the MLC.  There is thus no basis for the Court to strike the report.[12]

### CONCLUSION

For the foregoing reasons, Pandora respectfully requests that this Court enter judgment in favor of Pandora and deny the MLC's motion for summary judgment.

Dated:  March 31, 2026                                           Respectfully Submitted,

                                                                 */s/ Benajmin E. Marks*

                                                                 **WEIL, GOTSHAL & MANGES LLP**

---

[12] As a final matter, Pandora notes that the MLC's opposition brief appears not to comply with this Court's double-spacing requirement.  *See* L.R. 7.03(a).  Significant portions of the brief appear to use condensed spacing, and the brief includes 100 single-spaced footnotes, many of which are lengthy and substantive.

Benjamin E. Marks (admitted *pro hac vice*)
Todd Larson (admitted *pro hac vice*)
767 Fifth Avenue, 32nd Fl.
New York, NY 10153
Tel: (212) 310-8000
Benjamin.Marks@weil.com
Todd.Larson@weil.com

Crystal L. Weeks (admitted *pro hac vice*)
Sebastian Laguna (admitted *pro hac vice*)
2001 M Street, NW, Suite 600
Washington, DC 20036
Phone: (202) 682-7516
Fax: (202) 857-0940
Crystal.Weeks@weil.com
Sebastian.Laguna@weil.com

**SHERRARD ROE VOIGT &
HARBISON, PLC**

Michael G. Abelow (No. 26710)
Micah N. Bradley (No. 38402)
1600 West End Ave., Suite 1750
Nashville, TN 372013
Tel: (615) 742-4532
Fax: (615) 742-4539
mabelow@srvhlaw.com
mbradley@srvhlaw.com

*Counsel for Defendant Pandora Media, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 31, 2026, the foregoing **Reply In Support Of Pandora's Motion for Summary Judgment** was filed with the Court's electronic filing system, which will serve a copy on all counsel of record.  I further certify that on March 31, 2026, an unredacted version of the foregoing document was served on the Mechanical Licensing Collective's counsel via email.

*/s/ Benjamin E. Marks*