# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| MECHANICAL LICENSING COLLECTIVE, <br><br> Plaintiff, <br><br> v. <br><br> PANDORA MEDIA, LLC, <br><br> Defendant. | Civil Action No. 3:24-cv-00168 <br><br> District Judge Eli J. Richardson <br><br> Magistrate Judge Jeffrey S. Frensley <br><br> JURY DEMAND |

## MECHANICAL LICENSING COLLECTIVE'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF SUMMARY JUDGMENT ON LIABILITY

PRYOR CASHMAN LLP
Benjamin K. Semel (admitted *pro hac vice*)
M. Mona Simonian (admitted *pro hac vice*)
Joshua Weigensberg (N.Y. Bar No. 4894929)
Jason E. Sloan (admitted *pro hac vice*)
Erik F. Bakke (admitted *pro hac vice*)
7 Times Square
New York, New York 10036
Phone: (212) 421-4100
Fax: (212) 798-6326
bsemel@pryorcashman.com
msimonian@pryorcashman.com
jweigensberg@pryorcashman.com
jsloan@pryorcashman.com
ebakke@pryorcashman.com

RILEY & JACOBSON PLC
Elizabeth O. Gonser (TN Bar No. 026329)
1906 West End Ave.
Nashville, TN 37203
P: (615) 320-3738
egonser@rjfirm.com

*Attorneys for Mechanical Licensing Collective*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................ 3

I.    Summary Judgment Is Proper On Liability In Connection With Pandora Free ........................3

   A.   Summary Judgment Is Proper Based On The Ability To Select And Stream Music On Demand ................................................................................................................ 3

   B.   Summary Judgment Is Proper Based On The Ability To Move Forward And Backward Through Music Programs ................................................................................. 10

   C.   Summary Judgment Is Proper Based On The Ability To Receive Music Programs Specially Created For The User ....................................................................... 12

II.   Summary Judgment Is Proper On Liability In Connection With Pandora Plus ......................14

III.  The MLC Is Not Precluded From Pursuing Theories That Pandora Fully Litigated..............16

IV.  Pandora's Constitutional Complaints Have No Merit ............................................................18

CONCLUSION..................................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Cases** **Page(s)**

*Arista Records LLC v. Launch Media, Inc.*,
578 F.3d 151 (2d Cir. 2009)..................................................................................12, 13, 14

*Baity v. Kralik*,
51 F. Supp. 3d 414 (S.D.N.Y. 2014)................................................................................4, 5

*Boges v. Gen. Motors Co.*,
808 F. Supp. 2d 1043 (M.D. Tenn. 2011)...........................................................................4

*Boulger v. Woods*,
917 F.3d 471 (6th Cir. 2019) ...........................................................................................17

*CFPB v. Gordon*,
819 F.3d 1179 (9th Cir. 2016).........................................................................................20

*Davis v. Echo Valley Condo. Ass'n*,
945 F.3d 483 (6th Cir. 2019) ...........................................................................................16

*Delphi Inv. Grp., LLC v. Perry Cmty. Hosp., LLC*,
No. 3:20-cv-00007, 2022 WL 291714 (M.D. Tenn. Jan. 31, 2022) ...........................................3

*Goldstick v. The Hartford, Inc.*,
No. 00 CIV. 8577 (LAK), 2002 WL 1906029 (S.D.N.Y. Aug. 19, 2002) ...............................4

*Murphy v. NCAA*,
584 U.S. 453 (2018).........................................................................................................18

*Ohio Telecom Ass'n v. FCC*,
150 F.4th 694 (6th Cir. 2025) ............................................................................................8

*Oklahoma v. United States*,
163 F.4th 294 (6th Cir. 2025) ..........................................................................................20

*Pace Indus. Union-Mgmt. Pension Fund v. Dannex Mfg. Co.*,
No. 3:06CV0417, 2008 WL 11411760 (M.D. Tenn. Nov. 12, 2008)....................................17

*Pulsifer v. United States*,
601 U.S. 124 (2024)...........................................................................................................8

*Sasser v. ABF Freight Sys., Inc.*,
219 F. Supp. 3d 701 (M.D. Tenn. 2016)............................................................................11

*Smith v. Salem*,
378 F.3d 566 (6th Cir. 2004) ...........................................................................................17

*Spokane Arcades, Inc. v. Brockett*,
    631 F.2d 135 (9th Cir. 1980), aff'd, 454 U.S. 1022 (1981)......................................................18

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)......................................................20

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001)......................................................7

*United States v. Olano*,
    507 U.S. 725 (1993)......................................................16

*United States v. Wood*,
    877 F.2d 453 (6th Cir. 1989) ......................................................17

*Walker v. United States*,
    134 F.4th 437 (6th Cir. 2025) ......................................................17

**Statutes**

17 U.S.C. § 114......................................................2, 3, 5, 7, 8, 9, 10, 11, 14

17 U.S.C. § 115......................................................19

Copyright Act of 1909 ......................................................20

Copyright Act of 1976 ......................................................20

**Other Authorities**

37 C.F.R. § 385, App. A ......................................................14

37 C.F.R. § 385.2 ......................................................14

H.R. REP. NO. 94-1476 (1976)......................................................20

H.R. REP. NO. 104-274 (1995)......................................................8, 9

S. REP. NO. 115-339 (2018) ......................................................20

Statement on Signing the Orrin G. Hatch-Bob Goodlatte Music Modernization
    Act (Oct. 11, 2018) ......................................................18

Plaintiff Mechanical Licensing Collective ("The MLC") respectfully submits this reply memorandum of law in further support of its motion for summary judgment on liability.

**PRELIMINARY STATEMENT**

The parties agree that the material facts concerning how Pandora's[1] streaming services work are not in dispute, and that liability in this action should be resolved on summary judgment. Pandora's response to The MLC's Statement of Undisputed Material Facts bears out the lack of genuine dispute of material fact. Beyond this agreement, however, the approaches of the parties to these dispositive motions could not be more different.

The MLC has built a comprehensive record supporting its claims, with extensive declarations and expert reports attaching over a hundred exhibits providing direct proof and admissions of liability by Pandora. Pandora's approach, in contrast, only makes sense for a litigant that knows the real evidence would confirm The MLC's claims. In a case about how its streaming services work, Pandora chose not to show the Court how its services work. The MLC submitted video demonstrations of Pandora Free users searching Pandora's full catalog, selecting particular songs on demand, and playing them, and Pandora has no comment.[2] The MLC submitted Pandora's own internal competitive analysis — ███████████████████████ ████████████████████████████████████ ███████████████████ — and Pandora makes no attempt to articulate a response. Pandora's leadership described on-demand listening as a feature "within" and "in" Pandora Free in statements made under the penalty of law. Pandora's response is not that these statements are wrong, but just a hollow argument that party admissions are not technically dispositive. And when confronted with the fact that Pandora's own homepage advertises "search and play what you want" as a feature of Pandora Free, Pandora's response is to indict its own website as "puffery" rather

---

[1] The MLC respectfully refers the Court to its Memorandum of Law in Support of Motion for Summary Judgment on Liability, ECF No. 110 ("MLC Moving Br."), for terms not defined herein.

