# EXHIBIT 10

**From:** Larson, Todd [Todd.Larson@weil.com]
**Sent:** 11/16/2021 1:08:12 AM
**To:** Kristen Johns [Kristen.Johns@themlc.com]
**CC:** patrick.donnelly@siriusxm.com; Grochmal, Holly [hgrochmal@pandora.com]; David Ring (dring@pandora.com) [dring@pandora.com]; Marks, Benjamin [benjamin.marks@weil.com]
**Subject:** Pandora MLC reporting
**Attachments:** Johns MLC Ltr 11 15 2021.pdf

EXTERNAL EMAIL: This email originated from outside of MLC's email system. DO NOT click links or open attachments unless you recognize the sender and know the content is safe.

Ms. Johns,

Please see the attached correspondence.

Weil

**Todd Larson**
Partner

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Todd.Larson@weil.com
+1 212 310 8238 Direct
+1 347 306 3344 Mobile
+1 212 310 8007 Fax

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Todd Larson**
+1 (212) 310-8238
Todd.Larson@weil.com

November 15, 2021

***Sent Via Email***

Kristen Johns, Esq.
Chief Legal Officer
Mechanical Licensing Collective
333 11th Avenue South, Suite 200
Nashville, TN 37203

Dear Ms. Johns,

Pandora received your letter dated November 4, 2021, to Alex Winck. To cut to the chase, Pandora categorically rejects your contentions, which are outside the purview of the MLC and both factually and legally unfounded.

It is not the role of the MLC to offer "statements of the law" on whether particular transmissions offered by Pandora are properly characterized as interactive or non-interactive, whether they qualify for statutory licensing under 17 U.S.C. § 114, or whether Pandora's approach to calculating service revenue under Section 115 is therefore legally compliant with the governing definition set by the Copyright Royalty Board. The Copyright Office regulations require certification of a digital music provider's blanket license payments by a licensed certified public accountant, who must attest that the provider has fairly reported usage and statutory royalties in its annual report of usage. 37 C.F.R. § 210.27(j). And, in the event the MLC is concerned that a digital music provider has under-reported service revenue or underpaid royalties, the statute authorizes the MLC to retain a qualified auditor to conduct an audit of the provider in compliance with 17 U.S.C. § 115(d)(4)(D). The statute does not, however, provide free-floating authority for the MLC to vet or challenge Pandora's entitlement to the Section 114 statutory license or its interpretation of CRB regulations, or to demand higher payments based on such opinions under the guise of purported reporting or calculation errors.

Even if the statute did provide the MLC with this kind of broad authority, your legal contentions are flatly incorrect. The definition of "service revenue" under 37 C.F.R. § 385.11 (2016) calls for inclusion of "[a]ll revenue recognized by the service provider by way of sponsorship and commissions as a result of the inclusion of third-party 'in-stream' or 'in-download' advertising ***as part of licensed activity*** (*i.e.*, advertising placed immediately at the start, end or during the actual delivery, by way of interactive streaming or limited downloads, as applicable, of a musical work)." *See* ¶ (1)(ii) (emphasis added). "Licensed activity," in turn, "means interactive streams or limited downloads of musical works." Because Pandora offers interactive streams to non-subscribers solely in Premium Access sessions, it is only the revenue from the video ads that users must watch to enter such sessions—

literally, the "advertising placed immediately at the start" of the "actual delivery" of interactive streams—that is "part" of Pandora's licensed activity and appropriately is included in reported service revenue.

Lest there be any doubt, the service revenue definition excludes "revenue derived solely in connection with services and activities other than licensed activity" and "revenue derived from music or music-related products and services that are not or do not include licensed activity." Because Pandora's non-interactive streams offered outside of its Premium Access sessions are not licensed activity, revenue associated with those streams is rightly excluded from service revenue.