[2] Pandora's persistent refusal to acknowledge critical admissions and evidence has forced The MLC to litigate this action to this point, despite the fact that a few minutes of using Pandora Free is enough to prove its on-demand functionality beyond any doubt.

than admit that its homepage is accurate.

Because Pandora does not engage with the evidence, it instead resorts to rhetoric and fabricated terminology to distract from its liability. Pandora uses the word "radio" to describe Pandora Free more than 100 times across its moving and opposition briefs. Its home page and product plan web page never use "radio" to describe Pandora Free, which is not a radio service. Pandora cycles through an ever-shifting vocabulary of inscrutable terms — "sample sessions," "windows of access," "separable components," "state changes," "temporary transitions," "demarcated" transmissions — that are used interchangeably because they all mean nothing and serve only to distract from the evidentiary record. These self-serving abstractions are not facts. They do not create genuine disputes. They are the arguments of a party that cannot contest the evidence on its own terms.

Pandora's legal positions fare no better. Pandora's central legal defense is that on-demand features on Pandora Free can somehow be carved out as "separable components" and excluded from the statutory analysis, leaving only personalized station listening to define the service. Putting aside that those personalized stations alone make Pandora Free an interactive service, the "separable component" construct is incompatible with the statute and would turn the compulsory license on its head. It is a contrived litigation device that has never been used in practice, including by Pandora itself, who does not even apply the construct to its own services.[3] To the contrary, Pandora admits that all of Pandora Plus and Pandora Premium are subject to mechanical licensing because they are "interactive services" due to features also available on Pandora Free.

Indeed, Pandora's opposition brief goes even further to assert that "the entirety of" Pandora Plus is an interactive service simply because Pandora Plus has one limited interactive "functionality that takes it outside the Section 114 statutory license." This is a correct reading of the statutory test, which defines an interactive service based on its available features. It is also

---

[3] Pandora does not provide record evidence or citation indicating that subdividing a single service into discretionary components to avoid the interactive service definition was ever suggested as an interpretation of Section 114(j)(7) by anyone except Pandora itself in connection with this dispute.

*exactly* what Pandora is challenging in this lawsuit as to Pandora Free. The MLC called out this hypocrisy repeatedly in its moving papers, and Pandora made no attempt to explain its conflicted positions in its opposition papers.

As explained in The MLC's moving papers, Pandora Free unquestionably satisfies the statutory test for an interactive service in three independent ways: it enables users to (i) listen to specific sound recordings on demand, (ii) move forward and backward through music programs, and (iii) receive programs specially created for the individual user. 17 U.S.C. § 114(j)(7). Any one of these features is sufficient to show liability, and as demonstrated below, Pandora has no meritorious defense to any of them.

## ARGUMENT

### I.      Summary Judgment Is Proper On Liability In Connection With Pandora Free

#### A.      Summary Judgment Is Proper Based On The Ability To Select And Stream Music On Demand

##### 1.      There Is No Factual Dispute That Users Logged Into Pandora Free Can Stream Music On Demand

The statutory test on this prong is satisfied by a single undisputed fact: "Pandora Free users are able to search and play specific sound recordings from Pandora's catalog." (MLC SUF No. 7.) This fact should be deemed admitted. It rests on incontestable admissions that Pandora did not actually contest. (Response to MLC SUF No. 7 (ECF No. 152.) Despite being labeled "disputed," Pandora responds with improper narrative and argumentation that nonetheless admits the fact as written. After admitting that Pandora Free users "are able to search for specific sound recordings," Pandora describes a "series of steps" with the ultimate result that the Pandora Free user "will be able to listen to the desired song on demand." *Boges v. Gen. Motors Co.*, 808 F. Supp. 2d 1043, 1045, n.2 (M.D. Tenn. 2011) (no genuine issue is created when a nonmovant, in responding to Rule 56.1 statement, "essentially admits a fact but provides further commentary and arguments that do not controvert the underlying fact"); *Delphi Inv. Grp., LLC v. Perry Cmty. Hosp., LLC*, No.

3

3:20-cv-00007, 2022 WL 291714, at *2, n.2 (M.D. Tenn. Jan. 31, 2022). [4]

Pandora's other allusions to Pandora Free users "leaving" Pandora Free and "entering" or being "dropped into" somewhere else are incoherent. *See id; see also Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014); *Goldstick v. The Hartford, Inc.*, No. 00 CIV. 8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002). It appears that Pandora is attempting to obtain an unsubstantiated finding that users logged into Pandora Free are somehow not actually in Pandora Free when they utilize the advertised Pandora Free feature to "search and play what you want." This is an extraordinary request of the Court, particularly since Pandora itself does not even commit to such an incongruous claim, perhaps realizing that it would call into question numerous statements by its leadership under penalty of law. [5]

Thus, Pandora openly plays both sides of the fence. While implying a transition to Pandora Premium in its arguments, Pandora repeatedly gives itself plausible deniability for the false claim by admitting that Pandora Free users only receive the "feature set" or "listening experience" of Pandora Premium, or "all the functionality and experience available to Pandora Premium subscribers, with the exception of [offline track play]." (Pandora SUF No. 14 (ECF No. 132).) [6] These formulations are not defenses, but admissions that Pandora Free users are able to stream on demand, consistent with Pandora's own SEC filings describing Pandora Free users as "provided with the option to temporarily access on-demand listening, including certain features of the

---

[4] While the statute does not require seamlessness between request and delivery of a sound recording, the record shows the process is entirely seamless: for the price of a 15-second ad every 30 minutes, the Pandora Free user has immediate on-demand capability with no interruption, and without ever experiencing anything suggesting they have left the service. (Serruya Report ¶¶ 64-71, Exhs. 1(a), 1(b), 1(e) (ECF No. 116).)

[5] Pandora Premium is a subscription service and Pandora Free users are not subscribers. If Pandora Free users were actually accessing the Pandora Premium service when they play music on demand, then Pandora would have to report them to The MLC as subscribers. ███████████████████████ ███████████████████████ ██████████. (Marshall Decl. ¶¶ 34-40 (ECF No. 113).)