Perhaps recognizing these definitional limitations, your letter takes the remarkable position that because users of Pandora's free tier may opt to enter a Premium Access session, that somehow turns all activity on Pandora's free tier into interactive streams that do not qualify for statutory licensing under 17 U.S.C. § 114(d)(2) (and thus are covered activity under Section 115). That is a risible overreach. Section 114 plainly states that "[i]f an entity offers both interactive and non-interactive services (either concurrently or at different times), the noninteractive component shall not be treated as part of an interactive service." The legislative history behind that provision likewise instructs that "each transmission should be judged on its own merits with regard to whether it qualifies as part of an 'interactive' service." H.R. Rep. 104-274 (1995) at 26. Clearly, then, Pandora's offer of some interactive transmissions in discrete Premium Access sessions [redacted] does not alter the noninteractive status of the other [redacted] of plays that occur *outside* those Premium Access sessions.

Moreover, the apparent premise on which your letter is based—that Pandora free-tier users enjoy essentially unlimited and unparalleled on-demand functionality—badly mischaracterizes the nature of Pandora's service. As has been the case for more than 15 years, Pandora's core offering consists of non-interactive custom radio: users can "seed" a station with an artist name or song title, but Pandora, not the user, chooses the tracks that the users hear based on its programming algorithms, and in compliance with the sound recording performance complement and other limitations of Section 114. Consistent with those limitations, users are not informed what tracks are coming (as might be the case with a published "playlist" on other services), and cannot choose to listen sound recordings they select.

What consumers can do is agree to view a video advertisement and thereafter enter a Premium Access session: a 15-60 minute trial of Pandora Premium, Pandora's subscription on-demand tier. Users who choose to do so, however, *leave* the non-interactive service and enter a trial of the Premium service—albeit without needing to purchase a monthly subscription and only for a limited time frame. Only *within* that Premium service setting can they choose particular sound recordings. And when the session ends and the user returns to the non-interactive setting, he/she no longer has the ability to choose sound recordings.

Your characterization of users being "able" to receive on-demand transmissions "at all times" glosses over these meaningful and legally relevant distinctions. To the extent there is an interactive service being offered, it is *Premium Access*. The fact that a user can enter Premium Access *from* Pandora's free noninteractive product offering does not mean that Pandora's noninteractive product is somehow itself rendered an interactive service.

Not surprisingly (although unacknowledged in your letter), Pandora has operated under the Section 114 statutory license since its inception, and SoundExchange and its affiliated record labels have accepted its statutory royalty payments (and paid artists their statutory share for free-tier plays) throughout that time, including after Pandora began to offer Premium Access sessions in late 2017. As the country's leading noninteractive webcaster, Pandora has been the leading litigant in the last two CRB proceedings (*Web IV* and *Web V*) to set rates for the statutory license. Never once in those proceedings (the latter of which post-dated the introduction of Premium Access) did SoundExchange, the major label participants, or the Copyright Royalty Judges suggest Pandora's free tier was interactive or did not otherwise qualify for statutory licensing under Section 114. Indeed, Pandora would not have had standing to participate in those proceedings were that the case.

We categorically reject your effort to upend this longstanding consensus with unfounded legal conclusions that miscomprehend the law and mischaracterize the nature of Pandora's offering. Nor will Pandora comply with your demands for "corrected" usage reporting or additional payment; Pandora's previously submitted reports included the correct sources of revenue. Pandora does reserve the right to submit usage reports for its free tier that include only the Premium Access plays; while it does not alter the legal analysis described above, it appears the inclusion of the plays other than those in Premium Access sessions (albeit marked in the reports as such) may have played a role in the erroneous accusations in your letter.

The above is not intended to represent a complete statement of Pandora's rights and defenses in this matter, all of which are hereby expressly reserved.

Sincerely,

/s/ Todd Larson

*Counsel for Pandora Media, LLC*

cc: Patrick Donnelly, Esq.
Holly Grochmal, Esq.
David Ring, Esq.