[6] *See also, e.g.*, Pandora's Memorandum of Law in Opposition to The MLC's Motion for Summary Judgment ("Pandora Opp. Br."), at 8 (ECF No. 151) (Pandora Free users "are able to receive the Pandora Premium feature set more generally" when they use Premium Access); Responses to MLC SUF Nos. 7, 27.

4

Pandora Premium service." (SiriusXM 2021 10-K (Semel Exh. 18, p. 8; ECF No. 106-8).) All of this is a roundabout way of admitting MLC SUF No. 7 and, in turn, liability.

The final blow to Pandora's attempt to evade liability is its failure to contest MLC SUF Nos. 8 and 9, which call on Pandora to address its leadership's admissions that "[Premium Access] is a feature that allows you to listen on demand within [Pandora's] ad-supported product" and that Pandora "now [has] more compelling and complete functionality in [its] mobile ad-supported service than any other competitor." Pandora (i) admits that its leadership made these statements; (ii) does not contest their veracity; (iii) does not argue that the statements are incomplete, taken out of context, or otherwise misleading; and (iv) does not offer any explanation or testimony suggesting any disagreement with these statements. Yet these admissions state, in unmistakable terms, the very point that Pandora "disputes" in its response to MLC SUF No. 7 — namely, that the ability to "listen on demand" exists "within" Pandora Free. Because Pandora cannot deny the facts stated by its own leadership, it resorts to bald assertions that such statements are irrelevant. (Pandora Opp. Br. at 26-32.) *See Baity*, 51 F. Supp. 3d at 418 (admonishing non-movant for "speaking past [movants'] asserted facts without specifically controverting those same facts").

> 2. Pandora's "Separable Component" Construct Conflicts With The Law, The Facts, And Pandora's Other Positions

Pandora pins its entire legal defense with respect to on-demand functionality on a labored reading of the third sentence of Section 114(j)(7), which Pandora contends allows it to treat on-demand functionality on Pandora Free as a "separable component" that does not count toward the service's classification.[7] (Pandora Opp. Br. at 6.) The flaws in this argument are myriad.

---

[7] The unreasonableness of Pandora's legal defense is also palpable when seeing how it would work in practice. Exhibit 1(e) to the Serruya Report includes video of a listening session on a single "Morgan Wallen" personalized station. The video captures 18 consecutive track plays. Paragraph 5 and Exhibit 3 to the Semel Reply Decl., compiles frames from Exhibit 1(e) to show the session history, along with a table listing the track information in order. Pandora's argument is that 5 out of the 18 plays in this session (the ones circled in red in Exhibit 3 to the Semel Reply Declaration) should be deemed "separable" from the rest, and the other 13 plays (along with the advertising revenue associated with them) should be excluded from Pandora's royalty accounting. This position rests on the visibly untenable premise that the 5 plays can somehow be deemed not part

(a)     Pandora Itself Does Not Follow The Unworkable "Separable Component" Construct

Pandora does not actually apply its "separable component" construct to any of its services:

- For Pandora Premium, Pandora reports all activity, without any argument that personalized station plays are not Covered Activity because on-demand streaming is a "separable component," even though Pandora's CFO explained that "station" plays constitute 80 to 90 percent of Premium listening. (Serruya Report ¶ 89; Flynn Report ¶ 62 & n.60.)[8]

- Pandora "pays the MLC royalties for the entirety of Pandora Plus under Section 115" (Pandora Opp. Br. at 34), again without any argument that personalized station plays do not count as Covered Activity because on-demand streaming is a "separable component";

- For Pandora Free, while Pandora does exclude certain activity, it is not done in any discernable component-based way. The Serruya Report contains a detailed analysis of the lack of coherence behind the removal of activity from Pandora Free reporting under the Blanket License, and Pandora has provided no explanation for its practices, let alone one that could be reconciled with the statutory text. (Serruya Report ¶¶ 82-91.)

The MLC highlighted this contradiction in its moving brief, and Pandora offered no explanation in its opposition. (MLC Moving Br. at 13.) Pandora also failed to explain how its contrived "separable component" construct could possibly apply to Pandora Free but not to Pandora Plus or Pandora Premium, which are subject to the same statutory definitions.

The inconsistency between Pandora's actual practices and its contrived legal arguments runs even deeper. Pandora's admitted reason for reporting "the entirety of Pandora Plus" as Covered Activity reflects *the exact reading* of the statutory definition that underlies liability in this

---

of the same streaming service as the other 13 plays *in which they were interspersed in the same listening session*. Pandora offered no response to this video evidence, and no explanation for how its position passes even the smell test.

[8] The Flynn Report explained that Pandora's internal data shows that ███████████████ ███████████████████████████████████████████████████ ██████████████ (Flynn Report ¶¶ 62-63 (ECF No. 114).) Pandora did not attempt to explain the contradiction in calling certain personalized station streaming by Pandora Free users a "separable component" when it admits that ███████████████████████ ███████ without being a "separable component." Moreover, as explained in The MLC's Memorandum of Law in Opposition to Pandora's *Daubert* Motion to Exclude the Testimony of Robin Flynn ("Motion to Exclude Opposition"), Pandora's arguments that the interactive functionality that runs through Pandora Free is either "separable" or "trivial" also cannot be reconciled with Pandora's business conduct or competitive assessments. (ECF No. 161 at 4-10.) The MLC incorporates the arguments in its Motion to Exclude Opposition here.

6

action for Pandora Free.  Pandora states that it "categorizes the Plus service as interactive under Section 115 because of station caching." (Pandora Opp. Br. at 35, n.16.)  Station caching, or offline playback, is a feature that allows users to download personalized stations to a device for playback without an internet connection. (*See* Serruya Report ¶ 20.)  Pandora describes it as a "temporary" and "limited" feature, while admitting that it is also "a functionality that takes [Pandora Plus] outside the Section 114 statutory license" and requires Pandora to obtain a mechanical license for "the entirety of" Pandora Plus. (Pandora Opp. Br. at 30 n.12, 34-35.)  This admission by Pandora as to how the "interactive service" definition works reveals the inauthenticity of its posture in this action as to Pandora Free.  In the same brief in which Pandora feigns incredulity that "the existence of any interactive component … would convert every other transmission on the service into an interactive one," Pandora admits that this is *exactly* how the statute operates—and how Pandora has applied the definition to its own subscription services. [9]

(b)      The "Separable Component" Construct Is Inconsistent With The Law

*The Surplusage And Meaningful Variation Canons Both Cut Against Pandora's Reading*

Both canons that Pandora invokes cut against its position. (MLC's Memorandum of Law in Opposition to Pandora's Motion for Summary Judgment ("MLC Opp. Br.") at 19-22 (ECF No. 157).)  If the phrase "noninteractive component" in the third sentence of Section 114(j)(7) refers to features *within* an interactive service, the subordinate clause opening the third sentence — "If an entity offers both interactive and noninteractive services" — becomes surplusage, imposing a condition with no logical connection to the operative clause. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).  Pandora's reading would also render the feature-based definition set forth in the first sentence a charade: the features that Congress determined render a service "interactive" under

---

[9] Moreover, station caching was not the only feature that made Plus an interactive service.  As discussed in The MLC's moving brief, Pandora's executives testified that *skips and replays* made the entirety of the service an interactive service. (MLC Moving Br. at 10, n.19-21; Pandora Opp. Br. at 30 n.12.)  As discussed below, Pandora Free has the same skip and replay functionality, and the same conclusion is required: the entirety of Pandora Free is an interactive service.  Pandora challenges that conclusion as to Pandora Free, but fails to acknowledge, let alone explain, the fundamental contradiction with its reporting on Pandora Plus.

7

the first sentence of Section 114(j)(7) could instead be "separated" from the service to nullify their impact. The meaningful variation canon likewise does not assist Pandora because reliance on that interpretive principle "misses the mark" where, as here, the interpretation "creates anomalies across the remainder of the statute." *Ohio Telecom Ass'n v. FCC*, 150 F.4th 694, 710 (6th Cir. 2025); *see Pulsifer v. United States*, 601 U.S. 124, 150 (2024).[10] (MLC Opp. Br. at 19-20.)

*Pandora's Attempts To Pull Legislative History Out Of Context Cannot Save Its Position*

Pandora attempts to bolster its argument by plucking a phrase from the 1995 House Report out of context. The passage, in full, reads:

> If an entity offering a nonsubscription service (such as a radio or television station) chooses to offer an interactive service as a separate business, or only during certain hours of the day, that decision does not affect the exempt status of any component of the entity's business that does not offer an interactive service. In other words, each transmission should be judged on its own merits with regard to whether it qualifies as part of an "interactive" service. The third sentence of the definition of "interactive service" is intended to make this clear.

H.R. REP. NO. 104-274, at 25-26 (1995). Pandora seeks to read the second sentence as authorizing it to disaggregate a service into undefined "interactive" and "noninteractive" component bins on a feature or stream basis. (Pandora Opp. Br. at 10.) That reading is inconsistent with the plain text. The phrase "in other words" signals that what follows is a restatement of the preceding sentence. Pandora's reading requires "in other words" to introduce a new concept of disaggregation that appears nowhere in the sentence it purports to restate. Properly read as a restatement, the phrase "each transmission should be judged on its own merits with regard to whether it qualifies as part

---

[10] Pandora's reading would also sever the link between the statutory definition and the reporting obligations that depend on it. Under Section 114(j)(7), the "enables" test provides an administrable rule: if a service enables the specified activities, it is interactive and the licensee reports and pays royalties accordingly, which are calculated at the service level. (Marshall Decl. ¶¶ 30, 32.) Pandora proposes allowing individual streams to be "separable components," but cannot articulate what standard would govern reporting. The Serruya Report documents the unprincipled removal of activity from Pandora Free reporting with no coherent logic under this approach. (Serruya Report ¶¶ 82-91.) Pandora's euphemistic suggestion that its reporting "discrepancies" can simply be "correct[ed]" (Pandora Opp. Br. at 32, n.14) only sharpens the point that Pandora's reporting is incorrect under the service-level definition that Congress provided and that the entire industry uses. Pandora argues against that definition when there is no alternative definition under which Pandora could correct its reporting.

of an 'interactive' service" simply means that each transmission is judged by the nature of the service to which it belongs. Thus, a radio station's transmissions remain noninteractive because the radio station is noninteractive, while a new streaming platform's transmissions are interactive because the streaming platform is interactive.

Congress' grammar confirms this. Congress wrote that each transmission is judged as to "whether it qualifies as part of an interactive service." The word "whether" introduces a yes-or-no question: does this transmission qualify as part of an interactive service? That is not a classificatory inquiry. It does not ask "which service could we assign this transmission to?" — language Congress easily could have written but did not.[11]

*The "Separable Component" Defense Is Structurally Incompatible With The Statute*

Pandora's "component" defense rests on a term that Pandora never defines. Pandora variously describes the on-demand features of Pandora Free as a "component," an "offering," a "sample," a "window," a "session," an "experience," and more, without once explaining what any of these labels mean as a matter of statutory interpretation or what factual criteria would distinguish a "separable component" from any other part of a service.[12] Indeed, Pandora's claim that each

---

[11] Pandora also seizes on the statutory phrase "concurrently or at different times" in Section 114(j)(7), and the legislative history's reference to an entity offering an interactive service "as a separate business, or only during certain hours of the day," H.R. REP. NO. 104-274, at 25-26, to argue that Congress contemplated Pandora's position. (Pandora Opp. Br. at 10, 13.) But both phrases describe the same thing: how two *separate services* might coexist within one *entity*. The legislative history's examples reflected the 1990s context: a broadcaster with exempt public programming might launch a separate interactive offering as a new line of business running concurrently, or might repurpose its channel during off-hours as a paid jukebox. The examples reinforce that the interactive service determination is made at the *service* level, not the entity level and not by subdividing transmissions within a single service. Pandora is not operating different businesses "during certain hours of the day" or "concurrently or at different times." It offers one ad-supported service that enables interactive streaming at all hours of every day.

[12] These vague labels are replacements for a prior characterization that collapsed under scrutiny. In its Answer, Pandora consistently described on-demand streaming on Pandora Free as a "trial" of Pandora Premium. The Serruya Report dismantled that characterization as unsupportable through analysis of Pandora's product and documentation. (Serruya Report ¶¶ 72-81.) The "trial" characterization then disappeared from Pandora's filings, replaced by a cloud of vaguer labels that defy any definition that could be tested against the record.

9

individual skip or replay would constitute its own separable component reveals the lack of any coherent principle behind its argument.

The statute does not use the word "component" to describe a feature of a service, let alone an individual stream. The reason is structural. Section 114(j)(7) defines an "interactive service" as one that "enables" certain user activities. An interactive *transmission* is then defined derivatively as any transmission that is "part of" an interactive service. 17 U.S.C. § 114(d)(2)(A)(i). The statutory framework thus works from the service level down to individual transmissions—not the other way around. Pandora asks this Court to invert that structure by first examining individual transmissions, classifying each as interactive or noninteractive based on user conduct, and then aggregating only the "interactive" transmissions upward to create a so-called "service." That is not how the statute works. Neither Section 114 nor Section 115 articulate a freestanding definition of an "interactive transmission," and Pandora has not (and cannot) articulate any test for identifying an "interactive transmission" independent of the service-level definition. Congress made the service the unit of analysis: the Court determines whether a *service* enables the specified activities, and if it does, all transmissions part of that service are transmissions of an interactive service.

B.     Summary Judgment Is Proper Based On The Ability To Move Forward And Backward Through Music Programs

Pandora admits that skip and replay functionality exists on Pandora Free (Responses to MLC SUF Nos. 10-11) and does not dispute how it operates. (MLC Moving Br. at 16-17, 26-27.) Nevertheless, Pandora's opposition offers a factual and a legal argument on this point, neither of which preclude summary judgment. [13]

---

[13] Pandora also argues that replays are separable components and should be ignored when analyzing whether Pandora Free is an interactive service because advertisements are transmitted in connection with replays. (Pandora Opp. Br. at 16.) Pandora offers no authority supporting the subdivision of a service into *individual streams* and then exclusion of some streams from consideration when analyzing service functionality. Nor can Pandora reconcile this position with its own acknowledgements that replay functionality triggered the need for a mechanical license for the entire Pandora Plus service. (MLC SUF No. 14; Pandora Opp. Br. at 30, n. 12.)

10

*First*, Pandora argues that skips and replays are not "unlimited" because users must periodically watch advertisements. (Pandora Opp. Br. at 16.) The unlimited nature of skips and replays, however, is not necessary in the statutory analysis. And in any event, Pandora's semantic hedge is a distinction without a difference. Saying that skips are "limited" by the need to receive an advertisement is akin to saying that Pandora Premium's skip feature is "limited" by the requirement to pay a subscription fee. Both are simply the price of the service. Moreover, Pandora's own homepage advertises "unlimited skips" as a feature of Pandora Free. (Semel Exh. 77; ECF No. 106-33.)

*Second*, Pandora claims that "a service *would be interactive if it allowed* users to move back and forth between songs the user knows in advance and can thus select because they are part of a prerecorded or predetermined program that the service makes available to users — *i.e.*, what are now known as 'playlists'. . . ." (Pandora Opp. Br. 15.) This is yet another admission of liability, not a defense. When a user can skip forward through a music program and can then move backward and select from among the songs already played or skipped, the program *has become* a playlist. To be clear, the second prong of Section 114(j)(7) does not require the existence of an advance playlist as Pandora implies. But even if it did, skip-and-replay functionality turns any music program into a user-navigable playlist, rendering the service interactive under Pandora's own reading. As an example, the Serruya Report Exhibit 1(e) product video illustrates this directly.

Pandora also cannot escape its admissions describing additional skips and replays as "interactive features" requiring a "mechanical license." (MLC SUF Nos. 13-14; MLC Opp. Br. at 10, n.7; MLC Moving Br. at 10-11.) Pandora does not deny making these statements but instead "disputes the suggestion" that it used "interactive" in its legal sense. (Responses to MLC SUF Nos. 13-14.) The documents themselves refute this claim, as they are addressed to changes in royalty rates for the compulsory mechanical license and discuss how "interactive features" including "replays [and] additional skips" would affect Pandora's legal obligations. Pandora offers no evidence that these certified statements to investors are inaccurate. *Sasser v. ABF Freight Sys., Inc.*, 219 F. Supp. 3d 701, 705 (M.D. Tenn. 2016).

11

**Summary Judgment Is Proper Based On The Ability To Receive Music Programs Specially Created For The User**

1. **The Facts Establishing Liability Are Not In Dispute**

Pandora's response to The MLC SUFs confirms that the only disputes on this prong concern (1) the legal standard to apply and (2) the relevance of *LAUNCHcast*'s factual findings — both "strictly under the purview of the courts." *Arista Records LLC v. Launch Media, Inc.* ("*LAUNCHcast*"), 578 F.3d 151-152 (2d Cir. 2009).[14] On the material facts, Pandora's responses acknowledge most asserted facts as "undisputed" or "undisputed for summary judgment purposes only" (Responses to MLC SUF Nos. 15-22). The one fact Pandora disputes in substance, regarding constraints on user-signal influence (*Id.* No. 23), is corroborative and not necessary to establish liability, and as discussed below, Pandora's dispute rests entirely on inadmissible evidence.

2. **Pandora Cannot Evade Summary Judgment Through Undisclosed And Inadmissible Opinion Testimony**

None of the evidence that Pandora submits on summary judgment, even if admitted in full, changes that Pandora Free is liable under this prong of the statutory test. Nonetheless, the submissions are wholly improper and facially unreliable and should not divert the record. The evidence concerning the functioning of Pandora's algorithmic programming is technical material that can only be presented by an expert witness. (MLC Opp. Br. at 27.) The MLC properly designated an expert witness in product design and engineering and submitted an expert report on these matters (the Serruya Report) by the scheduling deadlines. (Serruya Report ¶¶ 92-122.)

Although personalized music programs were the subject of substantial litigation throughout fact discovery, including the deposition of W.B. Peale as a 30(b)(6) witness on Pandora's algorithmic programming, Pandora chose not to designate Peale or anyone else as an affirmative expert witness. Pandora further chose not to submit any expert rebuttal to the Serruya Report from Peale. This was a strategic choice by Pandora, as disclosing affirmative or rebuttal expert

---

[14] The parties' dueling comparisons with the *LAUNCHcast* service reflect disputes over legal standards, not material facts. The facts about *LAUNCHcast* are not in the record and relate to a fundamentally different service with less developed technology. (MLC Opp. Br. at 13-14; MLC Moving Br. at 27-29.)

testimony would have required Pandora to identify and produce the materials underlying the opinions, and allow cross-examination on such materials and opinions. (MLC Opp. Br. at 27-29.) Pandora apparently determined that the downside of such disclosures outweighed the benefits of submitting opinion testimony on these topics. [15]

Pandora's decision to submit undisclosed opinion testimony from Peale anyway on summary judgment is entirely inappropriate. Worse yet, the format of presentation could hardly be more unreliable: a declaration filled with technical assertions but without a single citation to an information source or a single exhibit, let alone the requisite disclosures. Depriving The MLC of the ability to review the materials behind his opinions resulted in clear prejudice, and Pandora should not be rewarded for its gamesmanship in evading the clear disclosure requirements for opinion testimony. (MLC Opp. Br. at 27-28.)

### 3. Pandora's Attempt To Rewrite The Statutory Test Cannot Succeed

Pandora does not dispute that its programs are "specially created for the recipient." 17 U.S.C. § 114(j)(7). It does not even argue that its algorithmic programming, as described in The MLC SUFs, are *not* specially created for each user. (Responses to MLC SUF Nos. 15-22; Declaration of W.B. Peale ¶¶ 5, 13-21 (ECF No. 131).) Indeed, Pandora's music programs — which deploy a level of highly individualized tailoring that was not even technologically possible when the statutory test was crafted — clearly meet the plain language test meant to capture personalization. Pandora knows this and does not attempt to defend itself on the actual statutory language. Instead, Pandora systematically substitutes "predict" or "control" for the language Congress enacted. (*See, e.g.*, Pandora Opp. Br. at 19 (stating test as whether user can "predict the songs she will hear"); *id.* at 20 (same).) Pandora's argument is that *LAUNCHcast* redefined the test, but *LAUNCHcast* does not (and could not) alter Congress' words. The Second Circuit discussed predictability as part of the reason Congress added the "specially created" prong, but the

---

[15] The scant discussion of algorithmic programming in the Rucinski Rebuttal Report does not rebut any of the key findings in the Serruya Report and does not reference materials beyond those in the Serruya Report. (Rebuttal Expert Report of Christopher Rucinski ("Rucinski Rebuttal Report") ¶¶ 79-86 (ECF No. 128).)

court's actual analysis applied the statutory text, and the statutory text must control. (MLC Opp. Br. at 14-15.)

Pandora's proposed "predict each song" standard must also fail because it is designed to be unreachable and unprovable. Consider that Pandora did not even attempt to submit evidence (or even describe what such evidence would look like) *proving* that Pandora Free users cannot predict the next song. It was comfortable just declaring that conclusion because its standard is so facially illogical. Pandora does not even hazard to explain in theory what kind of music program *could* meet the standard that it seeks to impose. Requiring actual prediction of each next song is effectively describing the selection of songs on demand. If Pandora's standard were the law, no program could ever satisfy the "specially created" prong without effectively satisfying the other prong, negating Congress' intentional expansion of the definition. [16] The consequence of Pandora's standard confirms it cannot be the law. Congress amended the statute to add this separate prong precisely to remove personalized programming from the compulsory license. (MLC Moving Br. at 23.)

## II.    Summary Judgment Is Proper On Liability In Connection With Pandora Plus

Pandora does not dispute that Pandora Plus is an interactive service under Section 114(j)(7) or that it pays The MLC mechanical royalties "for the entirety of Pandora Plus." (Pandora Opp. Br. at 34.) It contends only that Pandora Plus qualifies for the discounted royalty rate available to "Limited Offerings," which is reserved for subscription services where the end user "cannot choose to listen to a particular sound recording" or the available catalog is "substantially limited." 37 C.F.R. § 385.2; 37 C.F.R. Part 385 App. A at § 385.2. But Pandora Plus users *can* choose to

---

[16] Pandora Free of course does also provide on-demand functionality. The analysis that The MLC undertakes in these motion papers to analyze Pandora's liability *on each prong in isolation* is thus overly conservative. For the simple purpose of assessing whether Pandora Free is an interactive service, the expedient response to Pandora's contrived "predictable" test is to note that Pandora Free users can of course predict the next song whenever they want, because they can (1) skip ahead to see the music program playlist and then move backwards to select any song in the program, or (2) simply "search and play what they want." Nonetheless, The MLC respectfully submits that resolution of liability under each prong individually would be valuable (though not necessary) on this motion, if only to avoid confusion going forward.

listen to particular sound recordings on demand *and* have access to the same full catalog as Pandora Premium subscribers. (MLC SUF Nos. 27-28.) Pandora does not meaningfully contest this. [17]

Pandora's only comment on its liability is to import a different exclusionary theory, arguing that on-demand feature use on Pandora Plus should be excluded from the Limited Offering analysis because it is somehow separable from personalized station listening. (Pandora Opp. Br. at 35.) But Pandora cites no language in the definition that allows for such an exclusion, and Pandora admits that "the entirety" of Pandora Plus falls under the Blanket License. (*Id*. at 34.) The Limited Offering definition does not allow for a service to pretend that it does not have the features that it does. On the contrary, the entire point of the Limited Offering definition is to identify interactive services where one of two features is *missing*. Pandora's argument that, although Pandora Plus *has both features*, Pandora can just deem them missing and pretend to be a more limited service, is completely unsupportable and in conflict with the law.

Pandora's attempt to defend its Pandora Plus reporting also produces a severe contradiction with its attempt to defend its Pandora Free reporting. The contradiction exposes both positions as untenable. Pandora Free and Pandora Plus enable users to stream music through both personalized stations and on-demand selections. Pandora's defense for Pandora Plus asks the Court to consider only the personalized station plays, and to arbitrarily exclude the on-demand selections from consideration, so that it can claim that Pandora Plus is a Limited Offering that does not allow on-demand streaming. In contrast, Pandora's defense for Pandora Free asks the Court to arbitrarily exclude *precisely the opposite* activity. For Pandora Free, Pandora argues that the on-demand selections are what *should* be considered, and personalized stations are what should be excluded from consideration, so that Pandora can dramatically reduce the accounting of the advertising revenue that it must share under the Blanket License.

The only thing that connects these two positions is that each one asks the Court to ignore

---

[17] Pandora's responses to MLC SUF Nos. 27-28 do not dispute the underlying functionality, but simply reassert the same arguments advanced in connection with Pandora Free. Pandora submitted no testimony addressing its categorization of Pandora Plus as a Limited Offering.

exploitation of songs by Pandora in order to excuse its underpayment of the royalties due to songwriters. Pandora does not even attempt to justify its incompatible positions, and neither exclusionary approach is permitted. Both services are interactive services, and the entirety of both services is Covered Activity under the Blanket License.

## III. The MLC Is Not Precluded From Pursuing Theories That Pandora Fully Litigated

Pandora argues that The MLC "waived" theories of liability concerning (a) personalized algorithmic programming and (b) reporting for Pandora Plus. (Pandora Opp. Br. at 17-18, 33-34.) To begin, waiver is not the doctrine at issue here (or in any of the cases Pandora cites). *United States v. Olano*, 507 U.S. 725, 733 (1993) (waiver is the "intentional relinquishment or abandonment of a known right."). Pandora's contention is that two theories were insufficiently pled, a question whose consequence is at most that The MLC would need to pursue them through amendment or in a separate action.[18] But even that limited objection makes no sense here. These theories have been fully litigated. There is no genuine dispute of material fact concerning how Pandora's algorithm personalizes stations or how Pandora Plus operates. Pandora submitted to discovery on both issues, and identifies no discovery it was unable to take. Both sides have briefed these issues on summary judgment. Requiring The MLC to amend its complaint or bring a separate action to resolve claims that are ready for summary adjudication now would serve no purpose other than to delay the resolution of claims that Pandora anticipates losing.

Fully aware that both of these theories were part of the action, Pandora litigated them on the merits through all aspects of discovery: document discovery, interrogatories, requests for admission, depositions and 30(b)(6) testimony, and expert reports.[19] Pandora never sought a

---

[18] Pandora's lead authority states the remedy explicitly: parties "must first move to amend their pleadings . . . before asserting the claims in summary-judgment briefing." *Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 496 (6th Cir. 2019).

[19] On algorithmic personalization: RFAs Nos. 60-63, 104-07 (Semel Exh. 2; ECF No. 112-1); Interrogatory Nos. 17-20 (Semel Exh. 6; ECF No. 112-5); Peale Dep. Tr. at pp. 63-221 (Semel Exh. 11; ECF No. 112-10); Pandora 30(b)(6) Responses, Topic Nos. 4(a)-(k) (Semel Reply Exh. 2); Serruya Report ¶¶ 92-121; Flynn Report ¶¶ 70-78 (ECF No. 114).

On Pandora Plus: RFA Nos. 6, 15-16, 19-23, 25-26, 28-30, 67, 70, 72, 74, 87, 89-90, 92, 94 (Semel Exh. 2; ECF No. 112-1); Interrogatory Nos. 10-11 (Semel Exhs. 6-7; ECF Nos. 112-5, 112-6);

protective order or instructed a witness not to answer on the ground that either theory exceeded the scope of the Complaint. (Semel Reply Decl. ¶ 4.) To the contrary, Pandora even *moved* for summary judgment in its favor on personalized programming, citing *its* expert report (improperly disclosed only as rebuttal) discussing the issue. (Rucinski Rebuttal Report ¶¶ 79-91; Pandora's Memorandum of Law in Support of its Motion for Summary Judgment at 22-23.) These are not new claims, but additional bases for the same liability pled in the Complaint: that Pandora underpaid royalties owed under the Blanket License. *See Smith v. Salem*, 378 F.3d 566, 577 (6th Cir. 2004) ("[L]egal theories of recovery need not be spelled out as long as the relevant issues are sufficiently implicated in the pleadings.").

The word "prejudice" does not appear in Pandora's opposition brief for a reason. Pandora cannot show prejudice because it had ample notice, took extensive discovery, and had full opportunity to defend — all on a record it helped create. *See Pace Indus. Union-Mgmt. Pension Fund v. Dannex Mfg. Co.*, No. 3:06CV0417, 2008 WL 11411760, at *16-17 (M.D. Tenn. Nov. 12, 2008); *see also Boulger v. Woods*, 917 F.3d 471, 478 (6th Cir. 2019) (waiver of defense by litigation conduct, as sustained participation in discovery created a "reasonable expectation that [defendant] would defend the suit on the merits."); *Walker v. United States*, 134 F.4th 437, 443 (6th Cir. 2025) (waiver where party, fully aware of a defense, deliberately chose not to assert it and litigated case on the merits). In contrast, each case Pandora cites on this topic involved a theory raised for the first time *after* the close of discovery, where the opposing side lacked any opportunity to investigate. (Pandora Opp. Br. at 17-18, 33-34.)

To the extent the Court concludes amendment is required, The MLC requests leave to amend in parallel with summary judgment to conform the pleadings to the proof. *See United States v. Wood*, 877 F.2d 453, 456 (6th Cir. 1989). But The MLC respectfully submits that no amendment should be necessary, given Pandora's active litigation of these theories.

---

Pandora 30(b)(6) Responses, Topic Nos. 2(a)-(b), (e), 9(h)-(i), 10(a), 12(c), 18(d) (Semel Reply Exh. 2); Rucinski Rebuttal Report ¶ 9(a); Serruya Report ¶¶ 134-36.

17

## IV. Pandora's Constitutional Complaints Have No Merit

Pandora's opposition repeats the argument from its own motion that this action is "unconstitutional," asserting a problem with "two aspects of the Constitution's separation of powers: the private nondelegation doctrine and the Appointments Clause." (Pandora Opp. Br. at 4-6.) Pandora fails to explain why it did not plead this affirmative defense and why it is raising the meritless defense for the first time on summary judgment.[20] As explained in detail in The MLC's opposition, these arguments fail in every way. (MLC Opp. Br. at 29-34.) The MLC's operations, including bringing this action, are explicitly authorized by statute. (*Id.* at 30.) The MLC and the individual voting members of its board of directors are appointed and removable by a department head (the Librarian of Congress) and are subject to pervasive oversight by the Librarian and the Register of Copyrights such that The MLC and its directors function subordinately to them in all areas. (*Id.* at 30-34.)[21]

Notably, despite its vague and forfeited claims that The MLC's explicit statutory authority is "unconstitutional," Pandora does *not* ask the Court to find any particular statutory provisions unconstitutional. There is a good reason for that. If found unconstitutional, The MLC's enforcement authority cannot be severed from the rest of the statute, and the entire Blanket License regime upon which Pandora and other DSPs rely would need to be struck down.[22] Protections against abuse of the Blanket License cannot be disentangled from the Blanket License itself.

---

[20] As discussed in The MLC's Opposition, while its arguments are substantively baseless, Pandora has also forfeited them. (MLC Opp. Br. at 29 & n.86.)

[21] Any potential application of the Appointments Clause to The MLC is limited to its board of directors, as The MLC's statutory authority is vested in the board and not in any of its employees or others (*e.g.*, counsel) working on behalf of The MLC or its board. *See, e.g.*, 17 U.S.C. § 115(d)(3)(A)(iii) ("The mechanical licensing collective shall be a single entity that . . . is governed by a board of directors."); MLC Bylaws §§ 4.1 ("The [board] shall manage the business and affairs of the Collective."), 7.1 (officers of The MLC "shall have such powers and perform such duties as the Board may prescribe."); President Donald J. Trump, Statement on Signing the Orrin G. Hatch-Bob Goodlatte Music Modernization Act (Oct. 11, 2018) (confirming intended Appointments Clause compliance as to The MLC board only).

[22] *See, e.g.*, *Murphy v. NCAA*, 584 U.S. 453, 481-82 (2018) (courts "cannot rewrite a statute and give it an effect altogether different from that sought by the measure viewed as a whole"); *Spokane Arcades, Inc. v. Brockett*, 631 F.2d 135, 139 (9th Cir. 1980), aff'd, 454 U.S. 1022 (1981) ("To

18

The entire administration of the Blanket License is built around The MLC, and its statutory authorities work in tandem as the *only* way for the Blanket License to function and the only protection for songwriters against abuse of the Blanket License. Congress did not merely authorize The MLC to bring this legal action to "enforce rights and obligations" under the Blanket License. The MLC administers the Blanket License from start to finish. The statute directs The MLC to, *inter alia*, assess DSP eligibility for the Blanket License in the first place and "confirm" whether DSP royalty payments are "proper." 17 U.S.C. § 115(d)(2)(A), (d)(3)(G)(i)(I)(cc). Separate from its authority to bring suit, The MLC is authorized by the MMA to terminate Pandora's Blanket License in its entirety due to Pandora's material failure to comply with its statutory and regulatory requirements. *See id.* § 115(d)(4)(E)(i)-(ii).[23] After termination of its Blanket License, Pandora "may seek review of such termination in an appropriate district court" — which would lead the controversy right back to where the parties are now in this action. *Id.* § 115(d)(4)(E)(iv).[24]

These statutory authorities to protect against abuse are integral to and inseparable from the Blanket License. Severing them would leave the remaining statutory provisions governing the Blanket License unintelligible and incapable of functioning independently. Moreover, the notion that Congress would have ever enacted a blanket statutory license that confiscates from songwriters control over their songs *without also giving those songwriters the protections from abuse that The MLC is directed to provide* is completely untenable.[25] Such a statute would have

eliminate the[] enforcement provisions would essentially eviscerate the statute and would create a program quite different from the one the (people) actually adopted. . . . That the statute contains a severability clause does not authorize us to indulge in major revisions to salvage the statute.") (internal citations and quotation marks omitted).

[23] The MMA provides that a DSP "shall be in default" under a Blanket License for, *inter alia*, material failures to make royalty payments or material deficiencies in usage reporting. 17 U.S.C. § 115(d)(4)(E)(i)(II)-(III). Upon default, The MLC may terminate the Blanket License by providing written notice, after which the DSP has 60 days to cure or the license terminates. *Id.* § 115(d)(4)(E)(ii).

[24] Of note, the termination enforcement path carries significant consequences for Pandora: in addition to the liability Pandora faces in this action, it would face liability for copyright infringement, including statutory damages, and would lose access to the Blanket License for all of its services for at least three years. 17 U.S.C. § 115(c)(2)(C)(i), (d)(2)(A)(iii)(II), (d)(4)(E)(ii)(II).

[25] Severing these provisions would eliminate protections that Congress has consistently deemed

a drastically different effect from what Congress enacted.

In keeping with Pandora's offhand assertion of constitutional arguments,[26] Pandora does not even engage with these issues, apparently hoping to keep its statutory license while appealing to the Court to remove Congress' protections against its abuse of that license. Such a coup cannot be obtained, and by arguing that The MLC's authority is unconstitutional, Pandora casually asks this Court, with no basis, to strike down the signature aspect of landmark legislation, passed by a unanimous Congress and signed into law by President Trump, upon which the entire music industry (and Pandora itself) now relies.

## **CONCLUSION**

For the foregoing reasons, The MLC respectfully requests that the Court grant in full its Motion for Summary Judgment On Liability, along with all other relief as the Court deems just and proper.

---

essential to the compulsory mechanical license. Indeed, enforcement provisions have been a feature of the license since its inception. Copyright Act of 1909, § 1(e). When Congress overhauled the license in 1976, it strengthened the enforcement mechanism. Copyright Act of 1976, § 115(c)(4); *see* H.R. REP. NO. 94-1476, at 111 (1976) (explaining that the new provision was adopted because of the "rather ineffective sanctions" under the earlier statute). Congress continued this practice in the MMA, recognizing that late-fee risk alone "may not be enough to bring a provider back into compliance" and providing for license termination as a backstop. *See* S. REP. NO. 115-339, at 11 (2018).

[26] Pandora's passing reference to a potential lack of Article III standing if The MLC did not have governmental enforcement authority (Pandora Opp. Br. at 5-6) is a dead letter because The MLC has such authority. (MLC Opp. Br. at 30.) This is true if The MLC is construed as part of the federal government for constitutional purposes, where it has standing through its duly appointed board. *See CFPB v. Gordon*, 819 F.3d 1179, 1187-89 (9th Cir. 2016) (recognizing that duly appointed officers "are excepted from the generalized grievance prohibition that private parties face under Article III" and finding standing where agency brought suit "to vindicate, as codified by Congress, the public interest in making [private parties] whole"); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021). The MLC likewise has standing if construed as a private entity with delegated governmental authority, in which case it acts as an instrument of the Executive Branch in enforcing federal law. *See Oklahoma v. United States*, 163 F.4th 294, 306 (6th Cir. 2025). The permitted delegation resolves the question of standing. As the Sixth Circuit has recognized, "[t]he question . . . is not whether a private entity performs what looks like an enforcement function. It is whether the private entity is subject to the agency's supervision." *Id.* at 314.

20

Dated: New York, New York
March 31, 2026

**PRYOR CASHMAN LLP**

*/s/ Benjamin K. Semel*
Benjamin K. Semel (admitted *pro hac vice*)
M. Mona Simonian (admitted *pro hac vice*)
Joshua Weigensberg (N.Y. Bar No. 4894929)
Jason E. Sloan (admitted *pro hac vice*)
Erik F. Bakke (admitted *pro hac vice*)
7 Times Square
New York, New York 10036
Phone: (212) 326-0181
Fax: (212) 798-6326
bsemel@pryorcashman.com
msimonian@pryorcashman.com
jweigensberg@pryorcashman.com
jsloan@pryorcashman.com
ebakke@pryorcashman.com

*/s/ Elizabeth O. Gonser*
Elizabeth O. Gonser (TN Bar No. 026329)
**RILEY & JACOBSON PLC**
1906 West End Ave.
Nashville, TN 37203
P: (615) 320-3738
egonser@rjfirm.com

*Attorneys for Mechanical Licensing Collective*

21

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and exact copy of the foregoing document has been filed with the Clerk of Court using the CM/ECF system, which sent notice of such filing to the parties' counsel of record.

This 31st day of March, 2026.

_/s/ Benjamin K. Semel_
Benjamin K. Semel